## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | |
|---|---|
| AMBER COLVILLE; STATE OF MISSISSIPPI; STATE OF ALABAMA; STATE OF ARIZONA; STATE OF ARKANSAS; COMMONWEALTH OF KENTUCKY; STATE OF LOUISIANA; STATE OF MISSOURI; and STATE OF MONTANA,<br><br>*Plaintiffs,*<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; CHIQUITA BROOKS-LASURE, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services; THE CENTERS FOR MEDICARE AND MEDICAID SERVICES; THE UNITED STATES OF AMERICA,<br><br>*Defendants.* | No. 1:22-cv-113-HSO-RPM |

## FIRST AMENDED COMPLAINT

Plaintiffs bring this civil action against Defendants for declaratory and injunctive relief and allege as follows:

### INTRODUCTION

1.     Under our Constitution, "The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (plurality).

2.      But according to Ibram X. Kendi—the coiner of the term anti-racism—
"The only remedy to past discrimination is present discrimination, and "[t]he only rem-
edy to present discrimination is future discrimination." Ibram X. Kendi, *How to Be an
Antiracist* 19 (2019). "[T]reating, considering, or making a distinction … based on"
someone's race is good if it's "antiracist"—meaning it promotes "equity." *Id.* at 18-19.
Because "race-neutral" approaches supposedly do not promote equity, they are actively
"racist." *Id.* at 17. Equity, in turn, means that all racial groups must be "on approxi-
mately equal footing" in all things, no matter the cause of the existing disparity. *Id.*

3.      Unlike any prior administration, the Biden administration has decided to
use executive power to impose this philosophy on the country. The administration is
injecting the terms "antiracism" and "equity" into various agency regulations, knowing
full well what those terms of art mean—even citing Kendi himself in the Federal Reg-
ister. *E.g.*, 86 Fed. Reg. 20,349 & n.3. And now the administration is injecting these
concepts where they least belong: medicine.

4.      The Centers for Medicare and Medicaid Services released a final rule that
pays doctors more money if they will promulgate an "anti-racism" plan. CMS requires
these anti-racism plans to include a "clinic-wide review" of the doctor's "commitment
to anti-racism" based on a definition of race as "a political and social construct, not a
physiological one."

5.      This Anti-Racism Rule is ultra vires. Congress enacted the governing stat-
ute—the Medicare Access and CHIP Reauthorization Act of 2015, which created the

Merit-based Incentive Payment System (or MIPS)—to encourage doctors to keep costs down while maintaining the best quality care. It authorizes CMS to encourage activities that improve care and cost; it says nothing about race—the most odious classification known to American law.

6.      The Anti-Racism Rule is, of course, bad medicine. It takes time away from caring for patients. It encourages doctors to see patients not as individuals but as sub-components of racial groups. And it encourages doctors to elevate faddish theories about race above patient care. But the question before this Court is whether the Rule exceeds the agency's statutory jurisdiction. It does.

## PARTIES

7.      The individual plaintiff, Amber Colville, is a medical doctor practicing in Ocean Springs, Mississippi. Dr. Colville receives payments from Medicare, is a MIPS-eligible clinician, and participates in the MIPS program.

8.      Though she could theoretically do so, Dr. Colville will not submit an anti-racism plan under the Rule. She believes that racial discrimination, of any kind, has no place in medicine. She opposes the concepts of "antiracism" and "equity"—terms of art adopted from critical race scholarship—because they inject race-based decisionmaking into medical decisions without any medical justification. Dr. Colville believes that these concepts are not only bad medicine, but also unlawful and fundamentally un-American. She does not believe that creating these plans is in the best medical interests

of her patients, and the time needed to create and implement them would detract from providing real care.

9.     Dr. Colville works at a small office specializing in internal medicine. Given the nature of her practice, she is eligible and able to complete only a limited number of MIPS improvement activities. In the last three years, she reported no more than one improvement activity and did not receive the full 40 points on this metric. She was scored individually and received overall scores between 78 and 88. Her score would increase if she submitted an anti-racism plan under the Rule. But she is financially penalized for refusing to submit what she believes are unscientific, unethical, and unlawful plans.

10.     Dr. Colville competes with dozens of nearby internists in Ocean Springs with similar practices. Because she refuses to submit anti-racism plans, the Anti-Racism Rule places her at a direct disadvantage vis-à-vis these competitors. Her competitors can be reimbursed at higher rates, while she cannot. And her competitors can get higher MIPS scores. The MIPS score alone "has a significant impact on both the reputation and the finances of [a] practice" because "CMS publishes MIPS results … to help consumers evaluate and compare clinicians."

11.     The state plaintiffs are the sovereign States of Mississippi, Alabama, Arizona, Arkansas, Kentucky, Louisiana, Missouri, and Montana.

12.     The state plaintiffs oppose racial discrimination, of any kind, in medicine. Most prohibit racial discrimination in their laws and their agreements with medical providers. By encouraging Medicare providers to make medical decisions based on race, the Anti-Racism Rule puts these state plaintiffs in a bind: either enforce their rules against providers who submit anti-racism plans (and deprive their citizens of needed care), or stop enforcing their rules barring racial discrimination. Providers who fail to submit these plans, moreover, will get reimbursed at lower rates—increased costs that will fall on beneficiaries like the state plaintiffs and their citizens.

13.     The state plaintiffs also have a "quasi-sovereign interest" in the "health and well-being" of their citizens, including by protecting them from "the harmful effects of [racial] discrimination." *Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez*, 458 U.S. 592, 609 (1982). The Anti-Racism Rule harms that quasi-sovereign interests by encouraging race-based decisionmaking in medicine and decreasing the quality and availability of medical care.

14.     Defendant Xavier Becerra, sued in his official capacity, is Secretary of the Department of Health and Human Services.

15.     Defendant United States Department of Health and Human Services ("HHS") is a federal agency organized under the laws of the United States. It is responsible for administering federal healthcare policy and is the cabinet-level Department that houses CMS.

5

16. Defendant Chiquita Brooks-LaSure, sued in her official capacity, is the Administrator of CMS. She signed the final rule challenged in this lawsuit.

17. Defendant the Centers for Medicare and Medicaid Services is a federal agency organized under the laws of the United States. CMS is responsible for federally administering Medicare and promulgated the final rule challenged in this lawsuit.

18. Defendant United States of America is the federal sovereign.

## JURISDICTION AND VENUE

19. This Court has subject-matter jurisdiction because this case arises under the Constitution and laws of the United States. *See* 28 U.S.C. §1331; §1346; §1361; 5 U.S.C. §§701-06. An actual controversy exists between the parties within the meaning of 28 U.S.C. §2201(a), and this Court can grant declaratory relief, injunctive relief, and other relief under 28 U.S.C. §§2201-02; 5 U.S.C. §§705-06; and its inherent equitable powers.

20. Defendants' final rule constitutes a final agency action that is judicially reviewable under the APA. 5 U.S.C. §704; §706.

21. Venue is proper in this Court under 28 U.S.C. §1391(e)(1) because Defendants are United States agencies or officers sued in their official capacities, Dr. Colville is a resident of this judicial district, no real property is involved, and a substantial part of the events or omissions giving rise to the amended complaint occurred within this judicial district.

## BACKGROUND

### I.     The Law's Prohibition on Racial Decisionmaking

22.     Consistent with the principle of equality set out in the Declaration of Independence, federal law forbids racial discrimination in many ways. The Constitution bans racial discrimination by States and the federal government. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 215-16 (1995). Title VI bans racial discrimination by recipients of federal funds. 42 U.S.C. §2000d. Section 1981 bans private parties from racial discrimination in making and enforcing contracts. 42 U.S.C. §1981. The Affordable Care Act forbids racial discrimination by health-care providers who receive federal funds. 42 U.S.C. §18116. And much more.

23.     "[A]s a general rule," then "all race-based government decisionmaking—regardless of context—is" unlawful. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 751-52 (2007) (Thomas, J., concurring).

24.     The law's abhorrence of racial classifications leaves no room for racial decisionmaking seeking to remedy amorphous and poorly defined concepts like "systematic racism." Under the law, "there can be no such thing as either a creditor or a debtor race." *Adarand*, 515 U.S. at 239 (Scalia, J. concurring in part and concurring in the judgment).

### II.    The Medicare Access and CHIP Reauthorization Act of 2015

25.     The Medicare Access and CHIP Reauthorization Act of 2015 was enacted to implement a new scoring system—called the Quality Payment Program—to deter-

mine eligible doctors' reimbursement rates. The Act was a bipartisan compromise negotiated to control Medicare costs and prevent doctors from billing Medicare for services regardless of medical necessity. *See* House Energy & Commerce and Ways & Means Comms., *Section by Section Analysis of H.R. 2 Medicare Access and CHIP Reauthorization Act* (Mar. 24, 2015) ("The new system moves Medicare away from a volume-based system towards one that rewards value, improving the quality of care for seniors."); *accord* Senate Comm. on Finance, *Medicare Access and CHIP Reauthorization Act of 2015: Ensuring Successful Implementation of Physician Payment Reforms*, S. Hrg. 114-679 (July 13, 2016).

26.     The Act directed HHS to establish MIPS to incentivize cost-control, performance, and quality. Pub. L. 114-10 §101 (codified at 42 U.S.C. §1395w-4). "The MIPS program aims to drive value through the collection, assessment, and public reporting of data that informs and rewards the delivery of high-value care." 86 Fed. Reg. at 65375. CMS uses MIPS to "pay for health care services in a way that drives value by linking performance on cost, quality, and the patient's experience of care." 86 Fed. Reg. at 65375.

27.     Each year, clinicians who participate in MIPS get a score between 0 and 100. Depending on their score, CMS will adjust the amount that clinicians are paid up, down, or not at all. In 2022, for example, a clinician who scores lower than 75 will receive a payment reduction. The reduction can be as much as 9%.

28.     The payment adjustment is based on clinicians' performance in four categories: "quality," "resource use," "clinical practice improvement activities," and "meaningful use of certified EHR technology." 42 U.S.C. §1395w-4(q)(2)(B).

29.     In 2022, the improvement-activities category makes up 15% of a clinician's MIPS score.

30.     The Act defines "clinical practice improvement activity" to mean "an activity that relevant eligible professional organizations and other relevant stakeholders identify as improving clinical practice or care delivery and that the Secretary determines, when effectively executed, is likely to result in improved outcomes." §1395w-4(q)(q)(2)(C)(v)(III).

31.     The statute lists specific subcategories that meet this definition: "expanded practice access, such as same day appointments"; "population management, such as monitoring health conditions of individuals to provide timely health care intervention"; "care coordination, such as timely communication of test results"; "beneficiary engagement, such as the establishment of care plans for individuals with complex care needs"; "patient safety and practice assessment, such as through use of clinical or surgical checklists"; and "participation in an alternative payment model." §1395w-4(q)(2)(B)(iii).

32.    The term "equity" does not appear in the Act. And the only time that the Act references race or ethnicity is in an entirely unrelated directive to establish an educational campaign to encourage minorities to receive chronic care services. §1395w-4 note.

33.    Doctors who are eligible to participate in MIPS must participate, and 99.9999% of MIPS-eligible clinicians do. 86 Fed. Reg. at 65375. The program covers a broad array of providers: physicians (including doctors of medicine, osteopathy, dental surgery, dental medicine, podiatric medicine, and optometry); osteopathic practitioners; chiropractors; physician assistants; nurse practitioners; clinical nurse specialists; certified registered nurse anesthetists; physical therapists; occupational therapists; clinical psychologists; qualified speech-language pathologists; qualified audiologists; registered dietitians or nutrition professionals; clinical social workers; and certified nurse midwives.

34.    A clinician's MIPS score "has a significant impact on both the reputation and the finances of [her] practice."

35.    For this reason, a cottage industry of MIPS experts and consultants exists solely to assist clinicians in crafting their submissions and maximizing their MIPS scores.

36.    Although there are numerous MIPS improvement activities, many are applicable only to a particular specialty. Smaller practices, in particular, find it difficult to

find improvement activities they can conduct. Further, a study by the American Colleges of Physicians found that nearly two-thirds of the MIPS categories are either too difficult for most clinicians to satisfy or would be impractical to ask of clinicians because they contravene best medical practices. Another study found that, in the observed year, 16.9% of clinicians did not participate in *any* improvement activities.

37.     Most MIPS participants do not obtain the highest score possible. In 2020, the average score for outpatient physicians was 89.7, and the average score for group practices was 76. Virtually all participants would benefit from the availability of an additional MIPS improvement activity.

38.     To set the baseline score that determines whether clinicians get paid more or less, CMS uses the average MIPS score from a prior year. 42 U.S.C. §1395w-4(q)(6)(D). So if average MIPS scores increase, the baseline increases, and clinicians have a harder time avoiding a payment reduction. Payment reductions are a death knell for smaller practices.

39.     CMS always awards bonuses to clinicians who achieve high MIPS scores—at least 89, for performance year 2022. But the fund set aside for these bonuses is finite. §1395w-4(6)(F)(iv). So if more clinicians achieve high MIPS scores, the likelihood and amount of these bonuses decline for other clinicians.

## III.   Implementation in the Obama and Trump Administrations

40.     In November 2016, President Obama's CMS added "achieving health equity" as an improvement activity. 81 Fed. Reg. at 77189.

41.    But CMS rejected several recommendations that it establish specific equity activities related to race, such as "an activity that encourages referrals to a clinical trial for a minority population." *Id.* at 77195. CMS also rejected a comment suggesting that it "pursue additional approaches to the quality performance category to advance health equity and reward MIPS eligible clinicians who promote health equity," including "adding measures stratified by race and ethnicity or other disparity variable" and "developing and adding a stand-alone health equity measure as a high priority measure for which clinicians can receive a bonus point." *Id.* at 77293.

42.    President Trump's CMS similarly rejected suggestions for "the use of an equity bonus ... to address the additional costs for serving traditionally underserved populations." 83 Fed. Reg. 16440, 16584-85 (Apr. 16, 2018).

## IV.    The Biden Administration's Anti-Racism Rule

43.    On January 20, 2021, President Biden issued Executive Order 13985, directing the executive branch to address systematic racism and promote "equity." 86 Fed. Reg. 7009. The Order further directs agencies to identify policies undermining "equity" and to change policies so they promote "equity."

44.    Expressly relying on the Executive Order and its definition of equity, CMS published a proposed rule on July 23, 2021, regarding a new purported improvement activity called "create and implement an anti-racism plan." 86 Fed. Reg. 39104, 39346

(July 23, 2021). The two-sentence rationale for this new activity declares that "it is in-sufficient to gather and analyze data by race." *Id.* Instead, an anti-racism plan "empha-sizes systematic racism is the root cause for differences in health outcomes." *Id.*

45.     On November 19, 2021, CMS published the final rule, which adopts the proposed rule's anti-racism plans. In the final rule, CMS offers the same two-sentence rationale: "This improvement activity acknowledges it is insufficient to gather and ana-lyze data by race, and document disparities by different population groups. Rather, it emphasizes systemic racism is the root cause for differences in health outcomes be-tween socially defined racial groups." 86 Fed. Reg. 64996, 65384 (Nov. 19, 2021).

46.     The final rule's appendix asserts that "create and implement an anti-racism plan" will be a "new improvement activity" given "high" weighting. *Id.* at 65969. The appendix states that "[t]he plan should include a clinic-wide review of existing tools and policies, such as value statements or clinical practice guidelines, to ensure that they in-clude and are aligned with a commitment to anti-racism and an understanding of race as a political and social construct, not a physiological one." *Id.* The appendix adds that "[t]he plan should also identify ways in which issues and gaps identified in the review can be addressed and should include target goals and milestones for addressing priori-tized issues and gaps. This may also include an assessment and drafting of an organiza-tion's plan to prevent and address racism and/or improve language access and accessi-bility to ensure services are accessible and understandable for those seeking care." For good measure, "[t]he MIPS eligible clinician or practice can also consider including in

their plan ongoing training on anti-racism and/or other processes to support identifying explicit and implicit biases in patient care and addressing historic health inequities experienced by people of color."

47.    In the two-paragraph "rationale" for the racism plan requirement, CMS cites no statutory authority whatsoever. Instead, CMS states that the authority for the anti-racism plans is Executive Order 13985. *See id.* ("The proposed activity aimed to address systemic inequities, including systemic racism, as called for in Executive Order 13985."). But CMS "literally has no power to act ... unless and until Congress confers power upon it." *New York v. FERC*, 535 U.S. 1, 18 (2002).

48.    According to a former congressional staffer who worked on the legislation that created MIPS, the legislation's goal was to "develop an incentive for clinicians to provide higher-quality and more cost-effective medical care, and to penalize them for providing unnecessary or over-priced services." The legislation passed with bipartisan support, but the "Republicans … weren't voting" to authorize anything like the Rule. "The idea that this would be used as a tool of racial policy never came up."

49.    In a congressional hearing in April 2022, the Secretary gave a defensive answer that revealed his understanding that CMS lacks statutory authority over racial policy. When asked why HHS was incentivizing anti-racism plans, the Secretary responded, "I would challenge you to show me where in our policies we call anything we are doing anti-racism policies."

50.    The Anti-Racism Rule is new and is available for the first time this performance year, which ends on December 31, 2022. MIPS reports for the 2022 performance year will be submitted in March 2023.

51.    Many clinicians will submit anti-racism plans under the Rule.

52.    Of the seven new improvement activities added in 2022, anti-racism plans are one of the two "high weighted" activities. High weighted means this one improvement activity gets a clinician half the points needed for a full score in this performance category.

53.    This new activity is also available to more clinicians because it is not constrained to certain specialties or practices. And it is easy to complete—requiring clinicians to explain their commitment to antiracism on a worksheet—compared to many other improvement activities that require more tangible improvements for patients.

54.    CMS itself expects that "clinicians will" submit anti-racism plans under the Rule. *See* 86 Fed. Reg. at 65969. It has already created a worksheet that clinicians can fill out to do their anti-racism plans. *See Disparities Impact Statement*, CMS (rev. Mar. 2021), go.cms.gov/3PK0yHi. And the whole point of the Rule was to implement President Biden's executive order and purportedly address "systemic racism as a root cause" of disparities—goals that could be advanced only if clinicians participate and submit these plans. 86 Fed. Reg. at 65969. In an August 2022 letter to Members of Congress, Secretary Becerra defended the Anti-Racism Rule, stressing that it shows how HHS is

"committed to advancing health equity" and how "rooting out racism and prejudice is essential."

55.    MIPS consultants expect clinicians to submit anti-racism plans under the Rules. They are promoting their ability to help clinicians take advantage of Rule in their marketing materials. And they have spent time and money drafting step-by-step guides for how to draft these plans and even providing examples of what to say. The Rule is "likely to be a source of profit" for these consultants.

56.    Clinicians will also feel intense pressure to choose anti-racism plans as one of their improvement activities. The American Medical Association—a trade association and lobbyist with immense influence over the medical field—is pushing clinicians to adopt anti-racism plans. Indeed, major providers have already launched websites touting their dedication to anti-racism in 2022, including their intent to complete anti-racism plans.

## COUNT
### The Anti-Racism Rule is Ultra Vires

57.    Plaintiffs incorporate and repeat all their prior allegations.

58.    The Anti-Racism Rule is final agency action under the APA. Pursuant to the APA, a "reviewing court shall ... hold unlawful and set aside agency action ... found to be ... not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A), (C).

59.    Independent of the APA, a reviewing court can set aside and enjoin agency action that exceeds the agency's statutory authority.

60.    In adopting the Anti-Racism Rule, CMS acted well outside the bounds of its statutory authority.

61.    Though the Act contains a bar on judicial review, the bar covers only the "identification of measures and activities *specified under paragraph 2(B)*." 42 U.S.C. §1395w-4(q)(13)(B)(iii). Paragraph 2(B) in turn incorporates the definition of "clinical improvement activities" from "subparagraph (C)(v)(III)." §1395w-4(q)(2)(B)(iii). Anti-racism plans do not remotely fall under that definition.

62.    Anti-racism plans do not relate to "clinical practice or care delivery." §1395w-4(q)(2)(C)(v)(III). Statutory context requires those terms to be read in light of the enumerated examples, all of which deal with practical considerations like same-day appointments, test results, and patient safety. §1395w-4(q)(2)(B)(iii). Indeed, the Act's "core mission" is "patients' health and safety." *Biden v. Missouri*, 142 S. Ct. 647, 650 (2022). And while in rare circumstances a patient's race is medically relevant to their care, the Anti-Racism Rule expressly rejects that kind of consideration of race. *See* 86 Fed. Reg. at 65969.

63.    CMS also failed to identify "relevant eligible professional organizations and other relevant stakeholders" suggesting the Anti-Racism Rule. 42 U.S.C. §1395w-

4(q)(2)(C)(v)(III). CMS does not cite to any such professional organization or stakeholders who have examined and verified that the Anti-Racism Rule will improve clinical practice or care delivery.

64.   Nothing in the relevant section of the Act even hints at race. And myriad federal laws ban race-based decisionmaking in medical care. Congress would not have buried such a dangerous criterion in statutory silence.

65.   CMS cannot elevate Executive Order 13985's policy directives above Congress's commands, whose focus was patient care rather than equity. *See California v. Bernhardt*, 472 F. Supp. 3d at 605 ("A president's Executive Order cannot 'impair or otherwise affect' statutory mandates imposed on [an agency] by Congress." (citing *In re Aiken Cty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh, J.)).

## PRAYER FOR RELIEF

Plaintiffs request an order and judgment:

    a.   declaring, under 28 U.S.C. §2201, that the Anti-Racism Rule violates the Medicare Access Act and is ultra vires;

    b.   vacating the Anti-Racism Rule;

    c.   enjoining enforcement of the Anti-Racism Rule or providing the same benefits to those who do not submit anti-racism plans that satisfy the Rule as those who do; and

    d.   granting Plaintiffs all other appropriate relief.

Dated: August 24, 2022                    Respectfully submitted,

_s/ Jennifer Moran Young_                 _s/ Cameron T. Norris_
Jennifer Moran Young                      Cameron T. Norris*
GALLOWAY, JOHNSON, TOMPKINS,                  _Lead Counsel_
BURR & SMITH – GULFPORT                   CONSOVOY MCCARTHY PLLC
2510 14th Street, Suite 910               1600 Wilson Blvd., Ste. 700
Gulfport, MS 39501                        Arlington, VA 22209
228-214-4250                              (703) 243-9423
Fax: 228-214-9650                         cam@consovoymccarthy.com
jyoung@gallowaylawfirm.com

                    _Counsel for Dr. Colville_

*s/ Scott G. Stewart*
LYNN FITCH
   *Attorney General*
Scott G. Stewart (MS Bar No. 106359)
   *Solicitor General*
Justin L. Matheny (MS Bar No. 100754)
   *Deputy Solicitor General*
MISSISSIPPI ATTORNEY
GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
scott.stewart@ago.ms.gov
justin.matheny@ago.ms.gov

*Counsel for the State of Mississippi*


*s/ Nicholas J. Bronni*
LESLIE RUTLEDGE
   *Attorney General*
Nicholas J. Bronni***
   *Solicitor General*
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
nicholas.bronni@arkansasag.gov

*Counsel for the State of Arkansas*


*s/ Edmund G. LaCour Jr.*
STEVE MARSHALL
   *Attorney General*
Edmund G. LaCour Jr.*
   *Solicitor General*
OFFICE OF THE ALABAMA
ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
Tel.: (334) 353-2196
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for the State of Alabama*


*s/ Drew C. Ensign*
MARK BRNOVICH
   *Attorney General*
Drew C. Ensign***
   *Deputy Solicitor General*
OFFICE OF THE ARIZONA
ATTORNEY GENERAL
2005 N. Central Avenue
Phoenix, AZ 85004
Phone:   (602) 542-5025
Fax:      (602) 542-4377

*Counsel for the State of Arizona*

20

*s/ Aaron J. Silletto*
DANIEL CAMERON
  *Attorney General*
Aaron J. Silletto**
  *Assistant Attorney General*
KENTUCKY OFFICE OF THE
ATTORNEY GENERAL
700 Capital Avenue, Suite 118
Frankfort, Kentucky
502-696-5439
Aaron.Silletto@ky.gov

*Counsel for the Commonwealth of Kentucky*


*s/ D. John Sauer*
ERIC S. SCHMITT
  *Attorney General*
D. John Sauer*
  *Solicitor General*
OFFICE OF THE MISSOURI
ATTORNEY GENERAL
Supreme Court Building
P.O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-8870
John.Sauer@ago.mo.gov

*Counsel for the State of Missouri*


*s/ Scott St. John*
JEFF LANDRY
  *Attorney General*
Elizabeth B. Murrill*
  *Solicitor General*
Scott St. John (MS Bar No. 102876)
  *Deputy Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov

*Counsel for the State of Louisiana*


*s/ David M.S. Dewhirst*
AUSTIN KNUDSEN
  *Attorney General*
David M.S. Dewhirst*
  *Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders Street
Helena, MT 59601
David.Dewhirst@mt.gov

*Counsel for the State of Montana*


*pro hac vice
**pro hac vice pending
***pro hac vice forthcoming