**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | | |
|---|---|---|
| AMBER COLVILLE, et al. | | |
| | *Plaintiffs*, | No. 1:22-cv-113-HSO-RPM |
| v. | | |
| XAVIER BECERRA, et al., | | |
| | *Defendants.* | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................ iii

Introduction ......................................................................................................................... 1

Background ........................................................................................................................... 2

    A.    Congress creates a scheme that encourages Medicare providers to consider cost and quality of care—but not race ..................................................................................... 2

    B.    The Biden administration injects race with its Anti-Racism Rule ........................ 4

    C.    The Anti-Racism Rule harms Plaintiffs ................................................................. 5

    D.    Plaintiffs challenge the Anti-Racism Rule, and Defendants move to dismiss on procedural grounds ................................................................................................... 7

Argument .............................................................................................................................. 8

    I.    Dr. Colville and the States have standing ................................................................. 8

        A.    Dr. Colville ........................................................................................................ 9

        B.    The States .......................................................................................................... 13

    II.    No statute precludes this Court's review of the Anti-Racism Rule. .................... 18

        A.    Anti-racism plans are not one of the clinical practice improvement activities specified in the bar on judicial review ......................................................... 18

        B.    Plaintiffs allege that the Anti-Racism Rule is ultra vires ............................ 21

Conclusion ........................................................................................................................ 24

# TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995) ..................................................................................................... 15

*Aid Ass'n for Lutherans v. U.S. Postal Serv.,*
  321 F.3d 1166 (D.C. Cir. 2003) ............................................................................. 21, 22

*Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez,*
  458 U.S. 592 (1982) ..................................................................................... 2, 13, 14, 15

*Am. Airlines, Inc. v. Herman,*
  176 F.3d 283 (5th Cir. 1999) .................................................................................. 22, 23

*Am. Hosp. Ass'n v. Becerra,*
  142 S. Ct. 1896 (2022) ........................................................................................... 18, 20

*Am. Sch. of Magnetic Healing v. McAnnulty,*
  187 U.S. 94 (1902) ........................................................................................................ 21

*Backer ex rel. Freedman v. Shah,*
  788 F.3d 341 (2d Cir. 2015) ..................................................................................... 9, 10

*Barilla v. City of Houston,*
  13 F.4th 427 (5th Cir. 2021) ..................................................................................... 8, 10

*Bennett v. Spear,*
  520 U.S. 154 (1997) ................................................................................................ 12, 17

*Biden v. Missouri,*
  142 S. Ct. 647 (2022) .................................................................................................... 19

*Brackeen v. Haaland,*
  994 F.3d 249 (5th Cir. 2021) ....................................................................................... 14

*City of Richmond v. J.A. Croson Co.,*
  488 U.S. 469 (1989) ........................................................................................................ 1

*Cooper v. Tex. ABC,*
  820 F.3d 730 (5th Cir. 2016) ....................................................................................... 11

*CREW v. Trump,*
  953 F.3d 178 (2d Cir. 2019) .................................................................................... 11, 12

*Dart v. United States,*
  848 F.2d 217 (D.C. Cir. 1988) ........................................................................... 20, 21, 22

*Env't Def. Fund v. Marsh,*
  651 F.2d 983 (5th Cir. 1981) ....................................................................................... 10

*Gratz v. Bollinger,*
  539 U.S. 244 (2003) ...................................................................................................... 15

*Hollingsworth v. Harris,*
  608 F.2d 1026 (5th Cir. 1979) ................................................................................ 2, 10

*Jackson v. Wright,*
  2022 WL 179277 (E.D. Tex. Jan. 18) ............................................................9

*Kirby Corp. v. Pena,*
  109 F.3d 258 (5th Cir. 1997) ..........................................................22, 23, 24

*Louisiana v. Becerra,*
  577 F. Supp. 3d 483 (W.D. La. 2022) ..........................................................15

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) .......................................................................................8

*LULAC v. Perry,*
  548 U.S. 399 (2006) .......................................................................................1

*Mach Mining, LLC v. EEOC,*
  575 U.S. 480 (2015) .....................................................................................18

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) .....................................................................................17

*Multnomah Cnty. v. Azar,*
  340 F. Supp. 3d 1046 (D. Or. 2018) ............................................................10

*Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville,*
  508 U.S. 656 (1993) ...............................................................................10, 12

*Nyunt v. Chairman, Broad. Bd. of Governors,*
  589 F.3d 445 (D.C. Cir. 2009) .....................................................................22

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,*
  551 U.S. 701 (2007) .......................................................................................1

*Planned Parenthood v. U.S. Dep't of Health & Hum. Servs.,*
  946 F.3d 1100 (9th Cir. 2020) ...............................................................10, 12

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ..................................................................................8, 12

*Stormans, Inc. v. Selecky,*
  586 F.3d 1109 (9th Cir. 2009) .....................................................................17

*Texas v. Becerra,*
  575 F. Supp. 3d 701 (N.D. Tex. 2021) ...................................................13, 15

*Texas v. EEOC,*
  933 F.3d 433 (5th Cir. 2019) .....................................................................8, 14

*Texas v. United States (I),*
  809 F.3d 134 (5th Cir. 2015) .....................................................13, 14, 16, 17

*Texas v. United States (II),*
  50 F.4th 498 (5th Cir. 2022) ..................................................................passim

*Texas v. United States,*
  86 F. Supp. 591 (S.D. Tex. 2015) ................................................................15

*TransUnion LLC v. Ramirez,*
141 S. Ct. 2190 (2021) ..................................................................................... 9, 11

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*
139 S. Ct. 361 (2018) ................................................................................... 18, 23

## Statutes

42 U.S.C. §1395w-4(q) ........................................................................................ passim

42 U.S.C. §1981 ........................................................................................................ 15

42 U.S.C. §2000d ...................................................................................................... 15

5 U.S.C. § 701 .......................................................................................................... 21

5 U.S.C. §704 ...................................................................................................... 18, 20

5 U.S.C. §706 ............................................................................................ 7, 13, 18, 20

Pub. L. 114-10 §101 .................................................................................................... 2

## Other Authorities

Kendi, *How to Be an Antiracist* 19 (2019) ............................................................... 1

## Rules

Fed. R. Civ. P. 12(b)(1) .............................................................................................. 8

Fed. R. Civ. P. 12(b)(1), (6) ...................................................................................... 8

## Treatises

*Medicine*, Black's Law Dictionary (11th ed. 2019) .................................................. 19

Scalia & Garner, *Reading Law* 116 (2012) ............................................................. 19

## Regulations

86 Fed. Reg. 20,349 & n.3. ......................................................................................... 1

86 Fed. Reg. 39104, 39345 (July 23, 2021) .............................................................. 4

86 Fed. Reg. 64996, 65970 (Nov. 19, 2021) ...................................................... passim

86 Fed. Reg. 7009 (Jan. 20, 2021) ............................................................................. 4

## INTRODUCTION

"It is a sordid business, this divvying us up by race." *LULAC v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part, concurring in judgment in part, dissenting in part). Racial classifications are "'illegal, immoral, unconstitutional, inherently wrong, and destructive of democratic society.'" *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 521 (1989) (Scalia, J., concurring in judgment). Under the law, "The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (plurality). But according to Ibram X. Kendi—the coiner of anti-racism—"[t]he only remedy to past discrimination is present discrimination," and "[t]he only remedy to present discrimination is future discrimination." Kendi, *How to Be an Antiracist* 19 (2019). Antiracism, in other words, means deliberately treating people differently based on race.

The Biden administration has decided to inject Kendi's ideology into the Federal Register. *E.g.*, 86 Fed. Reg. 20,349 & n.3. And here the administration injected that ideology where it least belongs: medicine. The Centers for Medicare & Medicaid Services released a final rule that pays clinicians more money if they will promulgate an "anti-racism" plan. *See* 86 Fed. Reg. 64996, 65970 (Nov. 19, 2021). This Anti-Racism Rule states that anti-racism plans must conduct a "clinic-wide review" to prove the provider's "commitment to anti-racism" based on "an understanding of race as a political and social construct, not a physiological one." *Id.*

The Anti-Racism Rule is ultra vires. The governing statute allows CMS to identify "[c]linical practice improvement activities"—activities "that relevant eligible professional organizations and other relevant stakeholders identify as improving clinical practice or care delivery," 42 U.S.C. §1395w-4(q)(2)(A), (C)(v)(III). Anti-racism plans do not remotely satisfy that definition; in fact, the Rule tells

providers to consider race in ways that have no "physiological," *i.e.*, medical, relevance. And the governing statutes deal with cost and quality of care—not race, the most odious classification known to law.

Yet Defendants ask the Court to dismiss this case without reviewing the Rule's legality. *See* Def. Br. (ECF No. 37). They argue that both Dr. Colville and the States lack standing. *Id.* at 11-21. And they argue that Congress insulated the Rule from any judicial review. *Id.* at 21-29. Defendants are wrong about both points.

***First***, at least one Plaintiff has standing. The Anti-Racism Rule puts Dr. Colville at a competitive disadvantage. And "[e]conomic 'injury' … plainly can form the basis of a case or controversy." *Hollingsworth v. Harris*, 608 F.2d 1026, 1027-28 (5th Cir. 1979). Likewise, the States are suffering an injury because the Anti-Racism Rule frustrates their quasi-sovereign interests in protecting citizens' health and preventing "the harmful effects of discrimination." *Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez*, 458 U.S. 592, 609 (1982).

***Second***, no statute bars this Court's review. To be sure, Congress barred judicial review of "[t]he identification of measures and activities specified under" the provision that defines "clinical practice improvement activities." 42 U.S.C. §1395w-4(13). But anti-racism plans do not satisfy the definition of clinical practice improvement activities. §1395w-4(q)(2)(C)(v)(III). And Plaintiffs challenge the rule as ultra vires, a kind of claim that statutory bars on judicial review do not reach. This Court should deny Defendants' motion to dismiss and let the parties proceed to the merits.

## BACKGROUND

**A.    Congress creates a scheme that encourages Medicare providers to consider cost and quality of care—but not race.**

The Medicare Access and CHIP Reauthorization Act of 2015 directed the Department of Health and Human Services to establish the Merit-Based Incentive Payment System (MIPS) to incentivize cost-control, performance, and quality. Pub. L. 114-10 §101 (codified at 42 U.S.C. §1395w-4).

"The MIPS program aims to drive value through the collection, assessment, and public reporting of data that informs and rewards the delivery of high-value care." 86 Fed. Reg. at 65375. CMS uses MIPS to "pay for health care services in a way that drives value by linking performance on cost, quality, and the patient's experience of care." *Id.* Clinicians who are eligible to participate in MIPS must participate, and 99.9999% of MIPS-eligible clinicians do. *Id.*

Each year, clinicians who participate in MIPS get a "composite performance score" between 0 and 100. *See* 42 U.S.C. §1395w-4(q)(5)(A). Based on their score, CMS will adjust the amount clinicians are paid up, down, or not at all. In 2022, for example, a clinician who scores lower than 75 will receive a payment reduction up to 9%. *See* §1395w-4(q)(6). "Under the MIPS, the Secretary shall use the following performance categories … in determining the composite performance score": "(i) Quality"; "(ii) Resource use"; "(iii) Clinical practice improvement activities"; and "(iv) Meaningful use of certified EHR technology." §1395w-4(q)(2)(A)(i)-(iv). Clinical practice improvement activities make up 15 percent of a clinician's MIPS score. §1395w-4(q)(5)(E)(i)(III).

This case concerns clinical practice improvement activities. Under the Act, "the term 'clinical practice improvement activity' means" an activity that "relevant eligible professional organizations and other stakeholders identify as improving clinical practice or care delivery" and that "the Secretary determines, when effectively executed, is likely to result in improved outcomes." §1395w-4(q)(2)(C)(v)(III). The Act lists specific subcategories that meet this definition:

- "expanded practice access, such as same day appointments";
- "population management, such as monitoring health conditions of individuals to provide timely health care intervention";
- "care coordination, such as timely communication of test results";
- "beneficiary engagement, such as the establishment of care plans for individuals with complex care needs";
- "patient safety and practice assessment, such as through use of clinical or surgical checklists"; and
- "participation in an alternative payment model." §1395w-4(q)(2)(B)(iii).

The term "equity" does not appear in the Act.

3

**B.      The Biden administration injects race with its Anti-Racism Rule.**

On the first day of his presidency, President Biden issued Executive Order 13985, 86 Fed. Reg. 7009 (Jan. 20, 2021). The Order directs the executive branch to address systemic racism and promote "equity." *Id.* The Order further directs agencies to identify policies undermining "equity" and to change policies to promote "equity." *Id.*

In response to the order to "Advance Racial Equity," CMS published a proposed rule. *See* 86 Fed. Reg. 39104, 39345 (July 23, 2021). CMS "proposed" an "improvement activity titled 'create and implement an anti-racism plan.'" *Id.* The rationale for this proposed improvement activity asserts that "it is important to acknowledge systemic racism as a root cause for differences in health outcomes between socially-defined racial groups." *Id.* Both "equity" and "antiracism" are "terms of art" from the ideology of Ibram X. Kendi. Am. Compl. ¶¶2-3.

According to that ideology, "'[t]he only remedy to past discrimination is present discrimination, and [t]he only remedy to present discrimination is future discrimination.'" ¶2. "'[T]reating, considering, or making a distinction … based on' someone's race is good if it's 'antiracist'—meaning it promotes 'equity.'" *Id.* "Because 'race-neutral' approaches supposedly do not promote equity, they are actively 'racist.'" *Id.* "Equity, in turn, means that all racial groups must be 'on approximately equal footing' in all things, no matter the cause of the existing disparity." *Id.*

CMS later published the final rule. 86 Fed. Reg. 64996 (Nov. 19, 2021). The final rule adopts the proposed rule's anti-racism plans. *Id.* at 65384. It offers the same rationale: "This improvement activity acknowledges it is insufficient to gather and analyze data by race, and document disparities by different population groups. Rather, it emphasizes systemic racism is the root cause for differences in health outcomes between socially defined racial groups." *Id.* The final rule's "create and implement an anti-racism plan" improvement activity is "high-weighted." *Id.* at 65969. The Anti-Racism Rule is new

and available for the first time this performance year, which ends on December 31, 2022. Am. Compl. ¶50. MIPS reports for the 2022 performance year will be submitted in March 2023. *Id.*

The Anti-Racism Rule injects race ideology into medicine. Clinicians who participate in this improvement activity must "include a clinic-wide review of existing tools and policies … to ensure that they include and are aligned with a commitment to anti-racism and an understanding of race as a political and social construct, not a physiological one." *Id.* at 65970. The plan "should also … include target goals and milestones." *Id.* And the plan can include "ongoing training on anti-racism." *Id.*

**C.    The Anti-Racism Rule harms Plaintiffs.**

Plaintiffs are Dr. Amber Colville, an individual doctor, and eight sovereign States. The Anti-Racism Rule will cause Plaintiffs imminent, concrete harm.

Dr. Colville is a medical doctor who specializes in internal medicine in Ocean Springs, Mississippi. Am. Compl. (Doc. 28) ¶¶7, 9. "Dr. Colville receives payments from Medicare, is a MIPS-eligible clinician, and participates in the MIPS program." ¶7. But she "will not submit an anti-racism plan under the Rule" because she "believes that racial discrimination, of any kind, has no place in medicine." ¶8. In her view, "these concepts are … bad medicine," and "creating these plans" are not "in the best medical interests of her patients." *Id.* The "time needed to create and implement them" also would "detract from providing real care." *Id.*

The Anti-Racism Rule harms Dr. Colville in at least two ways. First, the Rule financially penalizes her. "Given the nature of her practice, she is eligible [for] and able to complete only a limited number of MIPS improvement activities." ¶9. In the last three years, she reported only one improvement activity "and did not receive the full 40 points on this metric." *Id.* "She was scored individually and received overall scores between 78 and 88." *Id.* Because "[h]er score would increase if she submitted an anti-racism plan under the Rule," she "is financially penalized for refusing to submit what

she believes are unscientific, unethical, and unlawful plans." *Id.*; *see also* ¶12 ("[P]roviders who fail to submit these plans … will get reimbursed at lower rates.").

Second, Dr. Colville cannot compete on an equal footing because the Rule puts her at competitive disadvantage. "Dr. Colville competes with dozens of nearby internists in Ocean Springs with similar practices." ¶10. The Anti-Racism Rule "places her at a direct disadvantage vis-à-vis these competitors." *Id.* "Her competitors can be reimbursed at higher rates, while she cannot." *Id.* "And her competitors can get higher MIPS scores." *Id.* Because "'CMS publishes MIPS results … to help consumers evaluate and compare clinicians,'" Dr. Colville's inability to compete on an equal footing will have "significant" reputational and financial consequences. *Id.*

The Anti-Racism Rule harms the States in three main ways. First, the Rule creates a dilemma—both horns of which injure them. The States "oppose racial discrimination, of any kind, in medicine." ¶12. "Most prohibit racial discrimination in their laws and their agreements with medical providers." *Id.* The Anti-Racism Rule "encourag[es] Medicare providers to make medical decisions based on race." *Id.* So the States must "either enforce their rules against providers who submit anti-racism plans (and deprive their citizens of needed care), or stop enforcing their rules barring racial discrimination." *Id.* Second, because providers "who fail to submit these plans … will get reimbursed at lower rates," the States "and their citizens" will suffer "increased costs." *Id.* Finally, the Rule "encourag[es] race-based decisionmaking in medicine and decreas[es] the quality and availability of medical care." *Id.*

The injuries to Dr. Colville and the States are imminent. Anti-racism plans will be popular this year because they are "high weighted" activities—clinicians who complete them get "half the points needed for a full score in this performance category." ¶52. Moreover, "[a]lthough there are numerous improvement activities, many are applicable only to a particular specialty. Smaller practices, in particular, find it difficult to find improvement activities they can conduct. ¶36. "[T]wo-thirds of the MIPS

categories are either too difficult for most clinicians to satisfy or would be impractical to ask of clinicians because they contravene best medical practices." *Id.* Indeed, "16.9% of clinicians d[o] not participate in *any* improvement activities." *Id.* "This new activity," by contrast, is "available to more clinicians because it is not constrained to certain specialties or practices." ¶53. "And it is easy to complete—requiring clinicians to explain their commitment to antiracism on a worksheet—compared to many other improvement activities that require more tangible improvements for patients." *Id.* "Virtually all participants would benefit from the availability of an additional MIPS improvement activity." ¶37.

Others agree. An entire market of "consultants" has sprung up on the expectation that many clinicians will submit anti-racism plans. ¶55. And "[c]linicians will also feel intense pressure to choose anti-racism plans as one of their improvement activities" because the "American Medical Association … is pushing clinicians to adopt anti-racism plans." ¶56. The result is that "[m]any clinicians will submit anti-racism plans under the Rule," ¶51, which is precisely what "CMS itself expects," ¶54; *see* 86 Fed. Reg. at 65969.

**D.    Plaintiffs challenge the Anti-Racism Rule, and Defendants move to dismiss on procedural grounds.**

Dr. Colville and the States filed an amended complaint in August. Am. Compl. (ECF No. 28). The complaint alleges that, "[i]n adopting the Anti-Racism Rule, CMS acted well outside the bounds of its statutory authority" and is contrary to law. ¶¶58-65; *see* 5 U.S.C. §706(2)(A), (C). Accordingly, the Anti-Racism Rule is *ultra vires.* Am. Compl. ¶¶5, 57-65. The complaint asks this Court to declare "that the Anti-Racism Rule violates the Medicare Access Act and is ultra vires"; to "vacat[e] the Anti-Racism Rule"; to "enjoi[n] enforcement of the Anti-Racism Rule or provid[e] the same benefits to those who do not submit anti-racism plans that satisfy the Rule as those who do"; and to "gran[t] Plaintiffs all other appropriate relief." *Id.* at 18.

Defendants filed a motion to dismiss the amended complaint on two procedural grounds. Def. Br. (ECF 37). Defendants first argue that Dr. Colville and the States lack standing. *Id.* at 11-21; Fed. R. Civ. P. 12(b)(1). Defendants then argue that a statutory bar precludes judicial review. Def. Br. 21-29; Fed. R. Civ. P. 12(b)(1), (6). This Court should deny Defendants' motion. And because Plaintiffs' ultra-vires claim presents a question of law, no discovery is needed, so the parties should proceed to cross-motions for summary judgment on the Rule's legality.

## ARGUMENT

Defendants' two grounds for dismissal fail. Both Dr. Colville and the States have standing: The Anti-Racism Rule will cause Dr. Colville financial and competitive injuries, and it will frustrate the States' sovereign and quasi-sovereign interests in preventing racial discrimination in medicine. No bar on judicial review precludes this Court from considering Plaintiffs' narrow claim because anti-racism plans are not covered by the bar's text and because the Rule is ultra vires. Defendants' motion should be denied, and this case should proceed to the merits.

## I.     Dr. Colville and the States have standing.

"[T]he 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* "At the pleading stage, general factual allegations" are sufficient. *Lujan*, 504 U.S. at 561. "[O]n a motion to dismiss," the Court must "'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* This Court must accept as true the factual allegations in the complaint "'and view them in the light most favorable to the plaintiff[s].'" *Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021). And it must "assume" that Plaintiffs are "correct on the merits of [their] claim that the [Rule] was promulgated in violation of the APA." *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019).

Defendants challenge the standing of both Dr. Colville, *see* Def. Br. 12-17, and the States, *see* Def. Br. 17-21. Though "[t]he presence of one party with standing is sufficient," *Texas v. United States (II)*, 50 F.4th 498, 514 (5th Cir. 2022), both sets of Plaintiffs have standing here.

### A.      Dr. Colville

The Anti-Racism Rule injures Dr. Colville in at least two ways.

***First***, the Rule will injure Dr. Colville financially. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (describing "monetary harms" as among "[t]he most obvious" Article III injuries). Dr. Colville is "eligible and able to complete only a limited number of MIPS improvement activities," and in the last three years she did not receive the full 40 points for the one improvement activity she reported. Am. Compl. ¶9. "Providers who fail to submit [anti-racism] plans … will get reimbursed at lower rates." ¶12. Because Dr. Colville's "score would increase if she submitted an anti-racism plan under the Rule," she "is financially penalized for refusing to submit what she believes are unscientific, unethical, and unlawful plans." ¶9.

Defendants describe this injury as "self-inflicted," Def. Br. 15, but they are wrong. "An injury is 'self-inflicted' so as to defeat standing only if 'the injury is so completely due to the plaintiff's own fault as to break the causal chain." *Backer ex rel. Freedman v. Shah*, 788 F.3d 341, 344 (2d Cir. 2015); *see id.* (explaining that an injury is not so "'self-inflicted' so as to defeat standing" when "the defendants have engaged in conduct that may have contributed to causing the injury" and the plaintiff's injury "was not 'solely' attributable to her own actions, but rather was caused in part by [the agency's] determination"). For that reason, an injury is not so self-inflicted as to defeat standing if, as here, the plaintiff's actions result from "pressure" by the government. *Jackson v. Wright*, 2022 WL 179277, at *11 (E.D. Tex. Jan. 18).

Defendants assert that there "are dozens of possible other activities in the list of available activities," Def. Br. 14, but that assertion fails to view the allegations in the light most favorable to Dr.

Colville, *see Barilla*, 13 F.4th at 431. For example, Defendants ignore that most of those activities "are either too difficult for most clinicians to satisfy or would be impractical to ask clinicians because they contravene best medical practices." Am. Compl. ¶36. And Dr. Colville alleges that she is "eligible and able to complete only a limited number." ¶9. So the Anti-Racism Rule puts her in a harmful bind: either she must create an anti-racism plan against "the best medical interests of her patients" to improve her score and prevent financial harm, or she must do what is in the best medical interest of her patients, and take the "financial[] penal[ty]." ¶¶8-9. Either horn of the dilemma is harmful, and it is the Rule, not Dr. Colville's voluntary choice, that creates it. Because Dr. Colville is not the "'sole[]'" cause of her injuries, Defendants' argument fails. *Shah*, 788 F.3d at 344.

**Second**, Dr. Colville is injured because the Anti-Racism Rule puts her at a competitive disadvantage. "Economic 'injury' in the form of increased competition plainly can form the basis of a case or controversy." *Hollingsworth*, 608 F.2d at 1027-28; *see also Env't Def. Fund v. Marsh*, 651 F.2d 983, 1003 (5th Cir. 1981) ("Economic injury from business competition created as an indirect consequence of agency actions can serve as the required 'injury in fact.'"). "Causation and redressability are generally implicit in injury-in-fact under the competitor standing doctrine." *Planned Parenthood v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020) (citing *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 n.5 (1993)). "[C]ompetitor standing 'relies on economic logic to conclude that a plaintiff will *likely* suffer an injury-in-fact when the [defendant] acts in a way that increases competition or aids the plaintiff's competitors.'" *Id.* at 190 (emphasis added); *see also Multnomah Cnty. v. Azar*, 340 F. Supp. 3d 1046, 1055-56 (D. Or. 2018) (explaining that "'[e]conomic actors suffer an injury when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them'" and that "a competitive-standing plaintiff need only articulate the 'basic economic logic' undergirding its claims to demonstrate redressability"). And "[i]t is a

'basic law of economics' that increased competition leads to actual economic injury." *Cooper v. Tex. ABC*, 820 F.3d 730, 738 (5th Cir. 2016).

At the motion-to-dismiss stage, Dr. Colville's "alleged injury meets the well-established Article III threshold for economic competitors who allege that, because of unlawful conduct, their rivals enjoy a competitive advantage in the marketplace." *CREW v. Trump*, 953 F.3d 178, 189-90 (2d Cir. 2019), *vacated due to subsequent mootness*, 141 S. Ct. 1262 (2021). There are "dozens" of "internists" with whom Dr. Colville competes. Am. Compl. ¶10. "[T]he Anti-Racism Rule places her at a direct disadvantage vis-à-vis these competitors" because they "can be reimbursed at higher rates, while she cannot." *Id.* Her competitors can also "get higher MIPS scores." *Id.* And because "CMS publishes MIPS results … to help consumers evaluate and compare clinicians," Dr. Colville's competitors will have "significant" reputational and financial advantages over Dr. Colville in their competition for customers. ¶¶10, 34; *see TransUnion*, 141 S. Ct. at 2200 (explaining that "reputational harm" is a traditional injury in fact). These allegations are sufficient at the pleading stage to plausibly allege that Defendants acted "'in a way that … aids [Dr. Colville's] competitors.'" *Trump*, 953 F.3d at 190.

Dr. Colville's competitive injury is not speculative. *Cf.* Def. Br. 16-17. Contrary to Defendants' strawman, Plaintiffs do not merely speculate that "competitors will choose the anti-racism plan improvement activity." *Id.* at 17. Their complaint includes factual allegations that, when accepted as true, make standing under this theory plausible. "Smaller practices" like Dr. Colville's already "find it difficult to find improvement activities they can conduct." Am. Compl. ¶36. As explained, "two-thirds of the MIPS categories" are out of the question for clinicians. *Id.* And about 17% of clinicians do "not participate in *any* improvement activities." *Id.* The Anti-Racism Rule thus creates an attractive, relatively easy-to-complete activity that is "available to more clinicians because it is not constrained to certain specialties or practices." ¶53. And CMS itself states that "MIPS eligible clinicians" in smaller practices "will be encouraged to fit these requirements to their specific context." 86 Fed. Reg. at 65969.

CMS is not alone: "MIPS consultants expect clinicians to submit anti-racism plans" and have built a market around that expectation, and clinicians "feel intense pressure to choose anti-racism plans as one of their improvement activities" from associations like "[t]he American Medical Association." Am. Compl. ¶¶55-56.

Those facts are sufficient to plausibly allege competitor standing at the pleading stage. Dr. Colville is a "'competitor whose bottom line *may be adversely affected* by the challenged action,'" *Trump*, 653 F.3d at 190, because her competitors can and will likely create anti-racism plans to get reimbursed at higher rates, to get higher MIPS scores, and to benefit reputationally from the published MIPS results, Am. Compl. ¶¶10, 51. Defendants imply that Dr. Colville's alleged injury might have other causes, Def. Br. 15-17, but at the pleading stage Dr. Colville need not "rul[e] out all possible alternative explanations," *Trump*, 653 F.3d at 191. Likewise, because the Anti-Racism Rule makes it "more difficult" for Dr. Colville to "obtain a benefit than it is for" her competitors, she "'need not allege that [s]he would have obtained the benefit but for the barrier in order to establish standing.'" *Id.* at 193 (quoting *Ne. Fla.*, 508 U.S. at 666); *see also Planned Parenthood*, 946 F.3d at 1108-09 (similar). The Anti-Racism Rule makes it so that Dr. Colville is unable "to compete on an equal footing," so she need not "allege the loss of any identifiable piece of business." *Trump*, 653 F.3d at 193.

In short, the Anti-Racism Rule will "skew[] the market in another competitor's favor, notwithstanding other possible, or even likely, causes for the benefit going to" Dr. Colville's "competition." *Id.* at 192. So vacating the Anti-Racism Rule would "redres[s]" Dr. Colville's injury by restoring the previous status quo. *Spokeo*, 578 U.S. at 338. Plaintiffs' allegations easily clear the bar for alleging standing at this stage of the litigation. *See Bennett v. Spear*, 520 U.S. 154, 168-69 (1997) ("Given petitioners' allegation that the amount of available water will be reduced and that they will be adversely affected thereby, it is easy to presume specific facts under which petitioners would be injured.").

B.      The States

Defendants argues that the States lack standing, Def. Br. 17-21, but their argument ignores the

"special solicitude in the standing analysis" to which these Plaintiffs are entitled, *Texas II*, 50 F.4th at

514; *see also Texas v. Becerra*, 575 F. Supp. 3d 701, 713 (N.D. Tex. 2021) ("A state alleging that the

defendant violated a congressionally accorded procedural right affecting the state's quasi-sovereign

interests in its law-making functions is afforded 'special solicitude' standing."). That special solicitude

lets States "establish standing 'without meeting all the normal standards for redressability and imme-

diacy.'" *Texas II*, 50 F.4th at 514. When a State "is entitled to … 'special solicitude,'" it can "satisf[y]

the causation requirement" by establishing a causal chain involving "some uncertainty." *See Texas v.*

*United States (I)*, 809 F.3d 134, 159-60 (5th Cir. 2015). The challenged action need not be "the sole

cause" of the alleged injuries. *Texas II*, 50 F.4th at 519 (explaining that "contribut[ing] to [the State's]

injuries" is enough). And "[s]tanding will exist 'if there is *some possibility* that the requested relief will

prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.'" *Id.* at

514 (emphasis added); *accord id.* at 520 ("The standard is met 'if there is some possibility that the

requested relief' will reduce the harm.").

The States deserve special solicitude here. "Special solicitude has two requirements: (1) the

State must have a procedural right to challenge the action in question, and (2) the challenged action

must affect one of the State's quasi-sovereign interests." *Id.* The States satisfy the first requirement

because they "asser[t] a procedural right under the APA to challenge the agency action." *Id.*; *see* Am.

Compl. ¶ 58 (quoting 5 U.S.C. §706(2)(A), (C)). The second requirement is also satisfied because the

Anti-Racism Rule harms the States' sovereign and quasi-sovereign interests.

A State has standing if it "assert[s] an injury to … a 'quasi-sovereign' interest." *Snapp*, 458 U.S.

at 601. Each State has a "sovereign interest[]" in "the exercise of [its] sovereign power over individuals

and entities within [its] jurisdiction." *Id.* "Pursuant to that interest, states may have standing based on

… federal interference with the enforcement of state law." *Texas I*, 809 F.3d at 153; *accord Brackeen v. Haaland*, 994 F.3d 249, 369 (5th Cir. 2021) (en banc). States also have quasi-sovereign interests "in the well-being of [their] populace." *Snapp*, 458 U.S. at 602; *accord id.* at 607 ("[A] State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general."). Those interests extend to "a similar state interest in securing residents from the harmful effects of discrimination"—an interest that "is peculiarly strong" when the discrimination "occurs along ethnic lines." *Id.* at 609. And harm to that interest confers standing "[r]egardless of the possibly limited effect of the alleged financial loss." *Id.* at 609.

The amended complaint alleges injuries to the States' sovereign and quasi-sovereign interests in at least two ways.

*First*, the amended complaint alleges injuries to the States' sovereign interest in exercising their sovereign power over persons and entities within their jurisdictions. *Snapp*, 458 U.S. at 601; *Texas I*, 809 F.3d at 153. "Most" of the plaintiff States "prohibit racial discrimination in their laws and their agreements with medical providers." Am. Compl. ¶12. But the Anti-Racism Rule will encourage "Medicare providers to make medical decisions based on race," forcing the States to "either enforce their rules against providers who submit anti-racism plans (and deprive their citizens of needed care), or stop enforcing their rules barring racial discrimination." *Id.* That dilemma is an injury caused by the Rule. *See Texas I*, 809 F.3d at 153 ("[S]tates may have standing based on … federal interference with the enforcement of state law."); *Texas v. EEOC* 933 F.3d 433, 446-47 (5th Cir. 2019) ("'[B]eing pressured to change state law constitutes an injury.'").

*Second*, the States have a quasi-sovereign interest in the health and well-being of their residents. Because the Anti-Racism Rule penalizes providers "who fail to submit" anti-racism plans, the States "and their citizens" will suffer "increased costs." Am. Compl. ¶12. And the Anti-Racism Rule "encourag[es] race-based decisionmaking in medicine and decreas[es] the quality and availability of

medical care." *Id.*; *see Louisiana v. Becerra*, 577 F. Supp. 3d 483, 492 (W.D. La. 2022) (quasi-sovereign interests include a state's interest "in having its citizens not discriminated against"); *Texas*, 575 F. Supp. at 713 (holding that negative consequences to health care in a State constituted an injury to the State).

The States have "standing to sue" because these injuries are ones that they, "if they could, would likely attempt to redress through [their] sovereign lawmaking powers." *Snapp*, 458 U.S. at 607. The States, per longstanding federal law, disfavor *all* racial discrimination, whatever the motivation. *E.g.*, *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) ("It is by now well established that 'all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized.'"); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224 (1995) (same); 42 U.S.C. §2000d (banning racial discrimination by recipients of federal funds); 42 U.S.C. §1981 (banning private parties from racially discriminating in making and enforcing contracts); Am. Compl. ¶12.

Defendants miss the point when they assert that the States' "theory of harm to the state's quasi-sovereign interest" does not "show a conflict between the States and the federal scheme" because "both Medicare and the state share the same goal of fostering discrimination-free and effective health care." Def. Br. 20 n.5. The conflict is not between the States and Medicare, but between the States and the Anti-Racism Rule. Anti-racism plans will frustrate the States' quasi-sovereign interest in the physical and economic well-being of their residents, as well as their "interest in securing residents from the harmful effects of discrimination." *Snapp*, 458 U.S. at 609; *see Texas v. United States*, 86 F. Supp. 591, 627 (S.D. Tex. 2015) (explaining that the "States' alleged injury" that the federal government's action "will create a discriminatory employment environment that will encourage employers to hire DAPA beneficiaries instead of those with lawful permanent status" is "within the quasi-sovereign interests" of the States).

Defendants' arguments to the contrary misfire. They assert that clinicians "who do not want to select this improvement activity will not be reimbursed at lower rates simply for that reason," Def.

Br. 17-18, but a challenged action need not be "the sole cause" of the alleged injury, *Texas II*, 50 F.4th at 519. As explained, "two-thirds of the MIPS categories are either too difficult for most clinicians to satisfy or would be impractical to ask of clinicians because they contravene best medical practices." Am. Compl. ¶36; *see* 86 Fed. Reg. at 65375 ("We have heard from clinicians that MIPS requirements are confusing, burdensome, and that it is difficult to choose measures from the several hundred MIPS … quality measures that are meaningful to their practices and have a direct benefit to patients."). And "16.9% of clinicians did not participate in *any* improvement activities." *Id.* So Defendants' assertion that the States' clinicians "can select" other activities fails to establish that the Anti-Racism Rule will not plausibly cause the States' injuries. Def. Br. 18. The Anti-Racism Rule "contribut[es] to [the States'] injuries," *Texas II*, 50 F.4th at 519, which is more than sufficient under special solicitude, *Texas I*, 809 F.3d at 159-60.

Defendants suggest that any injury to the State must consist in "a net negative impact for the state as a whole." Def. Br. 18. Not so. "'Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant.'" *Texas I*, 809 F.3d at 155-56.

Defendants also argue that it's "too speculative" to allege that the Anti-Racism Rule unduly pressures the States and encourages race-based deisionmaking in medicine, Def. Br. 18-19, but Plaintiffs plausibly alleged the opposite. The Rule incorporates the ideology of anti-racism. Am. Compl. ¶2. According to that ideology (which is quite popular in some circles), "'[t]he only remedy to past discrimination is present discrimination, and [t]he only remedy to present discrimination is future discrimination." *Id.* "Equity … means that all racial groups must be 'on approximately equal footing' in all things, no matter the cause of the existing disparity." *Id.* The Anti-Racism Rule expressly injects that ideology into medicine: CMS requires anti-racism plans to include a "clinic-wide review" of the doctor's "commitment to anti-racism" based on a definition of race as "a political and social construct,

*not a physiological one.*" 86 Fed. Reg. at 65970 (emphasis added); Am. Compl. ¶4. So the Anti-Racism Rule invites clinicians to use race in way that, *by definition*, does not have a medical purpose. And "[m]any clinicians will submit anti-racism plans under the Rule," ¶¶51, 54—exactly what "MIPS consultants" and "CMS itself" expect will happen, ¶¶54-55. The Anti-Racism Rule gives them "strong incentives" to implement anti-racist ideologies into their practices, including explicit and implicit racial classifications, "and it is hardly speculative that many would do so." *Texas I*, 809 F.3d at 160. This Court should not let the federal government tell the world that anti-racism plans will be a tool for fighting "systemic racism," Am. Compl. ¶47, but tell this Court that it's entirely speculative that anyone will ever implement one.

Finally, Defendants argue that the States do not allege causation and redressability "because plaintiffs' theory of harm depends on the … independent and speculative actions of third parties not before the Court." Def. Br. 20. But Article III "'does not exclude injury produced by determinative or coercive effect upon the action of someone else.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1121-22 (9th Cir. 2009); *see id.* (holding that, "[w]hile indirect, there [was] a causal connection between the new rules and [the plaintiff's] threatened termination" because the rules "require[d] a pharmacy to deliver medication in a timely manner" and pharmacies "may terminate" pharmacists who religiously object to delivering Plan B (quoting *Spear*, 520 U.S. at 169)).

And Defendants once again ignore the special solicitude that States get on standing. *Texas II*, 50 F.4th at 514. For example, the Supreme Court found standing in *Massachusetts v. EPA*, 549 U.S. 497 (2007), even though "[f]or Massachusetts's injury to have occurred, individuals would have had to drive less fuel-efficient cars as a result of the EPA's decision, and that would have had to contribute meaningfully to a rise in sea levels, causing the erosion to the state's shoreline." *Texas I*, 809 F.3d at 159-60. Despite "some uncertainty about whether the EPA's inaction was a substantial cause of the state's harm," the Court gave Massachusetts "special solicitude" and found Article III satisfied. *Id.*

Here, the causal chain is more direct: Clinicians will create anti-racism plans, Am. Compl. ¶¶51, 54, and those plans frustrate the sovereign and quasi-sovereign interests of the States, ¶13. Because "'there is some possibility that the requested relief'"—vacating the Anti-Racism Rule—"will reduce the harm," the States have standing. *Texas II*, 50 F.4th at 519.

## II.   No statute precludes this Court's review of the Anti-Racism Rule.

Defendants' attempt to evade judicial review depends on two arguments. First, they argue that a statutory bar on judicial review "expressly bar[s]" any challenge to the Anti-Racism Rule. Def. Br. 21. Second, they argue that the ultra vires exception to statutory bars does not apply here. *Id.* at 23. Both arguments fail.

### A.   Anti-racism plans are not one of the clinical practice improvement activities specified in the bar on judicial review.

Judicial review is available for Plaintiffs' claim. *See* 5 U.S.C. §704; §706(2)(A), (C). There is "a 'strong presumption' in favor of judicial review of final agency action." *Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896, 1902 (2022). Defendants "bear[] a heavy burden in attempting to show that Congress prohibited all judicial review of the agency's compliance with a legislative mandate." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015). So bars on judicial review of agency action must be "read … quite narrowly" to "honor the presumption of review." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018).

No bar on judicial review precludes review of the Anti-Racism Rule. Defendant relies only on section 1395w-4(q)(13)(B). That provision bars "judicial review … of … [t]he identification of measures and activities *specified* under paragraph (2)(B)." 42 U.S.C. §1395w-4(q)(13)(B) (emphasis added). Paragraph (2)(B), in turn, specifies "clinical practice improvement activities … as defined in subparagraph (C)(v)(III)." §1395w-4(q)(2)(B)(iii). And subparagraph (C)(v)(III), in turn, defines "'clinical practice improvement activity'" to "mean[] an activity that [1] relevant eligible professional organizations and other relevant stakeholders identify as improving clinical practice or care delivery *and* [2]

that the Secretary determines, when effectively executed, is likely to result in improved outcomes." §1395w-4(q)(2)(C)(v)(III) (emphasis added). Because subparagraph (C)(v)(III) uses the word *and*, an activity is a "clinical practice improvement activity" only if *both* conditions (1) and (2) are satisfied. *See* Scalia & Garner, *Reading Law* 116 (2012) (explaining that "[w]ith the conjunctive list, all … things [in the list] are required"). If one of the conditions is not true for anti-racism plans, then they are not "clinical practice improvement activities," 42 U.S.C. §1395w-4(q)(2)(B)(iii), and so cannot be "activities specified under paragraph (2)(B)," §1395w-4(q)(13)(B).

As Plaintiffs alleged, the first condition in the definition of "clinical practice improvement activity" is untrue for anti-racism plans. *See* Am. Compl. ¶¶61-64. Anti-racism plans do not relate to "clinical practice or care delivery," 42 U.S.C. §1395w-4(q)(2)(C)(v)(III), because the Anti-Racism Rule expressly encourages clinicians to use race in a way that does not relate to "physiolog[y]," 86 Fed. Reg. at 65970; *cf. Biden v. Missouri*, 142 S. Ct. 647, 650 (2022) (explaining that the Act's "core mission" is "patients' health and safety"); *Medicine*, Black's Law Dictionary (11th ed. 2019) ("The scientific study and practice of preserving health and treating disease or injury."). The statute itself enumerates examples that establish the nonexistence of the relationship between activities that improve "clinical practice or care delivery," 42 U.S.C. §1395w-4(q)(2)(C)(v)(III), and anti-racism plans. The term covers same-day appointments, "monitoring health conditions," "timely communication of test results," and use of "clinical or surgical checklists"—none of which is remotely related to nonphysiological considerations of race. §1395w-4(q)(2)(B)(iii). Moreover, an activity is not a "clinical practice improvement activity" if Defendants cannot show that "relevant eligible professional organizations and other relevant stakeholders" identified them "as improving clinical practice or care delivery." §1395w-4(q)(2)(C)(v)(III). "CMS … failed to identify" any such organizations or stakeholders who identified anti-racism plans as improving practice and care. Am. Compl. ¶63. Defendants merely dismiss that

fact as irrelevant, Def. Br. 27, but that fact means the Rule fails to satisfy the text of the bar on judicial review.

Missing the point entirely, Defendants assert that Plaintiffs' "criticisms amount to claims that CMS relied on factors which Congress has not intended it to consider or entirely failed to consider an important aspect of the problem when creating this new improvement activity." Def. Br. 27 (cleaned up). But that's not the point, and Plaintiffs raise no such claims. The point is that anti-racism plans are outside the definition of "clinical practice improvement activity" that paragraph 2(B) expressly incorporates. Because Defendants' jurisdictional defense depends entirely on the premise that anti-racism plans are "clinical practice improvement activities," Def. Br. 21, that defense fails. Even if that question were close, the presumption of review requires the Court to resolve it in Plaintiffs' favor. *Am. Hosp. Ass'n*, 142 S. Ct. at 1902; *see Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) (explaining that even if "one can *read*" a "clause as having greater preclusive effect," "the strong presumption favoring review, especially where the activities of an agency are facially invalid," counsels against that reading (cleaned up)). And Defendants' reading would lead to absurd results. Even if CMS used its authority over clinical practice improvement activities to encourage the *denial* of care to blacks and Hispanics based on race, Defendants think the courthouse doors would be closed. Defendants cannot be right.

Accordingly, the identified bar on judicial review does not apply here by its text. This Court's ordinary power to review agency action remains. *See* 5 U.S.C. §701(a)(1). Pursuant to the APA, this Court can exercise its ordinary power to "hold unlawful and set aside agency action … found to be … not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A), (C); *see also* §704. The Anti-Racism Rule is one such action, as Defendants do not challenge at this stage and Plaintiffs will prove on cross-motions for summary judgment.

### B.    Plaintiffs allege that the Anti-Racism Rule is ultra vires.

As just explained, anti-racism plans are categorically not clinical practice improvement activities, so they cannot be used "in determining the composite performance score" under the MIPS. *See* 42 U.S.C. §1395w-4(q)(2)(A). In other words, the Anti-Racism Rule is wholly outside the agency's statutory authority. So even if the Court construed the bar on judicial review in section 1395w-4(q)(13)(B) against the presumption of reviewability, the ultra vires exception to review preclusion would apply. The ultra vires exception is grounded, in part, on constitutional avoidance. Without it, "the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902).

The ultra vires exception to review preclusion applies independent of the availability of judicial review under statutes. *See Dart*, 848 F.2d at 224 ("Prior to the APA's enactment, after all, courts had recognized the right of judicial review of agency actions that exceeded authority. … Nothing in the subsequent enactment of the APA altered th[at] … doctrine." (citing *McAnnulty*, 187 U.S. at 110)). "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Id.* When a party claims that an agency "'exceeded its statutory authority' in purporting to apply the statute," the claim "clearly admit[s] of judicial review." *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1172-73 (D.C. Cir. 2003) (holding that the ultra vires exception to review preclusion applied notwithstanding clear statutory bar because "both AAL and ABE allege[d] that, in promulgating the postal regulations at issue, the Postal Service exceeded its statutory authority"); *id.* at 1172 ("It does not matter, therefore, whether traditional APA review is foreclosed, because judicial review is favored when an agency is charged with acting beyond its authority." (cleaned up)). And under the ultra-vires exception, "the APA's stricture barring judicial review 'to the extent that statutes preclude judicial review,' 5 U.S.C. § 701(a)(1), 'does not repeal the review of *ultra vires* actions.'" *Id.* at 1173; *see*

*also Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 293 (5th Cir. 1999) ("judicial intervention" is permitted, "even when the relevant statutory language precludes jurisdiction," where "an agency exceeds the scope of its delegated authority or violates a clear statutory mandate").

The ultra vires exception applies here. "In their complaints, both" Dr. Colville and the States "allege that, in promulgating the" Anti-Racism Rule, CMS "exceeded its statutory authority" by declaring anti-racism plans "clinical practice improvement activities" and using them under MIPS as such when they clearly are not. *Aid Ass'n for Lutherans*, 321 F.3d at 1172-73; *see* Am. Compl. ¶¶5, 47-48, 57-65. So even if there were "no doubt that" section 1395w-4(q)(13)(B) fell within the APA's exception for other "'statutes [that] preclude judicial review,'" the "claims here … clearly admit of judicial review." *Aid Ass'n for Lutherans*, 321 F.3d at 1172-73 (quoting 5 U.S.C. §701(a)(1)).

Citing a D.C. Circuit case, Defendants assert that the ultra vires exception "applies only when three requirements are met." Def. Br. 24 (citing *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)). Those conditions are "(i) the statutory preclusion of review is implied rather than express"; "(ii) there is no alternative procedure for review of the statutory claim"; "and (iii) the agency plainly acts 'in excess of its delegated powers and contrary to a specific prohibition in the' statute that is 'clear and mandatory.'" *Id.* But in the Fifth Circuit, the rule is different. When determining whether the ultra vires exception applies, the question is simply whether "an agency has exceeded its delegated powers or 'on its face' violated a statute." *Kirby Corp. v. Pena*, 109 F.3d 258, 268-69 (5th Cir. 1997) (quoting *Dart*, 848 F.2d at 222)). Plaintiffs satisfy this rule because they allege that "the agency's challenged action is so contrary to the terms of the relevant statute that it necessitates judicial review." *Id.* The point is not whether Plaintiffs' ultra vires claim is correct; that's a question for summary judgment. The point is that Plaintiffs plausibly alleged that the Rule is ultra vires, and Defendants move to dismiss solely on procedural grounds, not the merits. So "judicial review is proper" here regardless, even "despite there being a statutory provision prohibiting such review." *Id.*

But even if the D.C. Circuit's over-reticulated, three-part test bound this Court, Plaintiffs would satisfy all three elements.

***First***, the statutory preclusion of review here is implied. Defendants argue that "section 1395w-4(q)(13)(B) is express and could not be 'more clear' as to prohibition of judicial review," Def. Br. 24, but for reasons already explained, it is not at all clear that anti-racism plans are one of the defined activities that courts are barred from reviewing, *see supra* II.A. The bar to judicial review here would therefore be, at best, implied—not express. *Cf. Weyerhaeuser*, 139 S. Ct. at 370 (explaining that bars on judicial review must be read narrowly).

***Second***, there is no alternative procedure for review of Plaintiffs' claim. "Defendants do not contest the second element." Def. 25 n.6. Nor could they. According to Defendants, section 1395w-4(q)(13)(B), in conjunction with section 701(a) of the APA, eliminates any procedure for review. *See* Def. Br. 21-22. So if the Court rejects the argument that section 1395w-4(q)(13)(B) does not apply to the claims here, then the ultra vires exception to review preclusion is the *only* avenue for review.

***Third***, CMS plainly acted beyond its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory. Defendants asserts that the dispute between the parties is merely one over statutory interpretation. Def. Br. 25-26. Not true. This is not a case that "'simply involve[s] a dispute over statutory interpretation or challenged findings of fact.'" *Kirby*, 109 F.3d at 269. "[T]here is a 'plain' violation of an unambiguous and mandatory provision of the statute." *Herman*, 176 F.3d at 293. The definition of "clinical practice improvement activities" has nothing to do with race, enumerated examples in the statute clarify that anti-racism plans do not qualify, and the Rule rules out considerations of race that *are* medically relevant. *See supra* II.A. Moreover, the statute unambiguously declares that an activity is a "clinical practice improvement activity" only if two conditions

are met. 42 U.S.C. §1395w-4(q)(2)(C)(v)(III). Anti-racism plans do not satisfy at least one of the conditions. *See supra* II.A. And Defendants never argue that both conditions in the definition were satisfied. *See* Def. Br. 26-27.

Despite the failure of anti-racism plans to qualify as "clinical practice improvement activities" under the statute, the Anti-Racism Rule unambiguously declares and uses them as such. The "agency has exceeded its delegated powers or 'on its face' violated [the] statute." *See Kirby*, 109 F.3d at 269. This Court can and should review the legality of the Anti-Racism Rule.

## CONCLUSION

For all these reasons, this Court should deny Defendants' motion to dismiss.

Dated: November 21, 2022

Respectfully submitted,

*s/ Matthew M. Williams*
Matthew M. Williams (MS Bar No. 102541)
GALLOWAY, JOHNSON, TOMPKINS,
BURR & SMITH – GULFPORT
2510 14th Street, Suite 910
Gulfport, MS 39501
228-214-4250
Fax: 228-214-9650
mwilliams@gallowaylawfirm.com

*s/ Cameron T. Norris*
Cameron T. Norris (pro hac vice)
  *Lead Counsel*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

*Counsel for Dr. Colville*

*s/ Scott G. Stewart*
LYNN FITCH
  *Attorney General*
Scott G. Stewart (MS Bar No. 106359)
  *Solicitor General*
Justin L. Matheny (MS Bar No. 100754)
  *Deputy Solicitor General*
MISSISSIPPI ATTORNEY
GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
scott.stewart@ago.ms.gov
justin.matheny@ago.ms.gov

*Counsel for the State of Mississippi*

*s/ Edmund G. LaCour Jr.*
STEVE MARSHALL
  *Attorney General*
Edmund G. LaCour Jr. (pro hac vice)
  *Solicitor General*
OFFICE OF THE ALABAMA
ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
Tel.: (334) 353-2196
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for the State of Alabama*

*s/ Nicholas J. Bronni*
LESLIE RUTLEDGE
  *Attorney General*
Nicholas J. Bronni (pro hac vice)
  *Solicitor General*
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
nicholas.bronni@arkansasag.gov

*Counsel for the State of Arkansas*

*s/ Aaron J. Silletto*
DANIEL CAMERON
  *Attorney General*
Aaron J. Silletto (pro hac vice)
  *Assistant Attorney General*
KENTUCKY OFFICE OF THE
ATTORNEY GENERAL
700 Capital Avenue, Suite 118
Frankfort, Kentucky
502-696-5439
Aaron.Silletto@ky.gov

*Counsel for the Commonwealth of Kentucky*

*s/ D. John Sauer*
ERIC S. SCHMITT
  *Attorney General*
D. John Sauer (pro hac vice)
  *Solicitor General*
OFFICE OF THE MISSOURI
ATTORNEY GENERAL
Supreme Court Building
P.O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-8870
John.Sauer@ago.mo.gov

*Counsel for the State of Missouri*

*s/ Drew C. Ensign*
MARK BRNOVICH
  *Attorney General*
Drew C. Ensign (pro hac vice)
  *Deputy Solicitor General*
OFFICE OF THE ARIZONA
ATTORNEY GENERAL
2005 N. Central Avenue
Phoenix, AZ 85004
Phone:      (602) 542-5025
Fax:          (602) 542-4377

*Counsel for the State of Arizona*

*s/ Scott St. John*
JEFF LANDRY
  *Attorney General*
Elizabeth B. Murrill (pro hac vice)
  *Solicitor General*
Scott St. John (MS Bar No. 102876)
  *Deputy Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov

*Counsel for the State of Louisiana*

*s/ David M.S. Dewhirst*
AUSTIN KNUDSEN
  *Attorney General*
David M.S. Dewhirst (pro hac vice)
  *Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders Street
Helena, MT 59601
David.Dewhirst@mt.gov

*Counsel for the State of Montana*

**CERTIFICATE OF SERVICE**

I e-filed this brief with the Court, which will email everyone requiring service.

Dated: November 21, 2022                                         *s/ Cameron T. Norris*