**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**AMBER COLVILLE,** *et al.*                                    **PLAINTIFFS**

**v.**                                                 **Civil No. 1:22cv113-HSO-RPM**

**XAVIER BECERRA,** *in his official*
*Capacity as Secretary of Health and*
*Human Services, et al.*                                    **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND**
**DENYING IN PART DEFENDANTS' MOTION [36] TO DISMISS**
**PLAINTIFFS' FIRST AMENDED COMPLAINT [28]**

BEFORE THE COURT is Defendants' Motion [36] to Dismiss Plaintiffs' First

Amended Complaint [28]. Defendants assert that this Court lacks jurisdiction over

this dispute because Plaintiffs lack standing and because judicial review of the

challenged agency action is otherwise prohibited by statute. After due consideration

of the Motion [36], the parties' filings, and relevant legal authority, the Court finds

that Defendants' Motion [36] should be granted in part as to Plaintiff Amber

Colville, and that her claims should be dismissed without prejudice for lack of

standing, and denied in part as to the claims of the remaining State Plaintiffs,

whose claims will proceed.

## I. BACKGROUND

A.    General background

This dispute concerns a challenge to a portion of a final agency rule

promulgated by the Centers for Medicare and Medicaid Services ("CMS"), an agency

within the United States Department of Health and Human Services ("HHS") which administers the Medicare program. The rule in question created a new clinical practice improvement activity for eligible health care professionals titled "Create and Implement an Anti-Racism Plan." *See* Am. Compl. [28] at 2-3, 12-13; Medicare Program, CY 2022 Payment Policies Under the Physician Fee Schedule and Other Changes, 86 Fed. Reg. 64,996, 65,384, 65,969-70 (Nov. 19, 2021). Clinical practice improvement activities are one of four categories used by CMS to calculate an eligible health care professional's score under the Merit-based Incentive Payment System ("MIPS"), which determines whether a professional will receive a positive, negative, or neutral adjustment to the Medicare payments she receives for treating Medicare patients. Am. Compl. [28] at 9; 42 U.S.C. § 1395w-4(q)(2)(A), (6)(A).

Plaintiffs are Dr. Amber Colville ("Dr. Colville"), a medical doctor who practices in Ocean Springs, Mississippi, and participates in the MIPS program, and the States of Mississippi, Alabama, Arkansas, Louisiana, Missouri, and Montana, and the Commonwealth of Kentucky (collectively "State Plaintiffs" or "States"). Am. Compl. [28] at 3-5. Dr. Colville and the State Plaintiffs (collectively "Plaintiffs") assert that CMS lacks the statutory authority to promulgate the "Create and Implement an Anti-Racism Plan" improvement activity, which Plaintiffs refer to as the "Anti-Racism Rule," such that it is ultra vires. *Id.* at 16-18. Specifically, they claim that the Anti-Racism Rule does not satisfy the statutory definition of a "clinical practice improvement activity" because anti-racism plans do not relate to "clinical practice or care delivery," and because CMS did not specify relevant

professional organizations or stakeholders who identified such plans as improving clinical practice or care delivery. *Id.* at 17-18 (citing 42 U.S.C. § 1395w-4(q)(2)(C)(v)(III)).

Plaintiffs seek a declaratory judgment, vacatur of the Anti-Racism Rule, and an injunction prohibiting its enforcement. *Id.* at 3, 18. The Amended Complaint [28] names as Defendants Xavier Becerra, in his official capacity as the Secretary of HHS (the "Secretary"), HHS, CMS, Chiquita Brooks-LaSure, in her official capacity as the Administrator of CMS, and the United States of America (collectively "Defendants"). *Id.* at 5-6.

B.   <u>Statutory and regulatory background</u>

1.   <u>The impact of MIPS on Medicare payments to eligible professionals</u>

The Medicare Access and CHIP Reauthorization Act of 2015 ("MACRA") amended Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq., in order to, among other things, improve Medicare payments for health care professionals. Pub. L. No. 114-10, 129 Stat. 87. Specifically, MACRA sought to connect payments made to eligible professionals[1] to the performance and quality of the services provided by those professionals. *See id.* at § 101, 129 Stat. at 105-07; Am. Compl. [28] at 8; Mem. [37] at 10-11.

---

[1] Eligible professionals include physicians (defined in 42 U.S.C. § 1395x(r) as doctors of medicine, osteopathy, dental surgery, dental medicine, podiatric medicine, and optometry), physician assistants, nurse practitioners, clinical nurse specialists, certified registered nurse anesthetists, physical therapists, occupational therapists, qualified speech-language pathologists, qualified audiologists, certified nurse-midwives, clinical social workers, clinical psychologists, and registered dietitians and nutrition professionals, or groups of such professionals. § 1395w-4(q)(C); 86 Fed. Reg. at 65,389.

To accomplish this goal, Congress directed the Secretary of HHS to "establish an eligible professional Merit-based Incentive Payment System" for "payments for covered professional services . . . furnished on or after January 1, 2019." Pub. L. No. 114-10, § 101, 129 Stat. 87, 93; 42 U.S.C. § 1395w-4(q)(1)(A), (B). Under MACRA, the Secretary is instructed to develop a methodology to score the performance of a MIPS eligible professional, on a scale of 0 to 100, based on four categories: (1) quality; (2) resource use; (3) clinical practice improvement activities; and (4) meaningful use of certified electronic health records ("EHR") technology. § 1395w-4(q)(1)(A), (2)(A), (5)(A). A professional's overall score is then used "to determine and apply a MIPS adjustment factor" to that professional's Medicare payments based on the comparison of her score to the performance threshold established for that year. § 1395w-4(q)(1)(A), (6)(A). Using this MIPS score and adjustment factor, if a professional scores below the selected threshold, her Medicare payments will be lowered based on a specified percentage, meaning that while she may seek Medicare reimbursement for a certain amount, she will ultimately receive only a percentage of that payment sought. *See* § 1395w-4(q)(6)(A)(ii)(II). In contrast, a professional with a score exceeding the threshold is eligible to receive full reimbursement, plus an additional amount. *See* § 1395w-4(q)(6)(A)(ii)(I), (iii), (F).

For the first five payment years of MIPS, from 2019 to 2023,[2] the Secretary establishes the performance threshold "based on a period prior to such performance

---

[2] A "payment year" is based on an earlier "performance period" which is generally the calendar year that occurred two years prior to that payment year. *See* 42 C.F.R. § 414.1320. MACRA took effect for payments beginning in 2019, Pub. L. No. 114-10, § 101, 129 Stat. 87, 93, and, while the first payment year under MIPS was 2019, the relevant performance period was calendar year 2017, 42 C.F.R. §

periods," "data available with respect to performance on measures and activities that may be used under the performance categories," and "other factors determined appropriate by the Secretary." § 1395w-4(q)(6)(D)(iii). For the 2021 to 2023 payment years, the Secretary is directed to increase the performance threshold in order "to ensure a gradual and incremental transition to the performance threshold" for payment year six, which "shall be the mean or median (as selected by the Secretary) of the composite performance scores for all MIPS eligible professionals with respect to a prior period specified by the Secretary."[3] § 1395w-4(q)(6)(D)(i), (iv). "The Secretary may reassess the selection of the mean or median under the previous sentence every 3 years." § 1395w-4(q)(6)(D)(i).

The adjustment based on the comparison of the professional's score to the performance threshold can be positive, neutral, or negative. § 1395w-4(q)(6)(A). While the maximum negative MIPS adjustment a professional can receive is statutorily set at nine percent, § 1395w-4(q)(6)(B), positive adjustments vary year-to-year in light of a budget neutrality provision which requires that the amount of positive payment adjustments roughly equals the amount of negative payment adjustments, § 1395w-4(q)(6)(F). A professional receives a negative payment adjustment if her composite performance score is below the performance threshold, § 1395w-4(q)(6)(A)(ii)(II), and if her "composite performance score[ is] equal to or

---

414.1320(a). As a result, the MIPS adjustment for the 2024 payment year will be based on a professional's performance in 2022. *See* 42 C.F.R. § 414.1320(e), (h).

[3] For the 2024 and 2025 MIPS payment years, the Secretary selected "the mean and CY 2017 performance period/2019 MIPS payment year data, which will result in a performance threshold of 75 points." 86 Fed. Reg. at 65,377; Medicare Program, CY 2023 Payment Policies Under the Physician Fee Schedule and Other Changes, 87 Fed. Reg. 69,404, 70,034, 70,096-97 (Nov. 18, 2022); 42 C.F.R. § 414.1405(b).

greater than 0, but not greater than 1/4 of the performance threshold" for that year, the professional will receive the maximum nine percent negative adjustment, § 1935w-4(q)(6)(A)(iv)(II). For scores greater than 1/4 of the performance threshold, but less than the performance threshold itself, the professional receives a negative adjustment between zero and nine percent. § 1935w-4(q)(6)(A)(iv)(I). A professional with a score above the performance threshold receives a positive adjustment, subject to the budget neutrality provision. § 1395w-4(q)(6)(A)(ii)(I), (iii), (F).

To illustrate how these adjustments interact with MIPS scores and the performance threshold, using the 2025 MIPS payment year performance threshold of 75, a professional's payment adjustment will be as follows: (1) negative nine percent for a score of 0.0 to 18.75; (2) between negative nine and zero percent on a linear sliding scale for a score of 18.76 to 74.99; (3) zero percent for a score of 75.0; and (4) between zero and plus nine percent on a linear sliding scale multiplied by a scaling factor between zero and three for a score of 75.0 to 100.0, though the exact scale and percentages may vary depending on the distribution of positive and negative scores to preserve budget neutrality.[4] 87 Fed. Reg. at 70,102. Based on these adjustments, a professional with a score of 17.0 who would otherwise be eligible for Medicare payments in the amount of $100,000 would ultimately receive only $91,000 from CMS, while a professional with a score of 100.0 who is also

---

[4] The amount of a positive adjustment ranges from zero to nine percent multiplied by a scaling factor between zero and three. § 1395w-4(q)(6)(A)(iii), (F)(i), (ii). "If the scaling factor is greater than zero and less than or equal to 1.0, then the MIPS adjustment factor for a final score of 100 will be less than or equal to 9 percent. If the scaling factor is above 1.0 but is less than or equal to 3.0 then the MIPS payment adjustment factor for a final score of 100 will be greater than 9 percent." 87 Fed. Reg. at 70,101.

eligible for Medicare payments for $100,000 would receive a payment ranging from $100,000 to $127,000, depending on how the budget neutrality principle impacts positive adjustments.

As a result, a professional's MIPS score relative to all MIPS-eligible professionals impacts her Medicare payments. *See* § 1395w-4(q)(6)(A), (D). A professional who scores below the selected mean or median will receive decreased payments, while a professional who scores above may receive an increase. *Id.* However, the amount of the increase hinges on the number of professionals who score above and below the threshold given the budget neutrality provision. § 1395w-4(q)(6)(F). "[I]f more clinicians achieve high MIPS scores, the likelihood and amount of these bonuses decline for other clinicians," because the overall available funds for an increase are based on the funds from the decreased payments and must be spread across a greater number of professionals. Am. Compl. [28] at 11; *see* § 1395w-4(q)(6)(A)(ii)(I), (iii), (F).

Plaintiffs allege that, in addition to its financial impact on Medicare payments, a professional's MIPS score can also impact the reputation of her practice and her ability to obtain new patients and retain existing ones. Am. Compl. [28] at 10. The Secretary is required to publish the composite scores and performance category scores for each MIPS eligible professional on CMS's Physician Compare website, which allows the public to view and compare the scores of MIPS professionals. § 1395w-4(q)(9)(A). With these scores, patients can "evaluate and compare clinicians." Am. Compl. [28] at 4.

2.      The role of an improvement activity in a professional's MIPS score

A professional's MIPS score is comprised of four performance categories: (1) quality; (2) cost; (3) improvement activities; and (4) promoting interoperability.[5] § 1395w-4(q)(2)(A); 42 C.F.R. § 414.1380. A professional receives a score in each category, and these scores are then weighted to determine the composite score. *See* 42 C.F.R. § 414.1380. The general weights for the categories are: (1) thirty percent for quality; (2) thirty percent for cost; (3) fifteen percent for improvement activities; and (4) twenty-five percent for promoting interoperability.[6] § 1395w-4(q)(5)(E). However, under certain circumstances, the Secretary can reweigh the categories for a MIPS eligible professional, as CMS has done for clinicians "affected by extreme and uncontrollable circumstances." § 1395w-4(q)(5)(F); *see* 42 C.F.R. § 414.1380(c)(2). For the 2022 to 2024 MIPS payment years, this reweighing could result in the "improvement activities" category comprising zero, fifteen, or fifty percent of a professional's MIPS score. 42 C.F.R. § 414.1380(c)(2)(ii)(D)-(F).

---

[5] The statute refers to the four categories as quality, resource use, clinical practice improvement activities, and meaningful use of certified EHR technology. § 1395w-4(q)(2)(A). However, CMS refers to the performance categories of "resource use" as "cost" and "meaningful use of certified EHR technology" as "promoting interoperability," and shortens "clinical practice improvement activities" to "improvement activities." *See, e.g.*, Medicare Program, Merit-Based Incentive Payment System (MIPS) and Alternative Payment Model (APM) Incentive Under the Physician Fee Schedule, 81 Fed. Reg. 77,008, 77,010 (Nov. 4, 2016); Medicare Program, CY 2019 Payment Policies Under the Physician Fee Schedule and Other Changes, 83 Fed. Reg. 59,452, 59,720 (Nov. 23, 2018); 42 C.F.R. § 414.1380.

[6] Like many aspects of MIPS, for the first five payment years of the program, the statute sets forth special rules. Of relevance here, the improvement activities category remained constant at fifteen percent, though different weights applied for the cost and quality categories. § 1395w-4(q)(5)(E)(i)(I)(bb), (II)(bb), (III). In addition, under certain circumstances, the percentage for promoting interoperability can be reduced by the Secretary, though it cannot go below fifteen percent, with the reduced percentage points applied to one or more of the other categories. § 1395w-4(q)(5)(E)(ii).

A professional receives a score of 100 percent in the improvement activities category if she accumulates forty points. 42 C.F.R. § 414.1380(b)(3). To obtain points, a professional must complete clinical practice improvement activities, which are created by the Secretary. 42 C.F.R. § 414.1380(b)(3); § 1395w-4(q)(2)(B)(iii). "[T]he term 'clinical practice improvement activity' means an activity that relevant eligible professional organizations and other relevant stakeholders identify as improving clinical practice or care delivery and that the Secretary determines, when effectively executed, is likely to result in improved outcomes." § 1395w-4(q)(2)(C)(v)(III).

The number of points for a given improvement activity depends on whether CMS classifies it as high-weighted or medium-weighted. 42 C.F.R. § 414.1380(b)(3). Generally, a professional receives ten points for each medium-weighted improvement activity and twenty points for each high-weighted improvement activity. *Id.* Accordingly, to receive the maximum improvement activities score of forty points, a professional typically must complete two high-weighted activities, four medium-weighted activities, or one high-weighted and two medium-weighted activities. *See id.* Certain categories of professionals receive a greater number of points for each activity: "[n]on-patient facing MIPS eligible clinicians, small practices, and practices located in rural areas and geographic [Health Professional Shortage Areas] receive 20 points for each medium-weighted improvement activity and 40 points for each high-weighted improvement activity."[7] *Id.* These

---

[7] According to Defendants, Dr. Colville satisfies the definition of a small practice and is therefore subject to this provision. *See* Decl. [47-1] at 7; Attach. [49-1] at 1.

9

professionals would therefore need to complete either one high-weighted activity or two medium-weighted ones in order to receive a maximum score. *See id.*

For the 2022 performance period, professionals could select from 104 weighted improvement activities to perform.[8] *See 2022 Improvement Activities: Traditional MIPS*, Ctrs. for Medicare & Medicaid Servs., https://qpp.cms.gov/mips/ explore-measures?tab=improvementActivities&py=2022 (last visited Mar. 28, 2023). These included seventy-six medium-weighted and twenty-eight high-weighted activities. *Id.* Each activity is placed within a subcategory, such as "achieving health equity," "behavioral and mental health," "beneficiary engagement," "care coordination," "emergency response and preparedness," "expanded practice access," "patient safety and practice assessment," and "population management." *Id.*; *see also* § 1395w-4(q)(2)(B)(iii) (setting forth six subcategories and permitting the Secretary to specify others).

Although there are numerous improvement activities listed in the inventory, Plaintiffs allege that "many are applicable only to a particular specialty," Am. Compl. [28] at 10, and that smaller practices can struggle to find ones that they can complete, *id.* at 10-11. Moreover, "nearly two-thirds of the MIPS categories are

---

[8] The CMS website lists 105 activities, but one of these receives a weight of "none": an attestation that the professional works in a practice that is "a Patient Centered Medical Home (PCMH) or Comparable Specialty Practice that has achieved certification from a national program, regional or state program, private payer, or other body that administers patient-centered medical home accreditation," and, as such, should automatically receive a score of 100 percent in the category. *See 2022 Improvement Activities: Traditional MIPS*, Ctrs. for Medicare & Medicaid Servs., https://qpp.cms.gov/mips/explore-measures?tab=improvementActivities&py=2022 (last visited Mar. 3, 2023); 42 C.F.R. § 414.1380(b)(3)(ii) (providing that "[f]or MIPS eligible clinicians in a practice that is certified or recognized as a patient-centered medical home or comparable specialty practice, as determined by the Secretary, the improvement activities performance category score is 100 percent").

either too difficult for most clinicians to satisfy or would be impractical to ask of clinicians because they contravene best medical practices." *Id.* at 11. In light of the challenges professionals face in completing improvement activities, Plaintiffs assert that "16.9% of clinicians did not participate in *any* improvement activities" in at least one performance period, even though over ninety-nine percent of MIPS-eligible clinicians participate in MIPS. *Id.* at 10-11 (emphasis in original); *see also* 86 Fed. Reg. at 65,375 ("We saw 99.9999 percent of MIPS eligible clinicians participate in MIPS in 2020."). Therefore, to the extent these clinicians are not subject to reweighing of their scores, *see* 42 C.F.R. § 414.1380(c)(2), by not reporting participation in any improvement activities, fifteen percent of their overall MIPS score would be a score of zero, with the result being that the maximum potential MIPS score they could achieve would be eighty-five, *see* 42 C.F.R. § 414.1380(b)(3), (c).

3.    The Anti-Racism Rule

As part of CMS's annual rulemaking regarding physician payment policies for Medicare, on July 23, 2021, it proposed adding seven new improvement activities, two high-weighted and five medium-weighted. Proposed Rules for Medicare Program, CY 2022 Payment Policies Under the Physician Fee Schedule and Other Changes, 86 Fed. Reg. 39,104, 39,855-60 (proposed July 23, 2021). The Anti-Racism Rule was one of the proposed high-weighted activities. *Id.* at 39,345, 39,855. To complete this improvement activity, a professional must

> [c]reate and implement an anti-racism plan using the CMS Disparities
> Impact Statement or other anti-racism planning tools. The plan should

11

include a clinic-wide review of existing tools and policies, such as value statements or clinical practice guidelines, to ensure that they include and are aligned with a commitment to anti-racism and an understanding of race as a political and social construct, not a physiological one.

The plan should also identify ways in which issues and gaps identified in the review can be addressed and should include target goals and milestones for addressing prioritized issues and gaps. This may also include an assessment and drafting of an organization's plan to prevent and address racism and/or improve language access and accessibility to ensure services are accessible and understandable for those seeking care. The MIPS eligible clinician or practice can also consider including in their plan ongoing training on anti-racism and/or other processes to support identifying explicit and implicit biases in patient care and addressing historic health inequities experienced by people of color.

*Id.* at 39,855 (endnote omitted).[9]

CMS described the rationale for implementing the Anti-Racism Rule as

follows:

This proposed activity aims to address systemic inequities, including systemic racism as called for in Executive Order 13985: Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, published January 20, 2021. This activity begins with the premise that it is important to acknowledge systemic racism as a root cause for differences in health outcomes between socially-defined racial groups[.]

We believe this activity has the potential to improve clinical practice or care delivery and is likely to result in improved outcomes, per the improvement activity definition at [42 C.F.R.] § 414.1305, because it supports clinicians in identifying health disparities and implementing processes to reduce racism and provide equitable quality health care. This activity is intended to help clinicians move beyond analyzing data to taking real steps to naming and eliminating the causes of the disparities identified. We also propose making this activity high-weighed because clinicians will need considerable time and resources to

---

[9] The omitted endnote cites to the CMS Disparities Impact Statement. *See* 86 Fed. Reg. at 39,855, 39,860; *see also Disparities Impact Statement*, Ctrs. for Medicare & Medicaid Servs. (Mar. 2021), https://www.cms.gov/About-CMS/Agency-Information/OMH/Downloads/Disparities-Impact-Statement-508-rev102018.pdf.

develop a thorough anti-racism plan that is informed by data, and to
implement it throughout the practice or system.

*Id.* at 39,855 (endnotes omitted).

CMS also noted that "[t]his improvement activity acknowledges that it is
insufficient to gather and analyze data by race and document disparities by
different population groups. Rather, it emphasizes systemic racism is the root cause
for differences in health outcomes between socially defined racial groups." *Id.* at
39,345. In support of its proposal, CMS cited to: (1) Executive Order 13,985; (2) an
editorial by Camara Phyllis Jones, a former president of the American Public
Health Association; and (3) a webpage from the Centers for Disease Control and
Prevention ("CDC") entitled "Racism and Health." *Id.* at 39,855, 39,860 (citing
Executive Order 13,985, 86 Fed. Reg. 7,009 (Jan. 20, 2021); Camara Phyllis Jones,
Editorial: Applying Critical Race Theory, *Towards the Science and Practice of Anti-
Racism: Launching a National Campaign Against Racism*, 28 Ethnicity & Disease,
Suppl. 1 (2018), 231, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6092166/pdf/
ethndis-28-231.pdf; and *Racism and Health*, Ctrs. for Disease Control and
Prevention (2021), https://www.cdc.gov/healthequity/racism-disparities/
index.html).[10]

Following notice and comment, CMS finalized the Anti-Racism Rule as
proposed on November 19, 2021. 86 Fed. Reg. at 65,969-70.

---

[10] The link provided by CMS in the proposed and final rule for the cited CDC source leads to a
webpage that is no longer available. Defendants state that it is "now located at https://www.cdc.gov/
minorityhealth/racism-disparities/." Reply [47] at 10. The new address provided by Defendants leads
to a functional webpage.

C.   Procedural History

On May 5, 2022, Plaintiffs filed a Complaint [1] in this Court, challenging CMS's promulgation of the Anti-Racism Rule under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 et seq. Compl. [1] at 14-24. After Defendants first moved to dismiss for lack of subject-matter jurisdiction, Mot. [15], Plaintiffs amended their Complaint [1], *see* Am. Compl. [28].

The Amended Complaint [28] asserts that the Anti-Racism Rule is a final agency action that exceeded CMS's statutory authority, and, as such, that it should be set aside and enjoined. *Id.* at 16-18. Plaintiffs claim that § 1395w-4(q)(2)(B)(iii) authorizes CMS to promulgate clinical practice improvement activities only if such activities satisfy the statutory definition set forth in § 1395w-4(q)(2)(C)(v)(III). *Id.* at 17. According to Plaintiffs, the improvement activity set forth in the Anti-Racism Rule does not conform to the statutory definition in two respects. *Id.* First, improvement activities must "relate to 'clinical practice or care delivery,'" which Plaintiffs interpret, based on examples of activities listed in the statute, to "deal with practical considerations" of patients' health such as "same-day appointments, test results, and patient safety," *id.* (citing § 1395w-4(q)(2)(B)(iii), (C)(v)(III)), but the Anti-Racism Rule instead instructs professionals to consider a patient's race in treatment only for non-medically relevant reasons, *id.* Second, "relevant eligible professional organizations and other relevant stakeholders" must identify the activity as "improving clinical practice or care delivery," § 1395w-4(q)(2)(C)(v)(III), and "CMS does not cite to any such professional organization or stakeholders who

have examined and verified that the Anti-Racism Rule will improve clinical practice or care delivery," Am. Compl. [28] at 18.

In addition, Plaintiffs allege that the Anti-Racism Rule "encourages doctors to see patients not as individuals but as subcomponents of racial groups," and promotes race-based decisionmaking in medical care by directing professionals to align their clinical practices with the "philosophy" of anti-racism. *Id.* at 2-3. They argue that anti-racism endorses distinguishing between individuals based on their race in order to promote equity, including discriminating among racial groups as a means to place such groups on equal footing. *Id.* at 2. By making the Anti-Racism Rule a clinical practice improvement activity, CMS has provided a financial incentive for professionals to adopt this philosophy in their treatment of patients. *Id.* at 2-3. Plaintiffs contend that this promotion of race-based decisionmaking in medical treatment contravenes the State Plaintiffs' laws, harms patients, and would not have been authorized by Congress without explicit statutory language. *Id.* at 2-3, 5, 7, 18.

D.   The present Motion [36] to Dismiss

Defendants have filed a Motion [36] to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that this Court lacks subject-matter jurisdiction because Plaintiffs lack standing to challenge the Anti-Racism Rule, and because Congress has statutorily precluded judicial review of Plaintiffs' claims. Mem. [37] at 19, 29.[11] Regarding standing, Defendants assert that neither Dr. Colville nor the

---

[11] Page citations to the parties' filings refer to the electronic page number assigned by the Court's electronic filing system, CM/ECF.

State Plaintiffs have demonstrated an injury-in-fact, causation, or redressability. *Id.* at 20-29.

As for the bar on judicial review, Defendants cite to 42 U.S.C. § 1395w-4(q)(13)(B), which states that "there shall be no administrative or judicial review under section 1395ff of this title, section 1395oo of this title, or otherwise of the following: . . . (iii) [t]he identification of measures and activities specified under paragraph (2)(B). . . ." 42 U.S.C. § 1395w-4(q)(13)(B); Mem. [37] at 29. Paragraph (2)(B) includes the subparagraph which addresses clinical practice improvement activities. § 1395w-4(q)(2)(B)(iii). Defendants argue that the ultra vires exception asserted in the Amended Complaint [28] is inapplicable because the statutory bar on judicial review is express and Plaintiffs' dispute is one over statutory interpretation. Mem. [37] at 31-35.

Plaintiffs respond that both Dr. Colville and the State Plaintiffs have standing and that "the identified bar on judicial review does not apply here by its text." Mem. [43] at 14-23, 25. They assert that the Anti-Racism Rule creates financial injuries to Dr. Colville and places her at a competitive disadvantage "because her competitors can and will likely create anti-racism plans to get reimbursed at higher rates, to get higher MIPS scores, and to benefit reputationally from the published MIPS results." *Id.* at 14-17. The State Plaintiffs claim that they are entitled to special solicitude because the Anti-Racism Rule harms their sovereign interest in avoiding federal interference with the enforcement of state law

and their quasi-sovereign interest in their residents' health and well-being. *Id.* at 18-23.

Concerning the judicial review bar, Plaintiffs take the position that the Anti-Racism Rule does not satisfy the statutory definition of a "clinical practice improvement activity," and therefore is not protected from judicial review, *id.* at 23-25, and that, even if the bar does apply, they have plausibly alleged that "the agency's challenged action is so contrary to the terms of the relevant statute that it necessitates judicial review" under the ultra vires exception, *id.* at 27 (quoting *Kirby Corp. v. Pena*, 109 F.3d 258, 269 (5th Cir. 1997)).

In reply, Defendants reiterate their position that Plaintiffs lack standing. Reply [47] at 8-14. To demonstrate Dr. Colville's lack of harm, they have submitted a Declaration [47-1] of Aucha Prachanronarong, who is the Director of the Division of Electronic and Clinician Quality for CMS, which administers MIPS, and an Attachment [49-1], which show that Dr. Colville received the highest possible score in the improvement activities category for MIPS payment years 2019 to 2022. *See id.* at 10; Dec. [47-1]; Attach. [49-1]. Defendants next contend that special solicitude does not apply to the State Plaintiffs and that they have not shown a concrete injury. Reply [47] at 10-14. Finally, Defendants counter that the "definitional inquiry that Plaintiffs are asking this court to conduct falls within the jurisdictional bar because the interpretation of that definition is part of the process of the agency's identification of measures and activities," *id.* at 14 (quotation omitted), and Plaintiffs' claims do not fall within the "very limited" ultra vires exception, *id.* at 18.

17

## II. DISCUSSION

A.  Legal standard

Defendants' Motion [36] to Dismiss is based on arguments that this Court lacks jurisdiction over this case, and, as such, is governed by Federal Rule of Civil Procedure 12(b)(1). *See* Fed. R. Civ. P. 12(b)(1); *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011); *Griener v. United States*, 900 F.3d 700, 703 (5th Cir. 2018). "[I]f it appears certain that the plaintiff cannot prove a plausible set of facts that establish subject-matter jurisdiction," a Rule 12(b)(1) motion should be granted. *Davis v. United States*, 597 F.3d 646, 649 (5th Cir. 2009) (quotation omitted). In reviewing a Rule 12(b)(1) motion, a court must "take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

In resolving a Rule 12(b)(1) motion, a court may consider "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)); *Stratta v. Roe*, 961 F.3d 340, 349 (5th Cir. 2020). Here, Defendants have submitted a Declaration [47-1] and an Attachment [49-1], which discuss how MIPS operates and detail Dr. Colville's MIPS performance records for payment years 2019 to 2022. *See* Decl. [47-1]; Attach. [49-1]. Defendants state that the information regarding Dr. Colville's records is publicly accessible, *see*

Reply [47] at 8; Decl. [47-1] at 7, and, although some of the information in these documents conflicts with the allegations in the Amended Complaint [28], Plaintiffs have not disputed the accuracy of the records. Accordingly, in resolving the present Motion [36], the Court will consider the Declaration [47-1] and its Attachment [49-1] in addition to the allegations in the Amended Complaint [28]. *See Lane*, 529 F.3d at 557.

B.     Whether Plaintiffs have standing

1.     Relevant legal authority

Under Article III of the United States Constitution, the power of the federal judiciary extends only to "cases" and "controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016); U.S. Const. art. III, § 2. "One element of the case-or-controversy requirement is that [plaintiffs], based on their complaint, must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). In cases with multiple plaintiffs, the case-or-controversy requirement is satisfied so long as one plaintiff has standing. *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006); *Texas v. United States (DACA)*, 50 F.4th 498, 514 (5th Cir. 2022). Accordingly, the Court may "avoid complex questions of standing in cases where the standing of others makes a case justiciable." *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 344 n.3 (5th Cir. 2013) (emphasis removed). However, if the standing question is not complex, and the Court "*knows* that a party is without standing," that plaintiff must be dismissed. *Id.* (emphasis in original).

A plaintiff must demonstrate three elements to satisfy the standing requirement:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up). In sum, a plaintiff must show that she suffered an injury-in-fact that is traceable to the challenged action and that will likely be redressed if she prevails. *Id.*; *Spokeo*, 578 U.S. at 338. To survive a standing challenge at the pleading stage, a plaintiff must clearly allege facts that demonstrate each element. *Spokeo*, 578 U.S. at 338. These "allegations of injury are liberally construed," and a court should presume any general allegations encompass specific facts that are necessary to support a claim of injury. *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009) (citing *Lujan*, 504 U.S. at 560-61); *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 195 (5th Cir. 2012).

2.   <u>Whether Dr. Colville has standing</u>

a.   <u>The parties' arguments</u>

Dr. Colville alleges two injuries from the Anti-Racism Rule: (1) that she is financially harmed; and (2) that it places her at a competitive disadvantage. Mem. [43] at 14-15. Both injuries flow from the premise that Dr. Colville can "complete only a limited number of MIPS improvement activities" because she specializes in

internal medicine and works in a small office. Am. Compl. [28] at 4; Mem. [43] at 14. She further asserts that "[i]n the last three years, she reported no more than one improvement activity and did not receive the full 40 points on this metric," and that her MIPS composite scores were "between 78 to 88." Am. Compl. [28] at 4. The score of a professional who has not received all available points in the category "would increase if she submitted an anti-racism plan under the Rule," but Dr. Colville refuses to do so because she believes such plans "are unscientific, unethical, and unlawful." *Id.*

Based on the foregoing, Dr. Colville claims that "the Anti-Racism Rule puts her in a harmful bind: either she must create an anti-racism plan against 'the best medical interests of her patients' to improve her score and prevent financial harm, or she must do what is in the best medical interest of her patients, and take the 'financial[] penal[ty].'" Mem. [43] at 15 (quoting Am. Compl. [28] at 3-4). As for her competitive disadvantage, she asserts that the "dozens of nearby internists in Ocean Springs with similar practices" can submit an anti-racism plan, which could give them a higher MIPS score, leading to a higher reimbursement rate and better public perception through the public posting of their MIPS scores. Mem. [43] at 15-17; Am. Compl. [28] at 4. Further, because payment adjustments through MIPS are tied to the performance of all MIPS-eligible professionals, if more professionals raise their scores, then Dr. Colville could "have a harder time avoiding a payment reduction" and would be less likely to receive a payment increase.  Am. Compl. [28] at 11.

The Declaration [47-1] and the Attachment [49-1] submitted by Defendants challenge Dr. Colville's claim that she has not received the maximum points available in the improvement activities category, and she has not disputed the accuracy of these records. *See* Decl. [47-1] at 7; Attach. [49-1] at 1. Defendants assert that Dr. Colville has received forty points in the improvement activities category for each payment year from 2019 to 2022, even though she has only submitted one improvement activity for the 2020 to 2022 payment years.[12] Attach. [49-1] at 1. "According to Medicare records, Dr. Colville meets the definition of a 'small practice' under 42 C.F.R. § 414.1305 for the 2017-2022 performance periods," and, as a result, has only needed to complete one high-weighted activity in order to obtain the highest score available in the category,[13] which she has done. Decl. [47-1] at 7; Attach. [49-1] at 1; 42 C.F.R. § 414.1380(b)(3). In addition, while Defendants have not provided information regarding Dr. Colville's scores for performance year 2021, they maintain that she "can continue to submit the same high-weighted activity she has in the past at least through 2023—and for future performance periods as long as the activity continues to be a part of the MIPS improvement activities for later years." Decl. [47-1] at 7-8.

Consequently, according to Defendants, Dr. Colville does not face a dilemma between completing an anti-racism plan or facing a lower improvement activities

---

[12] Defendants state that "CMS did not make any information on improvement activities reported for the 2017 performance period publicly available," and they have limited the information provided regarding Dr. Colville's MIPS performance records to that which is publicly available. Decl. [47-1] at 7; Attach. [49-1] at 1.

[13] As the Court previously noted, small practices are one of the categories of professionals that obtain twenty points for each medium-weighted activity and forty points for each high-weighted activity. 42 C.F.R. § 414.1380(b)(3).

score and a financial penalty because she already has obtained the highest possible category score, and can continue to do so, without submitting an anti-racism plan. Reply [47] at 8-9. Moreover, Defendants assert that the allegation that Dr. Colville's competitors "who were not able to previously obtain a full score in the improvement activities category but who now 'can be reimbursed at higher rates' if they choose to create and implement an anti-racism plan rely on unfounded speculation as to the status and actions of third parties not before the Court." *Id.* at 9 (internal citation omitted) (quoting Am. Compl. [28] at 4).

b.    <u>Analysis</u>

In light of the documents demonstrating that Dr. Colville has obtained a full score in the improvement activities category and can continue to report the same activity in future years to receive a full score, *see* Decl. [47-1] at 7-8; Attach. [49-1] at 1, Dr. Colville cannot establish that any claimed injury due to a perceived dilemma over whether to participate in the activity set forth in the Anti-Racism Rule constitutes an injury-in-fact, *see Lujan*, 504 U.S. at 563. An injury-in-fact "requires that the party seeking review be [her]self among the injured," *id.* (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)), and Dr. Colville herself cannot raise her improvement activities score any further by creating an anti-racism plan because she already has obtained the maximum score without doing so, *see* Decl. [47-1] at 7-8. While some day CMS could eliminate the activity Dr. Colville currently performs in order to obtain her forty points, or she could no longer qualify under the small practice rules, such that she may confront a choice between making

23

an anti-racism plan or forgoing points in the category, that is not the case at present, and such a theoretical future injury does not satisfy the "actual or imminent" injury requirement of an injury-in-fact. *See Lujan*, 540 U.S. at 564.

But, Dr. Colville's theory of injury also extends beyond a relationship between the Anti-Racism Rule and her improvement activities score. She contends that the Anti-Racism Rule creates an "easy to complete" improvement activity that other professionals, including direct competitors who do not currently obtain forty points in the category, could complete. Am. Compl. [28] at 4, 11, 15. As the Court has outlined, payment adjustment calculations under 42 U.S.C. § 1395w-4(q)(6) are impacted in two primary ways by the overall scores of all MIPS-eligible professionals: (1) the mean or median composite score of all MIPS-eligible professionals from a performance period selected by the Secretary serves as the performance threshold, which is the basis for determining whether a professional receives a positive, neutral, or negative payment adjustment, § 1395w-4(q)(6)(A), (D)(i); and (2) due to the budget neutrality principle, the availability and extent of positive payment adjustments depends on the total amount of negative payment adjustments and the number of professionals with scores exceeding the performance threshold, § 1395w-4(q)(6)(A)(iii), (F).

As a result, if professionals who have previously not obtained the maximum possible points in the improvement activities category decide to implement an anti-racism plan and receive twenty additional points in the category, they would attain a higher category score and overall composite score, which could affect the

availability of positive payment adjustments. In addition, if these higher scores raise the median or mean composite score, the Secretary may select this new median or mean as the performance threshold, which would require professionals such as Dr. Colville to obtain a higher MIPS score in order to avoid a negative payment adjustment. And beyond the impact to payment adjustments, if Dr. Colville's competitors are able to obtain higher scores, patients will be able to view and compare those scores with Dr. Colville's, which could aid her competitors in obtaining business. Mem. [43] at 16.

However, it is evident that the existence of these claimed injuries hinges on the actions of third parties, specifically the hypothetical group of professionals who currently do not obtain the highest available score in the improvement activities category and who may choose to create an anti-racism plan in the future in order to raise their score. Plaintiffs who seek to demonstrate standing based on the choices of third parties bear a heavy burden of showing standing, and must "adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562. While the Amended Complaint [28] does not cite to any particular professional in the applicable group, Dr. Colville asserts that the difficulties professionals face in completing most improvement activities, accompanied by the relative ease of completing an anti-racism plan, make it plausible that these professionals will complete the activity. Mem. [43] at 11-12.

The Court agrees with Dr. Colville that it is plausible that some professionals will choose the Anti-Racism Rule as one of their improvement activities in light of the allegations in the Amended Complaint [28]. Assuming, as the Court must at this stage, that it is true that "[s]maller practices, in particular, find it difficult to find improvement activities they can conduct," and that the Anti-Racism Rule offers a relatively easy activity, *see* Am. Compl. [28] at 10-11, 15, and considering CMS's response in the finalized Anti-Racism Rule stating its belief that the activity can be completed by small practices and that they can "attest to this activity in multiple years as they make steady progress towards intended outcomes," 86 Fed. Reg. at 65,969, it appears plausible that some professionals would select this high-weighted activity.

Nevertheless, it is far from clear that a sufficient number of the professionals who might create anti-racism plans do not already obtain the maximum number of points in the improvement activity category as would be necessary to impact the payment adjustment that Dr. Colville will receive. Even if professionals increase their category score by twenty points by completing anti-racism plans,[14] the category typically counts for only fifteen percent of the overall score. § 1395w-4(q)(5)(E)(iii). Given the interrelated nature of all MIPS scores, an increase in a professional's score could possibly impact the budget neutrality principle. *See* § 1395w-4(q)(6)(F). However, any impact of this shift must be distributed across all

---

[14] As a high-weighted activity, completing the activity created by the Anti-Racism Rule would typically give a professional twenty additional points in the improvement activities category. 86 Fed. Reg. at 65,970; 42 C.F.R. § 414.1380(b)(3).

MIPS-eligible professionals. Thus, for this change to impact Dr. Colville's ability to receive a positive adjustment,[15] enough professionals must increase their scores due to their completion of an anti-racism plan that it actually affects the amount of the positive adjustment awarded to professionals with Dr. Colville's score.

All of that to say that this alleged injury is too speculative to support a finding of threatened injury sufficient to show standing, even at the pleading stage. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) ("[R]espondents' theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending."). While plaintiffs do not need to show "that it is literally certain that the harms they identify will come about," they must demonstrate a "substantial risk" of harm. *Id.* at 414 n.5; *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021) ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial.").

Here, Dr. Colville has not demonstrated a substantial risk of imminent harm. Even if there were enough professionals who raised their scores by completing an anti-racism plan such that Dr. Colville's payment adjustment would be affected, the effect on the amount of any adjustment could nevertheless be offset by Dr. Colville obtaining a higher composite score, or by enough other professionals obtaining

---

[15] Based on Dr. Colville's past composite MIPS scores, her scores have exceeded the performance threshold making her statutorily eligible for a positive adjustment. *See* Am. Compl. [28] at 4; Attach. [49-1] at 1; 87 Fed. Reg. at 70,096; § 1395w-4(q)(6)(A)(iii).

lower scores, such that she would not suffer an injury. Plaintiffs themselves allege that Dr. Colville's MIPS score has varied in a ten-point range, from seventy-eight to eighty-eight, over the last three years despite her improvement activities score remaining constant. Am. Compl. [28] at 4; *see also* Attach. [49-1] at 1 (showing different scores received by Dr. Colville for the 2019 to 2022 payment years). These types of shifts in scores, by Dr. Colville or other professionals, would also impact the overall availability of positive adjustments and could eliminate any potential harm caused by professionals who raise their scores due to implementing a plan under the Anti-Racism Rule.

Dr. Colville's other claimed injuries are even more speculative. In order for professionals completing anti-racism plans to make it harder for her to avoid a negative payment adjustment, these higher scores must raise the median or mean composite MIPS score, the Secretary must select this elevated score as the new performance threshold, and, as a result, Dr. Colville's score must drop below the performance threshold. As for an alleged benefit to her competitors' practices while harming her own, Dr. Colville's direct competitors must fall within this category of professionals who will raise their scores thanks to the Anti-Racism Rule, and current or prospective patients must use the Physician Compare website, compare her MIPS score to one of these competitors, and select the competitor due to a competitor's increased MIPS score due to the Anti-Racism Rule.

In sum, based on the allegations in the Amended Complaint [28] and the Declaration [47-1] and Attachment [49-1] submitted by Defendants, the Court finds

that Dr. Colville lacks standing to challenge the Anti-Racism Rule because she has not sufficiently shown an actual or imminent risk of harm. *See Lujan*, 540 U.S. at 563-64; *Clapper*, 568 U.S. at 410. Accordingly, Defendant's Motion [36] to Dismiss should be granted as to Dr. Colville's claims.[16] *See Nat'l Rifle Ass'n of Am., Inc.*, 719 F.3d at 344 n.3.

3.    Whether the State Plaintiffs have standing

a.    The parties' arguments

The eight State Plaintiffs assert three injuries, all of which they claim affect a sovereign or quasi-sovereign interest of the States. *See* Am. Compl. [28] at 5; Mem. [43] at 14. As such, they maintain that they are entitled to "special solicitude in the standing analysis" for all of their injuries. Mem. [43] at 18.

The State Plaintiffs' first two asserted injuries are related and are based on the contention that "[m]ost [of the State Plaintiffs] prohibit racial discrimination in their laws and their agreements with medical providers," and that the Anti-Racism Rule "encourag[es] Medicare providers to make medical decisions based on race" in violation of those laws and agreements. Am. Compl. [28] at 5; Mem. [43] at 14. The State Plaintiffs argue that the payment adjustment measures that coincide with professionals' MIPS scores place the States in a bind: if States enforce their laws and agreements, the professionals who practice in their States will be unable to

---

[16] The Court's conclusion in this regard should not in any way be read to suggest that an individual health care professional could never demonstrate standing. The Court's finding is limited strictly to Dr. Colville's circumstance based on the present record, and it need not and does not address whether a professional who does not currently obtain a maximum score in the improvement activities category could have an injury-in-fact.

complete the activity set forth in the Anti-Racism Rule and will risk receiving lower reimbursement rates, which would "increase[] costs that will fall on beneficiaries like the [S]tate [P]laintiffs and their citizens." Am. Compl. [28] at 5; Mem. [43] at 19. On the other hand, to avoid the potential lost reimbursement, the State Plaintiffs claim that they must stop enforcing their prohibitions on racial discrimination, at least as it pertains to the Anti-Racism Rule. Am. Compl. [28] at 5; Mem. [43] at 19. As a result, the Anti-Racism Rule injures "the States' sovereign interest in exercising their sovereign power over persons and entities within their jurisdiction," forcing them to choose between a financial injury or federal interference with the enforcement of their laws. Mem. [43] at 11, 19.

The State Plaintiffs also raise a third injury based on their "quasi-sovereign interest in the health and well-being of their residents." Am. Compl. [28] at 5; Mem. [43] at 19. They contend that the Anti-Racism Rule "elevate[s] faddish theories about race above patient care," and that this will harm the quality of care provided to their citizens and lead to racial discrimination against their citizens in the provision of care. Am. Compl. [28] at 3, 5; Mem. [43] at 19-20.

Defendants counter that the State Plaintiffs do not satisfy any of the three elements of the standing analysis. Mem. [37] at 25; Reply [47] at 10-14. They maintain that the States lack an injury-in-fact because their asserted injuries are too speculative. Mem. [37] at 26-27; Reply [47] at 10-11. Defendants assert that the State Plaintiffs' theory of claimed injuries based on potential discrimination relies on an "entirely unfounded assumption that the activity encourages race-based

30

decision making," Reply [47] at 10, and that Plaintiffs "do not allege that any in-state clinicians have yet created anti-racism plans, nor do they present any details of any such plans" to demonstrate that the plans would lead to discrimination or would violate the States' laws, Mem. [37] at 27. Defendants further argue that the alleged financial injuries suffer from the same chain of speculation as Dr. Colville's asserted injuries, and "might possibly be balanced out by different decisions by other in-state clinicians" such that there would be no injury to the States. *Id.* at 26.

On the question of traceability, Defendants posit that the discrimination-based arguments rely on the choices of third parties in implementing the Anti-Racism Rule, specifically that it is not the Anti-Racism Rule that creates any discrimination, but the manner in which clinicians who choose to implement anti-racism plans do so in order to complete the activity. *Id.* at 28. In other words, Defendants maintain that completing the activity does not require racial discrimination in medical care, so to the extent a professional residing in one of the States selects the activity and implements an anti-racism plan that results in racial discrimination, the harm was caused by that professional, rather than by the Anti-Racism Rule itself. *Id.*

Defendants reason that the alleged financial injuries are not traceable to the Anti-Racism Rule either because the harm is caused by the professionals' inability to satisfy the improvement activities requirement despite the 104 weighted activities available. *Id.* at 25-26. In addition, invalidating the Anti-Racism Rule would not redress the State Plaintiffs' claimed financial injuries because the

professionals who are currently unable to obtain a maximum score in the improvement activities category will still face that same problem and not receive a higher score if the Anti-Racism Rule is invalidated. *Id.* at 26.

Finally, Defendants assert that the State Plaintiffs are not entitled to special solicitude because the Anti-Racism Rule does not affect a sovereign or quasi-sovereign interest. Reply [47] at 11. Regarding the claimed conflict between state laws and the Anti-Racism Rule, Defendants contend that the State Plaintiffs have not shown that they are "expressly preempted from regulating in the area or directly pressured to change state law." *Id.* at 12. As for the asserted harm to the quality and availability of health care for their citizens, Defendants take the position that the States lack standing as *parens patriae* against the Federal Government unless they are seeking to enforce a federal statute, *id.* at 13, and that "special solicitude" requires a sufficiently concrete injury, which they argue the State Plaintiffs lack, *id.* at 12.

b.     The States' special solicitude theory

The Court finds that the State Plaintiffs are entitled to special solicitude and have sufficiently alleged standing due to the asserted injury to their sovereign interest in the enforcement of their anti-discrimination laws. Because the Court finds that the State Plaintiffs have standing based on the injury to their enforcement of their laws, it need not and does not address their other theories of alleged harm. *See Texas v. United States (DAPA)*, 809 F.3d 134, 150 (5th Cir. 2015), *aff'd by an equally-divided vote*, 579 U.S. 547 (2016).

"States are not normal litigants for the purposes of invoking federal jurisdiction," and, under certain circumstances, are "entitled to special solicitude in [the] standing analysis." *Massachusetts v. EPA*, 549 U.S. 497, 518-20 (2007). "Special solicitude has two requirements: (1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests." *Texas (DACA)*, 50 F.4th at 514. A procedural right under the APA satisfies the first requirement, *id.* ("In enacting the APA, Congress intended for those suffering legal wrong because of agency action to have judicial recourse, and the states fall well within that definition." (quotation omitted)), which the State Plaintiffs have asserted here, *see* Am. Compl. [28] at 16.[17]

Turning to the second requirement, quasi-sovereign interests "consist of a set of interests that the State has in the well-being of its populace," *Texas (DACA)*, 50 F.4th at 514 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 602 (1982)), such as an "interest in the health and well-being—both physical and economic—of its residents in general," *Snapp*, 458 U.S. at 607. States also possess a sovereign interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction," which "involves the power to create and enforce a legal code, both civil and criminal." *Id.* at 601. A State's interest in its

---

[17] The Court notes that the present Motion [36] also involves a challenge to whether Plaintiffs can seek judicial review of the Anti-Racism Rule, which may seem to call into question whether the State Plaintiffs, in fact, have a procedural right to challenge this agency action. However, under Fifth Circuit precedent, even where a defendant asserts a statutory prohibition on judicial review, this first requirement is satisfied so long as the State asserts a procedural right under the APA. *See Texas (DAPA)*, 809 F.3d at 152, 163-64; *Texas v. United States (Detention Memo)*, 40 F.4th 205, 216 n.4, 219 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 51 (2022). Moreover, Defendants agree that the State Plaintiffs have satisfied this first requirement. Reply [47] at 11.

laws can supply it with standing based upon "federal interference with the enforcement of state law, at least where 'the statute at issue regulate[s] behavior or provide[s] for the administration of a state program' and does not 'simply purport [ ] to immunize [state] citizens from federal law.'" *Texas (DAPA)*, 809 F.3d at 153 (footnotes omitted) (quoting *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269-70 (4th Cir. 2011)).

"When special solicitude is appropriate, a state can establish standing 'without meeting all the normal standards for redressability and immediacy.'" *Texas (DACA)*, 50 F.4th at 514 (quoting *Massachusetts*, 549 U.S. at 517-18). Redressability under special solicitude is satisfied when there is some possibility that the requested relief will reduce the harm. *Id.* at 520. A State entitled to special solicitude can satisfy traceability by showing that the challenged action "has contributed to an injury," and it need not demonstrate that the action was the sole cause. *Id.* at 519. Nevertheless, the asserted injury "must be sufficiently concrete to create an actual controversy between the State and the defendant." *Snapp*, 458 U.S. at 602.

c.    The State Plaintiffs' injury to the enforcement of their laws

The State Plaintiffs have plausibly alleged that the Anti-Racism Rule will harm their sovereign interests because it interferes with their enforcement of their laws prohibiting racial discrimination, entitling them to special solicitude. *See* Am. Compl. [28] at 5; *Massachusetts*, 549 U.S. at 520; *Snapp*, 458 U.S. at 601; *Texas (DAPA)*, 809 F.3d at 153. As the State Plaintiffs have alleged, the Anti-Racism Rule

"encourag[es] Medicare providers to make medical decisions based on race," Am. Comp. [28] at 5, because it "requires anti-racism plans to include a 'clinic-wide review' of the doctor's 'commitment to anti-racism' based on a definition of race as 'a political and social construct, *not a physiological one*,'" Mem. [43] at 21-22 (emphasis in original) (quoting 86 Fed. Reg. at 65,970). In requiring professionals who complete the activity in the Anti-Racism Rule to "align[]" their "value statements or clinical practice guidelines" with anti-racism, *see* 86 Fed. Reg. at 65,970, the Anti-Racism Rule, according to the State Plaintiffs, encourages professionals to make decisions in operating their medical practices based on race in order to "promote equity," but this racially-based decisionmaking is exactly what the States claim their laws prohibit, Am. Compl. [28] at 2-3, 5. According to the Amended Complaint [28], with the possibility of a higher MIPS score and a better payment adjustment if a professional completes the activity, the Anti-Racism Rule incentivizes professionals to violate those States' anti-discrimination laws. *See id.* at 5.

Further, while States can still enforce their anti-discrimination laws, doing so may eliminate one of the only improvement activities that their resident professionals could perform, causing financial harm to their professionals by making it more difficult for their citizens to receive a full category score in comparison to other States that would not prohibit this activity. *See id.* at 5, 10-11. Taking the State Plaintiffs' allegations as true, as the Court must at this stage of the proceeding, they have plausibly alleged that the Anti-Racism Rule will interfere

with the enforcement of their anti-discrimination laws, demonstrating a concrete harm to the States' sovereign interest in their laws. *See Texas (DAPA)*, 809 F.3d at 153.

While at first glance it may appear that both Dr. Colville and the State Plaintiffs' asserted harms rely on similar speculation as to the actions of other MIPS professionals and potential Medicare payment adjustments, the State Plaintiffs' alleged injury is distinguishable and sufficient to provide standing. First, the State Plaintiffs' entitlement to special solicitude allows for the risk of future harm to satisfy standing where it might not for an individual, and therefore alleviates imminency concerns. *See Massachusetts*, 549 U.S. at 521-23 (finding an injury-in-fact to Massachusetts's coastal land "over the course of the next century" due to the potential threat of rising sea levels caused by climate change in the absence of EPA regulation of greenhouse gases).

In addition, the State Plaintiffs argue that it is the threat of the possible financial harm to their resident MIPS-eligible professionals that interferes with the enforcement of their laws, such that their injury occurs regardless of whether the actual chain of events that causes different payment adjustments materializes. *See* Am. Compl. [28] at 5, 10-11; Mem. [43] at 19-23. The States' injury merely requires professionals in their States to implement an anti-racism plan pursuant to the Anti-Racism Rule which violates their anti-discrimination laws. *See* Am. Compl. [28] at 5. The States argue that once that occurs, the dilemma arises: whether to enforce their laws against the professionals, which risks eliminating the one activity that

the professionals may be able to perform while other professionals in other States have access to this activity, or to decline to enforce their duly-enacted laws to ensure that the professionals do not confront the potential financial consequences of reduced Medicare payments, which "are a death knell for smaller practices." *See* Am. Compl. [28] at 11. Whether or not a given professional confronts the financial harm, the possibility of it occurring discourages the States' enforcement of their laws and pressures them to construe their laws as permitting the race-based decisionmaking in patient care they claim that the anti-racism plans effectively require. Meanwhile the professional's conceivable financial benefit from completing the Anti-Racism Rule incentivizes him to do so in disregard of the States' laws. Given the alleged difficulties faced by professionals in completing other improvement activities, the relative ease of the Anti-Racism Rule, and the high weight given to anti-racism plans by CMS, the States have plausibly alleged that they will face a concrete harm from the likely occurrence of professionals in their States creating these anti-racism plans. *See* Am. Compl. [28] at 2-3, 5, 10-11, 13-15.

In contrast, Dr. Colville's alleged injury required the Court to consider whether she herself will face a financial harm from the Anti-Racism Rule, and as a result, her harm requires a substantial risk that she will face an actual reduction in her payment, not merely what the potential risk of that harm materializing may cause her to do. The States' asserted injury to the enforcement of their laws requires only the latter, and consequently is sufficient to demonstrate standing at this stage.

Defendants' arguments to the contrary are unavailing. They first challenge the concreteness of the injury to the States' enforcement of their laws. Mem. [47] at 12. Defendants maintain that the Court must disregard Plaintiffs' allegations that anti-racism plans will encourage decisionmaking based on race because "the stated goal of anti-racism plans [is] 'to prevent and address racism.'" *Id.* (quoting 86 Fed. Reg. at 65,970). However, Plaintiffs have asserted that a means by which anti-racism seeks to prevent and address racism is to actually make decisions based on race so long as it "promotes equity," Am. Compl. [28] at 2 (quotation omitted), and CMS states that the goal of the Anti-Racism Rule is to achieve health equity, *see* 86 Fed. Reg. at 65,384, 65,969-70. Moreover, the Anti-Racism Rule does not provide any definition of anti-racism. *See id.* In light of Plaintiffs' allegations and the absence of any record evidence that the Anti-Racism Rule rejects the race-based decisionmaking that is alleged to be promoted by the Rule, this argument by Defendants is not well-taken.

Defendants next claim that the State Plaintiffs must be "expressly preempted from regulating in the area" or "directly pressured to change state law" in order to show a concrete injury to the interest in their laws. Mem. [47] at 12. Such express preemption or direct pressure is unnecessary. *See Texas (DAPA)*, 809 F.3d at 153. "[F]ederal *interference* with the enforcement of state law" can be sufficient to confer standing, *id.* (emphasis added), and, as outlined above, the States have alleged that they are pressured either to not enforce their anti-discrimination laws against the professionals completing anti-racism plans, or to alter their laws such that these

anti-racism plans are not prohibited because of the threat of financial harm to the professionals who live within their States, Am. Compl. [28] at 5.  Further, the States assert that the Anti-Racism Rule encourages professionals to alter their clinical guidelines in a way that would violate their laws. *Id.* at 2, 5. This qualifies as sufficient interference with the States' laws as to support a concrete injury at the pleading stage. *See Texas v. Becerra*, No. 5:22-CV-185-H, 2022 WL 3639525, at *10 (N.D. Tex. Aug. 23, 2022) (finding that Texas sufficiently pled an actual injury to its sovereign interests in its laws where federal agency guidance "encouraged disregard of Texas abortion laws"), *appeal pending*, No. 23-10246 (5th Cir. Mar. 10, 2023).

Defendants also argue that any harm to these professionals will be offset by benefits to other professionals in the States due to the budget neutrality principle. However, the budget neutrality principle applies to all MIPS-eligible professionals nationally, and Defendants do not explain how such national-based neutrality would suggest that adjustments are neutral within a State. *See* § 1395w-4(q)(6)(F). Instead, as Defendants themselves state, "MACRA requires that the estimated aggregate yearly increase in payments attributable to positive adjustments equals the estimated aggregate yearly decrease in payments attributed to negative adjustments." Mem. [37] at 11 n.1 (citing § 1395w-4(q)(6)(F)(ii)(I)). If, as the eight State Plaintiffs allege, professionals within their States will be unable to complete the activity set forth in the Anti-Racism Rule if the States enforce their laws, and therefore could not complete a relatively easy activity available to professionals in other states that, at minimum, would provide half of the points necessary to obtain

a full score in the improvement activities category, *see* Am. Compl. [28] at 5, 11, 15; 86 Fed. Reg. at 65,970; 42 C.F.R. § 414.1380(b)(3), it is plausible that the budget neutrality offset from the negative payment adjustments to the States' residents would favor professionals in other states rather than the State Plaintiffs' other residents. Accordingly, based on the current record, the Court cannot say that the States' enforcement dilemma is negated by possible positive adjustments to its citizens.

The Court also finds that this concrete injury to the State Plaintiffs' sovereign interest in the enforcement of their laws is traceable to the Anti-Racism Rule and would be redressed by the remedy sought if Plaintiffs prevail. Regarding traceability, the Amended Complaint [28] sufficiently alleges that the Anti-Racism Rule creates both an incentive to the professionals to violate the States' anti-discrimination laws, and a dilemma for the States in choosing whether to enforce their laws against the professionals who complete the activity. Am. Compl. [28] at 5, 10-11, 15-16. While the ultimate violation of the State Plaintiffs' laws depends on professionals choosing the activity and carrying it out in a way that violates those laws, this concern over third party actors is mitigated when the basis for standing "does not rest on mere speculation about the decisions of third parties" but "instead on the predictable effect of Government action on the decisions of third parties." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019). Injuries "produced by determinative or coercive effect upon the action of someone else" are fairly traceable to the action that causes the coercion. *Bennett v. Spear*, 520 U.S. 154, 169 (1997).

The predictable effect of Defendants incentivizing professionals to create anti-racism plans by awarding them half of their necessary points for the improvement activities category if they do so is that the professionals will select the activity, and based on Plaintiffs' allegations, it is plausible that those plans will violate the States' laws. Accordingly, the harm to the State Plaintiffs' sovereignty is traceable to the Anti-Racism Rule.

Turning to redressability, because the State Plaintiffs are entitled to special solicitude, all they must show is a possibility that the requested relief will reduce the harm. *Texas (DACA)*, 50 F.4th at 520. They have carried this burden at the pleading stage as vacatur of the Anti-Racism Rule would remove the incentive provided to professionals to violate the States' anti-discrimination laws, and would alleviate the States' concern that enforcing those laws against professionals would harm the ability of their residents to obtain a full improvement activities category score. *See Becerra*, 2022 WL 3639525, at *15 (finding redressability where enjoining the agency action would remove the incentive to violate state law).

In light of the foregoing, the Court finds that the State Plaintiffs have carried their burden at the pleading stage to clearly allege facts that establish each element of standing by demonstrating the harm to their sovereign interest in the enforcement of their laws. *See Lujan*, 504 U.S. at 561; *Texas (DAPA)*, 809 F.3d at 153.

C.   Whether § 1395w-4(q)(13)(B)(iii) prohibits judicial review

Defendants next argue that this Court lacks subject-matter jurisdiction because § 1395w-4(q)(13)(B)(iii) erects a statutory bar to judicial review of activities selected by the Secretary for a MIPS performance category. Mem. [37] at 29.

The Court begins with "the strong presumption that Congress intends judicial review of administrative action," *Smith v. Berryhill*, 139 S. Ct. 1765, 1776 (2019) (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986)), which is rebutted "when a statute's language or structure demonstrates that Congress wanted an agency to police its own conduct," *id.* at 1776-77 (quoting *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015)). An "agency bears a heavy burden in attempting to show that Congress prohibit[ed] all judicial review of the agency's compliance with a legislative mandate." *Mach Mining, LLC*, 575 U.S. at 486 (quotation omitted). If multiple readings of the statutory language are possible, the Court must adopt the version that preserves judicial review. *Kucana v. Holder*, 558 U.S. 233, 251 (2010). Thus, if there is doubt as to Congress's intent, the presumption in favor of judicial review controls. *Texas (DAPA)*, 809 F.3d at 164.

Here, the statutory language at issue, § 1395w-4(q)(13)(B), states:

Except as provided for in subparagraph (A), there shall be no administrative or judicial review under section 1395ff of this title, section 1395*oo* of this title, or otherwise of the following: . . . (iii) The identification of measures and activities specified under paragraph (2)(B) and information made public or posted on the Physician Compare Internet website of the Centers for Medicare & Medicaid Services under paragraph (9).

§ 1395w-4(q)(13)(B).[18] The provision that "there shall be no administrative or judicial review under section 1395ff of this title, section 1395*oo* of this title, or otherwise" demonstrates a clear congressional intent to prohibit judicial review of those enumerated determinations. *See Paladin Cmty. Mental Health Ctr. v. Sebelius*, 684 F.3d 527, 531 (5th Cir. 2012) (interpreting identical language in a separate provision of 42 U.S.C. § 1395 as "clear congressional intent to preclude from judicial review"); *see also Tex. All. for Home Care Servs. v. Sebelius*, 681 F.3d 402, 408-09 (D.C. Cir. 2012) (same).

The question therefore is whether the action challenged by Plaintiffs falls within that prohibition. As relevant for the present case, "measures and activities" in § 1395w-4(q)(2)(B) include "clinical practice improvement activities (as defined in subparagraph (C)(v)(III)) under subcategories specified by the Secretary for such period." § 1395w-4(q)(2)(B)(iii). As defined in subparagraph (C)(v)(III), "clinical practice improvement activities" are

> activit[ies] that relevant eligible professional organizations and other relevant stakeholders identify as improving clinical practice or care delivery and that the Secretary determines, when effectively executed, [are] likely to result in improved outcomes.

§ 1395w-4(q)(2)(C)(v)(III). Reading this language together, § 1395w-4(q)(13)(B)(iii) prohibits judicial review of the identification of a clinical practice improvement activity, which is "an activity that relevant eligible professional organizations and other relevant stakeholders identify as improving clinical practice or care delivery

---

[18] Subparagraph (A) requires the Secretary to create a process for a MIPS professional to seek a review of his payment adjustment. § 1395w-4(q)(13)(A).

and that the Secretary determines, when effectively executed, is likely to result in improved outcomes." *See* § 1395w-4(q)(2)(B), (C)(v)(III), (13)(B)(iii).

Defendants assert that this statutory language precludes the Court from considering whether the Anti-Racism Rule falls within the statutory definition of a "clinical practice improvement activity," arguing that "the interpretation of that definition is part of the process of the agency's 'identification of measures and activities.'" Reply [47] at 14. According to Defendants, so long as CMS claims that an activity fits the definition of a clinical practice improvement activity, it falls within the statutory bar. Plaintiffs counter that an improvement activity cannot be an "activit[y] specified under paragraph (2)(B)" if it does not meet the definition of a clinical practice improvement activity to begin with under subparagraph (C)(v)(III). Mem. [43] at 23-24.

The Court finds that, in order for the prohibition on judicial review in § 1395w-4(q)(13)(B)(iii) to apply to a clinical practice improvement activity, the activity must satisfy the definition set forth in § 1395w-4(q)(2)(C)(v)(III), and, as a result, § 1395w-4(q)(13)(B)(iii) does not preclude judicial review of the question whether the promulgated activity falls within the statutory definition of a "clinical practice improvement activity." *See, e.g.*, *Amgen, Inc. v. Smith*, 357 F.3d 103, 112-13 (D.C. Cir. 2004) (finding that statutory language prohibiting "judicial review under section 1395ff, 1395*oo*, of this title, or otherwise" of "other adjustments" did not preclude review of whether the challenged "other adjustment" was one authorized by the statute); *N. Oaks Med. Ctr., LLC v. Azar*, No. 18-9088, 2020 WL 1502185, at

*5 (E.D. La. Mar. 25, 2020) (finding that although Congress had prohibited judicial review of "any estimate," the court must determine whether the plaintiff was challenging "an estimate"); *see also Patel v. Garland*, 142 S. Ct. 1614, 1621-23 (2022) (determining whether a judicial review bar on "any judgment" applied by first analyzing whether the challenged action was a "judgment").

If the activity is not "an activity that relevant eligible professional organizations and other relevant stakeholders identify as improving clinical practice or care delivery and that the Secretary determines, when effectively executed, is likely to result in improved outcomes," it does not meet the definition of a clinical practice improvement activity as defined in subparagraph (C)(v)(III), and it cannot qualify as an activity specified under paragraph (2)(B) and is thus not immune from judicial review. *See* § 1395w-4(q)(2)(B)(iii), (C)(v)(III), (13)(B)(iii); *see also Patel*, 142 S. Ct. at 1621-23. The Secretary lacks authority to "identif[y]" an activity as an "activit[y] specified under paragraph (2)(B)" when the activity does not satisfy the very definition of such activities set forth in the statute at paragraph (2)(B). *See* § 1395w-4(q)(2)(B)(iii), (C)(v)(III), (13)(B)(iii); *Amgen, Inc.*, 357 F.3d at 112-13. Even if Defendants' reading were a viable alternative construction, the presumption in favor of judicial review requires the Court to adopt the version that preserves judicial review. *Kucana*, 558 U.S. at 251.

Accordingly, the Court has jurisdiction to review whether the Anti-Racism Rule satisfies the definition of a "clinical practice improvement activity" as set forth in § 1395w-4(q)(2)(C)(v)(III), and at this stage, it finds that Plaintiffs have plausibly

alleged that the Anti-Racism Rule does not. Specifically, Plaintiffs have alleged that it is not "an activity that relevant eligible professional organizations and other relevant stakeholders identify as improving clinical practice or care delivery," *see* Am. Compl. [28] at 17, and neither the text of the Anti-Racism Rule itself nor Defendants' arguments show that such organizations or stakeholders identified the creation of anti-racism plans as improving clinical practice or care delivery, *see* 86 Fed. Reg. at 65,969-70; Reply [47] at 15-16. Based on this evidence, the Court cannot conclude at this juncture that the Anti-Racism Rule was identified as improving clinical practice or care delivery by eligible professional organizations or stakeholders.

Defendants argue that the Anti-Racism Rule cites to an article by Camara Phyllis Jones and to a CDC webpage for the proposition that "systemic racism [is] a root cause for differences in health outcomes between socially-defined racial groups." 86 Fed. Reg. at 65,969, 65,977; Reply [47] at 15-16. However, Defendants do not address whether or how Jones or the particular CDC webpage count as "relevant eligible professional organizations and other relevant stakeholders," *see* § 1395w-4(q)(2)(C)(v)(III), nor have they explained how that article and the CDC webpage identified that a "clinic-wide review" to align "value statements or clinical practice guidelines . . . with a commitment to anti-racism and an understanding of race as a political and social construct, not a physiological one" will improve clinical practice or care delivery, *see id.*; 86 Fed. Reg. at 65,970.[19]

---

[19] In addition, the CDC webpage to which the Anti-Racism Rule cites is no longer accessible. While Defendants state that the website is now available at a different address, Reply [47] at 10, it is

Nor do Defendants address Plaintiffs' argument that "clinical practice or care delivery" must be construed in light of the examples of clinical practice improvement activities set forth at § 1395w-4(q)(2)(B)(iii). *See* Mem. [43] at 24; Reply [47] at 15. If Plaintiffs are correct, then Defendants must further demonstrate how the article and webpage have shown that anti-racism plans will "improve clinical practice or care delivery" similarly to those activities in § 1395w-4(q)(2)(B)(iii) in order for the Anti-Racism Rule to satisfy the definition of a clinical practice improvement activity. Defendants have not done so.

Viewing the present record in the light most favorable to Plaintiffs, the Court cannot conclude at this stage that the Anti-Racism Rule falls within the statutory definition of a clinical practice improvement activity. Accordingly, Defendants' Motion [36] to Dismiss based on the statutory bar to judicial review is not well-taken and should be denied.

## III. CONCLUSION

In sum, the Court finds that Dr. Colville lacks standing to sue and that her claims must be dismissed without prejudice, that the State Plaintiffs have sufficiently alleged that they have standing to sue due to injury to their sovereign interest in the enforcement of their laws, and that § 1395w-4(q)(13)(B)(iii) does not preclude judicial review of whether the Anti-Racism Rule qualifies as a clinical practice improvement activity. In light of these findings, Defendants' Motion [36] to

---

unclear whether any changes in content have been made to the website since CMS first referenced it in promulgating the Anti-Racism Rule. The new webpage itself notes that it was "last reviewed" on November 24, 2021, which is after the dates when the proposed and finalized rules were published.

Dismiss should be granted in part and denied in part. To the extent the Court has not specifically addressed any of the parties' remaining arguments, it has considered them and determined that they would not alter the result.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Defendants Xavier Becerra, in his official capacity as the Secretary of Health and Human Services, the Department of Health and Human Services, Chiquita Brooks-LaSure, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services, the Centers for Medicare and Medicaid Services, and the United States of America's Motion [36] to Dismiss is **GRANTED IN PART** as to Plaintiff Amber Colville, and **DENIED IN PART** as to the State Plaintiffs.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Plaintiff Amber Colville's claims are **DISMISSED WITHOUT PREJUDICE** for lack of standing. The claims of the State Plaintiffs will proceed.

**SO ORDERED AND ADJUDGED**, this the 28th day of March, 2023.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE