**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

| | |
|---|---|
| STATE OF MISSISSIPPI; STATE OF ALABAMA; STATE OF ARKANSAS; COMMONWEALTH OF KENTUCKY; STATE OF LOUISIANA; STATE OF MISSOURI; and STATE OF MONTANA, <br> *Plaintiffs*, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; CHIQUITA BROOKS-LASURE, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services; THE CENTERS FOR MEDICARE AND MEDICAID SERVICES; THE UNITED STATES OF AMERICA, <br> *Defendants*. | No. 1:22-cv-113-HSO-RPM |

## MEMORANDUM OF LAW IN SUPPORT OF PROPOSED DEFENDANT INTERVENORS' MOTION TO INTERVENE

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

BACKGROUND ............................................................................................. 1

I.    Health Disparities and Discrimination in Health Care ................................... 1

    A.    In the United States, implicit and overt medical discrimination contributes to significant disparities in health care on the basis of race .......................................................................................... 2

    B.    Recent government efforts to remedy health disparities have fallen short ....................................................................................... 4

II.    Procedural History ...................................................................................... 5

III.    Proposed Intervenors Work to Reduce Racial Disparities in Health Care Outcomes, and to Counteract Discrimination in Health Care ................. 6

    A.    The NAACP State Conferences ............................................................ 6

    B.    The Greensboro Health Disparities Collaborative ................................. 8

ARGUMENT .................................................................................................... 9

I.    The Proposed Intervenors are Entitled to Intervene as Defendants of Right ............................................................................................................ 9

    A.    The intervention is timely ................................................................... 10

    B.    Plaintiffs' challenge to the CMS anti-racism rule may impair the Proposed Intervenors' legally protectable interests .................................. 12

    C.    The Agency Defendants may not adequately represent the NAACP State Conferences' and the Collaborative's interests ..................... 15

II.    Alternatively, Permissive Intervention is Proper Under Rule 24(b) ............... 18

CONCLUSION ................................................................................................. 19

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*Adam Joseph Res. v. CNA Metals Ltd.*,
   919 F.3d 856 (5th Cir. 2019) ...............................................11

*Brumfield v. Dodd*,
   749 F.3d 339 (5th Cir. 2015) ....................................12, 13, 15

*Edwards v. City of Houston*,
   78 F.3d 983 (5th Cir. 1996) ................................................12

*Entergy Gulf States La., L.L.C. v. EPA*,
   817 F.3d 198 (5th Cir. 2016) ..............................................15

*In re Estelle*,
   516 F.2d 480 (5th Cir. 1975) ..............................................18

*Fund for Animals v. Norton*,
   322 F.3d 728 (D.C. Cir. 2003) ............................................13

*Guenther v. BP Ret. Accumulation Plan*,
   50 F.4th 536 (5th Cir. 2022) ..............................................15

*Heaton v. Monogram Credit Card Bank of Ga.*,
   297 F.3d 416 (5th Cir. 2002) ..............................................15

*Hopwood v. State of Texas*,
   21 F.3d 603 (5th Cir. 1994) ................................................15

*John Doe #1 v. Glickman*,
   256 F.3d 371 (5th Cir. 2001) ........................................10, 11

*La Union del Pueblo Entero v. Abbott*,
   29 F.4th 299 (5th Cir. 2022) ........................................14, 15

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*,
   884 F.2d 185 (5th Cir. 1989) ..............................................19

*NextEra Energy Cap. Holdings, Inc. v. D'Andrea*,
   No. 20-50168, 2022 WL 17492273 (5th Cir. Dec. 7, 2022)...................18

*Sierra Club v. Espy*,
   18 F.3d 1202 (5th Cir. 1994) ..............................................10

*Stallworth v. Monsanto Co.*,
    558 F.2d 257 (5th Cir. 1977) ....................................................11, 18

*Texas v. United States*,
    805 F.3d 653 (5th Cir. 2015) ..............................................10, 12, 13

*Trans Chem. Ltd. v. China Nat'l Mach. Imp. & Exp. Corp.*,
    332 F.3d 815 (5th Cir. 2003) ..........................................................18

*Wachob Leasing Co., Inc. v. Gulfport Aviation Partners, LLC*,
    No. 1:15cv237-HSO-RHW, 2016 WL 10568063 (S.D. Miss. Nov. 30, 2016) ......................19

*Wal–Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*,
    834 F.3d 562 (5th Cir. 2016) ..........................................................10

## STATUTES:

42 U.S.C. § 1395w-4(q)(2)(C)(v)(III).........................................................16

42 U.S.C. § 1395w-4(q)(13)(B) ..............................................................5, 6

42 U.S.C. § 1395w-4(q)(13)(B)(iii) .........................................................6, 12

42 U.S.C. § 18116(a) .......................................................................4

## RULES AND REGULATIONS:

Fed. R. Civ. P. 24(a)(2).................................................................1, 9, 10

Fed. R. Civ. P. 24(b) ......................................................................1, 18

Fed. R. Civ. P. 24(b)(1)....................................................................18

Medicare Program; CY 2022 Payment Policies Under the Physician Fee Schedule
    and Other Changes to Part B Payment Policies, 86 Fed. Reg. 39,104 (July 23,
    2021). .................................................................................5

Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. 47,824 (Aug.
    4, 2022) ...............................................................................4

Medicare Program; CY 2022 Payment Policies Under the Physician Fee Schedule
    and Other Changes to Part B Payment Policies, 86 Fed. Reg. 64,996 (Nov. 19,
    2021). .................................................................................5

Rule 24(a)...........................................................................*passim*

## OTHER AUTHORITIES:

*About HHS*, https://www.hhs.gov/about/index.html (last visited May 10, 2023) ........................17

Am. Med. Ass'n, *Racism as a Public Health Threat H-65.952* (2022),
https://policysearch.ama-
assn.org/policyfinder/detail/racism?uri=%2FAMADoc%2FHOD.xml-H-
65.952.xml ....................................................................................................................3

Maureen R. Benjamins et al., *Comparison of All-Cause Mortality Rates and
Inequities Between Black and White Populations Across the 30 Most Populous
US Cities* (2021),
https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2775299 .............................3

CERD Working Grp. on Health & Env't Health, *Unequal Health Outcomes in the
United States: Racial and Ethnic Disparities in Health Care Treatment and
Access, the Role of Social and Environmental Determinants of Health, and the
Responsibility of the State* (2008),
https://www.prrac.org/pdf/CERDhealthEnvironmentReport.pdf ...............................4

Greensboro Health Disparities Collaborative, *The History of the Greensboro
Health Disparities Collaborative* (last visited May 9, 2023),
https://www.cdc.gov/nchhstp/healthequity/index.html ....................................9

Shirley A. Hill, *Inequality and African-American Health: How Racial Disparities
Create Sickness* (2016),
https://books.google.com/books?id=DLSPDQAAQBAJ&pg=PA11&source=g
bs_toc_r&cad=4#v=onepage&q&f=false ...................................................2

Kelly Hoffman et al., *Racial Bias In Pain Assessment and Treatment
Recommendations, and False Beliefs about Biological Differences Between
Blacks and Whites* (2016),
https://www.pnas.org/doi/10.1073/pnas.1516047113 .............................................2

Tiffani Johnson et al., *Association of Race and Ethnicity with Management of
Abdominal Pain in the Emergency Department* (2013),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4074647/pdf/peds.2012-
3127.pdf ....................................................................................................................2

Mathieu Rees, *Racism in Healthcare: What You Need to Know*, Med. News
Today (Sept. 16, 2020), https://www.medicalnewstoday.com/articles/racism-
in-healthcare....................................................................................................................3

Jennifer Schore et al., *Racial Disparities in Prescription Drug Use Among Dually
Eligible Beneficiaries*, 25 Health Care Fin. Rev. 77 (2003),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4194810/pdf/hcfr-25-2-
077.pdf ....................................................................................................................4

Brian D. Smedley et al., Unequal Treatment: Confronting Racial And Ethnic
Disparities In Health Care, Nat'l Academies Press (2003),
https://pubmed.ncbi.nlm.nih.gov/25032386/ ...........................................................3

iv

The Sullivan Comm'n on Diversity in the Healthcare Workforce, *Missing Persons: Minorities in the Health Professions* (2004), https://campaignforaction.org/wp-content/uploads/2016/04/SullivanReport-Diversity-in-Healthcare-Workforce1.pdf................................................................................1

*What is Health Equity?*, Ctrs. for Disease Control & Prevention (last visited May 9, 2023), https://www.cdc.gov/nchhstp/healthequity/index.html ...............................................8

David R. Williams, *The Health of U.S. Racial and Ethnic Populations*, 60 J. of Gerontology: Series B S53 (2005), https://academic.oup.com/psychsocgerontology/article/60/Special_Issue_2/S53/2965174 .................................................................................................................................3

Matthew Wynia et al., *Collecting and Using Race, Ethnicity and Language Data in Ambulatory Settings: A White Paper with Recommendations from the Commission to End Health Care Disparities* (2011), https://www.ama-assn.org/system/files/corp/media-browser/public/health-policy/cehcd-redata_0.pdf..................................................................................................................................2

The NAACP State Conferences from eight states and the Greensboro Health Disparities Collaborative (collectively "Proposed Intervenors") move to intervene as defendants under Federal Rule of Civil Procedure 24(a)(2). Proposed Intervenors timely seek to intervene and hold legally protected interests that may be impaired by the disposition of this case. The NAACP State Conferences' members are the intended beneficiaries of the rule that the States of Alabama, Arkansas, Louisiana Mississippi, Missouri, Montana, and the Commonwealth of Kentucky (collectively "State Plaintiffs") hope to strike down. Moreover, the NAACP State Conferences *and* the Collaborative have an interest in preserving research and program funding that may be diverted if this Court condemns a rule designed to combat discrimination as discrimination itself. Plaintiffs' suit threatens these interests, and Proposed Intervenors are uniquely capable of bringing the implications of Plaintiffs' theory into full view. Alternatively, Proposed Intervenors request permission to intervene under Federal Rule of Civil Procedure 24(b). Again, Proposed Intervenors' motion is timely. And their defense shares issues of fact and law with that of Defendants Xavier Becerra, the United States Department of Health and Human Services ("HHS"), Chiquita Brooks-LaSure, the Centers for Medicare and Medicaid Services ("CMS"), and the United States of America ("Agency Defendants").

## BACKGROUND

### I.    Health Disparities and Discrimination in Health Care

Black people in America "tend to receive less and lower quality health care than whites, resulting in higher mortality rates." The Sullivan Comm'n on Diversity in the Healthcare Workforce, *Missing Persons: Minorities in the Health Professions* i (2004).[1] Although the federal government has made efforts to combat these racial biases, those efforts have fallen short.

---

[1] Available at https://campaignforaction.org/wp-content/uploads/2016/04/SullivanReport-Diversity-in-Healthcare-Workforce1.pdf.

1

**A. In the United States, implicit and overt medical discrimination contributes to significant disparities in health care on the basis of race.**

Studies have shown for decades that discrimination in medicine is a significant reason why Black and white people in America have different access to health care. Black and other patients of color are less likely than non-Hispanic white patients to receive preventive care and routine medical procedures. Matthew Wynia et al., *Collecting and Using Race, Ethnicity and Language Data in Ambulatory Settings: A White Paper with Recommendations from the Commission to End Health Care Disparities* 6 (2011).[2] And white patients are almost twice as likely as Black patients to receive a referral to a specialist. *See* Shirley A. Hill, *Inequality and African-American Health: How Racial Disparities Create Sickness* 91 (2016).[3]

The quality of health care for Black patients is also often different from—and worse than—the care that white people receive. Although Black people are three times as likely to develop cardiovascular disease than white people, and are twice as likely to die from it, they are less likely than white people "to receive . . . newer or more expensive therapies." Dayna Bowen Matthew, *Just Medicine: A Cure for Racial Inequality in American Healthcare* 57-58 (2015) (hereinafter "Just Medicine"). And studies show that Black patients, including children, are also less likely to receive pain medication than white patients in emergency departments. Kelly Hoffman et al., *Racial Bias In Pain Assessment and Treatment Recommendations, and False Beliefs about Biological Differences Between Blacks and Whites* (2016);[4] *see, e.g.*, Tiffani Johnson et al., *Association of Race and Ethnicity with Management of Abdominal Pain in the Emergency Department*, 132 Pediatrics 851, 853, 855 (2013) (reporting that Black children who go to an

---

[2] Available at https://www.ama-assn.org/system/files/corp/media-browser/public/health-policy/cehcd-redata_0.pdf.

[3] Available at https://books.google.com/books?id=DLSPDQAAQBAJ&pg=PA11&source=gbs_toc_r&cad=4#v=onepage&q&f=false.

[4] Available at https://www.pnas.org/doi/10.1073/pnas.1516047113.

emergency room with stomach pain are less likely than non-Hispanic white children to receive pain medication, and citing studies of similar results for adult patients).[5]

Racial disparities in medical treatment lead to racial disparities in health outcomes. From 2016 to 2018, the all-cause mortality rate among Black populations in the United States was on average 24% higher than among white populations. Maureen R. Benjamins et al., *Comparison of All-Cause Mortality Rates and Inequities Between Black and White Populations Across the 30 Most Populous US Cities* 5 (2021).[6] These elevated death rates continue from birth through retirement. *See* David R. Williams, *The Health of U.S. Racial and Ethnic Populations*, 60 J. of Gerontology: Series B S53 (2005).[7]

Racial health disparities cannot be explained away by referencing the economic or educational differences between racial groups. "Racial and ethnic minorities tend to receive a lower quality of health care than non-minorities, even when access-related factors, such as patients' insurance status and income, are controlled." Brian D. Smedley et al., Unequal Treatment: Confronting Racial And Ethnic Disparities In Health Care, Nat'l Academies Press 1 (2003) (emphasis added).[8] Indeed, a survey of studies indicates that some racial disparities in health care are due to racism within the medical system. *See, e.g.*, Mathieu Rees, *Racism in Healthcare: What You Need to Know*, Med. News Today (Sept. 16, 2020) (collecting studies); *see also* Am. Med. Ass'n, Racism as a Public Health Threat H-65.952 (2022) (acknowledging that racism causes racial health inequity).[9]

---

[5] Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4074647/pdf/peds.2012-3127.pdf.

[6] Available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2775299.

[7] Available at https://academic.oup.com/psychsocgerontology/article/60/Special_Issue_2/S53/2965174.

[8] Available at https://pubmed.ncbi.nlm.nih.gov/25032386/.

[9] Available at https://www.medicalnewstoday.com/articles/racism-in-healthcare; https://policysearch.ama-assn.org/policyfinder/detail/racism?uri=%2FAMADoc%2FHOD.xml-H-65.952.xml.

**B.  Recent government efforts to remedy health disparities have fallen short.**

The federal government's efforts to deter discrimination in health care have been inadequate, particularly for older people of color.

In 2010, Congress enacted the Patient Protection and Affordable Care Act, prohibiting Medicare and other health programs and activities receiving federal funds from discriminating against individuals on any "ground prohibited under title VI of the Civil Rights Act of 1964" (e.g., race). 42 U.S.C. § 18116(a). But Title VI of the 1964 Civil Rights Act does not apply to physicians who receive federal Medicare Part B funds, so they have never been compelled to comply [with the Act] or even submit signed assurances of nondiscrimination. Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. 47,824, 47887 (Aug. 4, 2022) (explaining that "The Department's longstanding position has been that Medicare Part B funding does not constitute Federal financial assistance for the purpose of Title VI, Title IX, Section 504, the Age Act, and Section 1557," and "proposing to change that position and treat Medicare Part B funds as Federal financial assistance to the providers and suppliers subsidized by those funds"). Moreover, the Medicare program—designed to ensure that older Americans have access to quality, affordable health care—has in fact led to "increasing re-segregation of care and greater racial disparities in services." CERD Working Grp. on Health & Env't Health, *Unequal Health Outcomes in the United States: Racial and Ethnic Disparities in Health Care Treatment and Access, the Role of Social and Environmental Determinants of Health, and the Responsibility of the State* 27 (2008) (explaining that the low out-of-pocket costs associated with some Medicare plans "create financial incentives for low-and-moderate income consumers to select different plans than the more affluent"); *see also, e.g.*, Jennifer Schore et al., *Racial Disparities in Prescription Drug Use Among Dually Eligible Beneficiaries*, 25 Health Care Fin. Rev. 77, 77 (2003) ("Elderly black Medicare

beneficiaries are more than twice as likely as white beneficiaries . . . to not fill prescriptions because they cannot afford them.").[10]

As Plaintiffs acknowledge, CMS has only recently made it a priority to incentivize anti-racism interventions as a means for reducing racial health disparities. Am. Compl. ¶ 41, ECF No. 28 (citing 81 Fed. Reg. 77195).

## II.   Procedural History

In 2021, CMS proposed and finalized a rule that promotes health equity through the Merit-based Incentive Payment System ("MIPS"), a program of HHS that adjusts reimbursements payments for services covered by Medicare Part B based on the performance of an eligible medical professional. CMS's new rule—now dubbed the "anti-racism rule[11]" —allows MIPS-eligible professionals to "create and implement an anti-racism plan" as a high-weighted improvement activity. Medicare Program; CY 2022 Payment Policies Under the Physician Fee Schedule and Other Changes to Part B Payment Policies, 86 Fed. Reg. 64,996, 65,384, 65,969-70 (Nov. 19, 2021). CMS's rule construes "anti-racism plan" broadly. An anti-racism plan may set goals for preventing and addressing racism, plan trainings on implicit and explicit biases, or otherwise commit to increasing access and accessibility for all individuals seeking care. *Id.*

The anti-racism rule came under Plaintiffs' fire shortly after its enactment. Plaintiffs' amended complaint alleges that the Rule exceeds the agency's statutory jurisdiction and seeks an order from this Court that vacates the rule. Am. Compl. ¶ 6, ECF No. 28. The Agency Defendants filed a motion to dismiss these claims, arguing that Plaintiffs lacked standing, and that § 1395w-

---

[10] Available at https://www.prrac.org/pdf/CERDhealthEnvironmentReport.pdf;
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4194810/pdf/hcfr-25-2-077.pdf.
[11] CMS's rule does not mandate that any Medicare provider create or implement an anti-racism plan. It merely designates the anti-racism activity as one, of many, *optional* MIPS improvement activities. Medicare Program; CY 2022 Payment Policies Under the Physician Fee Schedule and Other Changes to Part B Payment Policies, 86 Fed. Reg. 39,104, 39,855 (July 23, 2021).

4(q)(13)(B) bars all their claims in any event. ECF No. 37 at 11-28. This Court granted in part and denied in part Defendants' motion, dismissing one individual plaintiff from the case, but allowing the State Plaintiffs to proceed to the merits of their claims. ECF No. 52 at 47-48. This Court determined that the State Plaintiffs had plausibly alleged standing because the States "alleged that the Anti-Racism Rule will interfere with the enforcement of their anti-discrimination laws." *Id.* at 35-36. The Court also found that § 1395w-4(q)(13)(B)(iii) does not at the motion-to-dismiss stage bar judicial review of the anti-racism rule because the State Plaintiffs alleged that the anti-racism rule does not qualify as a "clinical practice improvement activity." *Id.* at 42-47. Arizona voluntarily dismissed its claims with prejudice following the Court's order. ECF No. 58 at 1.

**III.   Proposed Intervenors Work to Reduce Racial Disparities in Health Care Outcomes, and to Counteract Discrimination in Health Care.**

The NAACP State Conferences and the Greensboro Health Disparities Collaborative seek to intervene and defend the anti-racism rule.

### A.  The NAACP State Conferences

The NAACP is the nation's oldest and largest civil rights organization. Ex. 1, Decl. of Robert James ¶ 4 (Mississippi). The NAACP's state conferences conduct programming at the state and local level to carry out the national NAACP's mission: "[A]chieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color." *Id.* Proposed Intervenors include the state conferences in each of the eight states that originally challenged the anti-racism rule: Mississippi, Alabama, Arizona, Arkansas, Missouri, Montana, Kentucky, and Louisiana. Each state conference has Medicare-eligible members (together, thousands of members who rely on Medicare) who benefit from a rule that incentivizes Medicare providers to be more attuned to Black and brown patients' specific needs. *See* James Decl. ¶¶ 5-6, 9-31 (Mississippi); Ex. 2, Decl. of Benard Simelton ¶¶ 5-18

6

(Alabama); Ex. 3, Decl. of Danielle Gilliam ¶¶ 6-23 (Arizona); Ex. 4, Decl. of Frank Shaw ¶¶ 5-17 (Arkansas); Ex. 5, Decl. of Nimrod Chapel, Jr. ¶¶ 5-13, 17-23 (Missouri); Ex. 6, Decl. of Portia Prescott ¶¶ 5-8, 12-24 (Montana); Ex. 7, Decl. of Marcus Ray ¶¶ 5-6, 9-17 (Kentucky); Ex. 8, Decl. of Michael McClanahan ¶¶ 6-18 (Louisiana).

The NAACP State Conferences organize programs and activities within their states to counteract the consequences of past and present discrimination against people of color by medical providers. NAACP members from each of the state conferences are either familiar with the state's history of medical racism or have experienced discrimination in the health care system themselves. *See, e.g.*, James Decl. ¶¶ 15, 18, 21, 23, 26, 28 (detailing Mississippi NAACP member complaints of racial discrimination by medical providers); Simelton Decl. ¶¶ 8-9 (explaining how the Tuskegee experiments created distrust between Black Alabamians and medical providers); Chapel Decl. ¶¶ 16, 23 (Missouri) (similar). Years of implicit and overt racial bias within the medical field have led many within the Black community to distrust medical providers and avoid routine, preventative care. *See, e.g.*, James Decl. ¶¶ 15-19 (Mississippi); Simelton Decl. ¶¶ 7-11 (Alabama); Shaw Decl. ¶¶ 14-17 (Arkansas). This history of discrimination and distrust has contributed to rampant health disparities. *See, e.g.*, James Decl. ¶¶ 16-17 (discussing racial disparities in pregnancy-related deaths); McClanahan Decl. ¶¶ 11-13, 16 (discussing racial disparities in COVD-19-related illness and death).

The NAACP State Conferences also work to improve health care access for people of color within their states—members and non-members alike. For example, the Mississippi, Alabama, and Missouri state conferences have spent substantial time and resources advocating for Medicaid expansion in their states—a program that would provide health insurance to thousands of lower wage earners who are currently uninsured. James Decl. ¶¶ 11-14 (Mississippi); Simelton

Decl. ¶ 12 (Alabama); Chapel Decl. ¶ 14 (Missouri). And the Kentucky NAACP collaborated with an organization called Pathways to create a mobile health clinic that delivers medical and mental-health services across around 10 of the State's rural counties. Ray Decl. ¶ 11 (Kentucky). These activities are possible only with the dues of the State Conference members, the work of local volunteers, and the philanthropic contributions provided by partner organizations. *See* James Decl. ¶¶ 14, 20 (Mississippi); Simelton Decl. ¶¶ 14, 17 (Alabama); Ray Decl. ¶ 11 (Kentucky).

History and experience drive the NAACP State Conferences' view that rescinding the anti-racism rule will harm their members and jeopardize their organizational partnerships. *See, e.g.*, Ray Decl. ¶¶ 13-14 (discussing how rescinding the anti-racism rule would exacerbate distrust of the medical profession among Black Kentuckians); Simelton Decl. ¶ 17 (explaining how rescission of the anti-racism rule will deter partner organizations from associating with the Alabama NAACP); Chapel Decl. ¶¶ 11-15 (similar). Without the financial incentive provided by the rule, Medicare providers may be less likely to pursue training on how to build trust, encourage preventative care, and communicate treatment options with their Black patients. James Decl. ¶ 15 (Mississippi); Ray Decl. ¶¶ 9, 12-15 (Kentucky); McClanahan Decl. ¶¶ 15, 17 (Louisiana).

### B. The Greensboro Health Disparities Collaborative

The Collaborative was founded in 2003 as a group of community leaders, advocates, scholars, clergy, and health care professionals committed to health equity. Ex. 9, Decl. of Kari Thatcher ¶¶ 3, 6; *see also What is Health Equity?*, Ctrs. for Disease Control and Prevention (last visited May 9, 2023) (defining "health equity" as "the state in which everyone has a fair and just opportunity to attain their highest level of health").[12] The Collaborative connects the public to resources on health equity, delivers presentations on racial equity, and holds multi-day racial

---

[12] Available at https://www.cdc.gov/nchhstp/healthequity/index.html.

equity workshops. Thatcher Decl. ¶¶ 20, 28; *see also* Greensboro Health Disparities Collaborative,

*The History of the Greensboro Health Disparities Collaborative* (last visited May 9, 2023).[13]

The Collaborative developed the Accountability for Cancer Care through Undoing Racism and Equity ("ACCURE") study, an intervention program designed to identify and diminish racial disparities in the quality and completion of treatment for patients with stage 1 or stage 2 breast and lung cancer. Thatcher Decl. ¶ 14. The study implemented four anti-racism interventions at two cancer centers. *Id.* ¶ 15. These interventions eliminated disparities between Black and white patients across several metrics and improved treatment outcomes for *both* Black and white patients. Thatcher Decl. ¶ 16.

In the Collaborative's view, the anti-racism rule is empirically sound and will advance the organization's mission to eliminate racial health disparities. *First*, reducing racial health disparities among Medicare recipients will go a long way in reducing racial health disparities across the board. Medicare-eligible people of color are older, more frequently interact with health care providers, and report higher incidents of discrimination than their younger counterparts. *Id.* ¶ 24; Ex. 10, Decl. of Sidney Callahan ¶ 11. *Second*, incentivizing Medicare providers to create and implement anti-racism plans will encourage hospitals and other health care providers to develop and maintain partnerships with health equity groups like the Collaborative. This institutional support is essential for sustaining the Collaborative's work. Thatcher Decl. ¶¶ 26-29.

## ARGUMENT

**I.   The Proposed Intervenors are Entitled to Intervene as Defendants of Right.**

Rule 24(a)(2) allows intervention as of right any time (1) the motion to intervene is timely, (2) the proposed intervenor asserts an interest in the controversy that the existing parties do not

---

[13] Available at https://greensborohealth.org/history.html.

adequately represent, and (3) the disposition of the case may impair or impede the potential intervenor's ability to protect that interest. *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015). Courts "allow intervention where no one would be hurt and the greater justice could be attained." *John Doe #1 v. Glickman*, 256 F.3d 371, 375 (5th Cir. 2001) (citation omitted).

Proposed Intervenors are entitled to intervene as of right. Their motion is timely. Moreover, Proposed Intervenors have legally protected interests that are not adequately protected by the Agency Defendants: Plaintiffs' challenge to the anti-racism rule threatens a government program that is intended to benefit the NAACP State Conferences' members and is likely to increase the costs for both the Collaborative and the NAACP State Conferences to conduct programs that advance their missions. The Agency Defendants have not yet adequately defended against Plaintiffs' damaging theory (and may never do so).

### A.  The intervention is timely.

Rule 24(a)(2)'s timeliness requirement considers: (1) how long the potential intervenor knew or reasonably should have known of her stake in the case; (2) the prejudice, if any, the existing parties may suffer because the potential intervenor failed to intervene when she knew or reasonably should have known of her stake in that case; (3) the prejudice, if any, the potential intervenor may suffer if the court does not let her intervene; and (4) any unusual circumstances. *Id.* at 376 (citation omitted). Here, each relevant factor demonstrates timeliness.

*First*, the Proposed Intervenors promptly sought to intervene. Indeed, the Collaborative and the NAACP State Conferences filed their motion the same day that the Agency Defendants filed their answer; before any discovery began; and before this Court issued a scheduling order. This timing is consistent with other motions to intervene that the Fifth Circuit has deemed timely. *See, e.g.*, *Wal–Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 834 F.3d 562, 565-566 (5th Cir. 2016) (motion timely when filed before discovery); *Sierra Club v. Espy*, 18 F.3d 1202, 1205-06

10

(5th Cir. 1994) (motion filed promptly after pertinent pre-trial motion was timely even though filed eight years into proceeding).

*Second*, neither party will be prejudiced by the Proposed Intervenor's timing. Rather, the Proposed Intervenors' timing conserved resources for both the parties and the Court. Premature intervention can risk squandering scarce judicial resources and increases litigation costs. *Stallworth v. Monsanto Co.*, 558 F.2d 257, 265 (5th Cir. 1977). The Proposed Intervenors avoided this disfavored result, declining to file their motion when the Agency Defendants' motion provided a jurisdictional basis for the Court to dispose of Plaintiffs' suit.

*Third*, the Proposed Intervenors will be severely prejudiced if their motion to intervene is denied. It is well-established that proposed intervenors are prejudiced when they are unable to be heard on a legal issue for which they have a substantive interest. *E.g.*, *Glickman*, 256 F.3d at 379. That is the case here. Moreover, due to the nature of Plaintiffs' claims—a challenge to an agency's rulemaking—the only way private organizations can help defend this rule, and their corresponding interests, is through intervention.

*Fourth*, this case does not present any unusual circumstances. The process of this case has been entirely typical. In any event, unusual circumstances typically lead courts to be more lenient, not more stringent, about Rule 24(a)'s timing requirement. *See, e.g.*, *Adam Joseph Res. v. CNA Metals Ltd.*, 919 F.3d 856, 866 (5th Cir. 2019) (allowing intervention after parties "settled the case surreptitiously"); *Stallworth*, 558 F.2d at 261-262, 264-267 (allowing intervention after plaintiff "urged the district court to make it more difficult" for intervenors to learn about the suit).

11

Three of the timing factors decisively favor intervention here, and the fourth factor is neutral. The Proposed Intervenors' motion is timely.

### B. Plaintiffs' challenge to the CMS anti-racism rule may impair the Proposed Intervenors' legally protectable interests.

Intervenors must have a "direct, substantial, legally protectable interest" in a case. *Edwards v. City of Houston*, 78 F.3d 983, 1004 (5th Cir. 1996) (quoting *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 463 (5th Cir. 1984)). This is not a demanding standard: "an interest is sufficient if it is of the type that the law deems worthy of protection, even if the intervenor does not have an enforceable legal entitlement or would not have standing to pursue her own claim." *Texas*, 805 F.3d at 659. Rule 24(a) recognizes a broad range of interests. *Id.* at 658-660 (collecting cases). Moreover, "[t]he interest requirement may be judged by a more lenient standard if the case involves a public interest question or is brought by a public interest group." *Brumfield v. Dodd*, 749 F.3d 339, 344 (5th Cir. 2015) (quotation marks and citation omitted).

The Proposed Intervenors' interests here—preserving a government rule that serves their members and retaining resources that advance their organizational missions—are legally protectable, and may all be impaired by the disposition of this suit. Plaintiffs present the theory that the anti-racism rule violates the APA, in part, because incentivizing anti-racism in medicine is incompatible with § 1395w-4(q)(13)(B)(iii)'s "core mission" of "patients' health and safety." Am. Compl. ¶ 62, ECF No. 28 (citation omitted). A judgment in Plaintiffs' favor will not only remove an incentive for Medicare providers to engage in anti-racism efforts, but affirmatively condemn it. This would impair Proposed Intervenors' interests because it would result in a substantial change in the status quo with respect to those interests. *See Fund for Animals v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003) (interest impaired where "reestablishing the status quo . . . will be difficult and burdensome"); *Brumfield*, 749 F.3d at 344-345 (similar).

12

*First*, intervenors have a legally protectable interest in receiving the benefits of a government program of which they are the "intended beneficiaries." *Texas*, 805 F.3d at 660. The NAACP State Conferences have members who are Black, receive Medicare, and will benefit from a program designed to reduce the disparate outcomes that result from overt and implicit racial biases in health care. *Supra* at pp. 1-3. Absent this incentive, racial health disparities may continue and members of the NAACP State Conferences may continue to suffer the consequences of inequitable health care systems. *See, e.g.*, Simelton Decl. ¶ 15 (Alabama) (anti-racism plan would provide members "hope[]" that medical providers "would be fair to them"); Ray Decl. ¶ 13 (Kentucky) (explaining that distrust of medical providers is one obstacle to members accessing routine medical care, and noting that providers' commitment "to understand and address issues of racial discrimination" would likely reduce that distrust).

In *Brumfield*, the Fifth Circuit recognized a legally protectable interest where parents receiving educational vouchers from Louisiana were allowed to intervene in a challenge to the voucher program. The parents' interest in continuing to receive the government benefit was legally protectable even though the vouchers were not a legal entitlement. *Brumfield*, 749 F.3d at 344. The NAACP State Conferences have a comparable interest here. Black Medicare recipients—like all patients—are the direct beneficiaries of government programs designed to combat racism in health care. *See* Thatcher Decl. ¶ 16. This is particularly true for Black Medicare recipients who have received disparate treatment because of their race. *See e.g.*, James Decl. ¶ 28 (Mississippi) (discussing how members may travel over an hour to seek routine medical care from Black physicians because of experiences with medical racism and discrimination); Chapel Decl. ¶ 20 (Missouri) (discussing how a member was forced out of an emergency room).

13

*Second*, the Proposed Intervenors have an interest in avoiding financial burdens that would interfere with their programming. This type of interest meets Rule 24(a)'s standards. *See La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 306 (5th Cir. 2022) (committees that "expend resources" recruiting and training election volunteers had legally protectable interest in challenge to law that regulates conduct of those volunteers).

The Collaborative advances its mission by partnering with hospitals and other organizations to conduct research on racial health disparities and how anti-racism interventions can reduce those disparities. Thatcher Decl. ¶¶ 10-29. But promoting anti-racism research and programming to hospitals and medical professionals is challenging because of their competing time and budgetary constraints. *See id.* ¶¶ 19, 26-27. If this Court strikes down the financial incentive provided by the CMS anti-racism rule, there will be less reason for them to engage in partnerships, which in turn may require the Collaborative to expend even more resources to carry out its mission. *Id.* ¶¶ 26-29.

The NAACP State Conferences face the same harm. Many of these organizations partner with hospitals and other health care providers to educate Black communities about health conditions that disproportionately affect Black people. *E.g.*, Shaw Decl. ¶¶ 9-13, 16 (Arkansas); McClanahan Decl. ¶¶ 8, 15 (Louisiana); Ray Decl. ¶ 11 (Kentucky). Plaintiffs' challenge to the anti-racism rule directly impacts these interests. If Plaintiffs prevail in their theory that physicians discriminate when they consider the needs of particular racial groups, some medical providers might step back from these outreach efforts. The loss of these partnerships would expose the NAACP State Conferences to a greater financial burden for engaging in effective public education and outreach to their members. *See* Simelton Decl. ¶ 17 (Alabama); Ray Decl. ¶ 15 (Kentucky).

14

**C. The Agency Defendants may not adequately represent the NAACP State Conferences' and the Collaborative's interests.**

The Proposed Intervenors satisfy Rule 24(a)'s inadequacy requirement. Any presumption of adequacy implicated by the State Plaintiffs is overcome because their interests are adverse to Proposed Intervenors'. *Hopwood v. State of Texas*, 21 F.3d 603, 605 (5th Cir. 1994) (presumption overcome when movant's "interest is in fact different from that of the state" (cleaned up) (citation omitted)). The Agency Defendants are not entitled to a presumption of adequacy at all. They are not "charged by law" to represent Proposed Intervenors' interests. *Entergy Gulf States La., L.L.C. v. EPA*, 817 F.3d 198, 203 n.2 (5th Cir. 2016). Nor do the Agency Defendants' interests "align[s] precisely" with those of Proposed Intervenors. *See Brumfield*, 749 F.3d at 345. Thus, the Proposed Intervenors need only show that their interests "may diverge" from the Agency Defendants'. *Heaton v. Monogram Credit Card Bank of Ga.*, 297 F.3d 416, 425 (5th Cir. 2002).

1. Agency Defendants' motions to dismiss demonstrate why the Proposed Intervenors cannot rely on them for adequate representation. A court can infer from the government's attempt to dismiss a case on procedural grounds that it would "prefer[] not to resolve the case on the merits." *Guenther v. BP Ret. Accumulation Plan*, 50 F.4th 536, 546 (5th Cir. 2022) (citing *La Union del Pueblo Entero*, 29 F.4th at 308-309) (recognizing that intervenors' interest in the "finality and certainty" that accompanies a merits decision may not be adequately protected by a procedural dismissal) (citation omitted). This Court should do so here. The Agency Defendants' preference for a resolution on procedural grounds is incompatible with Proposed Intervenors' interests, which require an unqualified rejection of the theory underlying Plaintiffs' claims.

Twice, the Agency Defendants barely refuted the substance of Plaintiffs' attempts to equate anti-racism with racism itself, and sought to dispose of this case on standing and immunity grounds instead. ECF No. 16 at 10-19; ECF No. 37 at 11-29. The NAACP State Conferences and the

Collaborative, by contrast, have a distinct interest in and are uniquely positioned to present arguments about how the anti-racism rule is likely to "improv[e] clinical practice or care delivery" and "result in improved outcomes," 42 U.S.C. § 1395w-4(q)(2)(C)(v)(III), and therefore falls within HHS's authority to define clinical practice improvement activities. Proposed Intervenors advocate for constituents who have lived, and continue to live, with long-ignored and still-unaddressed health disparities. There is substantial scientific and factual data demonstrating that these disparities have contributed to poor health outcomes, including higher mortality rates among the Black and brown communities in the United States. *See supra* at pp. 1-3. Moreover, the Collaborative would explain how the anti-racism rule will help ameliorate the effects of racially disparate medical treatment and outcomes and how the development of anti-racism plans will improve the quality of care provided to all individuals. *See* Thatcher Decl. ¶ 16.

2. The Agency Defendants' procedural arguments failed to completely represent Proposed Intervenors' interests. Unlike the Agency Defendants, Proposed Intervenors are steeped in the Plaintiff States' anti-discrimination laws and the on-the-ground reality of when (and whether) those laws are enforced to combat discrimination in health care. The NAACP State Conferences arose from and are grounded in the need to end anti-Black violence and discrimination and advance equality across the country. *E.g.* James Decl. ¶ 16 (Mississippi); Chapel Decl. ¶¶ 4, 9 (Missouri). As a result, they have decades of experience and knowledge as to the existence, enforcement and effectiveness of state laws designed to combat racial discrimination. *See* ECF No. 28 at 5; *e.g.* Shaw Decl. ¶¶ 4, 7, 15 (Arkansas); Chapel Decl. ¶ 18 (Missouri).

For example, the NAACP knows that Mississippi has no state Civil Rights Act or any other civil rights statutory protection related to discrimination in health care. James Decl. ¶ 19 (Mississippi). Moreover, the Collaborative's roster of physician-members bring expertise in how

medical providers can be conscious of patients' race and the impacts of medical racism without engaging in racial discrimination. Callahan Decl. ¶¶ 9-10, 12; *see also* Prescott Decl. ¶ 21 (Montana) (improving accuracy and specificity of racial demographic data improves health outcomes for people of color). The Agency Defendants lack both areas of expertise and will be ill-equipped to show at summary judgment why Plaintiffs' theory of standing—that an *anti-racism* rule violates state anti-discrimination laws—fails as a matter of law.

3. Proposed Intervenors' and the Agency Defendants' interests diverge even beyond the briefing. The Agency Defendants have an interest in preserving the scope of the agency's rulemaking authority, enhancing the health and well-being of all Americans, and enforcing Federal law, *see About HHS*, HHS.[14] Proposed Intervenors' interest in preserving the anti-racism rule because it will reduce racial disparities in health care access and treatment outcomes is consistent with, *but distinct from*, improving the health of all Americans. *See, e.g.*, James Decl. ¶¶ 16-21 (Mississippi); Simelton Decl. ¶¶ 7-17 (Alabama); *see also* Thatcher Decl. ¶ 16 (explaining how health equity initiatives improve health care outcomes for *all* patients). Moreover, the Agency Defendants' institutional interests make them uniquely unlikely to explain the role that the agency's *own inaction* has played in creating a need for the anti-racism rule. What is more, the Agency Defendants have no reason to take a position in litigation that accounts for the Proposed Intervenors' interest in preserving partnerships with hospitals and medical providers who support the organizations' health equity programming, *supra* at pp. 6-8, or the Collaborative's financial interest in providing hospitals the type of anti-racism trainings that CMS's rule incentivizes, *supra* at pp. 8-9. Across each of these dimensions, the Agency Defendant's defense of the anti-racism rule may fail to encompass or protect Proposed Intervenors' legally protected interests.

---

[14] Available at https://www.hhs.gov/about/index.html.

4. Finally, practical considerations show how the parties' interests may diverge. The next presidential election is 18 months away. There is no guarantee that the next administration will defend CMS's rule before this Court or on appeal—Democratic and Republican administrations have both declined to adopt health equity efforts like the anti-racism rule in the past. *See* ECF No. 28 at 12 (citing 81 Fed. Reg. 77195). This stands as good evidence that the Agency Defendants may not adequately represent Proposed Intervenors' interests in the future. *NextEra Energy Cap. Holdings, Inc. v. D'Andrea*, No. 20-50168, 2022 WL 17492273, at *4 (5th Cir. Dec. 7, 2022) (utility commission may inadequately represent intervenor's interest where commission's litigation position is inconsistent with commission's prior views).

* * *

The Proposed Intervenors satisfy Rule 24(a)'s requirements. This Court should grant Proposed Intervenors' motion to intervene as of right.

## II.   Alternatively, Permissive Intervention is Proper Under Rule 24(b).

Permissive intervention is also appropriate. Rule 24(b) allows this Court to "permit anyone to intervene" who has filed a "timely motion" and "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1), (B); *Stallworth*, 558 F.2d at 269. "[C]laim or defense" is "construed liberally." *In re Estelle*, 516 F.2d 480, 485 (5th Cir. 1975); *see also Stallworth*, 558 F.2d at 269. And the "common question of law or fact" requirement is satisfied so long as an intervenor's arguments are "related to" the claims in the lawsuit. *Cf. Trans Chem. Ltd. v. China Nat'l Mach. Imp. & Exp. Corp.*, 332 F.3d 815, 825 (5th Cir. 2003) (common question of law and fact must be "related to" proposed intervenor's arguments). Courts often allow organizations to permissively intervene where, as here, the potential intervenors may provide unique perspective or expertise for a shared legal defense. *See, e.g.*, *League of United Latin Am.*

*Citizens, Council No. 4434 v. Clements*, 884 F.2d 185, 189 (5th Cir. 1989) (courts should consider permitting intervention when intervenors may "contribute significantly to the development of the underlying factual issues"); *Wachob Leasing Co., Inc. v. Gulfport Aviation Partners, LLC*, No. 1:15cv237-HSO-RHW, 2016 WL 10568063, at *2 (S.D. Miss. Nov. 30, 2016) (same).

The Proposed Intervenors qualify for permissive intervention because, at minimum, the Agency Defendants' and Proposed Intervenors' defense of the rule will share a common issue of law. Proposed Intervenors intend to defend the anti-racism rule by using their experience with and expertise in discrimination and racial health disparities to explain why the anti-racism rule falls squarely within CMS's statutory authority to define clinical practice improvement activities.

## **CONCLUSION**

For the foregoing reasons, this Court should grant the Proposed Intervenors' motion to intervene as of right or by permission of the Court.

May 11, 2023                                        Respectfully submitted,

Jon Greenbaum*                                     */s/ Robert B. McDuff*
Kathryn Youker*                                    Robert B. McDuff (MS Bar #2532)
Emily Chong*                                       Mississippi Center for Justice
Lawyers' Committee for Civil Rights Under Law      210 E Capitol Street, Suite 1800
1500 K Street, NW, Suite 900                       Jackson, MS 39201
Washington, DC 20005                               Telephone: (601) 259-8484
Telephone: (202) 662-8355                          rmcduff@mscenterforjustice.org
kyouker@lawyerscommittee.org

                                                   Jo-Ann Tamila Sagar*
                                                   Stanley J. Brown*
                                                   Johannah Walker*
                                                   HOGAN LOVELLS US LLP
                                                   555 Thirteenth Street, NW
                                                   Washington, DC 20004
                                                   Telephone: (202) 637-5600
                                                   Facsimile: (202) 637-5910
                                                   jo-ann.sagar@hoganlovells.com

                                                   *Counsel for Intervenors*

                                                   * *Pro Hac Vice Application Forthcoming*

19

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on May 11, 2023, the foregoing document was filed on the Court's CM/ECF system which sent notification of such filing to all counsel of record.

*<u>/s/ Robert B. McDuff</u>*