# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

| | |
|---|---|
| STATE OF MISSISSIPPI; STATE OF ALABAMA; STATE OF ARKANSAS; COMMONWEALTH OF KENTUCKY; STATE OF LOUISIANA; STATE OF MISSOURI; and STATE OF MONTANA,<br><br>                                        *Plaintiffs*,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; CHIQUITA BROOKS-LASURE, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services; THE CENTERS FOR MEDICARE AND MEDICAID SERVICES; THE UNITED STATES OF AMERICA,<br><br>                                        *Defendants*. | No. 1:22-cv-113-HSO-RPM |

## DECLARATION OF ROBERT JAMES

I, Robert James, declare as follows:

1. The facts set forth in this declaration are based on my personal knowledge, and if called as a witness, I could and would competently testify to the following matters under oath.

2. I am the President of the Mississippi State Conference of the National Association for the Advancement of Colored People ("Mississippi NAACP"), a proposed intervenor in the above-captioned matter. The Mississippi NAACP is a nonpartisan, nonprofit organization that is an affiliate of the NAACP.

1

3. I am authorized to provide this declaration on behalf of the Mississippi NAACP. I have served as the President of Mississippi NAACP for around four years. As president, I often interact with Mississippi NAACP members, and I regularly work with the Mississippi NAACP units (branches, chapters, and committees) and other NAACP units responsible for carrying out the mission of the organization. The Mississippi NAACP typically holds 10 meetings of the State Conference per year. I also periodically attend after-hours meetings and receive phone calls from the branches about their operations and issues that arise, as needed. Before my term as the President of the State Conference, I spent approximately eight years serving as the President of the Stone County Branch of the NAACP. I have also served as the NAACP Membership Committee Chairman. I have been a member of the NAACP since 2013.

4. The NAACP is the nation's oldest and largest civil rights organization, which was founded in 1909. We share the mission of the NAACP, which is to "achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color."[1] Specifically, we focus on implementing the mission and goals of the NAACP at the state and local level in Mississippi.

5. We currently have over 11,000 members throughout the state, with more than 112 units, including branches, college chapters, and youth councils, across Mississippi. The Mississippi NAACP's membership consists largely of African Americans, and we aim to support all people of color and members of underrepresented and vulnerable populations,

---

[1] NAACP, *Our Mission*, https://naacp.org/about/mission-vision (last visited May 10, 2023).

regardless of membership in the Mississippi NAACP. We advocate for and work with all of our constituents on issues that matter to them.

6. Many of the Mississippi NAACP's members are eligible for Medicare, and a significant number of those eligible for Medicare are Medicare beneficiaries.

7. Dr. Sandra Carr-Melvin, Chief Executive Officer for the Institute for the Advancement of Minority Health, is the Health Committee Chair for Mississippi NAACP. Our Health Committees conduct various forms of Health programming, including health education, and advocacy in the community, and leading our efforts to decrease racial health disparities.

8. We often collaborate with other organizations in our health programming, but the money we receive from our membership dues is also vital to funding our programming and activities.

9. The Mississippi NAACP has strong interests in the stated aims of the Center for Medicare & Medicaid Services ("CMS") 2021 final rule, the rule that adds an improvement activity entitled "create and implement an anti-racism plan" in the health equity subcategory ("anti-racism rule"). The experiences of the Mississippi NAACP's members lead us to strongly disagree with the statements in Plaintiffs' complaint that anti-racism and equity do not belong in medicine. To the contrary, steps such as those promoted by the anti-racism rule are important to correct for the lingering effects of historic racism and persistent racial health disparities.

10. First, the Mississippi NAACP has an interest in preserving the anti-racism rule because many of our members are the intended beneficiaries of the rule and one of our primary

3

missions is to expand access to affordable, quality healthcare for all Mississippians, including our members. We've undertaken many projects in pursuit of this mission.

11. Currently, one of our largest campaigns involves advocating for Medicaid expansion in Mississippi, which would benefit many thousands of lower wage earners who lack access to medical insurance. Through this campaign, we have learned that many uninsured people forego medical care because they are forced to choose between getting medical care or providing food for their families or other necessities. When Mississippians delay care, they have worse health outcomes and are more likely to end up in the emergency room to receive treatment for their chronic medical conditions.

12. Our Health Chair, Dr. Carr-Melvin, has written about how neglecting preventative care drives up the cost of providing medical care for all Mississippians and burdens hospitals, "making it harder for them to invest in new technologies or equipment, maintain needed capacity to serve patients or even remain open."[2] Rural hospitals can be particularly affected by this issue: with a large patient population that has no health insurance, or who at best are under insured, many rural hospitals simply do not have the financial ability to continue their mission.

13. Through the Medicaid expansion campaign, we have learned from medical providers, hospital systems, and community members who have had a range of experiences with Mississippi's health care system. They told us about the many barriers that low-income Mississippians face gaining access to quality health care. For example, we have heard about rural hospital closures and how those closures force people living in rural areas to travel

---

[2] Dr. Sandra Carr-Melvin, *Medicaid Expansion In Mississippi Closes the Health Insurance Gap*, Miss. Free Press (Mar. 16, 2022), https://www.mississippifreepress.org/22004/medicaid-expansion-in-mississippi-closes-the-health-insurance-gap.

4

long distances for basic medical care. The closure of rural hospitals causes similar hardships for many of our members because Mississippi is a very rural state.

14. In addition to our Medicare expansion campaign, the Mississippi NAACP works with a diverse coalition of stakeholders—including hospital systems, physicians, community members, and advocacy groups—to conduct community education, legislative office visits, press conferences, public forums, op-ed's and other outreach efforts to raise awareness about the importance of access to healthcare. We hired a campaign manager, Dr. Ashley White Jones, and one of the initiatives she led was recording the stories of Mississippians whose lives have been impacted by their lack of medical insurance. Dr. Jones has a master's degree in public health. Her current academic research focuses on health equity and health disparities in the Black community, and she works on a variety of health equity initiatives, including creating a curriculum for nursing and public health studies regarding Black maternal health.

15. Rescinding the anti-racism rule will likely impede the Mississippi NAACP's efforts to increase access to quality health care for Black Mississippians. Our members have told us that they are deterred from overcoming logistical barriers to accessing routine, preventative healthcare when they feel like medical providers are not sensitive or responsive to their needs. The anti-racism rule, if left intact, is designed to incentivize medical providers to implement or instill measures to identify, prevent, and reduce racial health disparities, such as training providers on how to combat implicit biases, respond to the needs of all patients regardless of their race, and overcome the distrust that often exists between medical professionals and Black Mississippians.

16. Second, the Mississippi NAACP has an interest in defending the anti-racism rule because the rule furthers the organization's mission to eliminate racial health disparities. Although Mississippi has some of the worst health outcomes in the country for Black *and* white patients, Mississippi's track record on health outcomes for Black Mississippians is particularly dismal. Public and private discrimination has, for centuries, impeded Black Mississippians' access to quality health care. The resulting racial health disparities are intertwined with and exacerbated by other racial inequities throughout the state. Due to Mississippi's uniquely violent history of racism, the Mississippi NAACP continues to have an interest in overcoming the effects of historic and persistent racism in all aspects of society, including health care. I have discussed these racial health disparities with both experts and lay people within the Mississippi NAACP's membership.

17. Our Health Chair, Dr. Melvin, has stated that Mississippi's Black population has the highest mortality rate due to hypertension, stroke, diabetes, and other chronic conditions, and the highest prevalence of coronary heart disease, hypertension, obesity, and diabetes, compared to Mississippi's Hispanic and non-Hispanic white populations. Moreover, Black women in Mississippi are four times more likely to die from pregnancy-related deaths than non-Hispanic white women.

18. Some of our members have talked about the difference in pain management that Black patients receive as compared to white patients because Black patients' pain is more often ignored or minimized by health care providers. This occurs for several reasons, such as the stereotype that Black people do not feel as much pain and the fact that the medical system fails to account for physical differences between patients who are non-white. The anti-racism rule would likely help reduce bias in the medical profession because it incentivizes

Medicare providers to conduct activities such as providing training so that medical providers are more aware of, and can take into account the shortcomings of some medical equipment and standards of care when used with Black patients.

19. Racial health disparities became even more apparent during the COVID-19 pandemic, in which people of color were disproportionately affected by COVID-19. Due to the many ways that healthcare tends to be less accessible for people of color, as well as inequities in social and economic factors that influence health outcomes, many Black Mississippians are diagnosed with chronic conditions after the condition has worsened, resulting in worse health outcomes and making it more likely that they would die or suffer severe illness from COVID-19. Throughout the pandemic, we called for Mississippi to increase access to the vaccine for communities of color and other vulnerable populations. After the state largely ignored requests by the Mississippi NAACP throughout the pandemic that it develop a plan to distribute vaccines equitably, in March 2022, we filed an administrative complaint for race discrimination with the Federal Emergency Management Administration and the Department of Health and Human Services alleging the state had violated federal antidiscrimination requirements. Mississippi does not have a general civil rights or anti-discrimination law.

20. As we noticed that Mississippi was not working to directly provide assistance to Black communities, the Mississippi NAACP diverted our resources to protect these communities: we worked to promote vaccine campaigns and assisted our members and Mississippians of color in accessing COVID-19 vaccines, personal protective equipment, and other resources. For example, we set up an Emergency Response Program in which we distributed personal protective equipment and set up vaccine clinics. Specifically, the

Jackson City Branch, Panola County Branch, Oktibbeha County Branch, and Pearl River County Branch hosted vaccine clinics, distributed informational materials about the vaccine, and partnered with local organizations and community members to distribute donations such as hand sanitizers and masks, as well as work together to coordinate and publicize their clinics. Also, the Mississippi NAACP hosted a joint rental assistance and vaccine clinic in Greenville, Mississippi, as we found that housing insecure households were more susceptible to COVID-19 transmission.

21. Currently, many of our members continue to experience the consequences of this antipathy toward the health of Black people in Mississippi. For example, our members in the majority-Black city of Jackson, Mississippi went without drinkable running water for over a month in August 2022 after Jackson's largest water treatment plant failed. This water outage led the National NAACP and the Mississippi NAACP to file a Title VI complaint of race discrimination against the Mississippi State Department of Health and the Mississippi Department of Environmental Quality, citing the state's repeated failures to allocate federal funds for improvements to the city of Jackson's water system. Mississippi's repeated failures caused Jackson's crumbling water system, which has been an enormous problem for residents of the predominantly Black city, with frequent shutoffs, boil-water notices, and ongoing exposure to toxic lead and harmful bacteria.

22. Our complaint explains that Mississippi, for years, has discriminated on the basis of race against the City of Jackson, Mississippi and "its majority-Black population by diverting federal funds awarded to ensure safe drinking water and unpolluted surface waters and groundwater."[3] Our complaint describes how Mississippi repeatedly "deprived Jackson of

---

[3] Complaint at 2 (Sept. 27, 2022), https://naacp.org/articles/naacp-files-discrimination-complaint-mishandling-jackson-water-crisis.

federal funds to maintain its public drinking water system in favor of funding smaller, majority-white communities with less acute needs—despite the fact that Jackson is Mississippi's most populous city, with a demonstrated need for improvements to water infrastructure. The result is persistently unsafe and unreliable drinking water and massive gaps in the access to safe drinking water[]."[4]

23. The water crisis is only the latest example of racial disparities that are negatively affecting our members today. On a broader level, we have heard from our members and our chairs about many other examples of how they are still encountering racism and disparities in medical care. The Mississippi NAACP is also taking affirmative steps to identify other ways in which Black people experience disparate health outcomes. For example, we recently began a research project to study Black men's health and tobacco use.

24. The anti-racism rule is designed to encourage Medicare providers to identify and address health inequities experienced by Black people and other people of color. The rule would likely benefit many of our members, who are Medicare recipients, by encouraging doctors and health care providers to identify racial disparities, create a plan to prevent and address racism, including racism arising from implicit bias and stereotypical assumptions about Black patients, and ensure services are accessible and understandable for those seeking care. Moreover, a rule focused on advancing health equity would improve the quality of care for all patients, and benefit Mississippi NAACP's members who are not Medicare beneficiaries.

25. In our view, this rule would be especially beneficial for our Medicare-eligible members. This is because many of our older members hold a distinctive distrust of the healthcare

---

[4] *Id.*

system because it was deeply discriminatory for much of their lives. In addition to the racial health disparities that our members face, many of our older members have past trauma from their experiences with the healthcare system. This distrust and trauma deter some older members from pursuing the care they need.

26. Third, the Mississippi NAACP has an interest in seeing more cultural competency and racial sensitivity among medical providers. Our members often seek out medical care from Black physicians or physicians who are culturally competent because of the implicit bias and discrimination they have experienced in the healthcare system. But again, due to the state's history of discrimination, Black physicians in Mississippi are few and far between. In fact, one of our members, Dr. Robert L. Smith, is a medical doctor who experienced segregation and discrimination in his workplace when he began practicing medicine in Mississippi the 1960s. Dr. Smith has said he saw thousands of Mississippians, mostly poor Black families, going without medical care and forced to deal with ailments on their own. For example, Black individuals were refused care at some hospitals or forced into unsanitary wards.

27. Dr. Smith's experience is not unique: the American Medical Association ("AMA") and its Mississippi state affiliate have a long history of discrimination and abuse against Black patients and medical practitioners. Dating back to the 1800s and persisting through much of the 20th century, Black doctors were prohibited from using the same changing rooms, eating in the same dining rooms, or seeing patients in the same hospital rooms as white doctors in Mississippi hospitals.

28. The scarcity of Black physicians leads some rural Black Mississippians to regularly travel more than an hour away to receive routine care, as they have found that doctors are more

likely to be white in rural areas and some, but not all, of those physicians are insensitive to the needs of their Black patients. Many of our members feel they receive better care from Black doctors or white doctors who are culturally competent.

29. The anti-racism rule incentivizes health care providers to create and implement anti-racism plans with the goal of improving medical providers' cultural competencies. Our members would not have to travel so far to receive quality medical care if providers in rural areas were better equipped to meet the needs of Black Mississippians.

30. Ending the anti-racism rule, as Mississippi and other Plaintiffs seek, on the inaccurate grounds that anti-racism efforts are "bad medicine," would pose a significant risk of continuing the exacerbation of racial health disparities and poor health outcomes among Mississippians. In our experience, racial health disparities are a result of racism and discrimination, and we believe that the anti-racism rule is a positive step forward in working to reduce health disparities.

31. In summary, the anti-racism rule is designed to benefit our many members who are Medicare beneficiaries, as well as thousands of other people of color in Mississippi. The rule seeks to improve access to quality healthcare, a goal that the Mississippi NAACP is invested in, and currently spends time and resources on.

I solemnly swear and affirm under the penalties of perjury that the foregoing is true and correct based on my personal knowledge.

/s/ Robert James                                  5/11/2023
Declarant's Signature                             Date

Robert James
Declarant's Printed Name

11