# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

STATE OF MISSISSIPPI;
STATE OF ALABAMA;
STATE OF ARKANSAS; COMMONWEALTH OF
KENTUCKY; STATE OF
LOUISIANA; STATE OF Missouri;
and STATE OF MONTANA,

                                    *Plaintiffs*,

v.                                                                      No. 1:22-cv-113-HSO-RPM

XAVIER BECERRA, in his official
capacity as Secretary of Health and
Human Services; THE UNITED
STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
CHIQUITA BROOKS-LASURE, in her
official capacity as Administrator of the
Centers for Medicare and Medicaid
Services; THE CENTERS FOR
MEDICARE AND MEDICAID
SERVICES; THE UNITED STATES
OF AMERICA,

                                    *Defendants*.

_____

**DECLARATION OF NIMROD CHAPEL, JR.**

I, Nimrod Chapel, Jr., declare as follows:

1. The facts set forth in this declaration are based on my personal knowledge, and if called as a witness, I could and would competently testify to the following matters under oath.

2. I am the President of the Missouri State Conference of the National Association for the Advancement of Colored People ("Missouri NAACP"), a proposed intervenor in the above-captioned matter.

3. I am authorized to provide this declaration on behalf of the Missouri NAACP. I have held the position of President for the Missouri NAACP for approximately eight years. I am also

the President of the Jefferson City Branch of Missouri, and I have served as President of the branch since around 2006. Before my presidency, I was a member of the Missouri NAACP, involved in the Kansas City NAACP branch, and served as the chair of the Young Adult Committee in Kansas. In performing my duties as both the President of the Missouri NAACP and the Jefferson City Branch, I often interact with Missouri NAACP members. I also regularly work with the Missouri NAACP units and other NAACP units responsible for carrying out the mission of the organization.

4. The NAACP is the nation's oldest and largest civil rights organization, which was founded in 1909. The Missouri NAACP is a nonpartisan, nonprofit organization that is an affiliate of the NAACP. We share the mission of the NAACP, which is to "achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color."[1]

5. We currently have several thousand members throughout the state, with more than 30 active units across Missouri. The Missouri NAACP's membership consists largely of African Americans, and the organization supports all people of color and all members of underrepresented and vulnerable populations, regardless of their membership in the Missouri NAACP.

6. A large percentage of the Missouri NAACP members residing in Missouri are Medicare beneficiaries or are eligible for Medicare.

7. The Missouri NAACP has a Health Committee led by our Health Chair, Dr. Cheryl Avant, PhD, MBA, MHA. Our Health Committee consists of members who are medical providers,

---

[1] NAACP, *Our Mission*, https://naacp.org/about/mission-vision (last visited May 10, 2023).

advocates, professors, researchers, and other community members who have expertise in or interest in health justice issues.

8. We hold quarterly meetings for state conference members, which frequently include presentations or remarks by our Health Chair, who relays information about important health matters that the Missouri NAACP is working on.

9. The Missouri NAACP is uniquely well-positioned to understand the enduring effects of a long history of structural and individual racism. Missouri was founded as a "slave state," during the Missouri Compromise—a national compromise designed to protect slavery throughout major areas of the United States. Missouri's laws later served as a springboard for the *Dred Scott* decision—a case that ultimately concluded that African-Americans were not and could never be citizens of the United States. Even though *Dred Scott* has since been reversed and repudiated, Black Missourians continue to face overt and implicit racial discrimination, including in health care.

10. The Missouri NAACP has broad interests in the Center for Medicare & Medicaid Services' ("CMS") rule that adds an improvement activity entitled "create and implement an anti-racism plan" in the health equity subcategory ("anti-racism rule").

11. First, the Missouri NAACP has an interest in defending the anti-racism rule because of its potential to reduce racial disparities in health outcomes, particularly for our older members. Our Health Chair, Dr. Avant, co-authored the State of Missouri's – Office of Minority Health's report entitled, *State of Missouri Health Disparities Report: Promoting Health Equity and Reducing Disparities in Missouri*,[2] which found that there were large health

---

[2] Mo. Dep't of Health and Senior Servs., Mo. Office of Minority Health, *State of Missouri Health Disparities Report: Promotion Health Equity & Reducing Health Disparities in Missouri* (2008), https://health.mo.gov/living/families/minorityhealth/pdf/DisparityReport.pdf.

disparities in both the United States and Missouri. The report explains that health disparities (also called health inequalities) are "population-specific differences in the presence of disease and health outcomes, as well as differences in access to and quality of health and health care across racial, ethnic, gender, age and socioeconomic groups."[3] Unfortunately, in the years since the report was published, health disparities have continued in the United States and in Missouri.

12. As a result of these persistent racial health disparities across the state, we consider our Health Committee work to be a significant component of our efforts to implement the NAACP's mission at the state level in Missouri.

13. One example of our Health Committee's work is our initiative to draft health policy and health advancement recommendations to the Missouri Office of Minority Health. We plan to focus our report on sickle cell anemia research, but the report will also cover related conditions like heart disease and respiratory illness. As part of our research for the report, we are distributing questionnaires to our members and other individuals in the community regarding their exposure and experience with common health conditions and their knowledge of treatment and/or prevention measures.

14. The Missouri NAACP also advocated for Medicaid expansion, which the Missouri legislature passed into law in 2020. This advocacy spanned many years. We held panels featuring health experts discussing the importance of expanding Medicaid; drafted, shared, and collected petitions signed by community members; disseminated informational mailings; partnered with clergy and community groups to educate community members; discussed the issues with constituents, hosted town halls for Missouri NAACP members

---

[3] *Id.* at 6.

and the general public; and collaborated on a variety of communications to members and the public. Over the years, Black Missourians across the state told us about the importance of federal health insurance programs, including Medicare, in their everyday lives. Being able to access quality healthcare through Medicaid and Medicare is a critical issue to Black people in Missouri, including members of the Missouri NAACP.

15. The Missouri NAACP's COVID-19-related activities and efforts are another example of the health justice programming that is spearheaded by our Health Committee. First, we held several town halls and webinars about COVID-19. These provided the public with a wide range of information—from safety measures to disparities in accessing COVID-19 tests and treatments. Second, we worked diligently on partnerships with churches, such as churches affiliated with conventions and independent churches, to provide information on COVID-19 and on vaccines. Third, our Health Chair worked to secure more than 900 masks to distribute throughout Missouri, after we heard that individuals in Missouri were having mask access issues. Fourth, we partnered with local churches and Missouri community health centers on immunization clinics and mobile units, and supported their efforts to obtain vaccines. Fifth, we regularly released COVID-19 educational materials on our social media platforms to educate our community. Finally, our Health Committee researched and disseminated a report on COVID-19 to our members and community.

16. Notwithstanding these efforts, Black Missourians, including our members, died from COVID-19 at disproportionately higher rates than white Missourians. In the first few months of the COVID-19 pandemic, the disparity in death rates between Black individuals and white individuals was five to one. Accordingly, we believe that our Health Committee

work is very important to advance our mission, and we have a firm interest in defending this anti-racism rule that would work to reduce health disparities.

17. Second, the Missouri NAACP has an interest in CMS's anti-racism rule because it is likely to reduce the amount of implicit bias and overt discrimination that Black Missourians experience when seeking medical care.

18. The Missouri NAACP strives to listen to and amplify the interests of all Black Missourians, regardless of whether they are members of the Missouri NAACP. In doing so, we accept legal redress complaints from all Missourians. We have helped refer Missourians to a variety of resources, discussed potential solutions with the hospital or clinic directly, and engaged in policy advocacy and support of initiatives that we feel will improve health disparities.

19. Our members, and other Missourians of color, frequently face a variety of obstacles reflecting implicit structural biases that result in disparate access to quality healthcare. Our Health Chair, Dr. Avant, has written about barriers to accessing healthcare such as medical providers' limited locations and hours of operation, lack of transportation, lack of affordable healthcare, and language barriers.[4]

20. Black Missourians, including some of our members, also face overt medical racism on an individual level. Several Missouri NAACP members have confided in me about their experiences where they felt like they were treated differently than white patients. For example, one of our members told me that he went to the emergency room after a car accident. After being treated, he waited in the waiting room for his car ride back home. As he was waiting, the emergency room forced him to leave and then called the police on him.

---

[4] Mo. Dep't of Health and Senior Servs., *supra* note 2, at 8-9.

He was forced outside, even though it was December and cold outside. The member is a Black man, and he observed that no white patients were forced outside or reported to the police for waiting in the waiting room.

21. Third, we have an interest in seeing more cultural competency and racial sensitivity among medical providers, which the anti-racism rule promotes. As our Health Chair, Dr. Avant, found in her research, some Missourians of color have shared that, if the healthcare provider "was competent and had a genuine concern, warm spirit, and respect for the client," they have had good interactions when being seen by the provider, regardless of whether the provider was of a different nationality, race, or cultural background.[5] The anti-racism rule incentivizes health care providers to create and implement anti-racism plans with the goal of improving the provider's cultural competency and racial sensitivity. If more providers develop increased cultural competency, we believe our members and other Missourians of color will then experience better healthcare interactions.

22. The Missouri NAACP believes that it is important to provide medical care to patients on an equitable basis. The anti-racism rule plays an important role in advancing that objective. If, however, Plaintiffs succeed in striking down the anti-racism rule, Medicare providers will lose an important incentive to deliver culturally sensitive care. Rescission of the rule could also be harmful to the Missouri NAACP's efforts to pursue our organizational mission through our work to reduce health disparities.

23. Moreover, if the rule is rescinded on the grounds that anti-racism measures conflict with antidiscrimination laws, or that such efforts do not improve health care or outcomes, providers are likely to rescind existing anti-racism efforts. Such a result would require the

---

[5] *Id.* at 9.

Missouri NAACP to spend more resources on our health programming as we would need to address the deepening divide between the medical field and the communities we serve. The Missouri NAACP has spent its own resources through its Health Committee work to help facilitate better delivery of healthcare in the Black community. The rule would help accomplish these goals as well. Over time, this would allow the Missouri NAACP to spend less of its dues and resources on addressing medical distrust, outreach and other health programming, as the medical profession becomes better at serving all of the community.

I solemnly swear and affirm under the penalties of perjury that the foregoing is true and correct based on my personal knowledge.

/s/ Nimrod Chapel, Jr.                                    5/11/2023
Declarant's Signature                                     Date

Nimrod Chapel, Jr.
Declarant's Printed Name

8