UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| STATE OF MISSISSIPPI, et al.<br><br>*Plaintiffs*,<br><br>v.<br><br>XAVIER BECERRA, et al.,<br><br>*Defendants*. | No. 1:22-cv-113-HSO-RPM |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Table of Authorities ............................................................................................................................. iii

Introduction ............................................................................................................................................ 1

Background ............................................................................................................................................. 3

    A.    Congress creates a scheme that encourages Medicare providers to consider cost and quality of care—but not race. ........................................................................................... 3

    B.    The Biden administration injects race with its Anti-Racism Rule. ........................... 4

    C.    Plaintiffs challenge the Anti-Racism Rule, and this Court denies Defendants' motion to dismiss. ...................................................................................................................... 6

Legal Standard ....................................................................................................................................... 7

Argument ................................................................................................................................................ 7

    I.    The Anti-Racism Rule is unlawful. ............................................................................. 7

        A.    Anti-racism plans are not one of the clinical practice improvement activities specified in the bar on judicial review. ..................................................... 8

        B.    The Anti-Racism Rule is ultra vires. ............................................................. 11

    II.    No more is required for this Court to enter summary judgment now. ................. 13

Conclusion ........................................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
  321 F.3d 1166 (D.C. Cir. 2003) ................................................................................ 14, 15

*Am. Airlines, Inc. v. Herman*,
  176 F.3d 283 (5th Cir. 1999) ............................................................................................ 15

*Am. Hosp. Ass'n v. Becerra*,
  142 S. Ct. 1896 (2022) ....................................................................................................... 9

*Am. Sch. of Magnetic Healing v. McAnnulty*,
  187 U.S. 94 (1902) ........................................................................................................... 14

*Biden v. Missouri*,
  142 S. Ct. 647 (2022) ....................................................................................................... 11

*Citizens for Appropriate Rural Roads v. Foxx*,
  815 F.3d 1068 (7th Cir. 2016) ......................................................................................... 16

*Colville v. Becerra*,
  2023 WL 2668513 (S.D. Miss. Mar. 28) .................................................................. passim

*Dart v. United States*,
  848 F.2d 217 (D.C. Cir. 1988) .................................................................................. 14, 15

*Dep't of Com. v. New York*,
  139 S. Ct. 2551 (2019) ....................................................................................................... 3

*Kirby Corp. v. Pena*,
  109 F.3d 258 (5th Cir. 1997) ..................................................................................... 15, 16

*Mach Mining, LLC v. EEOC*,
  575 U.S. 480 (2015) ........................................................................................................... 9

*Poindexter v. United States*,
  777 F.2d 231 (5th Cir. 1985) ............................................................................................ 4

*Tex. Steel Co. v. Donovan*,
  93 F.R.D. 619 (N.D. Tex. 1982) ..................................................................................... 16

*Texas v. United States (Texas II)*,
  50 F.4th 498 (5th Cir. 2022) ............................................................................................. 8

*United States v. Garcon*,
  54 F.4th 1274 (11th Cir. 2022) (en banc) ..................................................................... 10

**Statutes**

42 U.S.C. §1395w-4 ..................................................................................................... passim

44 U.S.C. §1507 ...................................................................................................................... 4

5 U.S.C. §701 ................................................................................................................. 13, 14

5 U.S.C. §704 ................................................................................................................... 9, 13

5 U.S.C. §706 ................................................................................................................... 9, 13

Ark. Code Ann. §16-123-107 ............................................................................................ 17

Ky. Rev. Stat. Ann. §344.120 ........................................................................................... 17

Ky. Rev. Stat. Ann. §344.140 ........................................................................................... 17

La. Stat. Ann. §51:2247 ..................................................................................................... 17

Mo. Ann. Stat. §213.065 ................................................................................................... 17

Mont. Code Ann. §49-2-304 ............................................................................................. 17

Pub. L. 114-10 §101 ............................................................................................................. 4

**Other Authorities**

Canaparo, *Permissions to Hate: Antiracism and* Plessy, 27 Tex. Rev. L. & Pol. 97 (2022) ............................ 1

CMS, *Disparities Impact Statement* (Mar. 2021), perma.cc/NYL7-9AQ2 ............................ passim

*Explore Measures & Activities*, CMS, perma.cc/BHM9-D5EE ............................................ 5

Kendi, *How to Be an Antiracist* (2019) ........................................................................... 1, 5

*Timeline and Important Deadlines*, CMS, perma.cc/3ARG-4C2Y ..................................... 3

**Rules**

Fed. R. Civ. P. 12 .................................................................................................................. 8

Fed. R. Civ. P. 56 ...................................................................................................... 2, 3, 16

**Treatises**

*Medicine*, Black's Law Dictionary (11th ed. 2019) ........................................................... 9

Scalia & Garner, *Reading Law* (2012) ............................................................................... 8

**Regulations**

86 Fed. Reg. 20,348 (Apr. 19, 2021) ............................................................................. 1, 5

86 Fed. Reg. 39,104 (July 23, 2021) ................................................................................. 5

86 Fed. Reg. 64,996 (Nov. 19, 2021) ....................................................................... passim

86 Fed. Reg. 7,009 (Jan. 20, 2021) .................................................................................... 4

**INTRODUCTION**

The Centers for Medicare & Medicaid Services has a rule that pays clinicians more money if they will promulgate an "anti-racism" plan. *See* 86 Fed. Reg. 64,996, 65,970 (Nov. 19, 2021). This Anti-Racism Rule states that anti-racism plans must involve a "clinic-wide review" to prove the provider's "commitment to anti-racism" based on "an understanding of race as a political and social construct, not a physiological one." *Id.* The concept of "anti-racism" comes with ideological baggage, as the Biden administration knows; its lead proponent argues that a commitment to anti-racism requires "present discrimination." Kendi, *How to Be an Antiracist* 19 (2019); *see* 86 Fed. Reg. 20,348, 20,349 & n.3 (Apr. 19, 2021) (quoting Kendi). The Rule itself suggests that "doctors should engage in Antiracist discrimination to prioritize group disparities over individuals' needs while providing care." Canaparo, *Permissions to Hate: Antiracism and* Plessy, 27 Tex. Rev. L. & Pol. 97, 152 (2022); *see* 86 Fed. Reg. at 65,970 (directing clinicians to "us[e] the CMS Disparities Impact Statement"); CMS, *Disparities Impact Statement*, at 1 (Mar. 2021), perma.cc/NYL7-9AQ2 (*Statement*).

The Anti-Racism Rule is ultra vires. The governing statute allows CMS to identify "[c]linical practice improvement activities"—activities "that relevant eligible professional organizations and other relevant stakeholders identify as improving clinical practice or care delivery." 42 U.S.C. §1395w-4(q)(2)(A), (C)(v)(III). Anti-racism plans do not remotely satisfy that definition; in fact, the Rule tells providers to consider race in ways that have no "physiological"—*i.e.*, medical—relevance. Worse, the Rule directs clinicians to prioritize certain racial and ethnic populations over others, including certain minority groups. *See Statement* 1. The governing statutes deal with cost and quality of care, not race—the most odious classification known to American law.

This Court's order denying Defendants' motion to dismiss affirmed the legal conclusions that entitle the States to summary judgment. One, the Court held that it "has jurisdiction to review whether the Anti-Racism Rule satisfies the definition of a 'clinical practice improvement activity.'" *Colville v.*

1

*Becerra*, 2023 WL 2668513, at *20 (S.D. Miss. Mar. 28). Two, the Court held that the "Secretary lacks authority to 'identif[y]' an activity as" a clinical practice improvement activity "when the activity does not satisfy the very definition of" a clinical practice improvement activity "as set forth in the statute." *Id.* at *19. And three, the Court held that an activity "does not meet the definition of a clinical practice improvement activity" if "the activity is not 'an activity that relevant eligible professional organizations and other relevant stakeholders identify as improving clinical practice or care delivery.'" *Id.* at *19. So if anti-racism plans don't satisfy that condition, this Court should hold that the Anti-Racism Rule is unlawful.

There's no "genuine dispute" about whether that condition is satisfied. Fed. R. Civ. P. 56(a). "[T]he Anti-Racism Rule cites to an article … and to a CDC webpage for the proposition that 'systemic racism [is] a root cause for differences in health outcomes between socially-defined racial groups.'" *Colville*, 2023 WL 2668513, at *20. This Court has already reviewed those citations and Defendants' arguments about them. They were not cited for, and do not establish, the proposition that anti-racism plans that prioritize patients based on race are an activity that relevant eligible professional organizations and other relevant stakeholders identified as improving clinical practice or care delivery. *See id.* at *20; *Statement* 1. Moreover, Defendants cannot show that anti-racism plans that divorce race and physiology are even mildly like the examples of clinical practice improvement activities enumerated in the statute, *see id.*—"same day appointments," "monitoring health conditions," and the like, 42 U.S.C. §1395w-4(q)(2)(B)(iii). Anti-racism plans are categorically not clinical practice improvement activities. The Anti-Racism Rule is wholly outside the agency's statutory authority.

This Court should enter summary judgment now. Because no "material fact" is subject to "genuine dispute," Plaintiffs are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Neither discovery nor consideration of any administrative record is necessary before this Court can hold the

Anti-Racism Rule unlawful. Discovery is generally not required in APA cases because "a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019). And Plaintiffs may move for summary judgment "at any time." Fed. R. Civ. P. 56(b). While Defendants might insist that they want discovery on Plaintiffs' standing, at least one of Plaintiffs' theories of standing—the one this Court approved in its decision on the motion to dismiss—requires no factual development. The Anti-Racism Rule, the documents it incorporates (*e.g.*, the Diversity Impact Statement), and the States' antidiscrimination laws are subject to judicial notice, *Poindexter v. United States*, 777 F.2d 231, 236 (5th Cir. 1985) (citing 44 U.S.C. §1507); and they establish the facts this Court has already said would establish the States' standing. And the merits present a pure question of statutory interpretation. Especially because MIPS scores will be calculated in early 2024, *see Timeline and Important Deadlines*, CMS, perma.cc/3ARG-4C2Y, this Court should resolve this case as a matter of law now.

## BACKGROUND

**A.     Congress creates a scheme that encourages Medicare providers to consider cost and quality of care—but not race.**

The Medicare Access and CHIP Reauthorization Act of 2015 directed the Department of Health and Human Services to establish the Merit-Based Incentive Payment System (MIPS) to incentivize cost-control, performance, and quality. Pub. L. 114-10 §101 (codified at 42 U.S.C. §1395w-4). "The MIPS program aims to drive value through the collection, assessment, and public reporting of data that informs and rewards the delivery of high-value care." 86 Fed. Reg. at 65,375. CMS uses MIPS to "pay for health care services in a way that drives value by linking performance on cost, quality, and the patient's experience of care." *Id.* Clinicians who are eligible to participate in MIPS must participate, and 99.9999% of MIPS-eligible clinicians do. *Id.*; Answer (Doc. 59) ¶33.

3

Each year, clinicians who participate in MIPS get a "composite performance score" between 0 and 100. *See* 42 U.S.C. §1395w-4(q)(5)(A). Based on their score, CMS will adjust the amount clinicians are paid up, down, or not at all. In 2022, for example, a clinician who scores lower than 75 will receive a payment reduction up to 9%. *See* §1395w-4(q)(6). "Under the MIPS, the Secretary shall use the following performance categories … in determining the composite performance score": "(i) Quality"; "(ii) Resource use"; "(iii) Clinical practice improvement activities"; and "(iv) Meaningful use of certified EHR technology." §1395w-4(q)(2)(A)(i)-(iv). Clinical practice improvement activities make up 15 percent of a clinician's MIPS score. §1395w-4(q)(5)(E)(i)(III).

This case concerns clinical practice improvement activities. Under the Act, "the term 'clinical practice improvement activity' means" an activity that "relevant eligible professional organizations and other stakeholders identify as improving clinical practice or care delivery" and that "the Secretary determines, when effectively executed, is likely to result in improved outcomes." §1395w-4(q)(2)(C)(v)(III). The Act lists specific subcategories that meet this definition:

- "expanded practice access, such as same day appointments";
- "population management, such as monitoring health conditions of individuals to provide timely health care intervention";
- "care coordination, such as timely communication of test results";
- "beneficiary engagement, such as the establishment of care plans for individuals with complex care needs";
- "patient safety and practice assessment, such as through use of clinical or surgical checklists"; and
- "participation in an alternative payment model." §1395w-4(q)(2)(B)(iii).

The term "equity" does not appear in the Act.

**B.     The Biden administration injects race with its Anti-Racism Rule.**

On the first day of his presidency, President Biden issued Executive Order 13985, 86 Fed. Reg. 7,009 (Jan. 20, 2021). The Order directs the executive branch to address systemic racism and promote "equity." *Id.* The Order further directs agencies to identify policies undermining "equity" and to change policies to promote "equity." *Id.*

4

In response to the order to "Advance Racial Equity," CMS published a proposed rule. *See* 86 Fed. Reg. 39,104, 39,345 (July 23, 2021). CMS "proposed" an "improvement activity titled 'create and implement an anti-racism plan.'" *Id.* The rationale for this proposed improvement activity asserts that "systemic racism is the root cause for differences between socially-defined racial groups." *Id.*

According to the ideology of anti-racism, "'[t]he only remedy to past discrimination is present discrimination, and [t]he only remedy to present discrimination is future discrimination.'" Kendi, *How to Be an Antiracist* 19 (2019). "[T]reating, considering, or making a distinction … based on" someone's race is good if it's "antiracist"—meaning it promotes "equity." *Id.* at 18-19. Because "race-neutral" approaches supposedly do not promote equity, they are actively "racist." *Id.* Equity, in turn, means that all racial groups must be "on approximately equal footing" in all things, no matter the cause of the existing disparity. *Id.* The Biden administration has explicitly used Kendi's ideology in its regulations. *E.g.*, 86 Fed. Reg. 20,349 & n.3.

CMS later published the final rule. 86 Fed. Reg. 64,996 (Nov. 19, 2021). The final rule adopts the proposed rule's anti-racism plans. *Id.* at 65,384. It offers the same rationale: "This improvement activity acknowledges it is insufficient to gather and analyze data by race, and document disparities by different population groups. Rather, it emphasizes systemic racism is the root cause for differences in health outcomes between socially defined racial groups." *Id.* The final rule's "create and implement an anti-racism plan" improvement activity is "high-weighted." *Id.* at 65,969. That Rule governed performance year 2022. Consistent with the Rule, CMS encourages anti-racism plans "using the CMS Disparities Impact Statement" for performance year 2023. *See Explore Measures & Activities*, CMS, perma.cc/BHM9-D5EE (archived June 6, 2023) (under "Create and Implement Anti-Racism Plan").

The Anti-Racism Rule injects race ideology into medicine. Clinicians who participate in this improvement activity must "include a clinic-wide review of existing tools and policies … to ensure that they include and are aligned with a commitment to anti-racism and an understanding of race as a

5

political and social construct, not a physiological one." 86 Fed. Reg. at 65,970. The plan "should also … include target goals and milestones." *Id.* And the plan can include "ongoing training on anti-racism." *Id.*

Moreover, the Rule requires clinicians to "[c]reate and implement an anti-racism plan using the CMS Disparities Impact Statement or other anti-racism planning tools." *Id.* That CMS document, in turn, states that it "can be used by all health care stakeholders to achieve equity for racial and ethnic minorities." *Statement* 1; Answer (Doc. 59) ¶54 ("Defendants admit that CMS has developed a tool called the Disparities Impact Statement."). Clinicians should "[i]dentify health disparities and priority populations." *Statement* 1. Under that step of the plan, clinicians should "[s]tratify[] measures and health outcomes by race and ethnicity" to "help [them] get started." *Id.* at 2. Clinicians must use "data" to "identify health disparities and/or … priority population(s)." *Id.* And clinicians must then expressly identify the "population(s)" they will "prioritize." *Id.* at 2, 7.

## C. Plaintiffs challenge the Anti-Racism Rule, and this Court denies Defendants' motion to dismiss.

The States filed an amended complaint in August 2022. Am. Compl. (Doc. 28). The complaint alleges one claim: the Anti-Racism Rule is ultra vires. Am. Compl. ¶¶5, 57-65. The States ask this Court to declare "that the Anti-Racism Rule violates the Medicare Access Act and is ultra vires"; to "vacat[e] the Anti-Racism Rule"; to "enjoi[n] enforcement of the Anti-Racism Rule or provid[e] the same benefits to those who do not submit anti-racism plans that satisfy the Rule as those who do"; and to "gran[t] Plaintiffs all other appropriate relief." *Id.* at 18.

Defendants filed a motion to dismiss the amended complaint on two procedural grounds. MTD (Doc. 37). Defendants first argued that Plaintiffs lack standing. *Id.* at 11-21; Fed. R. Civ. P. 12(b)(1). Defendants then argued that a statutory bar precludes judicial review. MTD 21-29; Fed. R. Civ. P. 12(b)(1), (6). This Court later denied Defendants' motion in relevant part. It held that the States "are entitled to special solicitude and have sufficiently alleged standing due to their sovereign interest

6

in the enforcement of their anti-discrimination law." *Colville*, 2023 WL 2668513, at *14. It further held that "§1395w-4(q)(13)(B)(iii) does not preclude judicial review of the question whether the promulgated activity falls within the statutory definition of a 'clinical practice improvement activity.'" *Id.* at *19.

## LEGAL STANDARD

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Texas v. United States (Texas II)*, 50 F.4th 498, 521-22 (5th Cir. 2022).

## ARGUMENT

This Court should enter summary judgment based on the reasoning in its order denying Defendants' motion to dismiss. No bar to judicial review precludes this Court from considering the States' narrow claim because anti-racism plans are not covered by the bar's text. For similar reasons, the Anti-Racism rule violates clear statutory text and is ultra vires. The States' motion for summary judgment should be granted as soon as possible, given the impending close of the 2023 performance year. And no discovery is required to show that the States have standing: The Anti-Racism Rule will imminently and predictably frustrate their sovereign and quasi-sovereign interests in preventing racial discrimination in medicine.

**I.        The Anti-Racism Rule is unlawful.**

In their motion to dismiss, Defendants attempted to evade judicial review based on two arguments. First, they argued that a statutory limit on judicial review "expressly bar[s]" any challenge to the Anti-Racism Rule. MTD 21. Second, they argued that the ultra vires exception to statutory bars does not apply here. *Id.* at 23. This Court rejected the first argument, which is sufficient to reach the merits. Even if it hadn't, the second argument fails for the same reasons the States have already identified.

7

### A. Anti-racism plans are not one of the clinical practice improvement activities specified in the bar on judicial review.

Judicial review is available for Plaintiffs' claim. *See* 5 U.S.C. §704; §706(2)(A), (C). There is "a 'strong presumption' in favor of judicial review of final agency action." *Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896, 1902 (2022). Defendants "bea[r] a heavy burden in attempting to show that Congress prohibited all judicial review of the agency's compliance with a legislative mandate." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (cleaned up). "If multiple readings of the statutory language are possible, the Court must adopt the version that preserves judicial review." *Colville*, 2023 WL 2668513, at *18. "Thus, if there is doubt as to Congress's intent, the presumption in favor of judicial review controls." *Id.*

No bar on judicial review precludes review of the Anti-Racism Rule. Defendants relied only on section 1395w-4(q)(13)(B). That provision bars "judicial review … of … [t]he identification of measures and activities *specified under paragraph (2)(B)*." 42 U.S.C. §1395w-4(q)(13)(B) (emphasis added). Paragraph (2)(B), in turn, specifies "clinical practice improvement activities … as defined in subparagraph (C)(v)(III)." §1395w-4(q)(2)(B)(iii). And subparagraph (C)(v)(III), in turn, defines "'clinical practice improvement activity'" to "mean[] an activity that [(1)] relevant eligible professional organizations and other relevant stakeholders identify as improving clinical practice or care delivery *and* [(2)] that the Secretary determines, when effectively executed, is likely to result in improved outcomes." §1395w-4(q)(2)(C)(v)(III) (emphasis added). Because subparagraph (C)(v)(III) uses the word *and*, an activity is a "clinical practice improvement activity" only if *both* conditions (1) and (2) are satisfied. *See United States v. Garcon*, 54 F.4th 1274, 1278 (11th Cir. 2022) (en banc) ("[W]hen 'and' is used to connect a list of requirements, the word ordinarily has a 'conjunctive' sense, meaning that all the requirements must be met."); Scalia & Garner, *Reading Law* 116 (2012) (explaining that "[w]ith the conjunctive list, all … things [in the list] are required"). If one of the conditions is not true for anti-racism plans, then they

are not "clinical practice improvement activities," 42 U.S.C. §1395w-4(q)(2)(B)(iii), and so cannot be "activities specified under paragraph (2)(B)," §1395w-4(q)(13)(B).

This Court concluded the same. It "f[ound] that, in order for the prohibition on judicial review … to apply to a clinical practice improvement activity, the activity must satisfy the definition set forth in § 1395w-4(q)(2)(C)(v)(III)." *Colville*, 2023 WL 2668513, at *19. "[A]s a result, [the statutory bar] does not preclude judicial review of the question whether the promulgated activity falls within the statutory definition of a 'clinical practice improvement activity.'" *Id.* "Accordingly, the Court has jurisdiction to review whether the Anti-Racism Rule satisfies the definition of a 'clinical practice improvement activity.'" *Id.* at *20. It does not, for three main reasons.

***First***, anti-racism plans do not relate to "clinical practice or care delivery," 42 U.S.C. §1395w-4(q)(2)(C)(v)(III), because the Anti-Racism Rule expressly encourages clinicians to use race in a way that is unrelated to "physiolog[y]," 86 Fed. Reg. at 65,970; *cf. Biden v. Missouri*, 142 S. Ct. 647, 650 (2022) (explaining that the Department's "core mission" is "patients' health and safety"); *Medicine*, Black's Law Dictionary (11th ed. 2019) ("The scientific study and practice of preserving health and treating disease or injury."). Based on the Anti-Racism Rule's non-physiological account of race, Defendants require clinicians to "priorit[ize]" certain "racial and ethnic minorities." *See Statement* 1-2, 7.

***Second***, the Anti-Racism Rule fails to identify any "relevant eligible professional organizations and other relevant stakeholders" who "identif[ied]" anti-racism plans "as improving clinical practice or care delivery." §1395w-4(q)(2)(C)(v)(III). Anti-racism plans are not "clinical practice improvement activit[ies]" if Defendants cannot show that "relevant eligible professional organizations and other relevant stakeholders" identified them "as improving clinical practice or care delivery." §1395w-4(q)(2)(C)(v)(III); *Colville*, 2023 WL 2668513, at *20. "[T]he text of the Anti-Racism Rule" does not "show that such organizations or stakeholders identified the creation of anti-racism plans as improving clinical practice or care delivery." *Colville*, 2023 WL 2668513, at *20 (citing 86 Fed. Reg. at 65,969-70).

9

Defendants had an opportunity to identify the relevant organizations and stakeholders. But this Court found that Defendants' citations did no such thing. *See id.* And none of Defendants' citations say that anti-racism plans that "prioritize" certain "racial and ethnic … populations," *Statement* 1-2, 7, without consideration of physiological differences, *see* 86 Fed. Reg. at 65,970, "will improve clinical practice or care delivery," *Colville*, 2023 WL 2668513, at *20.

***Third***, the statute itself enumerates examples that establish the nonexistence of the relationship between activities that improve "clinical practice or care delivery," 42 U.S.C. §1395w-4(q)(2)(C)(v)(III), and anti-racism plans. For example, "clinical practice improvement activities" cover same-day appointments, "monitoring health conditions," "timely communication of test results," and use of "clinical or surgical checklists," §1395w-4(q)(2)(B)(iii)—none of which is remotely related to nonphysiological considerations of race or prioritizing some people over others based on race. Defendants have failed to "demonstrate" that their citations "have shown that anti-racism plans will 'improve clinical practice or care delivery' similarly to those activities." *Colville*, 2023 WL 2668513, at *20. On the contrary, Defendants require clinicians to "prioritize" certain "racial and ethnic … populations." *Statement* 1-2, 7. That kind of discrimination against populations not prioritized—including certain minority groups—cannot credibly relate to the kinds of activities enumerated in the statute. Accordingly, anti-racism plans are not "within the statutory definition of a clinical practice improvement activity," and the "statutory bar to judicial review" does not apply. *See Colville*, 2023 WL 2668513, at *20.

The bar on judicial review, by its own text, does not apply here. And "[e]ven if Defendants' reading were a viable alternative construction, the presumption in favor of judicial review requires the Court to adopt the version that preserves judicial review." *Id.* at *19-20. This Court's ordinary power to review agency action remains. *See* 5 U.S.C. §701(a)(1). Pursuant to the APA, this Court can exercise its ordinary power to "hold unlawful and set aside agency action … found to be … not in accordance

10

with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A), (C); *see also* §704. For the same reasons that the judicial review bar does not apply, the Anti-Racism Rule is one such action.

### B. The Anti-Racism Rule is ultra vires.

As just explained, anti-racism plans are categorically not clinical practice improvement activities, so they cannot be used "in determining the composite performance score" under the MIPS. *See* 42 U.S.C. §1395w-4(q)(2)(A). In other words, the Anti-Racism Rule is wholly outside the agency's statutory authority. *Colville*, 2023 WL 2668513, at *19 ("The Secretary lacks authority to 'identif[y]' an activity as an 'activit[y] specified under paragraph (2)(B)' when the activity does not satisfy the very definition of such activities set forth in the statute."). So even if the Court construed the bar on judicial review in section 1395w-4(q)(13)(B) against the presumption of reviewability, the ultra vires exception to such bars would apply. The ultra vires exception is grounded, in part, on constitutional avoidance. Without it, "the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902).

The ultra vires exception applies independent of the availability of judicial review under statutes. *See Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) ("Prior to the APA's enactment, after all, courts had recognized the right of judicial review of agency actions that exceeded authority. … Nothing in the subsequent enactment of the APA altered th[at] … doctrine." (citing *McAnnulty*, 187 U.S. at 110)). "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Id.* And when a party claims that an agency "'exceeded its statutory authority' in purporting to apply the statute," the claim "clearly admit[s] of judicial review." *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1172-73 (D.C. Cir. 2003) (holding that the ultra vires exception to review preclusion applied notwithstanding clear statutory bar because "both AAL and ABE allege[d]

11

that, in promulgating the postal regulations at issue, the Postal Service exceeded its statutory authority"); *id.* at 1172 ("It does not matter, therefore, whether traditional APA review is foreclosed, because judicial review is favored when an agency is charged with acting beyond its authority." (cleaned up)). Under the ultra-vires exception, "the APA's stricture barring judicial review 'to the extent that statutes preclude judicial review,' 5 U.S.C. § 701(a)(1), 'does not repeal the review of *ultra vires* actions.'" *Id.* at 1173; *see also Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 293 (5th Cir. 1999) ("judicial intervention" is permitted, "even when the relevant statutory language precludes jurisdiction," where "an agency exceeds the scope of its delegated authority or violates a clear statutory mandate").

The ultra vires exception applies here. As demonstrated above, CMS "exceeded its statutory authority," *Aid Ass'n for Lutherans*, 321 F.3d at 1172-73, by declaring anti-racism plans "clinical practice improvement activities" when they clearly are not. Because anti-racism plans are not clinical practice improvement activities by the statute's plain text, CMS "exceeded its delegated powers" and "'on its face' violated a statute." *Kirby Corp. v. Pena*, 109 F.3d 258, 268-69 (5th Cir. 1997) (quoting *Dart*, 848 F.2d at 222)). The definition of "clinical practice improvement activities" has nothing to do with race, enumerated examples in the statute clarify that anti-racism plans do not qualify, and the Rule precludes considerations of race that *are* medically relevant. *See supra* I.A. Moreover, the statute unambiguously declares that an activity is a "clinical practice improvement activity" only if two conditions are met. 42 U.S.C. §1395w-4(q)(2)(C)(v)(III). Anti-racism plans that require clinicians to prioritize certain populations over others do not satisfy at least one of the conditions. *See supra* I.A.

Despite the failure of anti-racism plans to qualify as "clinical practice improvement activities" under the statute, the Anti-Racism Rule unambiguously declares and uses them as such. The "agency has exceeded its delegated powers or 'on its face' violated [the] statute." *Kirby*, 109 F.3d at 269. This Court can and should review the legality of the Anti-Racism Rule. And in light of the Anti-Racism Rule's violation of clear statutory text, the Court should enter summary judgment, declare that the

12

Rule violates the Medicare Access Act and is ultra vires, vacate the Rule, and enjoin Defendants from enforcing it.

**II.     No more is required for this Court to enter summary judgment now.**

This Court's order denying Defendants' motion to dismiss already reached the legal conclusions that are sufficient to grant Plaintiffs' requested relief. "[A] party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). "Generally, discovery is not appropriate for claims brought under the APA." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1081 (7th Cir. 2016); *see also Tex. Steel Co. v. Donovan*, 93 F.R.D. 619, 621 (N.D. Tex. 1982) ("discovery beyond the administrative record is usually inappropriate and not relevant").[1] And on standing, no discovery is required here because the Court's order already reached the key conclusions needed to establish at least one theory of standing. And one theory is enough.

In its prior order, this Court held that if the Anti-Racism Rule "interferes with" the "enforcement of [state] laws prohibiting racial discrimination," then the States are entitled "to special solicitude" based on "concrete harm" to their "sovereign interest in their laws." *Colville*, 2023 WL 2668513, at *15. This Court further held that if "anti-racism seeks to prevent and address racism" by making "decisions based on race" to "'promote health equity,'" then "the concreteness of the injury to the States' enforcement of their laws" is established. *Id.* at *16. Traceability and redressability easily follow. *Id.* at *17-18.

The States can establish, and Defendants cannot refute, this theory of standing now. The Anti-Racism Rule directs clinicians to "[c]reate and implement an anti-racism plan using the CMS Disparities Impact Statement." 86 Fed. Reg. at 65,970. The CMS Disparities Impact Statement, in turn, directs clinicians to promote "health equity" by identifying "health disparities" and "priority populations."

---

[1] This Court's scheduling order requires Defendants to produce the administrative record by June 26, 2023. *See* Doc. 73.

*Statement* 1. Anti-racism plans therefore require clinicians to use "available data sources to help … identify and prioritize which population(s)" clinicians "want to address." *Id.* at 2. "Stratifying measures and health outcomes by race can help you get started," CMS tells clinicians. *Id.* And clinicians must expressly state "[w]hat population(s)" they "will … prioritize." *Id.* If that were not enough, the Anti-Racism Rule itself makes clear that they must do all this without accounting for physiology. *See* 86 Fed. Reg. at 65,970 ("policies" and "clinical practice guidelines" must be "aligned with a commitment to … an understanding of race as a political and social construct, not a physiological one"). This Court need not consider any other evidence to find that the Anti-Racism Rule not only encourages, *see* Answer (Doc. 59) ¶51, but *directs*, clinicians in the States to prioritize patients based on race. *See Statement*. That direction alone demonstrates "that the Anti-Racism Rule will interfere with the enforcement of … anti-discrimination laws, demonstrating a concrete harm to the States' sovereign interest in their laws." *Colville*, 2023 WL 2668513, at *25. And those laws, of course, are subject to judicial notice.[2] Accordingly, this Court can and should enter summary judgment.

---

[2] Prioritizing patients based on race and ethnicity constitutes discrimination based on race. *See, e.g.*, Mont. Code Ann. §49-2-304(a) ("[I]t is an unlawful discriminatory practice … to refuse, withhold from, or deny to a person any of its services, goods, facilities, advantages, or privileges because of … race."); Ark. Code Ann. §16-123-107 ("The right of an otherwise qualified person to be free from discrimination because of race … is recognized as and declared to be a civil right."); Ky. Rev. Stat. Ann. §344.120 ("it is an unlawful practice for a person to deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation … on the ground of … race."); Mo. Ann. Stat. §213.065(1)-(2) (similar); La. Stat. Ann. §51:2247 (similar). Additionally, completing and using CMS's Disparities Impact Statement to prioritize "populations" according to "race and ethnicity" constitutes discrimination. *See, e.g.*, Mont. Code Ann. §49-2-304(b) ("unlawful discriminatory practice … to publish, circulate, issue, display, post, or mail a written or printed communication, notice, or advertisement which states or implies that any of the services, goods, facilities, advantages, or privileges of the public accommodation will be refused, withheld from, or denied to a person of a certain race."); Ky. Rev. Stat. Ann. §344.140 ("It is an unlawful practice for a person, directly or indirectly, to publish, circulate, issue, display, or mail, or cause to be published, circulated, issued, displayed, or mailed, a written, printed, oral, or visual communication, notice, or advertisement, which indicates that the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation … will be refused, withheld from, or denied an individual on account of … race.").

## CONCLUSION

For all these reasons, this Court should grant the States' motion for summary judgment and vacate the Anti-Racism Rule.

Dated: June 9, 2023

Respectfully submitted,

*s/ Scott G. Stewart*
LYNN FITCH
  *Attorney General*
Scott G. Stewart (MS Bar No. 106359)
  *Solicitor General*
Justin L. Matheny (MS Bar No. 100754)
  *Deputy Solicitor General*
MISSISSIPPI ATTORNEY
GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
scott.stewart@ago.ms.gov
justin.matheny@ago.ms.gov

*s/ Cameron T. Norris*
Cameron T. Norris\*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

*s/ Edmund G. LaCour Jr.*
STEVE MARSHALL
  *Attorney General*
Edmund G. LaCour Jr.\*
  *Solicitor General*
OFFICE OF THE ALABAMA
ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 353-2196
Edmund.LaCour@AlabamaAG.gov

*s/ Nicholas J. Bronni*
LESLIE RUTLEDGE
  *Attorney General*
Nicholas J. Bronni\*
  *Solicitor General*
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
nicholas.bronni@arkansasag.gov

| | |
|---|---|
| *s/ Aaron J. Silletto* | *s/ Scott St. John* |
| DANIEL CAMERON | JEFF LANDRY |
|   *Attorney General* |   *Attorney General* |
| Aaron J. Silletto* | Elizabeth B. Murrill* |
|   *Assistant Attorney General* |   *Solicitor General* |
| KENTUCKY OFFICE OF THE ATTORNEY GENERAL | Scott St. John (MS Bar No. 102876) |
| |   *Deputy Solicitor General* |
| 700 Capital Avenue, Suite 118 | LOUISIANA DEPARTMENT OF JUSTICE |
| Frankfort, Kentucky | 1885 N. Third Street |
| (502) 696-5439 | Baton Rouge, Louisiana 70804 |
| Aaron.Silletto@ky.gov | (225) 326-6766 |
| | murrille@ag.louisiana.gov |
| | |
| *s/ Joshua M. Divine* | *s/ Christian Corrigan* |
| ANDREW BAILEY | AUSTIN KNUDSEN |
|   *Attorney General* |   *Attorney General* |
| Joshua M. Divine*** | Christian Corrigan*** |
|   *Solicitor General* |   *Solicitor General* |
| Samuel C. Freedlund | MONTANA DEPARTMENT OF JUSTICE |
| OFFICE OF THE MISSOURI ATTORNEY GENERAL | 215 North Sanders Street |
| | Helena, MT 59601 |
| 815 Olive Street | christian.corrigan@mt.gov |
| Suite 200 | |
| St. Louis, MO 63101 | |
| (314) 340-4869 | |
| Josh.Divine@ago.mo.gov | |
| Samuel.Freedlund@ago.mo.gov | |

*pro hac vice
**pro hac vice pending
***pro hac vice forthcoming

## CERTIFICATE OF SERVICE

    I e-filed this motion with the Court, which will email everyone requiring service.

Dated: June 9, 2023                                                                              *s/ Cameron T. Norris*