**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

|  |  |
|---|---|
| STATE OF MISSISSIPPI; STATE OF ALABAMA; STATE OF ARKANSAS; COMMONWEALTH OF KENTUCKY; STATE OF LOUISIANA; STATE OF MISSOURI; and STATE OF MONTANA, *Plaintiffs*, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; CHIQUITA BROOKS-LASURE, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services; THE CENTERS FOR MEDICARE AND MEDICAID SERVICES; THE UNITED STATES OF AMERICA, *Defendants*. | No. 1:22-cv-113-HSO-RPM |

**BRIEF OF THE GREENSBORO HEALTH DISPARITIES COLLABORATIVE AND THE NAACP STATE CONFERENCES FOR ALABAMA, ARIZONA, ARKANSAS, KENTUCKY, LOUISIANA, MISSOURI, MISSISSIPPI, AND MONTANA AS AMICI CURIAE IN SUPPORT OF DEFENDANTS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................ iii

INTEREST OF THE *AMICI CURIAE* ................................................................1

INTRODUCTION ..............................................................................................2

BACKGROUND ................................................................................................4

    I.      Statutory and Regulatory Background................................................4

    II.     Procedural History ..............................................................................7

LEGAL STANDARD.........................................................................................8

ARGUMENT .....................................................................................................9

    I.      Plaintiffs Lack Standing Because Some States Do Not Have Anti-Discrimination Laws And Others Have Anti-Discrimination Laws That Are Either Not Enforced Or Not Enforceable Against MIPS Eligible Clinicians ...............................................................................9

        A.     Plaintiffs Fail to Offer the Evidence Necessary to Sustain their Law-Enforcement Standing Theory at Summary Judgment...........................10

            1.     The States do not establish injury in fact because they have not offered evidence that the Anti-Racism Rule encourages Medicare providers to make decisions based on race ...............................11

            2.     Even if Plaintiffs had shown that the Anti-Racism Rule encourages clinicians to engage in race-based decisionmaking, they failed to show that their anti-discrimination statutes cover individual Medicare providers, prohibit all consideration of race, or have ever been enforced in this context ....................................................14

        B.     Plaintiffs' Back-Up Standing Theories, Which Were Not Addressed by the Court in the Motion to Dismiss Ruling, Also Fail ...............................................................16

            1.     The States cannot sue to assert the rights of their citizens against the federal government ....................................................16

            2.     Even if States could sue the federal government as parens patriae, the States here have failed to present the evidence necessary to support their claimed injuries................................20

C.    Special Solicitude Does Not Free Plaintiffs From Establishing Standing. .................................................................................21

II.    Plaintiffs Cannot Show As A Matter Of Law That Their Claims Evade § 1395w-4(q)(13)(B)(iii)'s Bar On Judicial Review .....................................23

A.    Plaintiffs' Claim that No Relevant Stakeholder Identified Anti-Racism Planning as Improving Clinical Practice or Care Delivery is Completely Speculative...............................................23

B.    Plaintiffs Ignore the Text of the Statute to Claim that All Clinical Practice Improvement Activities Must Mirror Those Listed in § 1395w-4(q)(2)(B)(iii)...............................................25

III.   Plaintiffs Are Not Entitled to Summary Judgment On Their Claim That The Anti-Racism Rule Is Ultra Vires .....................................28

A.    The Court's Decision on Whether Judicial Review is Available Does Not Control Whether the Anti-Racism Rule is Ultra Vires as a Matter of Law .....................................28

B.    Plaintiffs Incorrectly Assert that the Anti-Racism Rule Encourages Medical Providers to Discriminate Against Patients Solely on the Basis of Their Race .....................................32

CONCLUSION.....................................................................35

CERTIFICATE OF SERVICE .....................................................36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES:**

*Alcorn v. City of Baton Rouge*,
898 So. 2d 385 (La. Ct. App. 2004).........................................................................12

*Allen v. Wright*,
468 U.S. 737 (1984)...............................................................................................11

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986)...............................................................................................24

*Burns-Toole v. Byrne*,
11 F.3d 1270 (5th Cir. 1994) ................................................................................14

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)..................................................................................................15

*Clark v. AT&T Mobility Servs., LLC*,
623 S.W.3d 197 (Mo. Ct. App. 2021)...................................................................12

*Cox v. Wal-Mart Stores E., L.P.*,
755 F.3d 231 (5th Cir. 2014) ..................................................................................8

*Crawford v. Bd. of Educ. of City of Los Angeles*,
458 U.S. 527 (1982)................................................................................................33

*DAK Americas Miss., Inc. v. Jedson Eng'g, Inc.*,
No. 1:18cv31-HSO-JCG, 2019 WL 2397814 (S.D. Miss. June 6, 2019)................8

*Ellison v. Broadus*,
No. 1:08-cv-262-HSO-JMR, 2010 WL 988760 (S.D. Miss. Mar. 15, 2010) ............3

*Fontenot v. Upjohn Co.*,
780 F.2d 1190 (5th Cir. 1986) ....................................................................2, 8, 28

*Forsyth v. Barr*,
19 F.3d 1527 (5th Cir. 1994) ..................................................................................3

*FW/PBS, Inc. v. City of Dallas*,
493 U.S. 215 (1990)................................................................................................10

*Gov't of Manitoba v. Bernhardt*,
923 F.3d 173 (D.C. Cir. 2019)...............................................................................17

*Haalan v. Brackeen*,
   143 S. Ct. 1609 (2023) ................................................................ *passim*

*Int'l Shortstop, Inc. v. Rally's, Inc.*,
   939 F.2d 1257 (5th Cir. 1991) ........................................... 8, 9, 28

*Jefferson Cnty. v. Zaring*,
   91 S.W.3d 583 (Ky. 2002) ......................................................... 12

*Laufer v. Mann Hosp., L.L.C.*,
   996 F.3d 269 (5th Cir. 2021) ................................................... 11

*Lewis v. Ascension Par. Sch. Bd.*,
   806 F.3d 344 (5th Cir. 2015) .............................................. 12, 13

*Little v. KPMG LLP*,
   575 F.3d 533 (5th Cir. 2009) ................................................... 11

*Louisiana State by & through Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*,
   70 F.4th 872 (5th Cir. 2023) ................................................... 19

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ...................................................... 10, 15, 20

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ...................................................... 18, 19, 21

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ................................................ 16, 17, 18, 19

*McCardell v. U.S. Dep't of Hous. & Urb. Dev.*,
   794 F.3d 510 (5th Cir. 2015) ................................................... 13

*Michigan v. EPA*,
   581 F.3d 524 (7th Cir. 2009) ................................................... 17

*Mondou v. N.Y., New Haven, & Hartford R.R. Co.*,
   223 U.S. 1 (1912) ..................................................................... 18

*Moore v. Bryant*,
   853 F.3d 245 (5th Cir. 2017) ................................................... 11

*Scenic America, Inc. v. United States Department of Transportation*,
   836 F.3d 42 (D.C. Cir. 2016) ................................................... 13

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) .......................................................... 21, 22

*Texas State LULAC v. Elfant,*
    52 F.4th 248 (5th Cir. 2022) ................................................................................10

*Texas v. Equal Emp. Opportunity Comm'n,*
    933 F.3d 433 (5th Cir. 2019) ..............................................................................19

*Texas v. ICC,*
    258 U.S. 158 (1922) ............................................................................................17

*Texas v. United States,*
    50 F.4th 498 (5th Cir. 2022) ...............................................................................28

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) .......................................................................19, 21, 22, 23

*Travelers Indemnity Co. v. Mitchell,*
    925 F.3d 236 (5th Cir. 2019) ..............................................................................26

*United States v. Lauderdale Cnty.,*
    914 F.3d 960 ........................................................................................................25

**CONSTITUTIONAL PROVISION:**

U.S. Const. art. VI, cl. 2 ............................................................................................18

**STATUTES:**

42 U.S.C. § 395w-4(q)(2)(B)(iii)(III) ..................................................................26, 27

42 U.S.C. § 1395w-4(a)(7)(E)(iii) ............................................................................14

42 U.S.C. § 1395w-4(q) ...............................................................................................4

42 U.S.C. § 1395w-4(q)(2)(A)(i) .................................................................................4

42 U.S.C. § 1395w-4(q)(2)(A)(ii) ................................................................................4

42 U.S.C. § 1395w-4(q)(2)(A)(iii) ...............................................................................4

42 U.S.C. § 1395w-4(q)(2)(A)(iv) ...............................................................................4

42 U.S.C. § 1395w-4(q)(2)(B)(iii) .....................................................................25, 26, 27

42 U.S.C. § 1395w-4(q)(2)(B)(iii)(I) ..................................................................26, 27

42 U.S.C. § 1395w-4(q)(2)(B)(iii)(II) .................................................................26, 27

42 U.S.C. § 1395w-4(q)(2)(B)(iii)(III) ...............................................................26, 27

42 U.S.C. § 1395w-4(q)(2)(B)(iii)(IV) ..............................................................26, 27

42 U.S.C. § 1395w-4(q)(2)(B)(iii)(V) ...............................................................26, 27

42 U.S.C. § 1395w-4(q)(2)(B)(iii)(VI) ..............................................................26, 27

42 U.S.C. § 1395w-4(q)(2)(C)(v)(III) .................................................................. *passim*

42 U.S.C. § 1395w-4(q)(6)(A)(ii)(I)(iii)(F) ................................................................19

42 U.S.C. § 1395w-4(q)(13)(B)(iii) .................................................................7, 23

42 U.S.C. § 1395x(r) ...............................................................................................14

Ark. Code Ann. § 16-123-102(7) (2017) ................................................................14

Ark. Code Ann. § 16-123-107(a)(2) (2017) ...........................................................14

Ky. Rev. Stat. Ann. § 344.120 (2023) .....................................................................14

Ky. Rev. Stat. Ann. § 344.130 (2023) .....................................................................14

La. Stat. Ann. § 512332(10) ....................................................................................14

Medicare Access and CHIP Reauthorization Act of 2015........................................4

Mo. Ann. Stat. § 213.065(1) (2017) ........................................................................14

Mo. Ann. Stat. § 213.065(2) (2017) ........................................................................14

Mo. Ann. Stat. § 213.075 (2017) .............................................................................14

Mo. Rev. Stat. § 208.151(1)(28)(a) .........................................................................15

Mo. Rev. Stat. § 208.662(6)(2)(a) ...........................................................................15

Mont. Code Ann. § 49-1-102(1)(a) (2023) ..............................................................14

Mont. Code Ann. § 49-2-101(20)(a) (2023) ............................................................14

Pub. L. No. 114-10, § 101, 129 Stat. 87, 92 (2015)..................................................4

**REGULATIONS:**

28 C.F.R. § 42.104(b)(2)..........................................................................................20

42 C.F.R. § 414.1355(c)..............................................................................................4

42 C.F.R. § 414.1380(b)(3)..........................................................................................5

86 Fed. Reg. 20349 ...............................................................................................30

86 Fed. Reg. 39104 (July 23, 2021) ........................................................................5

86 Fed. Reg. 39344 ..................................................................................................5

86 Fed. Reg. 39345 (July 23, 2021) ........................................................................5

86 Fed. Reg. 39855 (July 23, 2021) ........................................................................5

86 Fed. Reg. 64996 .............................................................................................7, 33

86 Fed. Reg. 65969 .............................................................................................7, 33

86 Fed. Reg. 65970 .........................................................................................20, 33

**RULES:**

Fed. R. Civ. P. 56(a) ......................................................................................8, 13, 24

**OTHER AUTHORITIES:**

*A Multi Year Look at Maternal Mortality in Missouri, 2017-2019 Pregnancy-Associated Mortality Review: Annual Report*, Mo. Dep't of Health & Senior Servs. (2022), https://health.mo.gov/data/pamr/pdf/2019-annual-report.pdf .........................15

*About Priority Populations*, Agency for Healthcare Rsch. and Quality (2021), https://www.ahrq.gov/priority-populations/about/index.html ................................30

Camara Phyllis Jones, *Toward the Science and Practice of Anti-Racism: Launching a National Campaign against Racism*, 28 Ethnicity & Disease (2018) .................................................................................................................6, 25

César Caraballo, MD, et al., *Trends in Racial and Ethnic Disparities in Barriers to Timely Medical Care Among Adults in the US, 1999 to 2018*, 3 JAMA Health Forum (2022), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2797732 ..........................................................................27

Eric Bressman, MD, et al., *Association of Telemedicine with Primary Care Appointment Access After Hospital Discharge*, 37 J. Gen. Internal Med. 2879 (2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8751457/.......................27

*Explore Measures & Activities*, Quality Payment Program, https://qpp.cms.gov/mips/explore-measures?tab=improvementActivities&py=2023 (last visited Aug. 2, 2023).........27

Ibram X. Kendi, *How to Be an Antiracist* (2019) .................................................30

*Pain Assessment and Treatment Recommendations, and False Beliefs About Biological Differences Between Blacks and Whites*, 113 PNAS 4296, 4299 (2016), https://www.pnas.org/doi/10.1073/pnas.1516047113 ..................................................29

*Priority Populations Primer, a Few Things you Should Know about Social Inequities in Health in SDHU Communities*, Sudbury & District Health Unit (2009), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2797732 ...........................................................................................30

*Racism and Health – Science and Research*, Ctrs. for Disease Control & Prevention (2021), https://www.cdc.gov/minorityhealth/racism-disparities/research-articles.html .............................................................................25

*Social Determinants of Health at CDC*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/about/sdoh/index.html (last visited Aug. 2, 2023) ................................30

*State Public Accommodation Laws*, Nat'l Conf. of State Legislatures (last updated June 25, 2021), https://www.ncsl.org/civil-and-criminal-justice/state-public-accommodation-laws ...................................................................................................14

## INTEREST OF THE *AMICI CURIAE*

Amici curiae are the NAACP State Conferences from eight states (Mississippi, Alabama, Arkansas, Arizona, Missouri, Montana, Kentucky, and Louisiana) and the Greensboro Health Disparities Collaborative.  Because of its members' knowledge and personal experience with racial health disparities, the NAACP State Conferences conduct programming at the state and local level to combat discrimination in health care and improve the health of racially diverse individuals across their states.[1]  ECF No. 62-1, Decl. of Robert James ¶ 4 (Mississippi).  The Collaborative is a group of community leaders including health care professionals who, among other things, conduct research on racial health disparities.  ECF No, 62-9, Decl. of Kari Thatcher ¶¶ 20, 28.

Amici's longstanding commitment to combating the type of racial health disparities that Anti-Racism Rule targets gives them an interest in this case.  The NAACP State Conferences have members who are eligible for or recipients of Medicare; are familiar with the history of medical racism or have experienced it themselves; and would directly benefit from the Anti-Racism Rule.  *See, e.g.*, James Decl. ¶¶ 5-6, 9-31 (Mississippi); Simelton Decl. ¶¶ 5-18 (Alabama).  Moreover, one of the Collaborative's key functions is conducting research and publishing articles like those that CMS relied upon when issuing the Anti-Racism Rule.  Thatcher Decl. ¶¶ 10-18; *see also generally* AR265-473, 1430-1813, 2282-99.

Invalidating the Anti-Racism Rule would have adverse consequences to the health of the NAACP State Conferences' constituents and the sustainability of the Collaborative's research, education, and outreach efforts.  Amici have a direct interest in avoiding that result.

---

[1] The Court gave leave for the NAACP State Conferences and the Greensboro Health Disparities Collaborative to appear as amici curiae.  ECF No. 87 at 19.

## INTRODUCTION

This Court should deny Plaintiffs' early motion for summary judgment and grant the Government's cross motion for summary judgment. Plaintiffs are required to present concrete evidence and "establish beyond peradventure *all* of the essential elements of the claim" because they bear the ultimate burden of proof at trial on standing, judicial reviewability, and the merits of their ultra vires challenges. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Plaintiffs instead presented no evidence at all.

On standing, Plaintiffs fail to show any injury in fact. None of the three injuries asserted find any support on this record, and the latter two are barred by law. Plaintiffs' "law-enforcement" injury fails absent evidence that Plaintiffs have or enforce anti-discrimination laws that extend to individual Medicare providers, and that the type of plans encouraged by the Anti-Racism Rule would categorically violate those laws. The latter two theories—that the Anti-Racism Rule injures the Plaintiff States because it would penalize in-state clinicians and diminish the health care of in-state patients—are similarly unsupported. They are also legally barred: "[A] State does not have standing as parens patriae to bring an action against the Federal Government." *Haalan v. Brackeen*, 143 S. Ct. 1609, 1640 (2023) (citation omitted). Special solicitude does not free Plaintiffs from presenting concrete evidence of a cognizable injury-in-fact.

Plaintiffs' arguments in support of judicial reviewability are likewise flawed. This Court only lifted the statutory bar on judicial review to examine "whether the Anti-Racism Rule satisfies the definition of a 'clinical practice improvement activity.'" ECF No. 52 at 45. But Plaintiffs' attempts to link its ultra vires challenge to this statutory definition rest on an assumption that the statutory definition of clinical practice improvement activity (1) requires CMS to identify on the face of the rule what organizations and stakeholders endorsed the activity; and (2) prohibits CMS

from approving activities that are dissimilar from those listed in § 1395w-4(q)(2)(C)(v)(III).  The statute does neither of these things.  Plaintiffs' arguments thus fail as a matter of law.

At minimum, Plaintiffs' motion for summary judgment fails because Plaintiffs present *no* evidence in support of their ultra vires claim.  They offer no support for the idea that "understanding race as a political and social construct" is categorically unrelated to clinical practice or care delivery; no definition of "anti-racism"; and no basis for their belief that the Anti-Racism Rule lacks endorsement from eligible professional medical organizations or other relevant stakeholders.  What is more, the administrative record refutes Plaintiffs' position on all three of these factual issues.  Plaintiffs are not entitled to summary judgment.  *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994) ("[U]nsubstantiated assertions are not competent summary judgment evidence."); *Ellison v. Broadus*, No. 1:08-cv-262-HSO-JMR, 2010 WL 988760, at *18 (S.D. Miss. Mar. 15, 2010) (similar).

The Agency Defendants, however, are entitled to summary judgment.  They assert that Plaintiffs have no standing and that Plaintiffs have not shown that CMS acted ultra vires.  In support, Agency Defendants show that there is no evidence of a cognizable injury.  Further, Agency Defendants provide robust record evidence showing that relevant stakeholders identified that Anti-Racism plans improve clinical practice and care delivery.  No commentor raised concerns that the rule would cause clinicians to violate anti-discrimination laws.  And the Plaintiff States did not even bother to file comments.  If they really had objections to the Rule, they should have raised them when the Rule was being considered.  In any event, the Agency Defendants demonstrate that anti-racism planning relates to and may improve clinical practice and health outcomes.  Plaintiffs offer no evidence to support their claims.

The Agency Defendants provide ample evidence that the Anti-Racism Rule fits within the statutory bounds and Plaintiffs have no standing to challenge the rule.  This Court should grant the Agency Defendants' cross motion for summary judgment.

## BACKGROUND

### I.   Statutory and Regulatory Background

The Medicare Access and CHIP Reauthorization Act of 2015 ("MACRA") established a new method of payment for health care services paid for under Medicare Part B.  *See* Pub. L. No. 114-10, § 101, 129 Stat. 87, 92 (2015), codified at 42 U.S.C. § 1395w-4(q).  The law repealed the prior payment methodology and directed the Secretary of the Department of Health and Human Services ("HHS") to establish a Merit-based Incentive Payment System ("MIPS"), which adjusts payments to eligible medical professionals based on their performance across four performance categories: quality, resource use, clinical practice improvement activities, and meaningful use of certified electronic health records technology.  42 U.S.C. § 1395w-4(q)(2)(A)(i)-(iv).

MACRA's definition of clinical practice improvement activity is broad.  It includes any "activity that relevant eligible professional organizations and other relevant stakeholders identify as improving clinical practice or care delivery and that the Secretary determines, when effectively executed, is likely to result in improved outcomes."  42 U.S.C. § 1395w-4(q)(2)(C)(v)(III).  CMS has since added some precision, defining nine subcategories of clinical practices improvement activities: (1) expanded practice access*, (2) population management, (3) care coordination, (4) beneficiary engagement, (5) patient safety and practice assessment, (6) participation in an alternative payment model, (7) achieving health equity, (8) emergency preparedness and response, and (9) integrated behavioral and mental health.  42 C.F.R. § 414.1355(c).  A MIPS-eligible professional may secure full credit in the improvement activities performance category by

participating in two high-weighted activities, four medium-weighted activities, *or* one high-weighted and two medium-weighted activities.  42 C.F.R. § 414.1380(b)(3).

In July 2021, CMS published a proposed rule that established "create and implement an anti-racism plan" as a high-weighted improvement activity.  86 Fed. Reg. 39104, 39345, 39855 (July 23, 2021); AR243-244.  The rule affords clinicians leeway in constructing anti-racism plans, requiring only that the plan "include a clinic-wide review of existing tools and policies . . . to ensure that they include and are aligned with a commitment to anti-racism"; "identify ways in which issues and gaps identified in the review can be addressed"; and "include target goals and milestones for addressing prioritized issues and gaps."  86 Fed. Reg. at 39855; AR244.  In short, the Anti-Racism Rule asks physicians to consider and identify racial disparities that affect patient care, including racial stereotypes that physicians themselves have not recognized in the past, and to take concrete steps to address them in their clinical practices.  The purpose of the rule is not to encourage physicians to provide worse or lesser care to white patients, but to ensure that physicians are providing the best treatment to *all* patients.  The Rule's requirements reflect CMS's research-based understanding that racial health disparities exist and can only be eliminated through the deliberate efforts of health care providers.  *See* 86 Fed. Reg. at 39344; AR242 n.151-156 (collecting studies about the existence of racial health disparities); 86 Fed. Reg. at 39855; AR244 & n.3 (explaining that the rule "is intended to help MIPS eligible clinicians move beyond analyzing data to taking real steps to naming and eliminating the causes of the disparities identified").

The proposed rule explained that "among Medicare beneficiaries, racial and ethnic minority individuals often receive lower quality of care, report lower experiences of care, and experience more frequent hospital readmissions and procedural complications."  86 Fed. Reg. at 39344; AR242.  CMS invoked a range of scholarship in support of this finding, including a

longitudinal study showing that racial disparities in utilization and outcomes for total knee and hip arthroscopy have largely persisted or worsened over the course of 18 years, AR242 n.153 (citing AR366-384).  Three other studies showed that Black Medicare recipients have higher readmission rates than white Medicare recipients after hospitalization for common medical conditions like pneumonia and congestive heart failure.  AR242 n.155-157 (citing AR302-308, 385-417).  A comprehensive report conducted by CMS's Office of Minority Health revealed similar disparities across a range of medical conditions and treatment outcomes.  AR242 n.151 (citing 1430-1608).

CMS also identified research showing that health care providers must take deliberate, affirmative steps to eliminate these disparities, including articles explaining that racial health disparities have persisted over the years in part because the medical profession has failed to identify and eliminate aspects of the American health care system that unfairly disadvantage some people on the basis of race.  *See, e.g.*, AR2282; *see also* AR2254.  According to the authority CMS relies upon, addressing racial health disparities requires three steps: "1) naming racism; 2) asking 'how is racism operating here?' and 3) organizing and strategizing to act."  Camara Phyllis Jones, *Toward the Science and Practice of Anti-Racism: Launching a National Campaign against Racism*, 28 Ethnicity & Disease 231, 231-234 (2018).

CMS's proposed rule prompted comments from the American Hospital Association, the Association of American Medical Colleges, the Intersocietal Accreditation Commission, Marsden Advisors, and several medical professional organizations, all of whom supported CMS's efforts to reduce racial health disparities.  *See, e.g.*, AR46 ("The [American College of Radiology] agrees with including improvement activities in MIPS that address creating and implementing anti-racism plans"); AR146 ("[Association of American Medical Colleges] supports CMS' proposals to address health inequity and promote anti-racism in part by adding a new improvement activity");

6

AR215 (Intersocietal Accreditation Commission noting that CMS's rule "is an opportunity to recognize clinicians for developing and implementing processes to reduce racism and discrimination to ensure equitable health care").

CMS finalized the rule in 2021. 86 Fed. Reg. 64,996, 65969; AR5. It concluded that anti-racism planning "is likely to result in improved outcomes . . . because it supports MIPS eligible clinicians in identifying health disparities and implementing processes to reduce racism and provide equitable quality health care." 86 Fed. Reg. 64996, 65969; AR5.

## II.    Procedural History

Shortly after CMS enacted the Anti-Racism Rule, Amber Colville, Ralph Alvarado, and the states of Mississippi, Alabama, Arizona, Arkansas, Kentucky, Louisiana, Missouri, and Montana filed suit in the Southern District of Mississippi, alleging that the Rule exceeds the agency's statutory jurisdiction and seeking an order from this Court that vacates the rule and declares the rule unlawful. ECF No. 1 ¶¶ 7, 11, 42-51; *id.* at 24 (Prayer for Relief). After the Department, Secretary Becerra, CMS, Administrator Brooks-LaSure, and the United States filed a motion to dismiss these claims, ECF No. 15 at 1; ECF No. 16 at 9-18, Plaintiffs amended their complaint. ECF No. 28. Defendants filed a second motion to dismiss, arguing Plaintiffs lacked standing and Defendants were entitled to immunity. ECF No. 36; ECF No. 47 at 3-9.

This Court granted in part and denied in part Defendants' motion, dismissing Colville from the case but allowing the State Plaintiffs' claims to proceed. ECF No. 52 at 47-48. This Court determined that the State Plaintiffs had plausibly alleged standing because, "according to the State Plaintiffs," the rule "encourages professionals to make decisions . . . based on race in order to 'promote equity' " when "racially-based decisionmaking is exactly what the States claim their laws prohibit." *Id.* at 35. Additionally, the Court found that § 1395w-4(q)(13)(B)(iii) does not bar judicial review of the rule at the motion-to-dismiss stage because the State Plaintiffs alleged that

the rule does not qualify as a "clinical practice improvement activity" at all.  *Id.* at 42-47.  Arizona voluntarily dismissed its claims with prejudice following the Court's order.  ECF No. 58 at 1.

Plaintiffs moved for summary judgment.  ECF No. 78.  The Agency Defendants then filed the administrative record, ECF No. 86, and later filed their Cross Motion for Summary Judgment and Response in Opposition to Plaintiff's Motion for Summary Judgment, ECF No. 90.

## LEGAL STANDARD

A court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Cox v. Wal-Mart Stores E., L.P.*, 755 F.3d 231, 233 (5th Cir. 2014).  When the moving party brings an "offensive" motion for summary judgment, as Plaintiffs do here, it bears the "high burden . . . of establishing 'beyond peradventure'" that it is entitled to judgment as a matter of law.  *DAK Americas Miss., Inc. v. Jedson Eng'g, Inc.*, No. 1:18cv31-HSO-JCG, 2019 WL 2397814, at *4 (S.D. Miss. June 6, 2019) (quoting *Fontenot*, 780 F.2d at 1194).  This requires the moving party to "come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial,'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (citation omitted).  The nonmoving party can defeat summary judgment by showing the existence of a genuine dispute of material fact to defeat the motion or by showing that the moving party's evidence "may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."  *Id.* at 1265.  In all events, the court must view the evidence and draw inferences in the light most favorable to the nonmoving party.  *Cox*, 755 F.3d at 233.

**ARGUMENT**

I.   **Plaintiffs Lack Standing Because Some States Do Not Have Anti-Discrimination Laws And Others Have Anti-Discrimination Laws That Are Either Not Enforced Or Not Enforceable Against MIPS Eligible Clinicians.**

Plaintiffs allege three theories of standing.  ECF No. 28 at 5.  The first two rest on the premise that "[m]ost [of the State Plaintiffs] prohibit racial discrimination in their laws and their agreements with medical providers," and that the Anti-Racism Rule "encourage[es] Medicare providers to make medical decisions based on race" in violation of those laws and agreements.  *Id.*  Plaintiffs contend that they will suffer one injury if they enforce their prohibitions on discrimination (lost reimbursements for professionals within their states) and another if they forego enforcement (federal interference with the enforcement of state law).  *Id.*; *see also* ECF No. 43 at 11, 14, 19.  Plaintiffs' third theory supposes that the Anti-Racism Rule "elevate[s] faddish theories about race above patient care," and will lead to racial discrimination against their citizens in the provision of health care.  ECF No. 28 at 3.  For all three injuries, Plaintiffs claim they are entitled to "special solicitude in the standing analysis."  ECF No. 43 at 13 (citation omitted).

The Court's motion to dismiss ruling focused on only one of Plaintiffs' theories—the law-enforcement theory, as enhanced by the special solicitude analysis.  According to Plaintiffs, the Anti-Racism Rule's requirement that anti-racism plans align a clinician's tools and policies with a commitment to anti-racism "encourage[es] Medicare providers to make medical decisions based on race," in violation of Plaintiff States' laws.  ECF No. 28 at 5.  But this theory fails at summary judgment because Plaintiffs have offered no evidence to support their claim that the clinic-wide review requirement encourages Medicare providers to violate state law.  Far from "com[ing] forward with evidence which would 'entitle [them] to a directed verdict if the evidence went uncontroverted at trial,'" *Int'l Shortstop*, 939 F.2d at 1264-65 (citation omitted), Plaintiffs failed to present any evidence that the Anti-Racism Rule encourages unlawful race-based

9

decisionmaking or that the Plaintiff States' anti-discrimination laws even extend to individual clinicians.  At least two of the Plaintiff States do not have laws which prohibit racial discrimination at all.  *See* ECF No. 79 at 14 n.2 (omitting Mississippi and Alabama).  And the other five states have not identified evidence that their anti-discrimination statutes would cover discriminatory acts by physicians against their patients.  Plaintiffs' remaining standing theories—which were not examined or endorsed by the Court in the motion to dismiss ruling—are similarly flawed.  As a matter of law, Plaintiff States lack standing to sue the United States as parens patriae.  *Brackeen*, 143 S. Ct. at 1640.  And as a matter of fact, the record lacks any evidence anti-racism compromises the health of the Plaintiff States' citizens.  Plaintiffs' claims of special solicitude do not remedy these shortcomings.

### A. Plaintiffs Fail to Offer the Evidence Necessary to Sustain their Law-Enforcement Standing Theory at Summary Judgment

At summary judgment, Plaintiffs bear the burden of presenting concrete evidence of injury in fact, traceability, and redressability.  The elements of standing are "not mere pleading requirements but rather an indispensable part of [a] plaintiff's case"; Plaintiffs are required to support each of the standing elements "in the same way as any other matter on which the plaintiff bears the burden of proof."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (reiterating that "standing cannot be 'inferred argumentatively from averments in the pleading'") (internal citation omitted).  At summary judgment, this requires Plaintiffs to "point to specific . . . evidence" of their injuries.  *Texas State LULAC v. Elfant*, 52 F.4th 248, 255 n.4 (5th Cir. 2022).  Plaintiffs have *not* made this showing.  Indeed, by choosing to rest only on the allegations in their complaint, ECF No. 79 at 13-14, Plaintiffs have failed to offer any evidence at all.  *See also* ECF No. 91 at 10 (Defendants arguing that Plaintiffs lack standing for similar reasons).

> 1. The States do not establish injury in fact because they have not offered evidence that the Anti-Racism Rule encourages Medicare providers to make decisions based on race.

"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Laufer v. Mann Hosp., L.L.C.*, 996 F.3d 269, 272 (5th Cir. 2021) (quotation marks and citation omitted). But here, the record lacks any evidence that the Anti-Racism Rule causes physicians who formulate anti-racism plans to unlawfully discriminate against their white patients on the basis of race. Plaintiffs do not identify any in-state clinicians who have created anti-racism plans; do not present any evidence of what it means to "align[]" a clinician's tools and policies "with a commitment to anti-racism," AR6; and do not explain how that commitment would violate a state statute that makes it unlawful to "refuse, withhold from, or deny to a person . . . services, good, facilities, advantages, or privileges because of . . . race." *See* ECF No. 79 at 14 n.2 (collecting statutes). The states' alleged injury is therefore too speculative. *Little v. KPMG LLP*, 575 F.3d 533, 541 (5th Cir. 2009) (injury was too speculative to support standing where the claimed injury "depends on several layers of decisions by third parties"); *Moore v. Bryant*, 853 F.3d 245, 253 (5th Cir. 2017) (similar). As the Defendants state, Plaintiffs claimed law-enforcement injury reflects a "hypothetical chain of events involving independent third parties that is both speculative and too 'attenuated' and 'weak' to support standing." ECF No. 91 at 11 (citing *Allen v. Wright*, 468 U.S. 737, 759 (1984)).

Plaintiffs portray their laws as prohibiting any decision that accounts for a patient's race. But the compendium of statutes Plaintiffs set forth show that their anti-discrimination laws do little more than prohibit public accommodations from withholding goods, services, or other advantages because of a person's race. ECF No. 79 at 14 n.2 (collecting statutes). Plaintiffs do not even attempt to explain how conducting a clinic-wide review to ensure a clinician's tools reflect a

commitment to anti-racism is tantamount to a race-based denial of goods and services.  Equally remarkable is Plaintiffs' suggestion, *id.*, that an anti-racism planning document would violate state laws that prohibit publications from implying that goods and services would be denied to someone because of their race.

If anything, case law from several Plaintiff States indicates that their anti-discrimination laws simply parallel federal protections against discrimination.  *See, e.g.*, *Alcorn v. City of Baton Rouge*, 898 So. 2d 385, 388 (La. Ct. App. 2004) ("Louisiana's anti-discrimination law is similar in scope to the federal Title VII prohibition against discrimination"); *Jefferson Cnty. v. Zaring*, 91 S.W.3d 583, 590 (Ky. 2002) (The "claim of reverse discrimination under [Kentucky law] is governed by the allocation of the burden of proof in a reverse discrimination claim brought under Title VII"); *see also Clark v. AT&T Mobility Servs., LLC*, 623 S.W.3d 197, 203 (Mo. Ct. App. 2021) (State law prohibiting employment discrimination only prohibits "unfair treatment based on race" (internal quotation marks and citation omitted)).[2]

The Anti-Racism Rule readily comports with federal anti-discrimination principles, which require only a rational basis for government action that "is facially race neutral" when "there is no proof of *either* discriminatory purpose *or* discriminatory effect."  *Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344, 354 (5th Cir. 2015).  This differs from the strict scrutiny afforded to policies that facially discriminate against groups on the basis of race, or those enacted with discriminatory purpose that have a discriminatory effect.  *Id.* at 355.  The Anti-Racism Rule falls into the former category.  It does not make race-based distinctions; it does not serve a discriminatory purpose; and there is no evidence that it will have a discriminatory effect.  To the extent that federal anti-

---

[2] Case law from the Plaintiff States suggests that the States' anti-discrimination laws are rarely invoked outside of the employment discrimination context.  Plaintiffs did not cite, nor have Amici found, any cases interpreting the Plaintiff States' anti-discrimination laws as applied to health care providers.

discrimination law informs this Court's analysis, it affords the Anti-Racism Rule a "strong presumption of validity." *Id.* at 354.

If Plaintiffs had evidence that their laws proscribed a broader range of racial considerations, it was their burden to present it. *See McCardell v. U.S. Dep't of Hous. & Urb. Dev.*, 794 F.3d 510, 516 (5th Cir. 2015). "Although standing generally is a matter dealt with at the earliest stages of litigation . . . it sometimes remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial." *Id.* That was the case in *Scenic America, Inc. v. United States Department of Transportation*, 836 F.3d 42, 47 (D.C. Cir. 2016), where a plaintiff's allegations of standing were sufficient to survive a motion to dismiss, but the evidence presented at summary judgment failed to demonstrate redressability. *Id.* at 49, 51. Indeed, the plaintiff "introduced no evidence into the record," and instead relied upon "unadorned speculation" that the injury could be remedied by an order of the court. *Id.* at 51-52. The D.C. Circuit vacated the lower court's judgment, reiterating that the district court's finding that the plaintiff "established standing at the motion to dismiss stage" was only "the first step" of the analysis; it did not "obviate the court's responsibility to ensure that the plaintiff can actually prove those allegations when one or both parties seek summary judgment." *Id.* at 48.

So, too, here. This Court's rejection of the Agency Defendants' standing challenge was only the "first step," concluding only that Plaintiffs' allegations of standing were sufficiently plausible to survive a motion to dismiss. *See* ECF No. 52 at 38 (rejecting Agency Defendants' standing argument "[i]n light of Plaintiffs' allegations and the absence of any record evidence that the Anti-Racism Rule rejects the race-based decisionmaking that is alleged to be promoted by the Rule"). But at summary judgment, Plaintiffs are required to show that they are entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a), and to present concrete facts in support of that position.

*See Burns-Toole v. Byrne*, 11 F.3d 1270, 1273 (5th Cir. 1994). Plaintiffs have not satisfied that requirement. Rather, Plaintiffs' claim that "anti-racism seeks to prevent and address racism is to actually make decisions based on race" finds no more support in the record now than it had when Plaintiffs first filed their complaint.

> 2. Even if Plaintiffs had shown that the Anti-Racism Rule encourages clinicians to engage in race-based decisionmaking, they failed to show that their anti-discrimination statutes cover individual Medicare providers, prohibit all consideration of race, or have ever been enforced in this context.

MIPS creates opportunities for *individual* Medicare providers to receive increased reimbursements. *See* 42 U.S.C. § 1395w-4(a)(7)(E)(iii) (defining "eligible professional" to mean "a physician, as defined in section 1395x(4) of this title"); 42 U.S.C. § 1395x(r) (defining physician to refer to individual doctors or chiropractors). Yet, as Defendants note, Plaintiffs failed to "introduce any *evidence* of how they enforce their antidiscrimination laws in the healthcare setting." ECF No. 91 at 10. None of Plaintiffs' anti-discrimination statutes (where they exist) purport to cover individual doctors. Of the seven Plaintiff States, two (Montana, Louisiana) seem to cover hospitals as public accommodations, but fall short of regulating the individual physicians who may adopt Anti-Racism Plans. *See* Mont. Code Ann. § 49-1-102(1)(a) (2023); Mont. Code Ann. § 49-2-101(20)(a) (2023); La. Stat. Ann. § 51:2232(10). Three other states (Arkansas, Kentucky, Missouri) appear to limit the reach of their public accommodations statutes to facilities like hotels, restaurants, gas stations, bathrooms, and recreational areas. Ark. Code Ann. §§ 16-123-107(a)(2), 16-123-102(7) (2017); Ky. Rev. Stat. Ann. §§ 344.120, 344.130 (2023); Mo. Ann. Stat. §§ 213.065(1)-(2), 213.075 (2017). These Plaintiff States fail to explain whether or how these laws apply to health care providers covered by Medicare Part B. Two States (Alabama and Mississippi) do not prohibit racial discrimination in public accommodations at all. *See State Public Accommodation Laws*, Nat'l Conf. of State Legislatures (last updated June 25, 2021),

https://www.ncsl.org/civil-and-criminal-justice/state-public-accommodation-laws.  To be entitled to summary judgment, Plaintiffs were required to present evidence of their claimed injury in fact. *Lujan*, 504 U.S. at 561 (1992).  Yet, Plaintiffs fail to offer any evidence that clinicians are covered by the Plaintiff States' anti-discrimination laws, let alone that they risk violating those law by creating or implementing anti-racism plans.  The Agency Defendants have stated that they plan to engage in discovery on questions relating to standing.  Presumably the reach of the state anti-discrimination statutes which Plaintiffs rely on yet fail to provide any evidence for will be a subject of discovery making the Plaintiff States' motion for summary judgment premature at best.

The absence of any evidence about any of Plaintiffs' efforts to enforce their anti-discrimination laws similarly indicates that Plaintiffs lack the type of "personal stake" in a case's outcome that is required to show injury in fact.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983).  Plaintiffs have not offered evidence that they have ever enforced their anti-discrimination laws against clinicians based on their efforts to remedy racial health disparities.  In fact, one of the Plaintiff States, Missouri, recently passed legislation to address racial disparities in maternal mortality, Mo. Rev. Stat. §§ 208.151(1)(28)(a), 208.662(6)(2)(a)—based, in part, on a state report showing that maternal mortality for Black women was more than three time greater than maternal mortality in white women, *see A Multi Year Look at Maternal Mortality in Missouri, 2017-2019 Pregnancy-Associated Mortality Review: Annual Report*, Mo. Dep't of Health & Senior Servs. 5 (2022), https://health.mo.gov/data/pamr/pdf/2019-annual-report.pdf.  This is the same type of action that Plaintiffs contend is illegal if conducted by physicians to address racial health disparities in Medicare pursuant to the Anti-Racism Rule.  Indeed, there is no indication that Plaintiffs have ever enforced their anti-discrimination laws in response to allegations of discrimination in health care.

The dearth of evidence surrounding Plaintiffs' anti-discrimination laws, their scope, and Plaintiffs' record of enforcement preclude judgment on the question of whether Plaintiffs have suffered an injury in fact under their law-enforcement theory of standing.

### B. Plaintiffs' Back-Up Standing Theories, Which Were Not Addressed by the Court in the Motion to Dismiss Ruling, Also Fail.

Plaintiffs' remaining theories of standing are that in-state clinicians will not be able to take advantage of the Anti-Racism Rule as a clinical practice improvement activity, and that the rule will "elevate faddish theories about race above patient care[3]," leading to racial discrimination in health care. ECF No. 28 at 3. Both theories fare as poorly as Plaintiffs' law-enforcement theory. On the law, States cannot sue the federal government to vindicate the rights of their citizens. And on the facts, Plaintiffs have not presented any evidence in support of the claimed injuries to their clinicians' reimbursements or their citizens' well-being.

### 1. The States cannot sue to assert the rights of their citizens against the federal government.

Plaintiffs' alternative standing theories rest on injuries to unnamed citizens. Because Plaintiffs bring their suit against the federal government, the States' asserted interest in the wellbeing of unnamed citizens is foreclosed by binding precedent as argued by Defendants. *See* ECF No. 91 at 9. "[A] State does not have standing as parens patriae to bring an action against the Federal Government." *Brackeen*, 143 S. Ct. at 1640 (citation omitted). The "citizens of [a State] are also citizens of the United States." *Massachusetts v. Mellon*, 262 U.S. 447, 485 (1923). And

---

[3] Using Black's Law Dictionary as their main source of medical knowledge, Plaintiffs never expound on what "faddish theories" they refer to. Agency Defendants, by contrast, rely on well documented and data driven information. *See supra* at 5-7; *see also, e.g.*, AR265-301 (detailing racial disparities between Black and white Medicare recipients in life expectancy, immunization rates, use of supplemental health insurance, COVID-19 death rates, and cost-related barriers to care); AR1628-84 (detailing racial and ethnic health disparities among Medicare Advantage recipients); AR2286-94 (article explaining the harmful ways that the physiological consideration of race may "perpetuate or even amplify race-based health inequities).

with respect to "their relations with the Federal Government," "it is the United States, and not the State, which represents them as parens patriae, when such representation becomes appropriate." *Id.* at 486. "[A] state, as parens patriae," therefore may not "institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof." *Id*. at 485. Courts have also applied the *Mellon* bar to prohibit states from challenging agency actions. *See, e.g.*, *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 181-183 (D.C. Cir. 2019) ("[T]he *Mellon* bar applies to litigation that a State, using the APA, seeks to pursue against the federal government"); *Michigan v. EPA*, 581 F.3d 524, 529 (7th Cir. 2009) (similar).

This clear rule dates back a century, and has been repeatedly and recently applied. In *Massachusetts v. Mellon*, Massachusetts challenged the constitutionality of the Sheppard-Towner Act of 1921, which provided matching federal funds for private programs designed "to reduce maternal and infant mortality," on the ground that the Act interfered with state regulation in violation of the Tenth Amendment. 262 U.S. at 478-479. The Supreme Court held that Massachusetts lacked standing for this attempt "to protect the citizens of the United States" from application of federal law. *Id.* at 479, 485-486. The same principle held in *Texas v. ICC*, 258 U.S. 158, 162 (1922), where Texas challenged the constitutionality of key provisions of the Transportation Act of 1920, *see* 258 U.S. at 159-160. Again, the Court rejected the state's standing to proceed absent a showing of a more concrete and direct injury to Texas's sovereign interests. *See id.* at 162. And just a few weeks ago, in *Haaland v. Brackeen*, the Court held that "Texas . . . standing to challenge the placement preferences" in the Indian Child Welfare Act, because "it cannot assert equal protection claims on behalf of its citizens . . . against the Federal Government." 143 S. Ct. at 1640 (2023) (internal quotation marks and citation omitted).

Plaintiffs cannot escape *Mellon* by asserting a conflict between state law and federal law. *See* ECF No. 43 at 15.  The Supreme Court rejected precisely that argument in *Haaland v. Brackeen*, 143 S. Ct. at 1640.  Much like the Plaintiff States in this case, who argue that "the Anti-Racism Rule puts the[] state plaintiffs in a bind: either enforce their rules against providers who submit antiracism plans (and deprive their citizens of needed care) or stop enforcing rules barring racial discrimination," ECF No. 28 at 5, Texas argued before the Supreme Court that it had standing because the Indian Child Welfare Act is "a 'fiscal trap,' forcing [Texas] to discriminate against its citizens or lose federal funds." *Brackeen*, 143 S. Ct. at 1640 (citation omitted).  The Supreme Court rejected that argument, explaining that "[t]his is not the kind of 'concrete' and 'particularized' 'invasion of a legally protected interest' necessary to demonstrate an 'injury in fact.'" *Id*. (citation omitted).  After all, states cannot have an interest in protecting their citizens from the operation of valid federal laws, since those laws are "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2; *see also Mondou v. N.Y., New Haven, & Hartford R.R. Co.*, 223 U.S. 1, 57 (1912) ("When Congress . . . adopted that act, it . . . established a policy for all. That policy is as much the policy of [a state] as if the act had emanated from its own legislature, and should be respected accordingly in the courts of the state.").

Nor can Plaintiffs lean on *Massachusetts v. EPA* as justification for its suit.  *See* ECF 43 at 17 (citing *Massachusetts v. EPA*, 549 U.S. 497 (2007)).  While the opinion refers to Massachusetts' quasi-sovereign interests, the Court ultimately found that Massachusetts established standing based on evidence establishing "a particularized injury [it suffered] in its capacity *as a landowner*." *Massachusetts*, 549 U.S. at 522 (emphasis added).  More specifically, the Court relied on Massachusetts' unchallenged affidavits demonstrating that the State owned,

operated, and maintained "a substantial portion of the state's coastal property" and related infrastructure, and that rising sea levels had begun to diminish its property. *Id*. at 522-523 & n.19. The Supreme Court allowed the case to proceed because it perceived "a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." *Id.* at 520 n.17 (citation omitted); *see also id.* ("Massachusetts does not here dispute that the Clean Air Act *applies* to its citizens; it rather seeks to assert its rights under the Act."); *Louisiana State by & through Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 882 n.5 (5th Cir. 2023) (highlighting the same distinction). The same can be said of the Plaintiffs' other cases, which involved the Government's regulation of the state itself, and not its citizens. *See, e.g.*, *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 446 (5th Cir. 2019) ("Because it is the object of the Guidance and has suffered multiple injuries as a result, Texas has constitutional standing.").[4]  That distinction provides no help to the States here.  Plaintiffs are not asserting their own rights under federal law and do not purport to.

In short, because states cannot sue the federal government to vindicate their citizens' rights, Plaintiffs cannot claim to be injured because their clinician-citizens will not be able to claim a reimbursement provided by federal law or because their patient-citizens will allegedly receive care from a clinician who implements anti-racism planning.  *See Brackeen*, 143 S. Ct. at 1616 (State cannot assert citizens' claims that federal law places them on "unequal footing").

---

[4] Plaintiffs also cite *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ("*Texas I*"), but that case is inapposite.  *Texas* involved specific tangible economic harms to the State, not generalized claims of discrimination against the State's citizens.  *Id.* at 152 (States had standing to challenge federal program because it "would have a major effect on the states' fiscs").  The States here do not claim that the Anti-Racism Rule works any particular harm to their fiscs.  Nor could they—MIPS is required to be budget neutral.  42 U.S.C. § 1395w-4(q)(6)(A)(ii)(I)(iii)(F).

2. Even if States could sue the federal government as parens patriae, the States here have failed to present the evidence necessary to support their claimed injuries.

The record lacks any evidence about what sort of plans could receive credit under the Anti-Racism Rule. Thus, even assuming Plaintiffs have anti-discrimination laws that extend to medical providers, it is impossible at this stage to assess whether a credit-eligible plan would *ever* violate those laws, let alone *always* violate those laws. (And that is to say nothing of the 106 other activities that a clinician could complete for full reimbursement if state law *did* bar all anti-racism planning.)

Nor have Plaintiffs presented evidence that plans covered by the Anti-Racism Rule would diminish access to quality care for anyone. And they very likely cannot. The Anti-Racism Rule does nothing more than encourage clinicians to eliminate practices that federal law has long prohibited. As one example, the rule's requirement that anti-racism plans include a clinic-wide review of existing tools and policies, 86 Fed. Reg. at 65970, parallels Title VI's prohibition on any "criteria or methods of administration which have the effect of subjecting individuals to [racial] discrimination" or "have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race," 28 C.F.R. § 42.104(b)(2). Plaintiffs present no evidence that compliance with federal anti-discrimination law diminishes care for some patients. Rather, the only evidence in the record shows that anti-racism interventions *improve* care for everyone. Thatcher Decl. ¶¶ 15-16; *see also infra* 34-35.

Plaintiffs have not shown that either of their backup theories of standing succeed as a matter of law. Having failed to establish standing, Plaintiffs cannot be entitled to summary judgment on their claim. *See Lujan*, 504 U.S. at 561 (plaintiff must establish standing "with the manner and degree of evidence required at the successive stages of the litigation").

### C.  Special Solicitude Does Not Free Plaintiffs From Establishing Standing.

As Defendants point out, Plaintiffs wrongly rely on "special solicitude" to shore up the weaknesses in their standing arguments.  *See* ECF No. 91 at 11.  Special solicitude does not grant Plaintiffs greater latitude in meeting the injury-in-fact requirement.  Although the courts have, at times, "loosen[ed] the strictures of the redressability prong of our standing inquiry," "the requirement of injury in fact is a hard floor of Article III jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). The injury-in-fact requirement reflects the fact that, under the Constitution, the federal courts simply lack the power to decide general policy disputes, even when those disputes are between a State and the Federal Government.

The "special solicitude" cases on which Plaintiffs rely accordingly all depend on an injury-in-fact to some state interest.  For example, in *Massachusetts v. EPA*, the Supreme Court found standing based on Massachusetts's sovereign ownership of land along the state's seashore that would be adversely affected by the federal action at issue.  549 U.S. 497, 521-526 (2007).  Indeed, in *Massachusetts*, there was no dispute that Massachusetts was already being injured—"rising seas ha[d] already begun to swallow Massachusetts' coastal land." *Id.* at 522.  And in *Texas I*, which the Plaintiffs leaned on in their opposition to the motion to dismiss, *see* ECF No. 43 at 13-17, the Fifth Circuit was similarly careful not to substitute special solicitude for injury.  There, Texas was able to point to 500,000 people who would automatically be eligible for a $130 subsidy benefit from the State under the challenged federal program. "Even a modest estimate would put the loss at several million dollars." *Texas I*, 809 F.3d at 155 (internal quotation marks and citation omitted).

Here, the States have not presented any evidence that they have suffered an injury-in-fact to some state interest.  They have not identified even one health care provider who would be penalized for failure to submit an anti-racism plan.  *See* ECF No. 52 at 23 (Court's motion to dismiss ruling concluding that "Dr. Colville has obtained a full score in the improvement activities

21

category and can continue to report the same activity in future years to receive a full score.").  They have not identified a single occasion when they would have enforced a state anti-discrimination law if not for the existence of the Anti-Racism Rule.  *See supra* 14-16.  And their parens patriae theory fails as a matter of law.  *See supra* 16-19.  Special solicitude does not grant Plaintiffs a special license to sue absent any proof of injury.  *Summers*, 555 U.S. at 497 (2009).

Even where special solicitude to States "loosen[s]" the causation and redressability requirements, it cannot wholly eliminate them.  *Texas I* illustrates the limits of the doctrine's reach. There, the Fifth Circuit afforded the plaintiffs special solicitude because it concluded DAPA imposed "substantial pressure on [the states] to change their laws."  809 F.3d at 152-153.  The Court "stress[ed]," however, that its "decision [was] limited to [the] facts."  *Id*. at 154.  For example, if the population covered by DAPA were smaller, there would be "little pressure to change state law" and the states would not be entitled to special solicitude.  *See id.* at 162.  *Texas I* thus teaches that a state must do more than identify a quasi-sovereign interest that is only potentially or minimally implicated by a challenged policy: special solicitude applies only if a challenged action has a "direct, substantial" effect on a state's quasi-sovereign interests.  *See id.* at 154-155 ("*direct*, *substantial* pressure directed at states" sufficient for special solicitude, but mere "pressure to change state law may not be enough") (emphasis added).

Plaintiffs cannot satisfy that standard.  Even if Plaintiffs had offered sufficient evidence that their anti-discrimination laws would reach the types of plans incentivized by the Anti-Racism Rule (and they have not), the record would still be devoid of evidence that the rule imposes direct, substantial pressure on the states to change their laws.  Plaintiffs do not present any evidence of how many MIPS-eligible professionals reside within their states; how many MIPS-eligible professionals have created and implemented anti-racism plans; or how many of those professionals

would have created those plans absent the Anti-Racism Rule's incentive, particularly given the increasing recognition of the need to address racial disparities in health care by the medical profession. Unlike in *Texas I*, 809 F. 3d at 152-153, the court therefore cannot infer that the Anti-Racism Rule pressures the Plaintiff States to change their laws or alter their enforcement priorities.

## II.    Plaintiffs Cannot Show As A Matter Of Law That Their Claims Evade § 1395w-4(q)(13)(B)(iii)'s Bar On Judicial Review.

Congress barred judicial review of "[t]he identification of measures and activities specified under paragraph (2)(B)," which includes clinical practice improvement activities. 42 U.S.C. § 1395w-4(q)(13)(B)(iii). Plaintiffs contend that they evaded this bar and argue that this Court has already concluded that § 1395w-4(q)(13)(B)(iii) allows judicial review of Plaintiffs' claim. ECF No. 79 at 7. Not so. This Court held only that the bar to judicial review did not apply to the question of "whether the Anti-Racism Rule satisfies the definition of a 'clinical practice improvement activity.'" ECF No. 52 at 45. But Plaintiffs' attempts to link their ultra vires challenge to this statutory definition fail as a matter of law. *See* ECF No. 91 at 12 (Defendants' summary judgment brief noting that "Defendants continue to maintain that this review bar applies here to foreclose Plaintiffs' suit."). They assume, without support from the text of § 1395w-4(q)(2)(C)(v)(III), that the statutory definition of clinical practice improvement activity (1) requires CMS to identify on the face of the rule what organizations and stakeholders endorsed the activity; and (2) prohibits CMS from approving activities that are dissimilar from those listed in § 1395w-4(q)(2)(C)(v)(III). The statute does neither of these things.

### A.   Plaintiffs' Claim That No Relevant Stakeholder Identified Anti-Racism Planning as Improving Clinical Practice or Care Delivery is Completely Speculative.

Plaintiffs argue that the Anti-Racism Rule cannot be a clinical practice improvement activity because "the text of the Anti-Racism Rule" does not indicate what relevant stakeholders

identified anti-racism plans as improving clinical practice or care delivery.  ECF No. 79 at 9 (citation and alternation omitted).

Nothing in § 1395w-4(q)(2)(C)(v)(III) requires CMS to identify in the rule creating a clinical practice improvement activity which organizations and stakeholders endorsed the activity. To the contrary, Plaintiffs' proposed in-writing requirement is little more than an attempt to escape the fact that the administrative record reveals robust stakeholder support for the Anti-Racism Rule. *See supra* 6-7; *see also, e.g.*, Supp. AR2421 (Comment from Association of Black Cardiologists) (supporting "using MIPS to help bridge the health equity gap" and endorsing the Anti-Racism Rule "which emphasizes systemic racism is the root cause for differences in health outcomes between socially defined racial groups"); Supp. AR2431 (Comment from Society of General Internal Medicine) (commending CMS on the Anti-Racism Rule and recommending "that all health equity subcategory Improvement Activities receive high weighting to emphasize CMS' commitment to achieving health equity"); *see also* ECF No. 91 at 15 (Defendants' summary judgment brief citing additional stakeholder comments).  This Court should resist Plaintiffs' efforts to read in a statutory requirement where none exists. *Bates*, 522 U.S. 23, 29 (1997) (courts "resist reading words or elements into a statute that do not appear on its face").

Moreover, Plaintiffs do not seriously argue that the CDC and Professor Jones are not relevant stakeholders.  They merely highlight this Court's prior finding that the Agency Defendants failed at the motion-to-dismiss stage to address "whether or how Jones or the particular CDC webpage count as 'relevant eligible professional organizations and other relevant stakeholders.'"  ECF No. 79 at 10; *see also* ECF No. 52 at 46.  That does not help Plaintiffs on summary judgment, where they bear the burden of showing they are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-252 (1986).

24

Nor can Plaintiffs claim that these stakeholders do not identify anti-racism planning as improving clinical practice or care delivery.  Professor Jones and the CDC both recognize race and racism as a nonmedical determinant of health, and conclude that a commitment to anti-racism is a perquisite to improving health outcomes overall.  *Racism and Health – Science and Research*, Ctrs. for Disease Control & Prevention (2021), https://www.cdc.gov/minorityhealth/racism-disparities/research-articles.html; Camara Phyllis Jones, *Toward the Science and Practice of Anti-Racism: Launching a National Campaign against Racism*, 28 Ethnicity & Disease 231, 231-232 (2018).  The Administrative Record is rife with relevant professional organizations and stakeholders concluding the same.

### B. Plaintiffs Ignore the Text of the Statute to Claim That All Clinical Practice Improvement Activities Must Mirror Those Listed in § 1395w-4(Q)(2)(B)(iii).

Finally, Plaintiffs contend that, regardless of what stakeholders requested, the Anti-Racism Rule exceeds CMS's authority because it does not mirror § 1395w-4(q)(2)(B)(iii)'s examples of clinical practice improvement activities.  ECF No. 79 at 10.  But again, Plaintiffs' argument finds no footing in the text of the statute.  This is fatal to Plaintiffs' argument because "statutory interpretation begins and, if possible, ends with the language of the statute."  *United States v. Lauderdale Cnty.*, 914 F.3d 960, 964 (citation omitted).

1. The text of § 1395w-4(q)(2)(B)(iii) does not limit the range of permissible clinical practice improvement activities; it mandates certain *subcategories* of activities.  The provision reads in relevant part:

> For purposes of paragraph (3)(A) and subject to subparagraph (C), measures and activities specified for a performance period . . . for a year are established as follows:

> (iii) …clinical practice improvement activities under subcategories specified by the Secretary for such period, which shall include *at least* the following . . .

42 U.S.C. § 1395w-4(q)(2)(B)(iii) (emphasis added) (internal citation omitted).  Common sense and the nearest-reasonable-referent canon both indicate that "which shall include at least the following" modifies "subcategories," *not* "clinical improvement activities."  *Travelers Indemnity Co. v. Mitchell*, 925 F.3d 236, 243 (5th Cir. 2019) ("[P]repositive or postpositive modifier normally applies only to the nearest reasonable referent" when syntax "involves something other than a parallel series of nouns or verbs" (quoting Antonin Scalia & Bryan A. Garner, Reading Law 152 (2012)).

Were there any doubt, the statute then provides a non-exhaustive list of six different *subcategories* of clinical practice improvement activities:

> (I) The subcategory of expanded practice access . . .
> (II) The subcategory of population management . . .
> (III) The subcategory of care coordination . . .
> (IV) The subcategory of beneficiary engagement . . .
> (V) The subcategory of patient safety and practice assessment . . .
> (VI) The subcategory of participation in an alternative payment model . . .

*Id.* § 1395w-4(q)(2)(B)(iii)(I)-(VI).  Thus, a plain reading of the statute shows that Congress listed exemplar activities for each subcategory only to help clarify each category's scope.  *See id.* § 395w-4(q)(2)(B)(iii)(III) (listing "timely communication of test results" and "timely exchange of clinical information" as examples of improvement activities in "[t]he subcategory of care coordination").

Plaintiffs ignore the forest for the trees (along with six other subcategories) to suggest that a handful of cherry-picked activities—same-day appointments, monitoring health conditions, timely communication of test results, use of clinical or surgical checklists—foreclose the Anti-Racism Rule.  *See* ECF No. 79 at 10.  Indeed, Plaintiffs' narrow reading of § 1395w-4(q)(2)(B)(iii) would jeopardize a whole host of activities that fall outside the subcategories Congress mandated—"Promoting Clinician Well-Being," "Promoting Comprehensive Eye Exams," and

26

"Enhancing Engagement of Medicaid and Other Underserved Populations," just to name a few.[5] Plaintiffs cannot justify this sweeping attack on CMS's authority to identify clinical practice improvement activities.  The more natural reading of the text is that Congress intended § 1395w-4(q)(2)(B)(iii) to be a floor, not a ceiling, for what sorts of improvement activities are permissible.

2. Even if anti-racism planning must be measured against the statutory examples of clinical practice improvement activities, anti-racism plans measure up.  Indeed, the examples listed in § 1395w-4(q)(2)(B)(iii)(I)-(VI) would very likely be included in a plan targeting racial health disparities.  Take, for example, "use of remote monitoring or telehealth."  *Id.* § 1395w-4(q)(2)(B)(iii)(III).  A recent study showed that appointment completion rates for Black patients increased from 52% to 70% from January to June 2020, as telemedicine became increasingly available.  Eric Bressman, MD, et al., *Association of Telemedicine with Primary Care Appointment Access After Hospital Discharge*, 37 J. Gen. Internal Med. 2879, 2879 (2022).[6]  Providing "after hours access to clinician advice," 42 U.S.C. § 1395w-4(q)(2)(B)(iii)(I), is also likely to improve access to quality health care for non-white patients.  *See* César Caraballo, MD, et al., *Trends in Racial and Ethnic Disparities in Barriers to Timely Medical Care Among Adults in the US, 1999 to 2018*, 3 JAMA Health Forum 1, 2 (2022) (finding that "Black, Latino, and low-income individuals are more likely to experience barriers to timely medical care . . . such as . . . inconvenient office hours").[7]  Plaintiffs provide no explanation for why an anti-racism plan that include the activities listed in § 1395w-4(q)(2)(B)(iii) would nonetheless be impermissible.

---

[5] *Explore Measures & Activities*, Quality Payment Program, https://qpp.cms.gov/mips/explore-measures?tab=improvementActivities&py=2023 (last visited Aug. 2, 2023).
[6] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8751457/.
[7] https://jamanetwork.com/journals/jama-health-forum/fullarticle/2797732.

III.    **Plaintiffs Are Not Entitled to Summary Judgment On Their Claim That The Anti-Racism Rule Is Ultra Vires.**

Because Plaintiffs' challenge to the Anti-Racism Rule is untethered to the statutory definition of clinical practice improvement activities, *supra* 23-27, § 1395w-4(q)(13)(B)(iii)'s bar on judicial review applies.  But even if the bar on judicial review is inapplicable, Plaintiffs are still not entitled to summary judgment on their ultra vires claim.  To prevail at summary judgment, Plaintiffs must "establish beyond peradventure," *Fontenot*, 780 F.2d at 1194, that the Anti-Racism Rule does not satisfy the two criteria for clinical practice improvement activities: (1) relevant eligible professional organizations and other relevant stakeholders identify the activity as improving clinical practice or care delivery, and (2) the Secretary determines that, when effectively executed, the activity is likely to result in improved outcomes, 42 U.S.C. § 1395w-4(q)(2)(C)(v)(III).  Plaintiffs do not meet that burden.

A.    **The Court's Decision on Whether Judicial Review is Available Does Not Control Whether the Anti-Racism Rule is Ultra Vires as a Matter of Law.**

Plaintiffs are not entitled to summary judgment on their ultra vires claim even if judicial review is available for that claim.  As Plaintiffs acknowledge and this Court has found, the availability of judicial review is limited to the question of "whether the Anti-Racism Rule satisfies the definition of 'clinical practice improvement activity."  ECF No. 79 at 9; ECF No. 52 at 47.  Rule 56, by contrast, asks whether Plaintiffs have "come forward with evidence which would 'entitle [them] to a directed verdict if the evidence went uncontroverted at trial.'"  *Int'l Shortstop*, 939 F.2d at 1264-65 (citation omitted).  Regardless of the answer to the judicial-review question, the answer to the summary-judgment question is "no."  In fact, Plaintiffs fail to come forward with *any evidence* on three factual issues that are material to the resolution of their claim.  Summary judgment is premature.  *See Texas v. United State*s, 50 F.4th 498, 512 (5th Cir. 2022) (declining to review APA claims at summary judgment because it lacked administrative record for the rule).

*First*, Plaintiffs do not present any evidence in support of their argument (at 9) that "understanding race as a political and social construct" is categorically unrelated to clinical practice or care delivery.  The only information in the record about the relationship between "race as a political and social construct" and the quality of clinical practice or care delivery comes from Amici and severely undercuts Plaintiffs' claims.  Declarations from the NAACP State Conferences provide examples how clinicians' lack of cultural competence results in inadequate health care. *See, e.g.*, James Decl. ¶ 28 (Mississippi) (discussing how members may travel over an hour to seek routine medical care from Black physicians because of experiences with medical racism and discrimination with white providers); ECF No. 62-5, Decl. of Nimrod Chapel, Jr. ¶ 20 (Missouri) (discussing how a member was forced out of an emergency room); ECF No. 62-3, Decl. of Danielle Gilliam ¶ 11 (Arizona) (discussing how Black and Latinx patients are less likely to be treated with home dialysis than white patients, despite the fact that home dialysis has the potential to allow them to continue full time employment).  And declarations from the Collaborative describe a peer-reviewed medical study showing that educating clinicians about race and racial health equity improves health outcomes for both Black patients and non-Black patients alike.  Thatcher Decl. ¶¶ 15-16; ECF No. 62-10, Decl. of Sidney Callahan ¶¶ 9-12.  That evidence is unrefuted.

Instead of coming forward with evidence in support of their claims, Plaintiffs rely on a definition of "Medicine" from Black's Law Dictionary and CMS's Disparities Impact Statement. ECF No. 79 at 9-10.[8]  Neither source supports Plaintiffs' claim.  Black's definition of "medicine"

---

[8] Plaintiffs apparently approve of the "physiological" consideration of race.  ECF No. 79 at 9.  But studies show that clinicians' beliefs about racial physiology are more likely to impede than improve the provision of care.  For example, one study found that "many white medical students and residents"—50% of the study sample—"hold beliefs about biological differences between blacks and whites, many of which are false and fantastical in nature and that these false beliefs are related to racial bias in pain perception."  Kelly M. Hoffman et al., *Racial Bias in Pain Assessment and Treatment Recommendations, and False Beliefs About Biological Differences Between Blacks and Whites*, 113 PNAS 4296, 4299 (2016), https://www.pnas.org/doi/10.1073/pnas.1516047113.

("The scientific study and practice of preserving health and treating disease or injury") says nothing about whether anti-racism planning *does* facilitate the practice of preserving health and treating illness or injury.   It also ignores that nonmedical factors regularly influence health outcomes.  *See Social Determinants of Health at CDC*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/about/sdoh/index.html (last visited Aug. 2, 2023) (Nonmedical factors, such as "the conditions in which people are born, grow, work, live, and age" regularly influence health outcomes).  And CMS's reference to "priority populations," a globally used term of art that refers to any group of people who is at risk of socially produced health inequities.  *Priority Populations Primer, a Few Things you Should Know about Social Inequities in Health in SDHU Communities*, Sudbury & District Health Unit (2009).[9]  Far from requiring clinicians to prioritize the health of racial and ethnic minorities above all others, ECF No. 79 at 9, "priority population" may identify women, children, low-wage workers, or people living in rural areas.  *Id.* at 6; *see also About Priority Populations*, Agency for Healthcare Rsch. and Quality (2021).[10]

   *Second*, Plaintiffs do not present any evidence of what "anti-racism" means within the context of the Anti-Racism Rule.  Plaintiffs have from the outset suggested that CMS's reference to anti-racism is related to Ibram X. Kendi's use of the term in *How to Be an Antiracist* (2019).  ECF No. 1 ¶ 2.  In support of this suggestion, Plaintiffs invoke a reference to Kendi's book contained in the Department of Education's proposed priority to "Incorporate Racially, Ethnically, Culturally, and Linguistically Diverse Perspectives into Teaching and Learning.".[11]  *Id.* ¶¶ 2-3 (citing 86 Fed. Reg. 20349 & n. 3).  But nothing in the Anti-Racism Rule indicates that anti-racism

---

[9] https://www.phsd.ca/wp-content/uploads/2016/05/Priority_Populations_Primer_ENG.pdf.
[10] https://www.ahrq.gov/priority-populations/about/index.html.
[11] The proposed rule cites Kendi for the proposition that "[a]n antiracist idea is any idea that suggests the racial groups are equals in all their apparent differences—that there is nothing right or wrong with any racial group."  86 Fed. Reg. 20349 & n.3 (citation omitted).

planning must (or may) reflect Kendi's philosophy.  And nothing in the administrative record indicates that *How to Be an Antiracist*, or any of Kendi's writings, informed CMS's understanding of the term.  As Defendants note, "CMS did not cite Kendi."  ECF No. 91 at 19.  To the contrary, the rule's statement that an anti-racism plan may include an assessment for how to "prevent and address racism" undercuts the idea that the Agency Defendants adopted a definition of anti-racism that—like Kendi—calls for "present discrimination."  *How to Be an Antiracist* 19 (2019).  In short, Plaintiffs use Kendi, not because he has any relevance to the Anti-Racism Rule, but to incite a negative response to CMS's attempt to encourage physicians to analyze their own practices to ensure that they do not perpetuate racial stereotypes and address disparities.

The only two documents in the record that discuss anti-racism with any level of specificity are Jones's article, *Toward the Science and Practice of Anti-Racism*, AR2282-85, and an article by J. Nwando Olayiwola et al., *Making Anti-Racism a Core Value in Academic Medicine*, AR2295-2299.  Both scholars describe a view of anti-racism that requires people to identify how the country's history of racism has influenced health care institutions' systems and policies, and to take affirmative steps toward making those systems and policies more equitable.  *See* AR2282 (Jones) ("By acknowledging that racism saps the strength of the whole society, we recognize that we all have 'skin' in the game to dismantle this system and put in its place a system in which all people can know and develop to their full potential"); AR2295 (Olayiwola, et al.) ("[H]ealth care organizations not acting to eliminate racism are perpetuating its proliferation").  Neither endorse the eye-for-an-eye model of anti-racism that Plaintiffs seem to forecast.   The complete absence from the record of any conflicting scholarship on anti-racism stands as good evidence that Jones and Olayiwola's shared view of anti-racism is the one that CMS adopted.

31

*Third*, Plaintiffs do not present any evidence in support of their claim (at 9-10) that the Anti-Racism Rule is unsupported by "eligible professional organizations" or other "relevant stakeholders." Here, again, the administrative record belies Plaintiffs' supposition.

Professional organizations and relevant stakeholders like the Intersocietal Accreditation Commission, the Association of American Medical Colleges, and the American College of Radiology, all submitted comments that endorse the Anti-Racism Rule as a clinical practice improvement activity. *See, e.g.*, AR215-216 (Intersocietal Accreditation Commission) (recommending "the inclusion of the proposed improvement activity titled 'create and implement an anti-racism plan' " and identifying the activity as "an opportunity to recognize clinicians for developing and implementing processes to reduce racism and discrimination to ensure equitable health care"); AR146 (Association of American Medical Colleges) ("We agree that the inclusion of a proposed improvement activity titled 'create and implement an anti-racism plan' is an important activity that will address systemic racism as a root cause of inequity"); AR46 (American College of Radiology) ("The ACR agrees with including improvement activities in MIPS that address creating and implementing anti-racism plans"). Stated differently, Plaintiffs' stakeholder arguments are not merely unsupported; they're flat wrong.

## B. Plaintiffs Incorrectly Assert that the Anti-Racism Rule Encourages Medical Providers to Discriminate Against Patients Solely on the Basis of Their Race.

All told, the theory of Plaintiffs' ultra vires claim is that anti-racism planning cannot be a clinical practice improvement activity because it requires clinicians to prioritize certain populations over others. That argument presumes that health care providers cannot eliminate racial health disparities without providing worse health care to some class of patients. Plaintiffs do not offer any evidence in support of this fundamentally flawed premise.

Nothing in the Anti-Racism Rule causes medical providers to prioritize the health of one population over another on the basis of their race, *see supra* 11-14. The Anti-Racism Rule sets five mandatory guidelines for how Medicare providers may gain credit for the improvement activity. They must: (1) create and implement a plan using some anti-racism planning tool; (2) include in the plan an clinic-wide review of tools and policies that already exist; (3) ensure the clinic's tools and policies include and are aligned with a commitment to anti-racism and an understanding of race as a political and social construct; (4) identify in the plan any "issues and gaps" revealed by the clinic-wide review; and (5) include in the plan target goals and milestones for addressing those issues and gaps. 86 Fed. Reg. 64996, 65970. The Rule also identifies several discretionary criteria that a clinician may consider. Neither mandatory nor discretionary criteria require clinicians to discriminate against their patients on the basis of race.

Plaintiffs' arguments to the contrary ignore the difference "between state action that discriminates on the basis of race and state action that addresses, in neutral fashion, race-related matters." *Crawford v. Bd. of Educ. of City of Los Angeles*, 458 U.S. 527, 538 (1982). The Anti-Racism Rule is the latter. Nothing in the Rule, which addresses racial health inequity in a neutral manner, requires clinicians to discriminate against patients on the basis of race. A clinic could determine that its current practices allow race-based decisionmaking, including through clinicians' own implicit bias or through algorithmic bias in clinical tools using medical artificial intelligence, *see, e.g.*, AR903; AR2291, and create a plan to phase those practices out. A clinic could also find that broadening access to health care generally—increasing telehealth options, providing off-hour services, conducting mobile diagnostic testing—reduce racial disparities in access to care. These types of initiatives align with the very activities that Plaintiffs condone. *See supra* 25-27.

33

Plaintiffs' argument also suffers from a deeper flaw:  It presumes that eliminating racial health disparities requires clinicians to provide worse care to white patients.  But nothing in the Rule or the record suggests that CMS intends for clinicians to abate racial health disparities by diverting resources from one group of people to another.  To the contrary, CMS argues that remedying health disparities requires policies that ensure "quality improvement for both socially at-risk populations and *for patients overall*."  AR835 (emphasis added); *see also id.* (The "goal of Medicare payment and reporting systems are reducing disparities in health care access" and "quality improvement and efficient care delivery for all patients").

Research from amicus curiae the Greensboro Health Disparities Collaborative reaffirms this approach.  The Collaborative conducted a study that evaluated the success of four interventions in reducing health disparities in lung and breast cancer treatments.  *First*, each cancer center's "nurse navigator"—a health care provider and advocate who guides patients through the treatment process—participated in health equity training.  Thatcher Decl. ¶ 15.  *Second*, each cancer center used an electronic alert system which notified the nurse navigator any time a patient participating in the study missed an appointment or did not reach an expected treatment milestone in care.  *Id.* *Third*, each cancer center selected a "physician champion" who received health equity training and served as a liaison between the nurse navigator and other clinicians.  *Fourth*, the staff of each cancer center received continuing education sessions on implicit bias, unintentional attitudes, and institutional racism.  *Id.*  None of these interventions mandated or encouraged race-based decisionmaking.  Even so, they eliminated disparities between Black and white patients across several metrics and improved treatment outcomes for *both* Black and white patients.  *Id.* ¶ 16.

Plaintiffs have not pointed to a single practitioner who can say in any concrete terms that they would have to discriminate against white patients to provide equal care to their non-white

patients.  In contrast, the Government showed that anti-racism plans can improve clinical practice and health outcomes for all patients.  Plaintiffs' challenge to the Anti-Racism Rule is flawed to its core.  At minimum, summary judgment for Plaintiffs is improper.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' motion for summary judgment, and grant Defendants' motion for summary judgment.

August 4, 2023                                               Respectfully submitted,

Jon Greenbaum*
Kathryn Youker*
Lawyers' Committee for Civil Rights Under Law
1500 K Street, NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8355
kyouker@lawyerscommittee.org

*/s/ Robert B. McDuff*
Robert B. McDuff (MS Bar #2532)
Mississippi Center for Justice
210 E Capitol Street, Suite 1800
Jackson, MS 39201
Telephone: (601) 259-8484
rmcduff@mscenterforjustice.org

Jo-Ann Tamila Sagar*
Stanley J. Brown*
Johannah Walker*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
jo-ann.sagar@hoganlovells.com

*Counsel for Intervenors*

*\* Admitted Pro Hac Vice*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on August 4, 2023, the foregoing document was filed on the Court's CM/ECF system which sent notification of such filing to all counsel of record.

*<u>/s/ Robert B. McDuff</u>*