# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

STATE OF MISSISSIPPI, et al.

*Plaintiffs*,

No. 1:22-cv-113-HSO-RPM

v.

XAVIER BECERRA, et al.,

*Defendants.*

## PLAINTIFFS' COMBINED REPLY IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT AND OPPOSITION
## TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT[*]

---

[*] The States have 35 pages to respond to Defendants' cross-motion for summary judgment and 20 pages for their rebuttal in support of their motion for summary judgment. *See* Loc. R. 7(b)(5). With Defendants' consent, the States file this 26-page consolidated reply and opposition.

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................. iii

Introduction & Summary of Argument ...................................................................................... 1

Argument ..................................................................................................................................... 2

    I.   The States are entitled to summary judgment on standing. ............................................ 2

        A.  The States are entitled to special solicitude. ............................................................. 2

        B.  The States have concrete injuries. ............................................................................. 3

        C.  Anti-racism plans encourage clinicians to prioritize patients based on race in
            violation of the States' laws. ..................................................................................... 7

        D.  The States satisfy the traceability and redressability standing requirements. ......... 9

        E.  Defendants' arguments about standing fail. ............................................................ 11

    II.  Plaintiffs are entitled to summary judgment on the merits. ........................................ 16

        A.  The judicial review bar does not stop this Court from reaching the merits. ......... 16

        B.  Judicial review is limited to the administrative record. ......................................... 17

        C.  Anti-racism plans are not one of the clinical practice improvement activities specified
            in the statute. ........................................................................................................... 18

        D.  The States weren't obliged to raise their objections during the notice-and-comment
            period. ..................................................................................................................... 24

        E.  Vacatur of the Anti-Racism Rule is the appropriate remedy. ................................. 25

Conclusion ................................................................................................................................. 26

# TABLE OF AUTHORITIES

## Cases

*Alfred L. Snapp & Son, Inc. v. P.R., ex rel. Barez,*

  458 U.S. 592 (1982) .........................................................................................3, 6, 11, 12

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.,*

  2023 WL 5266026(5th Cir. Aug. 16) ...................................................................... 6

*Am. Forest & Paper Ass'n v. EPA,*

  137 F.3d 291 (5th Cir. 1998) ................................................................................. 25

*Baker v. Bell,*

  630 F.2d 1046 (5th Cir. 1980) ............................................................................... 18

*BCCA Appeal Grp. v. EPA,*

  355 F.3d 817 (5th Cir. 2003) ................................................................................. 25

*Biden v. Nebraska,*

  143 S. Ct. 2355 (2023) ....................................................................................... 1, 23

*Cargill v. Garland,*

  57 F.4th 447 (5th Cir. 2023) ............................................................................. 20, 24

*Cent. & S. W. Servs., Inc. v. EPA,*

  220 F.3d 683 (5th Cir. 2000) ................................................................................. 26

*Colville v. Becerra,*

  2023 WL 2668513 (S.D. Miss. Mar. 28) ........................................................passim

*Compassionate Care Hospice v. Sebelius,*

  2010 WL 2326216 (W.D. Okla. June 7) ............................................................... 14

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.,*

  45 F.4th 846 (5th Cir. 2022) ......................................................................... 2, 25, 26

*Dep't of Com. v. New York,*

  139 S. Ct. 2551 (2019) ..................................................................................... 10, 15

*Devs. Sur. & Indem. Co. v. Driftwood Dev., LP,*

  2008 WL 4838606 (W.D. Tex. Nov. 5) ................................................................. 14

*Franciscan All., Inc. v. Azar,*

  414 F. Supp. 3d 928 (N.D. Tex. 2019) .................................................................. 26

*Franciscan All., Inc. v. Becerra,*

  47 F.4th 368 (5th Cir. 2022) ................................................................................. 25

*Gonzales v. Carhart,*

550 U.S. 124 (2007) ....................................................................................................4

Haaland v. Brackeen,

143 S. Ct. 1609 (2023) ..............................................................................11, 12, 13

Harrison v. Jefferson Par. Sch. Bd.,

2023 WL 5359049 (5th Cir.) ...................................................................... 1, 13

Kentucky v. Biden,

23 F.4th 585 (6th Cir. 2022) ...............................................................passim

Louisiana v. Becerra,

577 F. Supp. 3d 483 (W.D. La. 2022) ..................................................5, 6, 10, 11

Mallory v. Norfolk S. Ry. Co.,

143 S. Ct. 2028 (2023) ........................................................................... 14, 16

Martinez v. Bally's La., Inc.,

244 F.3d 474 (5th Cir. 2001) .......................................................................14

Massachusetts v. EPA,

549 U.S. 497 (2007) ......................................................................... 1, 2, 13

Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,

60 F.4th 956 (5th Cir. 2023) .......................................................................22

Michigan v. EPA,

576 U.S. 743 (2015) .....................................................................................17

Missouri v. Biden,

2023 WL 4335270 (W.D. La. July 4) .....................................................13, 16

Nebraska v. Wyoming,

515 U.S. 1 (1995) ..........................................................................................14

Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.,

50 F.4th 1126 (11th Cir. 2022) ...................................................................4

SEC v. Chenery Corp.,

318 U.S. 80 (1943) ......................................................................................17

SFFA v. Harvard,

143 S. Ct. 2141 (2023) ..................................................................... 1, 9, 23

Sierra Club v. Pruitt,

293 F. Supp. 3d 1050 (N.D. Cal. 2018) ......................................................25

Susan B. Anthony List v. Driehaus,

573 U.S. 149 (2014) .......................................................................................2

*Sw. Elec. Power Co. v. U.S. Env't Prot. Agency,*
   920 F.3d 999 (5th Cir. 2019) ...................................................................................24

*Tennessee v. U.S. Dep't of Educ.,*
   615 F. Supp. 3d 807 (E.D. Tenn. 2022) ......................................................................4

*Texas v. Becerra,*
   575 F. Supp. 3d 701 (N.D. Tex. 2021) .....................................................................23

*Texas v. Becerra,*
   623 F. Supp. 3d 696 (N.D. Tex. 2022) .................................................................5, 10

*Texas v. Biden,*
   20 F.4th 928 (5th Cir. 2021) ..................................................................2, 17, 25, 26

*Texas v. Biden,*
   2021 WL 4552547 (N.D. Tex. July 19) ....................................................................18

*Texas v. DHS,*
   2023 WL 2842760 (S.D. Tex. Apr. 7) ......................................................................17

*Texas v. EEOC,*
   933 F.3d 433 (5th Cir. 2019) ....................................................................................5

*Texas v. United States,*
   50 F.4th 498 (5th Cir. 2022) .....................................................................................2

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) .............................................................................3, 10

*TransUnion LLC v. Ramirez,*
   141 S. Ct. 2190 (2021) .............................................................................................7

*United States v. Texas,*
   143 S. Ct. 1964 (2023) .....................................................................................16, 26

*United Steel v. Mine Safety & Health Admin,*
   925 F.3d 1279 (D.C. Cir. 2019) ..............................................................................25

*Voices for Int'l Bus. & Educ., Inc. v. NLRB,*
   905 F.3d 770 (5th Cir. 2018) ....................................................................................7

*West Virginia v. EPA,*
   142 S. Ct. 2587 (2022) .......................................................................................1, 23

**Statutes**

42 U.S.C. §1395w-4 ...........................................................................................passim

5 U.S.C. §706 .........................................................................................17, 18, 25

5 U.S.C. §704 .................................................................................................................... 17

Ark. Code Ann. §16-123-102 ............................................................................................. 7

Ark. Code Ann. §16-123-107 ............................................................................................. 8

Ky. Rev. Stat. §344.120 ...................................................................................................... 8

Ky. Rev. Stat. Ann. §344.130 ............................................................................................. 7

Ky. Rev. Stat. Ann. §344.140 ............................................................................................. 9

Ky. Rev. Stat. Ann. §344.145 ............................................................................................. 7

La. Stat. Ann. § 51:2232 .................................................................................................. 7, 9

La. Stat. Ann. §51:2247 ...................................................................................................... 8

Mo. Ann. Stat. §213.010 .................................................................................................... 7

Mo. Ann. Stat. §213.065 .................................................................................................... 8

Mont. Code Ann. §49-1-102 .............................................................................................. 8

Mont. Code Ann. §49-2-101 .............................................................................................. 7

Mont. Code Ann. §49-2-304 ........................................................................................... 8, 9

Mont. Code Ann. §49-2-601 .............................................................................................. 8

## Other Authorities

*Prioritize*, New Oxford American Dictionary (3d ed. 2010) .............................................. 9

## Rules

Fed. R. Civ. P. 56(d) .......................................................................................................... 6

## Treatises

Scalia & Garner, *Reading Law* 167 (2012) ....................................................................... 20

## Regulations

86 Fed. Reg. at 65969 ........................................................................................................ 19

## INTRODUCTION & SUMMARY OF ARGUMENT

Despite their many pages of briefing, Defendants cannot deny one crucial fact: the Anti-Racism Rule expressly tells doctors to prioritize patients based on race. That kind of express race-based government action is forbidden by the Constitution, *see SFFA v. Harvard*, 143 S. Ct. 2141, 2161-62 (2023), and by state antidiscrimination laws, *see infra* 7-9. Yet Defendants claim that, by enacting a statute about activities that promote clinical practice or care delivery for patients, 42 U.S.C. §1395w-4(q)(2)(c)(v)(III), Congress gave them the extraordinary power to encourage doctors to consider race, Def.-Br. 12-21. "Congress does not 'hide elephants in mouseholes.'" *Biden v. Nebraska*, 143 S. Ct. 2355, 2382 (2023) (Barrett, J., concurring). And agencies cannot pretend to find them there. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2622 (2022). This Court should hold that Defendants' racial-prioritization plans are not clinical practice improvement activities within the meaning of the statute.

This Court should also reject Defendants' attempts to evade judicial review. "States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). As this Court held before, the States "are 'entitled to special solicitude in [the] standing analysis.'" *Colville v. Becerra*, 2023 WL 2668513, at *14 (S.D. Miss. Mar. 28) (quoting *Massachusetts*, 549 U.S. at 518-20). The Anti-Racism Rule injures the States' sovereign and quasi-sovereign interests in several ways. Encouraging the prioritization of patients based on race interferes with the States' antidiscrimination laws. It intrudes upon an area the States have traditionally regulated—public health. And it will result in discrimination against residents despite the States' interest in their health and wellbeing. Those injuries are concrete. *See Kentucky v. Biden*, 23 F.4th 585, 598-99 (6th Cir. 2022); *Harrison v. Jefferson Par. Sch. Bd.*, 2023 WL 5359049, at *2-3 (5th Cir.). And they're traceable to the Anti-Racism Rule and redressable by vacatur. *Colville*, 2023 WL 2668513, at *15-18. Because the Anti-Racism Rule is unlawful and exceeds Defendants' authority, this Court should grant the States' motion for summary judgment, deny Defendants' cross-motion, and vacate the Rule.

1

## ARGUMENT

**I.      The States are entitled to summary judgment on standing.**

The States have standing. "To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (cleaned up). The States can establish each element here.

### A.      The States are entitled to special solicitude.

"'States are not normal litigants for the purposes of invoking federal jurisdiction,' and, under certain circumstances, are 'entitled to special solicitude in [the] standing analysis.'" *Colville*, 2023 WL 2668513, at \*14 (quoting *Massachusetts*, 549 U.S. at 518-20). "'Special solicitude has two requirements: (1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests.'" *Id.* (quoting *Texas v. United States*, 50 F.4th 498, 514 (5th Cir. 2022)). As this Court found, a "procedural right under the APA satisfies the first requirement," and "the State Plaintiffs have asserted" such a right here. *Id.*; *see also Texas v. Biden*, 20 F.4th 928, 969 (5th Cir. 2021) ("the first prong was satisfied because a State challenged an agency action as invalid under a statute"), *rev'd on other grounds* 142 S. Ct. 2528 (2022).[1] And the second requirement is satisfied because States "possess a sovereign interest in 'the exercise of sovereign power over individuals and entities within the relevant jurisdiction,' which 'involves the power to create and enforce a legal code, both civil and criminal.'" *Id.* at \*15. As explained more fully below, the States have proven that "the Anti-Racism Rule will harm their sovereign interests because it interferes with their enforcement of their laws prohibiting racial discrimination," *id.*, and that it will harm their quasi-sovereign interests because it causes discrimination against residents, *infra* 7-9.

---

[1] The "panel's understanding of … Article III standing" and of other issues not decided by the Supreme Court "remains binding." *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 856 n.2 (5th Cir. 2022).

Because the States enjoy special solicitude, they "can establish standing without meeting all the normal standards for redressability and immediacy." *Colville*, 2023 WL 2668513, at *15 (cleaned up); *see id.* at *16 ("the State Plaintiffs' entitlement to special solicitude allows for the risk of future harm to satisfy standing where it might not for an individual, and therefore alleviates immediacy concerns"). "Redressability under special solicitude is satisfied when there is some possibility that the requested relief will reduce the harm." *Id.* at *15. And a "State entitled to special solicitude can satisfy traceability by showing that the challenged action 'has contributed to an injury,' and it need not demonstrate that the action was the sole cause." *Id.* at *15.

### B.     The States have concrete injuries.

At least two broad types of injuries establish the States' standing. First, the Anti-Racism Rule causes a concrete injury to their sovereign interest in "the exercise of sovereign power over individuals and entities within the" States, which "involves the power to create and enforce a legal code, both civil and criminal." *Alfred L. Snapp. & Son, Inc. v. P.R., ex rel. Barez*, 458 U.S. 592, 601 (1982). Second, "states also have a recognized quasi-sovereign interest in the health and 'economic well-being' of their populaces," which the Rule likewise injures. *Kentucky*, 23 F.4th at 599.

As for their sovereign interests, the Anti-Racism Rule injures the States' sovereign power to create and enforce their legal codes. States can suffer injuries to this interest in at least three ways: (1) "federal assertions of authority to regulate matters [the States] believe they control"; (2) "federal preemption of state law"; and (3) "federal interference with the enforcement of state law." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) (cleaned up). All three exist here.

**1.** Defendants assert authority over health care, which is traditionally an area of local concern. States "have sovereign interests to sue when they believe that the federal government has intruded upon areas traditionally within states' control." *Kentucky*, 23 F.4th at 598 (citing *Texas*, 809 F.3d at 153).

3

"'The States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons'—latitude that includes regulating economic relationships." *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.*, 50 F.4th 1126, 1142 (11th Cir. 2022). "The regulation of health and safety matters is primarily, and historically, a matter of local concern." *Id.* (cleaned up); *see also Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) ("it is clear the State has a significant role to play in regulating the medical profession"). These traditional interests extend to protecting residents from discrimination in health care. *E.g.*, *Norwegian*, 50 F.4th at 1142-43. Defendants have therefore "intruded upon an area traditionally left to the states—the regulation of the public health of state citizens in general," *Kentucky*, 23 F.4th at 599—with an unlawful regulation that encourages clinicians to racially discriminate, *infra* 7-9, 14-15. That unlawful interposition narrows the States' discretion in health and deters them from exercising their historic discretion in that area—they must either enforce their laws against residents for doing what the federal government tells them to do, or else not enforce their laws so that their clinicians don't suffer a competitive disadvantage. *See Colville*, 2023 WL 2668513, at *16-17. Accordingly, the States "have shown that they have sovereign interests and traditional prerogatives in regulating public health … and that the [Anti-Racism Rule] invades these prerogatives."[2] *Kentucky*, 23 F.4th at 602.

**2.** The States' laws "plausibl[y]" or "arguably" conflict with Defendants' Rule, *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 821-22 (E.D. Tenn. 2022): They forbid precisely what the Rule allows or requires, *infra* 7-9; MSJ-Br.13-14. The Anti-Racism Rule directs clinicians to prioritize patients based on race or ethnicity. *See infra* 8-9; MSJ-Br.13-14. Deploying the kinds of anti-racism plans

---

[2] The States, of course, extensively exercise their traditional control over the field of health, *see generally, e.g.*, Miss. Code Ann. Title 41 (public health), and the States' role in that field has long been recognized, *e.g.*, *State v. J.J. Newman Lumber Co.*, 59 So. 923, 926-27 (Miss. 1912).

that the Rule contemplates is therefore against several state laws that prohibit racial discrimination. *See infra* 7-9; MSJ-Br.13-14.

**3.** Relatedly, the Anti-Racism Rule interferes with the enforcement of several state laws. As this Court has explained, if "the Anti-Racism Rule encourages professionals to alter their clinical guidelines in a way that would violate their laws," then that "qualifies as sufficient interference with the States' laws." *Colville*, 2023 WL 2668513, at *17 (citing *Texas v. Becerra*, 623 F. Supp. 3d 696, 714 (N.D. Tex. 2022)); *accord id.* at *16 ("Whether or not a given professional confronts the financial harm, the *possibility* of it occurring discourages the States' enforcement of their laws and pressures them to construe their laws as permitting the race-based decisionmaking in patient care they claim that the anti-racism plans effectively require." (emphasis added)). At the summary-judgment stage, the States have proven that the Anti-Racism Rule not only encourages, but *directs*, clinicians to prioritize patients based on race in violation of state law. *See infra* 7-9; MSJ-Br.13-14. The Rule therefore forces a choice upon the States: enforce state laws against residents who are violating them because of the Rule, or choose not to enforce them (or construe them narrowly) to protect resident clinicians from competitive disadvantage. *See Colville*, 2023 WL 2668513, at *16-17. Either horn of that dilemma is enough to establish a concrete injury. *See id.*; *Becerra*, 623 F. Supp. 3d at 714 ("Here, the Guidance interferes with Texas's enforcement of its laws because it encourages its hospitals and doctors to violate Texas … laws."); *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) ("The Guidance consequently encourages employers, to avoid liability, to deviate from state law when it conflicts with the Guidance.").

Independently, "states also have a recognized quasi-sovereign interest in the health and 'economic well-being' of their populaces," *Kentucky*, 23 F.4th at 599, and "in having [their] citizens not discriminated against," *Louisiana v. Becerra*, 577 F. Supp. 3d 483, 492 (W.D. La. 2022). "One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could,

would likely attempt to address through its sovereign lawmaking powers." *Snapp*, 458 U.S. at 607. Explained below, States *do* address the issue here: discrimination in public accommodations. *See infra* 7-9. And the Anti-Racism Rule encourages clinicians within the States to prioritize patients based on race. *See infra* 14-15. That dynamic injures the "state interest in securing residents from the harmful effects of discrimination," an interest that is "peculiarly strong" when "invidious discrimination …along ethnic lines" is involved. *Snapp*, 458 U.S. at 609. The strength of that interest, moreover, sustains standing even if a "small number of individuals [are] directly involved." *See id.* at 599, 609.

*

In sum, the Anti-Racism Rule "implicates states' power to make and enforce policies and regulations, as well as states' traditional prerogative to superintend their citizens' health and safety." *Kentucky*, 23 F.4th at 599. Moreover, the Anti-Racism Rule risks racial discrimination against patients in the States, implicating the States' traditional quasi-sovereign interests, *Louisiana*, 577 F. Supp. 3d at 492. Those injuries to the States' sovereign and quasi-sovereign interests are imminent, *see infra* 7-11: they are based on the "'predictable'" choices of clinicians who will "'will likely act'" in precisely the ways Defendants' encourage and incentivize. *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 2023 WL 5266026, at *12 (5th Cir. Aug. 16). And as Defendants themselves concede, clinicians *are* using anti-racism plans under the Anti-Racism Rule. Answer (Doc. 59) ¶54.[3]

---

[3] The States moved for summary judgment, prior to any discovery, because they can prove standing based on, for example, a predictable risk of harm. *See Colville*, 2023 WL 2668513, at *17. But if this Court thinks that the States need to submit evidence that clinicians in the States *are* employing anti-racism plans (beyond the predictability of that fact), Defendants still aren't entitled to summary judgment. That evidence is within Defendants' control; they easily could have said in their cross-motion that there are no such clinicians in the Plaintiff States, if that (facially implausible) fact were true. Defendants put on evidence against standing at the motion-to-dismiss stage, after all. *See* Def. MTD Attach. (Doc. 47-1). Thus, even if this Court denies the States' pre-discovery motion for summary judgment, it should not rule on Defendants' cross-motion until after the States are given a chance to discover the facts that this Court says are necessary to establish standing. *See* Fed. R. Civ. P. 56(d); Def.-Br. 10 n.4.

6

## C.   Anti-racism plans encourage clinicians to prioritize patients based on race in violation of the States' laws.

Defendants nowhere contest that the States' antidiscrimination laws forbid prioritizing pa-
tients based on race. *See* MSJ-Br.14 & n.2; Def.-Br.8-12. They have therefore "forfeited" any "new
argument" in reply that there is no tension between anti-racism plans and the States' antidiscrimination
laws. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 n.6 (2021) (party forfeited standing argu-
ment). A new argument "in a reply brief" would come too late. *Accident Ins. Co. v. Dennis Collier Constr.,
LLC*, 2021 WL 329898, at *4 n.3 (S.D. Miss.).

For their part, amici remarkably suggest that "individual physicians" can racially discriminate
consistent with state law, and that the state laws reach only "facilities like hotels, restaurants, gas sta-
tions, bathrooms, and recreational areas." NAACP-Br. (Doc. 96) at 14.[4] But the States define public
accommodations broadly to include *all* facilities that provide services to the public, or that are sup-
ported directly or indirectly by state funds.[5] Some statutes expressly identify hospitals, proving that
medical services are not exempt.[6] Others make it a criminal offense for *persons*, broadly, to unlawfully

---

[4] This Court should not consider any arguments amici make that Defendants did not. *See Voices
for Int'l Bus. & Educ., Inc. v. NLRB*, 905 F.3d 770, 776 n.6 (5th Cir. 2018) ("[W]e do not consider
arguments raised by an amicus that the party it is supporting never made.").

[5] *See* Ky. Rev. Stat. Ann. §344.130 ("includes any place … licensed or unlicensed, which sup-
plies goods or services to the general public … or which is supported directly or indirectly by govern-
ment funds"); Ark. Code Ann. §16-123-102(7) ("any place … licensed or unlicensed, that supplies
accommodations, goods, or services to the general public … or that is supported directly or indirectly
by government funds"); Mont. Code Ann. §49-2-101(20)(a) ("a place that … offers its services, goods,
or facilities to the general public"); La. Stat. Ann. § 51:2232(10) ("any place … or other establishment,
either licensed or unlicensed, which supplies goods or services to the general public … or which is
supported directly or indirectly by government funds"); Mo. Ann. Stat. §213.010(16) ("all places or
businesses offering or holding out to the general public, goods, services, privileges, facilities, ad-
vantages or accommodations for the peace, comfort, health, welfare and safety of the general public").

[6] *E.g.*, Mont. Code Ann. §49-2-101(20)(a) ("includes without limitation a … hospital and all
other … business establishments"). Other statutes make express exceptions for "[h]ospitals" and
"nursing homes" to make clear that the prohibition of discrimination doesn't apply to bathrooms,
proving that "facility" otherwise applies to medical facilities. Ky. Rev. Stat. Ann. §344.145(2)(d).

discriminate.[7] And all protect *persons* from discrimination by *persons*, which includes patients and physicians.[8]

Unable to credibly defend their view that state antidiscrimination laws don't prohibit discrimination by physicians against patients, amici falsely assert that the States did "not even attempt to explain how" adopting anti-racism plans "is tantamount to a race-based denial of goods and services." NAACP-Br.11-12. The Rule makes clear what anti-racism plans are: plans to prioritize certain races and ethnicities over others. MSJ-Br.6, 13-14. The Rule requires clinicians to "[c]reate and implement an anti-racism plan using the CMS Disparities Impact Statement or other anti-racism planning tools." AR6; Answer (Doc. 59) ¶54. In that Disparities Impact Statement, CMS tells clinicians what it means by anti-racism planning tools: clinicians should "identify and prioritize which population(s)" physicians "want to address." AR2248. It further states: "Stratifying measures and health outcomes by race and ethnicity can help you get started." *Id.* Creating an anti-racism plan therefore unambiguously involves a "direct or indirect act or practice of exclusion, distinction, restriction, segregation, limitation, refusal, denial, or any other act or practice of differentiation or preference in the treatment of a person

---

[7] *E.g.*, Mont. Code Ann. §49-2-601 ("A person … who … willfully engages in an unlawful discriminatory practice prohibited by this chapter … is guilty of a misdemeanor").

[8] *E.g.*, La. Stat. Ann. §51:2247 ("it is a discriminatory practice for a person to deny an individual the full and equal enjoyment of the … services, facilities, privileges, advantages, and accommodations of a place of public accommodation … as defined in this Chapter, on the grounds of race. …"); Ky. Rev. Stat. §344.120 ("unlawful practice for a person to deny an individual the full and equal enjoyment of the … services, facilities, privileges, advantages, and accommodations of a place of public accommodation … on the ground of … race"); Ark. Code Ann. §16-123-107(a) ("The right of an otherwise qualified person to be free from discrimination because of race … is recognized as and declared to be a civil right"); Mont. Code Ann. §49-2-304(1) ("it is an unlawful discriminatory practice for the owner, lessee, manager, agent, or employee of a public accommodation … to refuse, withhold from, or deny to a person any of its services … facilities, advantages, or privileges because of … race"); Mont. Code Ann. §49-1-102(1) ("The right to be free from discrimination because of race … is recognized as and declared to be a civil right."); Mo. Ann. Stat. §213.065 (similar).

or persons because of race."[9] *E.g.*, La. Stat. Ann. §51:2232(5). And beyond their own incredulity, NAACP-Br.12, amici have nothing to say about statutes that prohibit completing and using tools like the ones the Rule requires.[10]

Amici argue that the States' laws "parallel federal protections," but then implausibly suggest that anti-racism plans "compor[t] with federal anti-discrimination principles." NAACP-Br.12. As amici acknowledge, those federal protections ban facially race-based classifications, *id.*, which is precisely what anti-racism plans as conceived in the Anti-Racism Rule involve: express prioritizations of some races and ethnicities over others. AR2247-53. Just last Term, the Supreme Court held that Title VI prohibits that kind of discrimination in education, even if the discrimination is meant to combat disparities. *SFFA*, 143 S. Ct. at 2156 & n.2; *id.* at 2175-76 (Thomas, J., concurring). Discrimination is unlawful, whether it's done in education or in medicine (and *especially* in medicine).

### D.     The States satisfy the traceability and redressability standing requirements.

The States have established traceability and redressability too. As explained, "the Anti-Racism Rule creates … an incentive to the professionals to violate the States' anti-discrimination laws." *Colville*, 2023 WL 2668513, at *17. The States thus must choose "whether to enforce their laws against the professionals who complete the activity," *id.*, and whether to exercise discretion in an area over which

---

[9] Defendants assert that "[i]n this context, the 'priority' population is simply the population affected by the health disparity." Def.-Br.20. Amici argue similarly that priority populations are "any group of people who is at risk of socially produced health inequities." NAACP-Br.30. But neither Defendants nor amici can escape the fact that their conception of anti-racism plans is expressly race-based. They are meant to "be used by all health care stakeholders to achieve health equity for *racial and ethnic minorities*" by "identify[ing] … priority populations" and, using that prioritization decision, defining goals. AR2247-53 (emphases added). And the plans expressly involve "identify[ing] and prioritiz[ing] [the] population(s)" clinicians "want to address," including "by race and ethnicity," AR2248, proving that the plans don't just use the term "priority population" as some kind of term of art. It's clear what the plans encourage: "designat[ing] or treat[ing] [races or ethnicities] as more important than other[s]" and "determin[ing] the order for dealing with [them] according to their relative importance" in clinical practice. *Prioritize*, New Oxford American Dictionary (3d ed. 2010).

[10] *See, e.g.*, Mont. Code Ann. §49-2-304(1)(b); Ky. Rev. Stat. Ann. §344.140.

they traditionally have control, *supra* 4; *see Louisiana*, 577 F. Supp. 3d at 492 (holding that a state "statute conflicts with the Head Start Mandate" and that "there is an obvious link between the Head Start Mandate" and that injury). It doesn't matter that "the ultimate violation of the State Plaintiffs' laws depends on professionals choosing the activity and carrying it out in a way that violates those laws." *Colville*, 2023 WL 2668513, at \*17. The States' "basis for standing 'does not rest on mere speculation about the decisions of third parties' but 'instead on the predictable effect of Government action on the decisions of third parties.'" *Id.* (quoting *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019)). "The predictable effect of Defendants incentivizing professionals to create anti-racism plans by awarding them half of their necessary points for the improvement activities category if they do so is that the professionals will select the activity, and" as has been proven above, "those plans will violate the States' laws." *Id.*; *see also Texas*, 809 F.3d at 159-60 (explaining that the traceability requirement is satisfied even if "the independent act of a third party was a necessary condition of the harm's occurrence, and it was uncertain whether the third party would take the required step"); *id.* ("DAPA beneficiaries have strong incentives to obtain driver's licenses, and it is hardly speculative that many would do so if they became eligible"). Patients will predictably be discriminated against, injuring the States quasi-sovereign interest in protecting them from discrimination. *Supra* 7-9. "Accordingly, the harm to the State Plaintiffs' sovereignty is traceable to the Anti-Racism Rule." *Colville*, 2023 WL 2668513, at \*17.

"Turning to redressability, because the State Plaintiffs are entitled to special solicitude, all they must show is a possibility that the requested relief will reduce the harm." *Id.* at \*18. "[V]acatur of the Anti-Racism Rule would remove the incentive provided to professionals to violate the States' anti-discrimination laws." *Id.*; *see Becerra*, 623 F. Supp. 3d at 719 ("forbidding HHS from enforcing the Guidance's interpretation … 'would safeguard Texas's sovereign interests'" because "an injunction would restore the status quo" and "Texas hospitals and doctors would defer to Texas law"). It would also end federal "intru[sion] upon areas traditionally within states' control," *Kentucky*, 23 F.4th at 598,

and the incentive to "discriminat[e] against" citizens, *Louisiana*, 577 F. Supp. 3d at 492; *see id.* ("If Plaintiff States are successful in having the Head Start Mandate declared invalid, this would redress their injuries."). Accordingly, the States have established traceability and redressability for their injuries, especially given special solicitude. *See Colville*, 2023 WL 2668513, at *17.

### E.    Defendants' arguments about standing fail.

This Court's order denying Defendants' motion to dismiss already adopted the legal conclusions necessary to establish that the States have standing. The two relevant factual questions—whether the States have antidiscrimination laws that prohibit racial prioritization and whether the Disparities Impact Statement encourages or requires racial prioritization—are either subject to judicial notice or supported by undisputed record evidence. Unable to deny those facts, Defendants continue to resist this Court's legal conclusions. Each of their four arguments fail. Def.-Br.8-12.

**1.** *Haaland v. Brackeen*, 143 S. Ct. 1609 (2023), does not "displac[e] this Court's earlier analysis." Def.-Br. 1, 9; *see also* NAACP-Br.18. To reach that conclusion, Defendants incorrectly assert that the "States' standing theory in this case, at bottom, is one of *parens patriae*." Def.-Br.9. After erecting that straw man, they knock it down by quoting *Brackeen*'s conclusion that States do "'not have standing as *parens patriae* to bring an action against the Federal Government.'" 143 S. Ct. at 1640 (quoting *Snapp*, 458 U.S. at 610 n.16). Yet the States' theories of standing here aren't forbidden third-party *parens patriae* theories—where "a state asserts in a purely vicarious manner the interests of its citizens." *Kentucky*, 23 F.4th at 599. Rather, the States assert a direct injury to their *own* sovereign and quasi-sovereign interests.

"'*Parens patriae*' … really encompasses two distinct concepts." *Id.* at 596. "First is the original *parens patriae* doctrine, a form of third-party standing that existed at common law." *Id.* "Today, states may not invoke this third-party standing conception of *parens patriae* to sue the United States on behalf

of state citizens allegedly harmed by the federal government." *Id.* The "second, more modern conception of *parens patriae*," by contrast, "generally *is* permissible." *Id.* Under that conception, "states sometimes purport to sue in a 'parens patriae' capacity, yet what they are really doing is asserting some injury to their *own* interests separate and apart from their citizens' interests." *Id.* "The distinction between the two theories becomes most acute when a state sues the United States and its officers. While a state may so sue when it seeks to vindicate its *own* sovereign and quasi-sovereign interests against the United States, it cannot sue when it claims to represent its citizens in a purely third-party *parens patriae* capacity." *Id.* "So, in other words, when sovereign and quasi-sovereign interests are *not* on the line, a state cannot litigate in a third-party capacity as *parens patriae* against the United States." *Id.* at 597.

The States do not assert standing as *parens patriae* to pursue the interests of their injured residents. Instead, the States assert "'concrete harm' to their '*sovereign* interest in their laws.'" MSJ-Br.13 (emphasis added) (quoting *Colville*, 2023 WL 2668513, at *15). Neither did this Court rest its decision on the States' standing as *parens patriae* to sue on behalf of injured residents: "the Anti-Racism Rule," it said, "will interfere with the enforcement of … anti-discrimination laws," "demonstrating a concrete harm to the States' *sovereign* interest in their laws." *Colville*, 2023 WL 2668513, at *15 (emphasis added); *see also id.* at *14 (States "have sufficiently alleged standing due to their sovereign interest in the enforcement of their anti-discrimination law"). And *Snapp* unambiguously said that States have a sovereign interest that involves "the power to create and enforce a legal code, both civil and criminal." 458 U.S. at 601. When injured, that "sovereign" interest "satisf[ies] standing's first requirement." *Harrison*, 2023 WL 5359049, at *3.

*Brackeen*, therefore, has nothing to do with these cross-motions. In that case, Texas brought "an *equal protection* challenge to" a federal statute. 143 S. Ct. at 1638 (emphasis added). Because Texas "has no equal protection rights of its own," it attempted to "assert equal protection claims on behalf of its citizens," a claim that fits comfortably within the third-party standing bar for suits against the

federal government.[11] 143 S. Ct. at 1640. The argument that Texas advanced and that the Supreme Court rejected was "an 'unclean hands' injury," one that stemmed from Texas's alleged "complicit[y] in enforcing federal law." *Id.* And "the Supreme Court rejected this argument for a specific reason:" Had it not, "'a State would always have standing to bring *constitutional challenges* when it is complicit in enforcing federal law.'" *Missouri v. Biden*, 2023 WL 4335270, at *65 (W.D. La. July 4) (emphasis added) (quoting *Brackeen*, 143 S. Ct. at 1640); *see id.* (Texas's claimed interest "clearly did not qualify as a quasi-sovereign interest"). By contrast, the States here don't assert standing to bring any individual-rights-based "constitutional challenge," and they don't assert "that the federal government mandates their complicity in enforcing" the Anti-Racism Rule. *See id.*  On the contrary, the States have standing to assert injuries to their *own* sovereign and quasi-sovereign interests, including their interests in exercising "'sovereign power'" *against* "'individuals and entities within'" the States because of federal interference with enforcement of state law. *See Harrison*, 2023 WL 5359049, at *4. An injury to that sovereign interest "satisf[ies] standing's first requirement." *Id.* at *3. "[N]one of th[e] sovereign-and-quasi-sovereign-interest theories" the States advance, *see supra* 7-11, "relies on impermissible notions of third-party standing in which a state asserts in a purely vicarious manner the interests of its citizens" against the federal government. *See Kentucky*, 23 F.4th at 596-99.

Other Supreme Court decisions support the States' reading of the bar to third-party *parens patriae* standing. The Supreme Court has held that the third-party standing bar to *parens patriae* suits against the federal government does not apply with respect to "'*quasi-sovereign rights actually invaded or threatened.*'" *Massachusetts*, 549 U.S. at 520 n.17. For example, in one case the Supreme Court "h[eld] that Wyoming had standing to bring a cross-claim against the United States to vindicate its 'quasi-sovereign interests which are independent of and behind the titles of its citizens, in all the earth and

---

[11] Indeed, the Court rejected Texas's explicit assertion of "third-party standing" as "a thinly veiled attempt to circumvent the limits on *parens patriae* standing." *Brackeen*, 143 S. Ct. at 1640 n.11.

air within its domain.'" *Id.* (cleaned up) (quoting *Nebraska v. Wyoming*, 515 U.S. 1, 20 (1995)). This Court would "clearly er[r]" if it were to say, as Defendants counsel, that the Supreme Court "had 'implicitly overruled'" those other decisions. *Mallory v. Norfolk S. Ry. Co.*, 143 S. Ct. 2028, 2038 (2023).

**2.** Defendants incorrectly argue that "Plaintiffs rest on the allegations in their Amended Complaint." Def.-Br.10. In the amended complaint, "Plaintiffs … asserted that a means by which anti-racism seeks to prevent and address racism is to actually make decisions based on race so long as it 'promotes equity.'" *Colville*, 2023 WL 2668513, at *16. "In light of Plaintiffs' allegations and the absence of any record evidence that the Anti-Racism Rule rejects the race-based decisionmaking that is alleged to be promoted by the Rule," this Court rejected Defendants' argument that "the injury to the States' enforcement of their laws" isn't concrete. *Id.*

At this stage, the Court needn't "conside[r] only the allegations in the Amended Complaint," *contra* Def.-Br.10, to find that there is no genuine dispute that "anti-racism seeks to prevent and address racism [by] mak[ing] decisions based on race," *Colville*, 2023 WL 2668513, at *16. As the States argued, the Disparities Impact Statement proves that anti-racism plans involve prioritizing certain races over others. MSJ-Br.13-14. That document is expressly cited in the Rule and is judicially noticeable. It's also part of the record, AR2247-53,[12] and Defendants admit that CMS developed it, Answer ¶54.[13] Defendants also admit that "clinicians and groups have attested to completing the activity to create and implement anti-racism plan." Answer ¶51. And Defendants don't dispute that prioritizing races con-

---

[12] Facts in the administrative record can establish standing. *See, e.g.*, *Compassionate Care Hospice v. Sebelius*, 2010 WL 2326216, at *3 (W.D. Okla. June 7).

[13] Admissions in an answer establish that there is no genuine dispute as to the fact to which the defendant admitted. *See, e.g.*, *Martinez v. Bally's La., Inc.*, 244 F.3d 474, 476 (5th Cir. 2001) ("A judicial admission is a formal concession in the pleadings by a party or counsel that is binding on the party making them."); *Devs. Sur. & Indem. Co. v. Driftwood Dev., LP*, 2008 WL 4838606, at *2 n.6 (W.D. Tex. Nov. 5) ("Defendants' admissions in their Answer are legally determinative admissions of fact and serve as proper summary judgment evidence to demonstrate that there is no genuine issue of fact.").

flicts with state law. *See* MSJ-Br.14 & n.2. Given this Court's prior legal analysis, Defendants them-selves supplied the "'specific facts,'" Def.-Br.10, needed to show that the Anti-Racism Rule "encour-ages professionals to alter their clinical guidelines in a way that would violate [the States'] laws," *Colville*, 2023 WL 2668513, at *17. And special solicitude "allows for the risk of future harm to satisfy standing … and therefore alleviates immediacy concerns." *Id.*, at *16.

**3.** This Court expressly rejected Defendants' argument that the States' injuries are not "trace-able to the improvement activity or redressable by the Court." Def.-Br.10-11. Just like the motion-to-dismiss stage, Defendants make the wholly legal argument that a plaintiff cannot establish those ele-ments "where plaintiff's allegations rely on the independent and speculative actions of third parties not before the Court"—"namely, clinicians." *Id.* As this Court explained, "the basis for standing 'does not rest on mere speculation about the decisions of third parties' but 'instead on the predictable effect of Government action on the decisions of third parties.'" *Colville*, 2023 WL 2668513, at *17 (quoting *Dep't of Com.*, 139 S. Ct. at 2566). This Court rightly held that "[t]he predictable effect of Defendants incentivizing professionals to create anti-racism plans by awarding them half of their necessary points for the improvement activities category if they do so is that the professionals will select the activity." *Id.* Again, the Court needn't rely on mere allegations. Consistent with what was always predictable, Defendants admitted that their Rule causes clinicians to adopt anti-racism plans, Answer ¶51, and, as part of those plans, Defendants *direct* clinicians to prioritize populations based on race, MSJ-Br.13-14 & n.2. Beyond the judicially noticeable state laws themselves, nothing more is needed to show that the Rule causes the States' injuries.

**4.** Defendants' attack on this Court's holding that the States are entitled to special solicitude is unavailing. *See Colville*, 2023 WL 2668513, at *14. Defendants observe that "three Justices suggest[ed] lower courts should" no longer grant States special solicitude, and they quote a dissenting opinion stating that *Massachusetts* had been "'quietly interred.'" Def.-Br.11 (quoting *United States v. Texas*, 143

15

S. Ct. 1964, 1997 (2023) (Alito, J., dissenting)) (citing *id.* at 1977 (Gorsuch, J, concurring in judgment)). But "the majority opinion in *Texas* does not mention special solicitude"—let alone purport to cast aside that principle. *Missouri*, 2023 WL 4335270, at *64. As explained above, this Court would "clearly er[r]" if it were to say, as Defendants counsel, that the Supreme Court "had 'implicitly overruled'" *Massachusetts*. *Mallory*, 143 S. Ct. at 2038. When a "lower court thinks [a] precedent is in tension with 'some other line of decisions,'" the Supreme Court's instructions couldn't be clearer: "'follow the case which directly controls,'" and let the Court "'overrul[e] its own decisions.'" *Id.*

Unable to dispute that *Massachusetts* and its progeny mean that the States enjoy special solicitude, *see Colville*, 2023 WL 2668513, at *14-15, Defendants cursorily assert that the States haven't "provided sufficient evidence of a quasi-sovereign injury" or "a procedural right," both of which are required for special solicitude. Def.-Br.12. Regarding the latter, that tack represents an about-face. Defendants had previously conceded that the procedural-right "requirement is met by virtue of the Administrative Procedure Act." Def. MTD Reply (Doc. 47) 6; *see Colville*, 2023 WL 2668513, at *14 n.17 ("Defendants agree that the State Plaintiffs have satisfied this first requirement."). And regarding the former, this Court correctly observed that the States "possess a sovereign interest in 'the exercise of sovereign power over individuals and entities within the relevant jurisdiction,' which 'involves the power to create and enforce a legal code.'" *Colville*, 2023 WL 2668513, at *15. That's precisely the kind of interest that's harmed by "'federal interference with the enforcement of state law'"—here, by encouraging residents to prioritize patients based on race. *Id.*

## II. Plaintiffs are entitled to summary judgment on the merits.

### A. The judicial review bar does not stop this Court from reaching the merits.

Defendants concede that this "Court has already held that, in the context of this case, it has jurisdiction to review whether a promulgated activity falls within the statutory decision of a 'clinical practice improvement activity,' notwithstanding … 42 U.S.C. §1395w-4(q)(13)(B)(iii)." Def.-Br.12. Defendants therefore "accept for the purposes of this motion the Court's prior conclusion that it has

jurisdiction to determine whether the review bar applies and thus to address the merits of Plaintiffs' *ultra vires* claim, if it determines Plaintiffs have standing." *Id.* The States have nothing to add, except to note that this Court's prior conclusion was correct. *See Apter v. HHS*, 2023 WL 5664191, at *4-6 (5th Cir.) (plaintiffs can use the APA to assert *ultra vires* claim and overcome sovereign immunity).

### B.   Judicial review is limited to the administrative record.

Under the APA, when a court decides "questions of law," "interprets constitutional and statutory provisions," and determines "the meaning and applicability of the terms of an agency action," it "shall review the whole record or those parts of it cited by a party." 5 U.S.C. §706. It is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). That rule also applies "to review for compliance with statutes." *Texas*, 20 F.4th at 965 (citing 5 U.S.C. §706(2)(C)).

Defendants incorrectly argue that this Court can consider "evidence outside of the record." Def.-Br.21-22. To reach that conclusion, Defendants assert that the States assert a claim that does "not arise within the APA context." *Id.* at 22. But the States' claim expressly arises under the APA. Am. Compl. ¶58 (quoting 5 U.S.C. §706(2)(A), (C)); *id.* ¶20 ("Defendants' final rule constitutes a final agency action that is judicially reviewable under the APA." (citing 5 U.S.C.§704; §706)). And the States seek a declaration "that the Anti-Racism Rule violates the Medicare Access Act," *id.* at 18, because it is "'not in accordance with law' or 'in excess of statutory jurisdiction, authority, or limitations'" under the APA. *Id.* ¶58 (quoting 5 U.S.C. §706(2)(A), (C)); *see also Colville*, 2023 WL 2668513, at *7 (Plaintiffs' "Complaint" challenges "the Anti-Racism Rule under the Administrative Procedure Act"), *id.* at *14 (States have asserted "a procedural right under the APA").

The decisions that Defendants cite aren't to the contrary. Def.-Br.22. At most, they say that extra-record evidence can sometimes be considered for claims that involve a "stand-alone" "*ultra vires*

claim." *Texas v. DHS*, 2023 WL 2842760, at *3 (S.D. Tex. Apr. 7); *see also Texas v. Biden*, 2021 WL 4552547, at *5-6 (N.D. Tex. July 19). By contrast, the States argue both that anti-racism plans are not clinical performance improvement activities under the statute, Am. Compl. ¶¶61-63, and, "[i]ndepend-ent[ly]," that the judicial review bar doesn't apply because the "agency action … exceed[ed] the agency's authority," *id.* ¶¶59-60. Only if this Court had found that the judicial review bar precluded it from reviewing whether anti-racism plans are "clinical practice improvement activities" would the *ultra vires* exception to review preclusion be relevant. If anti-racism plans aren't clinical practice improve-ment activities in the first place, then the judicial review bar doesn't apply and, for the same reason, the Anti-Racism Rule is reviewable as "not in accordance with the law" under the APA. 5 U.S.C. §706. Because this Court held that it "has jurisdiction to review whether the Anti-Racism Rule satisfies the definition of a 'clinical practice improvement activity,'" the States needn't rely on the *ultra vires* excep-tion to review preclusion. Their claim is an APA claim. *See Colville*, 2023 WL 2668513, at *7, *14. Accordingly, review of whether anti-racism plans are within the statutory definition is limited to the "agency record." *Baker v. Bell*, 630 F.2d 1046, 1051 (5th Cir. 1980).

### C.  Anti-racism plans are not one of the clinical practice improvement activities specified in the statute.

The "Secretary lacks authority to 'identif[y]' an activity as" a clinical practice improvement activity "when the activity does not satisfy the very definition of such activities" in the statute. *Colville*, 2023 WL 2668513, at *19. The statute, in turn, declares that "the term 'clinical practice improvement activity' means an activity that relevant eligible professional organizations and other relevant stake-holders identify as improving clinical practice or care delivery and that the Secretary determines, when effectively executed, is likely to result in improved outcomes." 42 U.S.C. §1395w-4(q)(2)(C)(v)(III). This Court must therefore determine whether anti-racism plans *as conceived of in the Rule* are clinical practice improvement activities within the meaning of the statute. As Defendants assert, "anti-racism" can mean different things to different people. *See* Def.-Br.19 ("there are many other definitions of

anti-racism"). What matters is the kind of plans that *the Rule* requires—namely, plans that have clini-cians prioritize patients based on socially construed race or ethnicity, not based on physiology. *See supra* 14-15; 86 Fed. Reg. at 65969. Accordingly, this Court must determine whether "relevant eligible professional organizations and other relevant stakeholders identif[ied]" the prioritization of patients based on race or ethnicity "as improving clinical practice or care delivery."[14] 42 U.S.C. §1395w-4(q)(2)(C)(v)(III). And it must determine whether racial prioritization relates to "clinical practice or care delivery" in light of the specific examples enumerated in the statute. §1395w-4(q)(2)(B)(iii); *Col-ville*, 2023 WL 2668513, at *20. Four independent reasons support the States' view that anti-racism plans aren't clinical practice improvement activities. *See also* MSJ-Br. 9-10.

**1.** Anti-racism plans don't reasonably relate to "the examples of clinical practice improvement activities set forth at §1395w-4(q)(2)(B)(iii)." *Colville*, 2023 WL 2668513, at *20. Those examples— same-day appointments, "monitoring health conditions," "timely communication of test results," and the like—have one thing in common, 42 U.S.C. §1395w-4(q)(2)(B)(iii): improving care for patients generally, not a subset of them. If a relevant organization had said that more pay for physicians im-proves physicians' performance, and an agency had then incentivized plans that quadruple the cost of care for patients, no one thinks that proposed activity is contemplated by the Rule—whatever the organization said. MSJ-Br. 9-10. Just so for anti-racism plans: The fact that the specific examples

---

[14] Even if this Court considers "extra-record evidence that racism within the medical system contributes to health disparities between races," Def.-Br.22-23, that evidence would have to support the proposition that prioritizing patients based on race or ethnicity, not physiology, improves clinical practice or care delivery, as informed by the examples given in the statute. Evidence that attending anti-racism training improves medical practice doesn't do that. *E.g.*, *id.* at 22.

enumerated don't look anything like prioritizing patients of one race over patients of another, all divorced from physiology, shows that anti-racism plans aren't the kinds of activities that relevant organizations *can* identify as improving "clinical practice or care delivery" *within the meaning of the statute*.[15]

**2.** Relatedly, relevant organizations didn't identify, before Defendants' acted, race-prioritization plans as improving clinical practice improvement activities within the meaning of the statute. "With statutes, '[c]ontext is the primary determinant of meaning.'" *Cargill v. Garland*, 57 F.4th 447, 461 (5th Cir. 2023) (en banc) (quoting Scalia & Garner, *Reading Law* 167 (2012)). Considering context, the statute unambiguously requires that Defendants considered whether relevant stakeholders identified plans that prioritize patients by race or ethnicity *before Defendants acted*. The text of the relevant provision makes this clear: The Secretary is supposed to act based on what professionals think, and he can't do that if he acts before they "identify" racial prioritization as "improving clinical practice or care delivery." 42 U.S.C. §1395w-4(q)(2)(C)(v)(III). Post-hoc general support for an activity that Defendants identified won't cut it. That's why "[i]n initially applying" the statute, "the Secretary shall use a request for information to solicit recommendations from stakeholders." §1395w-4(q)(2)(C)(v)(I). Accordingly, and as explained above, "'clinical practice or care delivery' must be construed in light of the examples of clinical practice improvement activities." *Colville*, 2023 WL 2668513, at *20. Reading the statute correctly, an activity isn't a clinical practice improvement activity unless relevant third parties *first* identify activities like "expanded practice access," "care coordination," etc., and specify the criteria for

---

[15] Defendants argue that *any* activity is a clinical practice improvement activity if relevant organizations say it's a good thing and the Secretary agrees, Def.-Br.15-16, but that defies a "common sense" reading of the statute read in context. *See Biden*, 143 S. Ct. at 2379 (Barrett, J., concurring). Congress did not (and could not) wholly outsource these important decisions to private organizations. Organizations can use words in senses that are clearly different from those used in the statute. If an organization identifies an activity that bears a remote relationship to the kinds of activities with which the statute is expressly concerned, that's relevant evidence that the organization is using "clinical practice or care delivery" in a different sense. For example, Defendants' citation of evidence that racism adversely affects health, Def.-Br.16-17, doesn't show that *racial-prioritization plans* relate to clinical practice or care delivery.

them. *See* §1395w-4(q)(2)(B)(iii), (C)(v)(I), (III). Given the unambiguous meaning of the statute, the question is whether the relevant third parties identified and specified criteria for plans to prioritize patients based on race or ethnicity, not physiology, as within the categories the statute enumerates.

As at the motion-to-dismiss stage, Defendants have failed to make that showing. It's no mystery which authorities[16] the Secretary relied on, since Defendants identified those authorities in the Rule itself, 86 Fed. Reg. at 65,969, 65,977, and elsewhere, AR2275 (listing three sources under "Evidence/Resources"). This Court was rightly unmoved by the sources "that the Anti-Racism Rule cites." *Colville*, 2023 WL 2668513, at *20. The sources apparently considered before proposing the Rule described "anti-racism approaches," Def.-Br.15, without identifying Defendants' approach—plans that prioritize patients based on race, not physiology.[17]

Even if Defendants' new authorities had been considered before Defendants identified and proposed race-based plans, they wouldn't satisfy the statute's requirements. *See* Def.-Br.15 & n.5. Those sources announced their general support for combating racism and discrimination and promoting health equity *after Defendants* identified the activity, but the commenters didn't say that prioritizing

---

[16] Defendants again "do not address whether or how [their sources] count as 'relevant eligible professional organizations and other relevant stakeholders." *Colville*, 2023 WL 2668513, at *20. The statute defines "'eligible professional organization'" to "mea[n] a professional organization as defined by nationally recognized specialty boards of certification or equivalent certification boards." 42 U.S.C. §1395w-4(q)(2)(D)(ii)(II). The *relevant* stakeholders are therefore organizations of that type. *See, e.g.*, §1395w-4(q)(2)(D)(viii) ("other relevant stakeholders" "includ[es] State and national medical societies"). The three sources the Secretary apparently considered are papers by individuals, not professional organizations. AR2282 (Camara Phyllis Jones); AR2286 (Darshali A. Vyas, et al.); AR2295 (J. Nwando Olayiwola, et al.).

[17] *E.g.*, AR2295-99 (opposing racism and endorsing an "Anti-Racism Plan" that "consists of four key pillars": elevate the cause ("work to raise awareness within and outside of our institution, focusing on educational and curricular reform, community engagement, and strategy"), engage stakeholders ("engage employees, faculty, staff, students, and other learners and stakeholders in tactical solutions and activities to confront and mitigate racism"), equip communities, employees, and learners ("investing in scholarships, funding, training, toolkits, people, positions, and pathways that support anti-racism initiatives"), and empower those who are marginalized or oppressed ("anti-racist culture that encourages individuals to speak out against racism, invests in the voices of the unheard, and leads comprehensive evaluation efforts to demonstrate impact")).

patients based on race, not physiology, satisfies any of the subcategories in the statute (or ones like them).[18] Def.-Br.15 & n.5. Organizations can support anti-racism plans for many reasons, including ideological ones that have little to do with the reason the statute requires: improving clinical practice or care delivery in the ways the statute describes. Defendants' argument that racism has adverse health effects doesn't show that prioritizing patients based on race, not physiology, was ever identified as the answer by the relevant organizations. Def.-Br. 16-17 & n.7.

**3.** Requiring the activities that stakeholders identify to "be construed in light of the examples of clinical improvement activities set forth" in the statute avoids constitutional concerns. *Colville*, 2023 WL 2668513, at *20. Even if a statute is "ambiguous," courts should "construe [it] against" "what the Government says [it] mean[s]" if "to do otherwise would raise grave constitutional concerns." *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 966-67 (5th Cir. 2023). If the statute means that any

---

[18] AR215-16 (International Accreditation Commission asserting that this is an "opportunity to recognize clinicians for developing and implementing processes to reduce racism and discrimination to ensure equitable health care" without saying that prioritizing patients based on race improves clinical practice or care delivery within the meaning of the statute); AR210 (American Academy of Dermatology Association, similar, "important objectives"); C-TAC Comments, at 4, https://downloads.regulations.gov/CMS-2021-0119-32235/attachment_1.pdf (Coalition to Transform Advanced Care, similar, announcing support for "[h]ealth equity" and its "feel[ing]" that "activities about health equity" "will help to address inequity in the health care system"); AR46 (American College of Radiology announcing support for "anti-racism plans" without any additional details); AR146 (Association of American Medical Colleges endorsing the view that anti-racism plans "address systemic racism as a root cause of inequity" without saying that the ones contemplated by the Rule improve clinical practice or care delivery in the ways that the statute contemplates); AR191 (American Society of Radiation Oncology saying broadly that it "supports the addition of the proposed improvement activities" without additional details); AR233 (MarsdenAdvisors saying broadly that it "applaud[s] CMS's proposal to include this IA in the inventory in 2022" without additional details).

Amici cite authorities in the administrative record, NAACP-Br.24, but those authorities also include only general statements of support. Supp.AR2421 (Association of Black Cardiologists, Inc., "agree[ing]" that "systematic racism is the root cause for differences in health outcomes between socially defined racial groups"); Supp.AR2431 (Society of General Internal Medicine announcing that it "appreciates the new and modified MIPS improvement activities"). Amici's argument that some authorities recognized "race and racism as a nonmedical determinant of health, and conclude[d] that a commitment to anti-racism is a prerequisite to improving health outcomes overall," NAACP-Br.25, misses the point. Defendants needed to identify relevant organizations and stakeholders who said anti-racism plans as conceived in the Rule improve clinical practice or care delivery; merely stating a general and vague commitment to "anti-racism" because of adverse health effects of racism isn't enough.

activity can be a clinical practice improvement activity—however unrelated to the enumerated examples—if a stakeholder says they're a good thing, *see* Def.-Br.15-16, then any number of illegal and even unconstitutional rules could be promulgated. If a stakeholder had said expressly that turning white patients away improves clinical practice and care delivery because it would reduce disparities, on Defendants' view, they could incentivize exactly that.

The Anti-Racism Rule likewise involves an express racial classification—clinicians should prioritize patients based on race or ethnicity. *See supra* 14-15. Race-based classifications are unconstitutional if they can't survive strict scrutiny. *SFFA*, 143 S. Ct. at 2161-63. And the Supreme Court has made clear that they don't, even if the goal is to reduce disparities. *See id.* at 2172. They also can't be used as a negative. *See id.* at 2168-69. Accordingly, this Court should hold what the statute already unambiguously says, *see supra* 18-21: a clinical practice improvement activity is one that reasonably "improves clinical practice or care delivery" in light of the subcategories enumerated, and that relevant organizations first identified it as such. MSJ-Br.9.

**4.** Even if Defendants' reading has "a colorable textual basis," this Court should reject it under the major questions doctrine. *See West Virginia*, 142 S. Ct. at 2609; *Texas v. Becerra*, 575 F. Supp. 3d 701, 714 (N.D. Tex. 2021). Defendants took the remarkable step of injecting antiracist ideology into medicine, going so far as to encourage clinicians to prioritize patients based on race or ethnicity. Explained above, that approach involves an "intrusion into state police powers." *Texas*, 575 F. Supp. 3d at 716-17 (holding that a "CMS [Rule] implicates 'vast economic and political consequences'" where rule "appl[ies] to myriad employees and already understaffed employers"). The injection of race into medicine is precisely the kind of application that Congress would have reserved for itself. *See Nebraska*, 143 S. Ct. at 2375. Given the specific enumeration of the kinds of activities implicated in the statute that have no relationship to antiracist ideology, Defendants require clear congressional authorization "to justify the challenged program." *Id.* Yet the statute "provides no authorization for the Secretary's

plan even when examined using ordinary tools of statutory interpretation—let alone 'clear congressional authorization' for such a program." *See id.*

Defendants betray the weakness of their position by invoking *Chevron* deference. Def.-Br.13-14. But "before" this Court considers *Chevron*'s applicability, it must "determine the statute's meaning using traditional statutory-interpretation tools … 'the old-fashioned way.'" *Cargill*, 57 F.4th at 458. "If the statute is unambiguous, it does not matter whether *Chevron* applies." *Id.*; *see id.* at 464-65 (if "the statute is unambiguous, *Chevron* deference does not apply even if the *Chevron* framework does"). Each of the above arguments shows why this Court should *not* defer to Defendants' reading of the statute.[19] *See supra* 19-24.

*

The kinds of anti-racism plans described by the Anti-Racism Rule are not "clinical practice improvement activities." For that reason, the statutory bar to judicial review doesn't apply. *Colville*, 2023 WL 2668513, at *19-20. And for the same reason, the Secretary "lacks authority" to promulgate the Anti-Racism Rule. *Id.* at *19. Accordingly, the Rule exceeds Defendants' authority and is unlawful. *See* MSJ-Br.10-13.

### D.   The States weren't obliged to raise their objections during the notice-and-comment period.

Defendants argue that this "Court should decline to review Plaintiffs' claim" because "Plaintiffs have waived any challenge that CMS's actions are ultra vires," Def.-Br.23, but admit that this "argument is foreclosed by [Fifth Circuit] precedent," *Sw. Elec. Power Co. v. U.S. Env't Prot. Agency*, 920 F.3d 999, 1022 n.23 (5th Cir. 2019). Because "the question presented" here is "a purely legal one,

---

[19] *Chevron* should be overruled. That doctrine "wrests from Courts the ultimate interpretive authority to 'say what the law is,'" a "transfer" that "is in tension with Article III's Vesting Clause." *Michigan*, 576 U.S. at 762 (Thomas, J., concurring). The Supreme Court recently granted certiorari on whether it should overrule *Chevron*. *Loper Bright Enters. v. Raimondo*, 143 S. Ct. 2429 (2023).

requiring [the] court's evaluation of whether [Defendants] complied with the statute," the waiver doctrine doesn't apply. *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 829 n.10 (5th Cir. 2003). And, in any event, "the waiver rule does not apply to preclude argument where," as here, "the scope of the agency's power to act is concerned." *Sierra Club v. Pruitt*, 293 F. Supp. 3d 1050, 1061 (N.D. Cal. 2018). The rule urged by Defendants "'would require everyone who wishes to protect himself from arbitrary agency action not only to become a faithful reader of the notices of proposed rulemaking published each day in the Federal Register, but a psychic able to predict the possible changes that could be made in the proposal when the rule is finally promulgated.'" *Am. Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 295 (5th Cir. 1998). Defendants haven't identified "any provision in the" governing statutes supporting such a requirement, and a court cannot write one into it. *See id.*

### E. Vacatur of the Anti-Racism Rule is the appropriate remedy.

This Court should vacate the Anti-Racism Rule. *Contra* Def.-Br.24-25. "The APA gives courts the power to 'hold unlawful and set aside agency action[s].'" *Data Mktg.*, 45 F.4th at 859 (quoting 5 U.S.C. §706(2)); *see Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 274-75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation." (citing 5 U.S.C. §706(2)(A)). "The default rule is that vacatur is the appropriate remedy," meaning courts "'formally nullify and revoke … an unlawful agency action.'" *Data Mktg.*, 45 F.4th at 859; *see also United Steel v. Mine Safety & Health Admin*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (If a rule is "*ultra vires* and unenforceable," the "ordinary practice is to vacate unlawful agency action.").

This Court should not remand without vacatur. "Remand without vacatur of the agency action is 'generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so.'" *Texas*, 20 F.4th at 1000. The exception for disruptive consequences of vacatur is *conjunctive*, requiring the agency to prove both disruptive consequences "and" that it could make the rule lawful on remand. *Cent. & S. W. Servs., Inc. v. EPA*, 220

F.3d 683, 692 (5th Cir. 2000). Defendants "ma[de] no developed argument that" they will be able to get it right on remand, "so [Defendants] forfeited the argument." *Data Mktg.*, 45 F.4th at 860; *see* Def.-Br.24-25 (arguing that vacatur would be disruptive, not that they could make the Anti-Racism Rule lawful after a ruling that it's outside of agency authority). That argument would have been unavailing, even if it were preserved. If this Court holds that the "Secretary lacks authority to 'identif[y]'" anti-racism plans as clinical practice improvement activities, *Colville*, 2023 WL 2668513, at *19, then that ruling means case closed; there's nothing the agency can do on remand to fix the Anti-Racism Rule. The default rule of vacatur applies. *See Data Mktg.*, 45 F.4th at 860.

Defendants' final argument that "any injunctive relief should be limited to the states that are parties to this lawsuit and that have pertinent antidiscrimination laws" finds no support in binding precedent on the appropriateness of vacatur *in this context.* Def.-Br.25. For example, Defendants rely on a concurrence. *Texas*, 143 S. Ct. at 1985 (Gorsuch, J., concurring) (doubting that courts have "equitable power to vacate agency action (in § 706)" and arguing that district courts should "'think twice … before granting'" vacatur). But binding circuit precedent provides otherwise. *Texas*, 20 F.4th at 1000-01 ("[B]y default, remand *with* vacatur is the appropriate remedy."); *Data Mktg.*, 45 F.4th at 859 ("Under prevailing precedent, §706 extends beyond the mere non-enforcement remedies available to courts that review the constitutionality of legislation, as it empowers courts to 'set aside'—*i.e.*, formally nullify and revoke—an unlawful agency action." (cleaned up)). Vacatur is the "default rule" in this circuit until that precedent is overruled. *Data Mktg.*, 45 F.4th at 859. Under §706, "'the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'" *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 944 (N.D. Tex. 2019). Because the Anti-Racism Rule "'conflict[s]'" with the statute, "the appropriate remedy is vacatur." *See id.*

## CONCLUSION

This Court should grant the States summary judgment and vacate the Anti-Racism Rule.

Dated: September 5, 2023                          Respectfully submitted,

*s/ Scott G. Stewart*                             *s/ Cameron T. Norris*
LYNN FITCH                                        Cameron T. Norris*
  *Attorney General*                    CONSOVOY MCCARTHY PLLC
Scott G. Stewart (MS Bar No. 106359)              1600 Wilson Blvd., Ste. 700
  *Solicitor General*                    Arlington, VA 22209
Justin L. Matheny (MS Bar No. 100754)             (703) 243-9423
  *Deputy Solicitor General*             cam@consovoymccarthy.com
MISSISSIPPI ATTORNEY
GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
scott.stewart@ago.ms.gov
justin.matheny@ago.ms.gov


*s/ Edmund G. LaCour Jr.*                         *s/ Nicholas J. Bronni*
STEVE MARSHALL                                    LESLIE RUTLEDGE
  *Attorney General*                      *Attorney General*
Edmund G. LaCour Jr.*                             Nicholas J. Bronni*
  *Solicitor General*                      *Solicitor General*
OFFICE OF THE ALABAMA                             OFFICE OF THE ARKANSAS
ATTORNEY GENERAL                                  ATTORNEY GENERAL
501 Washington Ave.                               323 Center Street, Suite 200
Montgomery, AL 36130                              Little Rock, AR 72201
(334) 353-2196                                    (501) 682-6302
Edmund.LaCour@AlabamaAG.gov                       nicholas.bronni@arkansasag.gov

*s/ Aaron J. Silletto*
DANIEL CAMERON
   *Attorney General*
Aaron J. Silletto*
   *Assistant Attorney General*
KENTUCKY OFFICE OF THE
ATTORNEY GENERAL
700 Capital Avenue, Suite 118
Frankfort, Kentucky
(502) 696-5439
Aaron.Silletto@ky.gov

*s/ Scott St. John*
JEFF LANDRY
   *Attorney General*
Elizabeth B. Murrill*
   *Solicitor General*
Scott St. John (MS Bar No. 102876)
   *Deputy Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
(225) 326-6766
murrille@ag.louisiana.gov

*s/ Joshua M. Divine*
ANDREW BAILEY
   *Attorney General*
Joshua M. Divine***
   *Solicitor General*
Samuel C. Freedlund
OFFICE OF THE MISSOURI
ATTORNEY GENERAL
815 Olive Street
Suite 200
St. Louis, MO 63101
(314) 340-4869
Josh.Divine@ago.mo.gov
Samuel.Freedlund@ago.mo.gov

*s/ Christian Corrigan*
AUSTIN KNUDSEN
   *Attorney General*
Christian Corrigan***
   *Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders Street
Helena, MT 59601
christian.corrigan@mt.gov

*pro hac vice
**pro hac vice pending
***pro hac vice forthcoming

## CERTIFICATE OF SERVICE

    I e-filed this brief with the Court, which will email everyone requiring service.

Dated: September 5, 2023                    *s/ Cameron T. Norris*