**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**STATE OF MISSISSIPPI, *et al.*** **PLAINTIFFS**

**v.** **Civil No. 1:22cv113-HSO-RPM**

**XAVIER BECERRA, *in his official Capacity as Secretary of Health and Human Services, et al.*** **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' MOTION [78] FOR SUMMARY JUDGMENT, DENYING WITHOUT PREJUDICE DEFENDANTS' CROSS-MOTION [90] FOR SUMMARY JUDGMENT, AND GRANTING PLAINTIFFS' REQUEST FOR LIMITED DISCOVERY AS TO STANDING UNDER FEDERAL RULE OF CIVIL PROCEDURE 56(d)**

BEFORE THE COURT are the Motion [78] for Summary Judgment filed by Plaintiffs State of Mississippi, State of Alabama, State of Arkansas, Commonwealth of Kentucky, State of Louisiana, State of Missouri, and State of Montana ("Plaintiffs" or "State Plaintiffs"), and the Cross-Motion [90] for Summary Judgment filed by Defendants Xavier Becerra, in his official capacity as Secretary of Health and Human Services; United States Department of Health and Human Services; Chiquita Brooks-LaSure, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services; Centers for Medicare and Medicaid Services; and United States of America ("Defendants"). The Court held oral argument on the Motions [78], [90] on March 13, 2024.

After due consideration of the Motions [78], [90], the record, and relevant legal authority, the Court concludes that Plaintiffs have not demonstrated that they have standing to bring the present suit. Plaintiff's Motion [78] for Summary Judgment should therefore be denied. Because Plaintiffs have requested standing-related discovery under Federal Rule of Civil Procedure 56(d) in order to respond to Defendants' Cross-Motion [90] for Summary Judgment, the Court will deny Defendants' Cross-Motion [90] without prejudice and permit limited discovery solely as to the question of State Plaintiffs' standing to maintain this suit. Defendants may reurge their request for summary judgment upon the conclusion of this limited discovery.

## I. BACKGROUND

### A. General background

This dispute concerns a challenge to a portion of a final agency rule promulgated by the Centers for Medicare and Medicaid Services ("CMS"), an agency within the United States Department of Health and Human Services ("HHS") which administers the Medicare program. The rule in question created a new clinical practice improvement activity for eligible health care professionals titled "Create and Implement an Anti-Racism Plan." *See* Am. Compl. [28] at 2-3, 12-13; Medicare Program, CY 2022 Payment Policies Under the Physician Fee Schedule and Other Changes, 86 Fed. Reg. 64,996, 65,384, 65,969-70 (Nov. 19, 2021). Clinical practice improvement activities are one of four categories used by CMS to calculate an eligible health care professional's score under the Merit-based Incentive Payment

System ("MIPS"), which determines whether a professional will receive a positive, negative, or neutral adjustment to the Medicare payments she receives for treating Medicare patients.  Am. Compl. [28] at 9; 42 U.S.C. § 1395w-4(q)(2)(A), (6)(A).

Plaintiffs assert that CMS lacks the statutory authority to promulgate the "Create and Implement an Anti-Racism Plan" improvement activity, which they refer to as the "Anti-Racism Rule," such that it is ultra vires.  Am. Compl. [28] at 16-18.  Specifically, Plaintiffs claim that the Anti-Racism Rule does not satisfy the statutory definition of a "clinical practice improvement activity" because anti-racism plans do not relate to "clinical practice or care delivery," and because CMS did not specify relevant professional organizations or stakeholders who identified such plans as improving clinical practice or care delivery.  *Id.* at 17-18 (citing 42 U.S.C. § 1395w-4(q)(2)(C)(v)(III)).

According to Plaintiffs, the Anti-Racism Rule is a final agency rule constituting a final agency action under the Administrative Procedure Act, 5 U.S.C. §§ 704, 706.  They seek a declaratory judgment, vacatur of the Anti-Racism Rule, and an injunction prohibiting the Rule's enforcement.  *Id.* at 3, 18.  The Amended Complaint [28] names as Defendants Xavier Becerra, in his official capacity as the Secretary of HHS (the "Secretary"), HHS, CMS, Chiquita Brooks-LaSure, in her official capacity as the Administrator of CMS, and the United States of America (collectively "Defendants").  *Id.* at 5-6.

B. Statutory and regulatory framework

1. The impact of MIPS on Medicare payments to eligible professionals

The Medicare Access and CHIP Reauthorization Act of 2015 ("MACRA") amended Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq., to, among other things, improve Medicare payments for health care professionals. Pub. L. No. 114-10, 129 Stat. 87. Specifically, MACRA sought to connect payments made to eligible professionals[1] to the performance and quality of the services provided by those professionals. *See id.* at § 101, 129 Stat. at 105-07; Am. Compl. [28] at 8; Mem. [37] at 10-11.

To accomplish this goal, Congress directed the Secretary of HHS to "establish an eligible professional Merit-based Incentive Payment System" for "payments for covered professional services . . . furnished on or after January 1, 2019." Pub. L. No. 114-10, § 101, 129 Stat. 87, 93; 42 U.S.C. § 1395w-4(q)(1)(A), (B). Under MACRA, the Secretary is instructed to develop a methodology to score the performance of a MIPS eligible professional, on a scale of 0 to 100, based on four categories: (1) quality; (2) resource use; (3) clinical practice improvement activities; and (4) meaningful use of certified electronic health records ("EHR") technology. 42 U.S.C. § 1395w-4(q)(1)(A), (2)(A), (5)(A). A professional's overall score is then used "to

[1] Eligible professionals include physicians (defined in 42 U.S.C. § 1395x(r) as doctors of medicine, osteopathy, dental surgery, dental medicine, podiatric medicine, and optometry), physician assistants, nurse practitioners, clinical nurse specialists, certified registered nurse anesthetists, physical therapists, occupational therapists, qualified speech-language pathologists, qualified audiologists, certified nurse-midwives, clinical social workers, clinical psychologists, and registered dietitians and nutrition professionals, or groups of such professionals. 42 U.S.C. § 1395w-4(q)(C); 86 Fed. Reg. at 65,389.

determine and apply a MIPS adjustment factor" to that professional's Medicare payments based on the comparison of her score to the performance threshold established for that year. § 1395w-4(q)(1)(A), (6)(A). Using this MIPS score and adjustment factor, if a professional scores below the selected threshold, her Medicare payments will be lowered based on a specified percentage, meaning that while she may seek Medicare reimbursement for a certain amount, she will ultimately receive only a percentage of that payment sought. *See* 42 U.S.C. § 1395w-4(q)(6)(A)(ii)(II). In contrast, a professional with a score exceeding the threshold is eligible to receive full reimbursement, plus an additional amount. *See* 42 U.S.C. § 1395w-4(q)(6)(A)(ii)(I), (iii), (F).

For the first five payment years of MIPS, from 2019 to 2023,[2] the Secretary establishes the performance threshold "based on a period prior to such performance periods," "data available with respect to performance on measures and activities that may be used under the performance categories," and "other factors determined appropriate by the Secretary." 42 U.S.C. § 1395w-4(q)(6)(D)(iii). For the 2021 to 2023 payment years, the Secretary is directed to increase the performance threshold in order "to ensure a gradual and incremental transition to the performance threshold" for payment year six, which "shall be the mean or median

[2] A "payment year" is based on an earlier "performance period" which is generally the calendar year that occurred two years prior to that payment year. *See* 42 C.F.R. § 414.1320. MACRA took effect for payments beginning in 2019, Pub. L. No. 114-10, § 101, 129 Stat. 87, 93, and, while the first payment year under MIPS was 2019, the relevant performance period was calendar year 2017, 42 C.F.R. § 414.1320(a). As a result, the MIPS adjustment for the 2024 payment year will be based on a professional's performance in 2022. *See* 42 C.F.R. § 414.1320(e), (h).

(as selected by the Secretary) of the composite performance scores for all MIPS eligible professionals with respect to a prior period specified by the Secretary."[3] 42 U.S.C. § 1395w-4(q)(6)(D)(i), (iv). "The Secretary may reassess the selection of the mean or median under the previous sentence every 3 years." 42 U.S.C. § 1395w-4(q)(6)(D)(i).

The adjustment based on the comparison of the professional's score to the performance threshold can be positive, neutral, or negative. 42 U.S.C. § 1395w-4(q)(6)(A). While the maximum negative MIPS adjustment a professional can receive is statutorily set at nine percent, 42 U.S.C. § 1395w-4(q)(6)(B), positive adjustments vary year-to-year in light of a budget neutrality provision which requires that the amount of positive payment adjustments roughly equals the amount of negative payment adjustments, 42 U.S.C. § 1395w-4(q)(6)(F). A professional receives a negative payment adjustment if her composite performance score is below the performance threshold, 42 U.S.C. § 1395w-4(q)(6)(A)(ii)(II), and if her "composite performance score[ is] equal to or greater than 0, but not greater than 1/4 of the performance threshold" for that year, the professional will receive the maximum nine percent negative adjustment, 42 U.S.C. § 1935w-4(q)(6)(A)(iv)(II). For scores greater than 1/4 of the performance threshold, but less than the performance threshold itself, the professional receives a negative

[3] For the 2024 and 2025 MIPS payment years, the Secretary selected "the mean and CY 2017 performance period/2019 MIPS payment year data, which will result in a performance threshold of 75 points." 86 Fed. Reg. at 65,377; Medicare Program, CY 2023 Payment Policies Under the Physician Fee Schedule and Other Changes, 87 Fed. Reg. 69,404, 70,034, 70,096-97 (Nov. 18, 2022); 42 C.F.R. § 414.1405(b).

adjustment between zero and nine percent. 42 U.S.C. § 1935w-4(q)(6)(A)(iv)(I). A professional with a score above the performance threshold receives a positive adjustment, subject to the budget neutrality provision. 42 U.S.C. § 1395w-4(q)(6)(A)(ii)(I), (iii), (F).

To illustrate how these adjustments interact with MIPS scores and the performance threshold, using the 2025 MIPS payment year performance threshold of 75, a professional's payment adjustment will be as follows: (1) negative nine percent for a score of 0.0 to 18.75; (2) between negative nine and zero percent on a linear sliding scale for a score of 18.76 to 74.99; (3) zero percent for a score of 75.0; and (4) between zero and plus nine percent on a linear sliding scale multiplied by a scaling factor between zero and three for a score of 75.0 to 100.0, though the exact scale and percentages may vary depending on the distribution of positive and negative scores to preserve budget neutrality.[4] 87 Fed. Reg. at 70,102. Based on these adjustments, a professional with a score of 17.0 who would otherwise be eligible for Medicare payments in the amount of $100,000 would ultimately receive only $91,000 from CMS, while a professional with a score of 100.0 who is also eligible for Medicare payments for $100,000 would receive a payment ranging from $100,000 to $127,000, depending on how the budget neutrality principle impacts positive adjustments.

---

[4] The amount of a positive adjustment ranges from zero to nine percent multiplied by a scaling factor between zero and three. 42 U.S.C. § 1395w-4(q)(6)(A)(iii), (F)(i), (ii). "If the scaling factor is greater than zero and less than or equal to 1.0, then the MIPS adjustment factor for a final score of 100 will be less than or equal to 9 percent. If the scaling factor is above 1.0 but is less than or equal to 3.0 then the MIPS payment adjustment factor for a final score of 100 will be greater than 9 percent." 87 Fed. Reg. at 70,101.

As a result, a professional's MIPS score relative to all MIPS-eligible professionals impacts her Medicare payments. *See* 42 U.S.C. § 1395w-4(q)(6)(A), (D). A professional who scores below the selected mean or median will receive decreased payments, while a professional who scores above may receive an increase. *Id.* However, the amount of the increase hinges on the number of professionals who score above and below the threshold given the budget neutrality provision. 42 U.S.C. § 1395w-4(q)(6)(F). "[I]f more clinicians achieve high MIPS scores, the likelihood and amount of these bonuses decline for other clinicians," because they must be spread across a greater number of professionals, and the overall available funds for an increase are finite, based on the funds available from the decreased payments to other professionals. Am. Compl. [28] at 11; *see* 42 U.S.C. § 1395w-4(q)(6)(A)(ii)(I), (iii), (F).

Plaintiffs allege that, in addition to its financial impact on Medicare payments, a professional's MIPS score can also impact the reputation of her practice and her ability to obtain new patients and retain existing ones. Am. Compl. [28] at 10. The Secretary is required to publish the composite scores and performance category scores for each MIPS eligible professional on CMS's Physician Compare website, which allows the public to view and compare the scores of MIPS professionals. 42 U.S.C. § 1395w-4(q)(9)(A). With these scores, patients can "evaluate and compare clinicians." Am. Compl. [28] at 4.

2. The role of an improvement activity in a professional's MIPS score

A professional's MIPS score is comprised of four performance categories: (1) quality; (2) cost; (3) improvement activities; and (4) promoting interoperability.[5] 42 U.S.C. § 1395w-4(q)(2)(A); 42 C.F.R. § 414.1380. A professional receives a score in each category, and these scores are then weighted to determine the composite score. *See* 42 C.F.R. § 414.1380. The general weights for the categories are: (1) thirty percent for quality; (2) thirty percent for cost; (3) fifteen percent for improvement activities; and (4) twenty-five percent for promoting interoperability.[6] 42 U.S.C. § 1395w-4(q)(5)(E). However, under certain circumstances, the Secretary can reweigh the categories for a MIPS eligible professional, as CMS has done for clinicians "affected by extreme and uncontrollable circumstances." 42 U.S.C. § 1395w-4(q)(5)(F); *see* 42 C.F.R. § 414.1380(c)(2). For the 2022 to 2024 MIPS payment years, this reweighing could result in the "improvement activities"

[5] The statute refers to the four categories as quality, resource use, clinical practice improvement activities, and meaningful use of certified EHR technology. 42 U.S.C. § 1395w-4(q)(2)(A). However, CMS refers to the performance categories of "resource use" as "cost" and "meaningful use of certified EHR technology" as "promoting interoperability," and shortens "clinical practice improvement activities" to "improvement activities." *See, e.g.*, Medicare Program, Merit-Based Incentive Payment System (MIPS) and Alternative Payment Model (APM) Incentive Under the Physician Fee Schedule, 81 Fed. Reg. 77,008, 77,010 (Nov. 4, 2016); Medicare Program, CY 2019 Payment Policies Under the Physician Fee Schedule and Other Changes, 83 Fed. Reg. 59,452, 59,720 (Nov. 23, 2018); 42 C.F.R. § 414.1380.

[6] Like many aspects of MIPS, for the first five payment years of the program, the statute sets forth special rules. Of relevance here, the improvement activities category remained constant at fifteen percent, though different weights applied for the cost and quality categories. 42 U.S.C. § 1395w-4(q)(5)(E)(i)(I)(bb), (II)(bb), (III). In addition, under certain circumstances, the percentage for promoting interoperability can be reduced by the Secretary, though it cannot go below fifteen percent, with the reduced percentage points applied to one or more of the other categories. 42 U.S.C. § 1395w-4(q)(5)(E)(ii).

category comprising zero, fifteen, or fifty percent of a professional's MIPS score. 42 C.F.R. § 414.1380(c)(2)(ii)(D)-(F).

A professional receives a score of 100 percent in the improvement activities category if she accumulates forty points. 42 C.F.R. § 414.1380(b)(3). To obtain points, a professional must complete clinical practice improvement activities, which are created by the Secretary. 42 C.F.R. § 414.1380(b)(3); 42 U.S.C. § 1395w-4(q)(2)(B)(iii). "[T]he term 'clinical practice improvement activity' means an activity that relevant eligible professional organizations and other relevant stakeholders identify as improving clinical practice or care delivery and that the Secretary determines, when effectively executed, is likely to result in improved outcomes." 42 U.S.C. § 1395w-4(q)(2)(C)(v)(III).

The number of points received for a given improvement activity depends on whether CMS classifies it as high-weighted or medium-weighted. 42 C.F.R. § 414.1380(b)(3). Generally, a professional receives ten points for each medium-weighted improvement activity and twenty points for each high-weighted improvement activity. *Id.* Accordingly, to receive the maximum improvement activities score of forty points, a professional typically must complete two high-weighted activities, four medium-weighted activities, or one high-weighted and two medium-weighted activities. *See id.* Certain categories of professionals receive a greater number of points for each activity: "[n]on-patient facing MIPS eligible clinicians, small practices, and practices located in rural areas and geographic [Health Professional Shortage Areas] receive 20 points for each medium-weighted

improvement activity and 40 points for each high-weighted improvement activity." *Id.* These professionals would therefore need to complete either one high-weighted activity or two medium-weighted ones in order to receive a maximum score. *See id.*

For the 2022 performance period, professionals could select from 104 weighted improvement activities to perform.[7] *See 2022 Improvement Activities: Traditional MIPS*, Ctrs. for Medicare & Medicaid Servs., https://qpp.cms.gov/mips/explore-measures?tab=improvementActivities&py=2022 (last visited Mar. 28, 2024). These included seventy-six medium-weighted and twenty-eight high-weighted activities. *Id.* Each activity is placed within a subcategory, such as "achieving health equity," "behavioral and mental health," "beneficiary engagement," "care coordination," "emergency response and preparedness," "expanded practice access," "patient safety and practice assessment," and "population management." *Id.*; *see also* 42 U.S.C. § 1395w-4(q)(2)(B)(iii) (setting forth six subcategories and permitting the Secretary to specify others).

Although there are numerous improvement activities listed in the inventory, Plaintiffs allege that "many are applicable only to a particular specialty," Am.

---

[7] The CMS website lists 105 activities, but one of these receives a weight of "none": an attestation that the professional works in a practice that is "a Patient Centered Medical Home (PCMH) or Comparable Specialty Practice that has achieved certification from a national program, regional or state program, private payer, or other body that administers patient-centered medical home accreditation," and, as such, should automatically receive a score of 100 percent in the category. *See 2022 Improvement Activities: Traditional MIPS*, Ctrs. for Medicare & Medicaid Servs., https://qpp.cms.gov/mips/explore-measures?tab=improvementActivities&py=2022 (last visited Mar. 28, 2024); 42 C.F.R. § 414.1380(b)(3)(ii) (providing that "[f]or MIPS eligible clinicians in a practice that is certified or recognized as a patient-centered medical home or comparable specialty practice, as determined by the Secretary, the improvement activities performance category score is 100 percent").

Compl. [28] at 10, and that smaller practices can struggle to find ones that they can complete, *id.* at 10-11. Moreover, "nearly two-thirds of the MIPS categories are either too difficult for most clinicians to satisfy or would be impractical to ask of clinicians because they contravene best medical practices." *Id.* at 11. In light of the challenges professionals face in completing improvement activities, Plaintiffs assert that "16.9% of clinicians did not participate in *any* improvement activities" in at least one performance period, even though over ninety-nine percent of MIPS-eligible clinicians participate in MIPS. *Id.* at 10-11 (emphasis in original); *see also* 86 Fed. Reg. at 65,375 ("We saw 99.9999 percent of MIPS eligible clinicians participate in MIPS in 2020."). Therefore, to the extent these clinicians are not subject to reweighing of their scores, *see* 42 C.F.R. § 414.1380(c)(2), by not reporting participation in any improvement activities, fifteen percent of their overall MIPS score would be a score of zero, with the result being that the maximum potential MIPS score they could achieve would be eighty-five, *see* 42 C.F.R. § 414.1380(b)(3), (c).

3. <u>The Anti-Racism Rule</u>

As part of CMS's annual rulemaking regarding physician payment policies for Medicare, on July 23, 2021, it proposed adding seven new improvement activities, two high-weighted and five medium-weighted. Proposed Rules for Medicare Program, CY 2022 Payment Policies Under the Physician Fee Schedule and Other Changes, 86 Fed. Reg. 39,104, 39,855-60 (proposed July 23, 2021). The

Anti-Racism Rule was one of the proposed high-weighted activities. *Id.* at 39,345, 39,855. To complete this improvement activity, a professional must

> [c]reate and implement an anti-racism plan using the CMS Disparities Impact Statement or other anti-racism planning tools. The plan should include a clinic-wide review of existing tools and policies, such as value statements or clinical practice guidelines, to ensure that they include and are aligned with a commitment to anti-racism and an understanding of race as a political and social construct, not a physiological one.
>
> The plan should also identify ways in which issues and gaps identified in the review can be addressed and should include target goals and milestones for addressing prioritized issues and gaps. This may also include an assessment and drafting of an organization's plan to prevent and address racism and/or improve language access and accessibility to ensure services are accessible and understandable for those seeking care. The MIPS eligible clinician or practice can also consider including in their plan ongoing training on anti-racism and/or other processes to support identifying explicit and implicit biases in patient care and addressing historic health inequities experienced by people of color.

*Id.* at 39,855 (endnote omitted).[8]

CMS described the rationale for implementing the Anti-Racism Rule as follows:

> This proposed activity aims to address systemic inequities, including systemic racism as called for in Executive Order 13985: Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, published January 20, 2021. This activity begins with the premise that it is important to acknowledge systemic racism as a root cause for differences in health outcomes between socially-defined racial groups[.]
>
> We believe this activity has the potential to improve clinical practice or care delivery and is likely to result in improved outcomes, per the improvement activity definition at [42 C.F.R.] § 414.1305, because it

[8] The omitted endnote cites to the CMS Disparities Impact Statement. *See* 86 Fed. Reg. at 39,855, 39,860; *see also Disparities Impact Statement*, Ctrs. for Medicare & Medicaid Servs. (Mar. 2021), https://www.cms.gov/About-CMS/Agency-Information/OMH/Downloads/Disparities-Impact-Statement-508-rev102018.pdf (last visited Mar. 28, 2024).

> supports clinicians in identifying health disparities and implementing processes to reduce racism and provide equitable quality health care. This activity is intended to help clinicians move beyond analyzing data to taking real steps to naming and eliminating the causes of the disparities identified. We also propose making this activity high-weighed because clinicians will need considerable time and resources to develop a thorough anti-racism plan that is informed by data, and to implement it throughout the practice or system.

*Id.* at 39,855 (endnotes omitted).

CMS also noted that "[t]his improvement activity acknowledges that it is insufficient to gather and analyze data by race and document disparities by different population groups. Rather, it emphasizes systemic racism is the root cause for differences in health outcomes between socially defined racial groups." *Id.* at 39,345. In support of its proposal, CMS cited to: (1) Executive Order 13,985; (2) an editorial by Camara Phyllis Jones, a former president of the American Public Health Association; and (3) a webpage from the Centers for Disease Control and Prevention ("CDC") entitled "Racism and Health." *Id.* at 39,855, 39,860 (citing Executive Order 13,985, 86 Fed. Reg. 7,009 (Jan. 20, 2021); Camara Phyllis Jones, Editorial: Applying Critical Race Theory, *Towards the Science and Practice of Anti-Racism: Launching a National Campaign Against Racism*, 28 Ethnicity & Disease, Suppl. 1 (2018), 231, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6092166/pdf/ethndis-28-231.pdf; and *Racism and Health*, Ctrs. for Disease Control and Prevention (2021), https://www.cdc.gov/healthequity/racism-disparities/index.html).[9]

---

[9] The link provided by CMS in the proposed and final rule for the cited CDC source leads to a webpage that is no longer available. In briefing an earlier Motion to Dismiss, Defendants

Following notice and comment, CMS finalized the Anti-Racism Rule as proposed on November 19, 2021. 86 Fed. Reg. at 65,969-70.

C. Procedural History

On May 5, 2022, Plaintiffs filed a Complaint [1] in this Court, challenging CMS's promulgation of the Anti-Racism Rule under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 et seq. Compl. [1] at 14-24. After Defendants moved to dismiss for lack of subject-matter jurisdiction, Mot. [15], Plaintiffs amended their Complaint [1], *see* Am. Compl. [28].[10]

The Amended Complaint [28] asserts that the Anti-Racism Rule is a final agency action that exceeds CMS's statutory authority, and that, as such, it should be set aside and enjoined. *Id.* at 16-18. Plaintiffs claim that § 1395w-4(q)(2)(B)(iii) authorizes CMS to promulgate clinical practice improvement activities only if such activities satisfy the statutory definition set forth in § 1395w-4(q)(2)(C)(v)(III). *Id.* at 17. According to Plaintiffs, the improvement activity set forth in the Anti-Racism Rule does not conform to the statutory definition in two respects. *Id.* First, improvement activities must "relate to 'clinical practice or care delivery,'" which Plaintiffs interpret, based on examples of activities listed in the statute, to "deal with practical considerations" of patients' health such as "same-day appointments,

stated that it is "now located at https://www.cdc.gov/minorityhealth/racism-disparities/." Reply [47] at 10. The new address provided by Defendants leads to a functional webpage.

[10] Plaintiff Amber Colville, a medical doctor, and the State of Arizona also filed the Amended Complaint. *See* Am. Compl. [28] at 1. Colville's claims were subsequently dismissed without prejudice for lack of standing, *see* Order [52] at 48, while the State of Arizona voluntarily dismissed its claims with prejudice, *see* Notice [58] at 1. Only the other State Plaintiffs' claims remain. *See* Am. Compl. [28].

test results, and patient safety," *id.* (citing § 1395w-4(q)(2)(B)(iii), (C)(v)(III)), but the Anti-Racism Rule instead instructs professionals to consider a patient's race in treatment only for non-medically relevant reasons, *id.*  Second, "relevant eligible professional organizations and other relevant stakeholders" must identify the activity as "improving clinical practice or care delivery," 42 U.S.C. § 1395w-4(q)(2)(C)(v)(III), and "CMS does not cite to any such professional organization or stakeholders who have examined and verified that the Anti-Racism Rule will improve clinical practice or care delivery," Am. Compl. [28] at 18.

In addition, Plaintiffs allege that the Anti-Racism Rule "encourages doctors to see patients not as individuals but as subcomponents of racial groups," and promotes race-based decision-making in medical care by directing professionals to align their clinical practices with the "philosophy" of anti-racism. *Id.* at 2-3.  They argue that anti-racism endorses distinguishing between individuals based on their race in order to promote equity, including discriminating among racial groups as a means to place such groups on equal footing. *Id.* at 2.  By making the Anti-Racism Rule a clinical practice improvement activity, CMS has provided a financial incentive for professionals to adopt this philosophy in their treatment of patients. *Id.* at 2-3.  Plaintiffs contend that this promotion of race-based decision-making in medical treatment contravenes the State Plaintiffs' laws, harms patients, and would not have been authorized by Congress without explicit statutory language. *Id.* at 2-3, 5, 7, 18.

D. Defendants' earlier Rule 12(b)(1) Motion [36] to Dismiss

Defendants filed a Motion [36] to Dismiss the Amended Complaint [28] pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that this Court lacked subject-matter jurisdiction because Plaintiffs lacked standing to challenge the Anti-Racism Rule, and because Congress had statutorily precluded judicial review of Plaintiffs' claims. *See* Mem. [37] at 19, 29.[11] The Court granted the Motion as to Plaintiff Amber Colville but denied it as to the State Plaintiffs. *See* Order [52] at 48. Specifically, the Court found that, at the pleading stage, because the Amended Complaint [28] alleged facts sufficient to plausibly establish each element of standing by asserting harm to the State Plaintiffs' sovereign interest in the enforcement of their laws, there was jurisdiction to review whether the Anti-Racism Rule satisfies the definition of a "clinical practice improvement activity" as set forth in § 1395w-4(q)(2)(C)(v)(III), and the Court could not conclude that the Rule falls within the statutory definition. *See id.* at 41, 45, 47-48.

E. The parties' current Motions [78], [90] for Summary Judgment

Plaintiffs and Defendants have now filed competing Motions [78], [90] for Summary Judgment. Plaintiffs contend that the Court's Order [52] denying Defendants' earlier Motion to Dismiss affirmed the legal conclusions entitling them to summary judgment: (1) the Court "has jurisdiction to review whether the Anti-Racism Rule satisfies the definition of a 'clinical practice improvement activity"; (2) "the Secretary lacks authority to identify an activity as a clinical practice

---

[11] Page citations to the parties' filings refer to the electronic page number assigned by CM/ECF, the Court's electronic filing system.

improvement activity when the activity does not satisfy the very definition of a clinical practice improvement activity as set forth in the statute"; and (3) "an activity does not meet the definition of a clinical practice improvement activity if the activity is not an activity that relevant eligible professional organizations and other relevant stakeholders identify as improving clinical practice or care delivery." Mem. [79] at 5-6 (quotations and alterations omitted). According to Plaintiffs, because there is no genuine dispute as to any material fact, they are entitled to judgment as a matter of law on their claim that the Anti-Racism Rule is ultra vires, and the Court should vacate the Anti-Racism Rule. *See id.* at 7, 15-18.

Defendants counter with their own Cross-Motion [90] for Summary Judgment, in which they contend that Plaintiffs lack standing and that enactment of the Anti-Racism Rule was within CMS's statutory authority. *See* Mot. [90]; Mem. [91] at 8.[12] With respect to standing, Defendants argue that Plaintiffs "have failed to establish harm to any legally cognizable state interest" and that intervening Supreme Court precedent has displaced the Court's earlier standing analysis. *See* Mem. [91] at 8 (citing *Haaland v. Brackeen*, 599 U.S. 255, 143 S. Ct. 1609, 1640 (2023)). In addition, "in *United States v. Texas*, [599 U.S. 670,] 143 S. Ct. 1964, 1977 (2023), the Supreme Court also called into question this Court's earlier determination that the States were entitled to 'special solicitude.'" *Id.* Even if the State Plaintiffs' asserted interests were cognizable for Article III standing purposes,

---

[12] Defendants' Memorandum [91] in support of their Cross-Motion [90] and their Memorandum [92] in opposition to Plaintiffs' Motion [78] for Summary Judgment are identical. The Court will cite to the first filing [91].

Defendants maintain they "have failed to introduce evidence, as required at the summary judgment stage, of how they are harmed by the improvement activity," depriving the Court of jurisdiction to consider their challenge and requiring summary judgment in Defendants' favor.  *Id.* at 8-9.

And even if the Court has jurisdiction, Defendants contend that Plaintiffs have failed to show that CMS acted ultra vires, and that the creation of the Anti-Racism Rule fell within its statutory authority.  *Id.* at 9; *see id.* at 19-31. Defendants maintain that the agency's actions are supported by evidence outside the Administrative Record, which they argue the Court may consider in evaluating an ultra vires claim.  *Id.* at 28-29.  According to Defendants, this evidence shows that racism within the medical system contributes to health disparities and that anti-racism programs directed at addressing racism are likely to improve treatment outcomes.  *Id.* at 29.  Defendants further state that "the Court should decline to review Plaintiffs' claim for one additional reason": they waived any ultra vires challenge to CMS's actions because no one raised this issue during the notice-and-comment period.  *Id.* at 30.  Finally, in the event the Court grants Plaintiffs any relief, Defendants argue that the Court must tailor that relief to only redress Plaintiffs' injuries and it "should not vacate the improvement activity or issue a nationwide injunction."  *Id.* at 31.  "Rather, remand to the Secretary to address the improvement activity through rulemaking would be the proper remedy."  *Id.*

Greensboro Health Disparities Collaborative, NAACP State Conference for Alabama, NAACP State Conference for Arizona, NAACP State Conference for

Arkansas, NAACP State Conference for Kentucky, NAACP State Conference for Louisiana, NAACP State Conference for Mississippi, NAACP State Conference for Missouri, and NAACP State Conference for Montana (the "NAACP Amici")[13] have filed an amicus Brief [96] in support of Defendants' Cross-Motion [90] for Summary Judgment and in opposition to Plaintiffs' Motion [78]. *See* Br. [96]. They assert that Plaintiffs have failed to show standing, that Plaintiffs cannot show as a matter of law that their claims evade the bar to judicial review under § 1395w-4(q)(13)(B)(iii), and that Plaintiffs have not presented any evidence to support their ultra vires claim. *See id.* at 11, 18-44. The NAACP Amici argue that Defendants are entitled to summary judgment because Plaintiffs lack standing, the "anti-racism planning relates to and may improve clinical practice and health outcomes," and the Anti-Racism Rule fits within statutory bounds. *Id.* at 12-13.

The American Medical Association and National Medical Association (the "Medical Association Amici") have also filed amicus Briefs [105], [106] in support of Defendants' Cross-Motion [90] for Summary Judgment and in opposition to Plaintiffs' Motion [78] for Summary Judgment. *See* Br. [105]; Br. [106].[14] They maintain that racism is a threat to public health, that anti-racism plans improve clinical practice and health outcomes for all Americans, and that evidence shows that such plans fall within the improvement activities Congress authorized CMS to consider for MIPS purposes. Br. [105] at 10-21. According to the Medical

---

[13] The Court denied these parties leave to intervene but has permitted them to appear as amici curiae. *See* Order [87] at 18-19.

[14] Because Briefs [105], [106] are identical, the Court will only cite the first-filed one.

Association Amici, anti-racism initiatives are essential to improving clinical practice and health outcomes for all patients, anti-racism plans are widely accepted tools for addressing health inequity, and nothing in the design or effect of the anti-racism plans promotes racism. *Id.* at 21-25.

Plaintiffs filed a combined Memorandum [108] in opposition to Defendants' Cross-Motion [90] for Summary Judgment and Reply [109] in support of their own Motion [78] for Summary Judgment. *See* Mem. [108]; Reply [109].[15]  Plaintiffs maintain that they are entitled to special solicitude in the standing analysis and that they have at least two types of injuries that establish standing: (1) injury to their sovereign interest in the exercise of their power to create and enforce a legal code; and (2) injury to the health and welfare of their citizens under the recognized quasi-sovereign interest in the health and economic well-being of their populaces. Mem. [108] at 8-12.  Plaintiffs assert that injuries to their sovereign and quasi-sovereign interests are imminent, and "are based on the 'predictable' choices of clinicians who . . . 'will likely act' in precisely the ways Defendants' [sic] encourage and incentivize." *Id.* at 12 (quoting *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 233 (5th Cir. 2023)).  They contend that Defendants have admitted that clinicians are in fact using anti-racism plans under the Anti-Racism Rule, *id.* (citing Ans. [59] at ¶54),[16] and that anti-racism plans encourage clinicians

---

[15]  Plaintiffs filed the document twice, as a Memorandum [108] and as a Reply [109].  The Court will cite the document as a Memorandum [108].

[16]  Plaintiffs state that they moved for summary judgment prior to any discovery based upon a predictable risk of harm, but that if the Court believes evidence that clinicians are employing anti-racism plans is needed to show standing, Defendants' Cross-Motion [90] should not be granted solely on this basis. *See* Mem. [108] at 12 n.3.  "That evidence is

to prioritize patients based on race in violation of their State laws, satisfying the traceability and redressability requirements of standing, *id.* at 13-19.

## II. DISCUSSION

### A. Summary judgment standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'material' fact is one 'that might affect the outcome of the suit under governing law,'" *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)), and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party," *id.* (quotation omitted). If the movant initially shows the non-movant's case lacks support, then the non-movant must come forward with specific facts showing a genuine factual issue for trial. *Id.* In considering the record at summary judgment, all evidence of the non-movant is to be believed, and all justifiable interferences are to be drawn in the non-movant's favor. *Id.*

---

within Defendants' control; they easily could have said in their cross-motion that there are no such clinicians in the Plaintiff States, if that (facially implausible) fact were true." *Id.* To the extent the Court denies Plaintiffs' Motion [78] for Summary Judgment, they argue that the Court should not rule on the Cross-Motion [90] until after they are given an opportunity to discover facts necessary to establish standing. *Id.* (citing Fed. R. Civ. P. 56(d)).

B. Whether Plaintiffs have shown standing at the summary judgment stage

1. Relevant legal authority

a. Standing generally

Under Article III of the United States Constitution, the power of the federal judiciary extends only to "cases" and "controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016); U.S. Const. art. III, § 2. A case or controversy can exist only if a plaintiff has standing to sue, and the plaintiff bears the burden of establishing its constitutional standing. *See Texas*, 599 U.S. at 675; *Raines v. Byrd*, 521 U.S. 811, 818 (1997). Standing requires a personal stake in the case. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). To demonstrate a personal stake, "plaintiffs must be able to sufficiently answer the question: 'What's it to you?'" *Id.* (quoting Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 882 (1983)).

In cases where there are multiple plaintiffs, so long as one plaintiff has standing, the case may proceed. *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023); *Texas v. United States (DACA)*, 50 F.4th 498, 514 (5th Cir. 2022). Accordingly, the Court may "avoid complex questions of standing in cases where the standing of others makes a case justiciable." *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 344 n.3 (5th Cir. 2013) (emphasis removed).

The Article III standing requirement "is built on separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408

(2013). "In keeping with the purpose of this doctrine, [the] standing inquiry has been especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Id.* (quotation omitted); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) ("This Court has recognized that the case-or-controversy limitation is crucial in maintaining the tripartite allocation of power set forth in the Constitution." (quotations omitted)).

Three elements are necessary to establish standing:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up). In sum, a plaintiff must show that it suffered an injury-in-fact that is traceable to the challenged action and that will likely be redressed if it prevails. *Id.*; *Spokeo*, 578 U.S. at 338.

Each element of standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof during the litigation, meaning "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. At the summary judgment stage, a plaintiff cannot rest on "mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be

taken to be true." *Id.* (quotations omitted); *see also Louisiana State by & through Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 879 (5th Cir. 2023) ("[A]lleging grounds for standing in a complaint is not the same as asserting—and substantiating—those theories when resisting summary judgment, because the district court cannot 'rule on' mere allegations at the summary judgment stage of litigation."). The standing inquiry is "focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); *see also Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007) (holding that "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction").

States are not normal litigants for purposes of invoking federal jurisdiction, but "they, too, are bound by Article III's standing requirements." *Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 769 (5th Cir. 2023). "States undoubtedly have an interest in enforcing their laws," but "when it comes to federal courts, [a State] must claim an injury to a traditional, sovereign interest to invoke Article III jurisdiction." *Id.* at 767. States may sue either on their own behalf in a direct suit or in the interest of their residents in a *parens patriae* capacity.[17] *Id.* at 769. "The capacity in which the state is suing changes the standing calculus." *Id.*

---

[17] The Supreme Court has explained that,

> [*p*]*arens patriae* means literally parent of the country. The *parens patriae* action has its roots in the common-law concept of the royal prerogative. The royal prerogative included the right or responsibility to take care of persons who are legally unable, on account of mental incapacity, whether it proceed from 1st. nonage: 2. idiocy: or 3. lunacy: to take proper care of themselves and

b. States and sovereign interests

For a direct suit, if a State can satisfy the ordinary demands of Article III, that is injury-in-fact, causation, and redressability, it can vindicate its sovereign, proprietary, or private interests. *Id.* Two clear sovereign interests are clear: (1) "the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal;" and (2) "the demand for recognition from other sovereigns—most frequently this involves the maintenance and recognition of borders." *Harrison*, 78 F.4th at 770 (quoting *Snapp*, 458 U.S. at 601). Examples of the first type of sovereign interest include: "(1) federal assertions of authority to regulate matters [states] believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law, at least where the state statute at issue regulates behavior or provides for the administration of a state program and

> their property. At a fairly early date, American courts recognized this common-law concept, but now in the form of a legislative prerogative: This prerogative of *parens patriae* is inherent in the supreme power of every State, whether that power is lodged in a royal person or in the legislature and is a most beneficent function often necessary to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves.
>
> This common-law approach, however, has relatively little to do with the concept of *parens patriae* standing that has developed in American law. That concept does not involve the States stepping in to represent the interests of particular citizens who, for whatever reason, cannot represent themselves. In fact, if nothing more than this is involved—*i.e.*, if the State is only a nominal party without a real interest of its own—then it will not have standing under the *parens patriae* doctrine.

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600 (1982) (quotations and footnotes omitted).

does not simply purport to immunize state citizens from federal law." *Id.* (quotation omitted).

According to the Fifth Circuit, "for a sovereign interest to serve as a cognizable injury for federal standing, the acts of the defendant must invade the government's sovereign right, resulting in some tangible interference with its authority to regulate or to enforce its laws." *Id.* (quotations omitted). But the Fifth Circuit has held that a violation of state law does not become an injury until a state brings an enforcement action against a violator to bring the violator into compliance with the law, and the violator or another entity hinders the State from doing so. *Id.* at 771. In other words, injuries to a state "'conventionally arise' when the state 'has enacted a law, enforced it against a resident, and the resident has refused to comply.'" *Id.* (quoting *Saginaw Cnty., Michigan v. STAT Emergency Med. Servs., Inc*., 946 F.3d 951, 956 (6th Cir. 2020)).

For a state to show an injury in fact, it must demonstrate the "'invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560); *see also Lujan*, 504 U.S. at 561 n.1 ("By particularized, we mean that the injury must affect the plaintiff in a personal and individual way."). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Clapper*, 568 U.S. at 409 (quotation omitted). The Supreme Court has "repeatedly

reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Id.* (emphasis is original) (quotation omitted). A "highly attenuated chain of possibilities" does not satisfy the requirement that "threatened injury must be certainly impending." *Id.* at 410. "A claim of injury generally is too conjectural or hypothetical to confer standing when the injury's existence depends on the decisions of third parties not before the court." *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009).

As for redressability, the Supreme Court has explained that, "[w]hen the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue." *Lujan*, 504 U.S. at 561.

> If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it. When, however, . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. The existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. Thus, when the plaintiff is not himself the object of the

> government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.

*Id.* at 561-62 (citations and quotations omitted).

c. States and quasi-sovereign interests

In the case of *parens patriae* standing, ordinarily "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Brackeen*, 599 U.S. at 295 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610, n.16 (1982)). To determine whether a State has *parens patriae* standing to sue the federal government, the Supreme Court has distinguished its precedent where the issue "involved a challenge to the denial of a statutorily authorized petition for rulemaking," from "a challenge to an exercise of the Executive's enforcement discretion," which is not ordinarily subject to judicial review. *Texas*, 599 U.S. at 685 n.6. According to the Supreme Court, "there is a critical difference between allowing a State to protect her citizens from the operation of federal statutes (which is what [its precedent] prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007).

In a *parens patriae* suit, States "must do more than meet Article III's irreducible minimum; they must assert a quasi-sovereign interest apart from the interests of particular private parties." *Id.* at 520 (quotation omitted). Quasi-sovereign interests "are not sovereign interests, proprietary interests, or private interests pursued by the State as a nominal party"; instead, "they consist of a set of

interests that the State has in the well-being of its populace." *Snapp*, 458 U.S. at 602.

> Although the articulation of such interests is a matter for case-by-case development—neither an exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract—certain characteristics of such interests are so far evident. These characteristics fall into two general categories. First, a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system.
>
> The [Supreme] Court has not attempted to draw any definitive limits on the proportion of the population of the State that must be adversely affected by the challenged behavior. Although more must be alleged than injury to an identifiable group of individual residents, the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population. One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.

*Id.* at 607. Classic examples of suits vindicating such interests are those involving public nuisances and economic interests, where "the state is not suing simply to protect the interests of a private citizen, but the interest of the state to be free from the invasion of out-of-state nuisances or discriminatory policies that threaten the state's economy." *Harrison*, 78 F.4th at 772-73 (footnotes omitted) (collecting cases). The Supreme Court has cautioned that if formulated too broadly, the concept risks being too vague to survive the standing requirements of Article III. *Snapp*, 458

U.S. at 602. Thus, "[a] quasi-sovereign interest must be sufficiently concrete to create an actual controversy between the State and the defendant." *Id.*

To the extent States have a stake in protecting their quasi-sovereign interests, they may be entitled to "special solicitude" in the standing analysis. *Massachusetts*, 549 U.S. at 520.[18] When a State demonstrates that special solicitude is appropriate, it can establish standing "without meeting all the normal standards for redressability and immediacy." *Id.* at 517-18 (quotation omitted).

2. <u>The parties' arguments</u>

Defendants argue that Plaintiffs do not satisfy any of the three elements of standing because they have failed to identify a cognizable injury, and they improperly rest on the allegations in their Amended Complaint [28] without introducing any evidence of how they enforce their antidiscrimination laws in the healthcare setting. Mem. [91] at 15-17. Even if there is evidence of an injury-in-fact, Plaintiffs' "harms would not be traceable to the improvement activity or redressable by the Court," as their "theory of harm depends on the actions of third parties not before the Court, that is, clinicians who choose to create and implement anti-racism plans that may conflict with the States' antidiscrimination laws." *Id.* at 17. According to Defendants, Plaintiffs' allegations depend on several layers of

---

[18] But the Fifth Circuit has noted that "the 'special solicitude' once afforded to states under *Massachusetts v. EPA*, 549 U.S. 497, 520, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007), with respect to justiciability doctrines like standing, seems to also be falling out of favor with the Supreme Court." *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1090 n.12 (5th Cir. 2023) (citing William Baude & Samuel L. Bray, *Proper Parties, Proper Relief*, 137 HARV. L. REV. 153, 174-77 (2023)).

decision-making by third-party clinicians that is both too speculative and too attenuated and weak to support standing.  *Id.* at 17-18.

Defendants assert that special solicitude does not cure Plaintiffs' standing deficiencies, and "they have not attempted to establish another theory of redressability."  *Id.* at 18.  Defendants further maintain that, "[i]n any event, at the summary judgment stage, Plaintiffs have not provided sufficient evidence of a quasi-sovereign injury, as explained above, or of a procedural right, both of which were required by earlier Fifth Circuit precedent regarding special solicitude."  *Id.* at 19.

Plaintiffs assert three injuries, all of which they claim affect a sovereign or quasi-sovereign interest.  *See* Am. Compl. [28] at 5; Mem. [108] at 9-15.  The first two asserted injuries are related and are based on the contention that "[m]ost [of the State Plaintiffs] prohibit racial discrimination in their laws and their agreements with medical providers," and the Anti-Racism Rule "encourag[es] Medicare providers to make medical decisions based on race" in violation of these laws and agreements.  Am. Compl. [28] at 5; *see also* Mem. [108] at 10-11 (asserting that the State Plaintiffs' laws plausibly or arguably conflict with the Anti-Racism Rule, that "[d]eploying the kinds of anti-racism plans that the Rule contemplates is therefore against several state laws that prohibit racial discrimination," and that "the Anti-Racism Rule interferes with the enforcement of several state laws").

According to Plaintiffs, the payment adjustment measures that coincide with professionals' MIPS scores place the States in a bind: if States enforce their laws,

the professionals who practice in their States will be unable to complete the activity set forth in the Anti-Racism Rule and will risk receiving lower reimbursement rates, which would "increase[] costs that will fall on beneficiaries like the [S]tate [P]laintiffs and their citizens." Am. Compl. [28] at 5; *see* Mem. [108] at 11.  "The Rule therefore forces a choice upon the States: enforce state laws against residents who are violating them because of the Rule, or choose not to enforce them (or construe them narrowly) to protect resident clinicians from competitive disadvantage."  Mem. [108] at 11.   For this reason, the Anti-Racism Rule concretely injures the States' sovereign interest, forcing them to choose between a financial injury or federal interference with the enforcement of their laws.  *Id.* at 10-11.

Plaintiffs raise a third injury based on their "quasi-sovereign interest in the health and well-being of their residents." Am. Compl. [28] at 5; *see* Mem. [108] at 11-12.  They contend that the Anti-Racism Rule "elevate[s] faddish theories about race above patient care," which will harm the quality of care and lead to racial discrimination against their citizens in the provision of care. Am. Compl. [28] at 3, 5; *see* Mem. [108] at 8, 11-12.

3.    Analysis

Plaintiffs have not submitted any exhibits in support of their summary judgment Motion [78] or in response to Defendants' Cross-Motion [90] for Summary Judgment, instead relying upon the Administrative Record.  *See* R. [86-3]; R. [86-4]; Supp. R. [95-3].   First, Plaintiffs contend that the States have a recognized quasi-sovereign interest in the health and economic well-being of their populaces, *see*

Mem. [108] at 11, but they have not presented any competent summary judgment evidence showing how, at the time the suit was filed, the challenged action has or had affected any one of these quasi-sovereign interests, *but see Brackeen*, 599 U.S. at 295; *Texas (DACA)*, 50 F.4th at 514. More than allegations from the Amended Complaint are required at summary judgment. *See Texas*, 599 U.S. at 675; *Lujan*, 504 U.S. at 561. Plaintiffs have not pointed to any relevant evidence supporting these alleged quasi-sovereign interests, such as the size or number of citizens affected and whether the alleged injury is to a "sufficiently substantial segment" of any State Plaintiff's population, *but see Snapp*, 458 U.S. at 602, nor have they adduced evidence tending to show how the Anti-Racism Rule threatens any State Plaintiff's economy, *but see Harrison*, 78 F.4th at 773.

Turning to State Plaintiffs' direct suit to vindicate a sovereign interest, at least one State Plaintiff must satisfy the ordinary requirements of Article III standing, including injury in fact to their own sovereign, proprietary, or private interests. *See Harrison*, 78 F.4th at 769; *see also, e.g., Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009) (recognizing that "the requirement of injury in fact is a hard floor of Article III jurisdiction"). The summary judgment record does not support a finding that they have done so.

Plaintiffs specifically claim an injury to their sovereign interest in the exercise of their power to create and enforce a legal code. *See* Mem. [108] at 8-11. A State's interest in enforcing its laws can supply it with standing based upon "federal interference with the enforcement of state law, at least where 'the statute at issue

regulate[s] behavior or provide[s] for the administration of a state program' and does not 'simply purport [ ] to immunize [state] citizens from federal law.'" *Texas (DAPA)*, 809 F.3d at 153 (footnotes omitted) (quoting *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269-70 (4th Cir. 2011)). But the asserted injury "must be sufficiently concrete to create an actual controversy between the State and the defendant." *Snapp*, 458 U.S. at 602.

In support of their Motion [78] and in opposition to Defendants' Cross-Motion [90], Plaintiffs cite the Court's prior Order [52] denying Defendants' Motion [36] to Dismiss, *see* Order [52] at 48; Mem. [79] at 17-18, but at the summary judgment stage, Plaintiffs cannot rest on the allegations in their Amended Complaint [28], *see Lujan*, 504 U.S. at 561. Instead, they must "set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (quotations omitted). Plaintiffs have not done so.

The only evidence that has been filed of the record is the Administrative Record. *See* R. [86-3]; R. [86-4]; Supp. R. [95-3]. To support their standing argument, Plaintiffs cite the Anti-Racism Rule itself and the CMS Disparities Impact Statement to argue that the two work together and make clear that anti-racism plans prioritize certain races and ethnicities over others, in violation of the State Plaintiffs' anti-discrimination laws. Mem. [108] at 14-15 (citing AR6 & AR2247-53).

Although the Court may take judicial notice of each State's discrimination laws as they are recited in Plaintiffs' Memorandum [108], at summary judgment the

mere existence of these laws is an insufficient basis upon which the Court can conclude that any Plaintiff satisfies the Article III minima for standing. *See* Fed. R. Evid. 201; Mem. [108] at 13-15 (citing Ark. Code Ann. §§ 16-123-102(7) [sic],[19] 16-123-107(a); Ky. Rev. Stat. Ann. §§ 344.120, 344.130, 344.140, 344.145; La. Stat. Ann. §§ 51:2232(5), 51:2232(10), 51:2247; Mo. Ann. Stat. §§ 213.010(16), 213.065; Mont. Code Ann. §§ 49-1-102(1), 49-2-101(20)(a), 49-2-304(1), 49-2-601).

Relying upon the Anti-Racism Rule itself and the CMS Disparities Impact Statement, the State Plaintiffs argue that the Rule encourages race-based decision-making and prioritization, which violates their anti-discrimination laws. *See* Mem. [79] at 18 n.2; Mem. [108] at 13-15. But even if one were to construe the Rule as conflicting with any of State Plaintiffs' laws, "what has traditionally counted as an injury to a sovereign interest does not include every act of disobedience to a state's edicts." *Harrison*, 78 F.4th at 770. As the Fifth Circuit has stated, a violation of state law does not become an injury until a state brings an enforcement action against the violator to bring the violator into compliance, and the violator or another entity hinders the State from doing so. *Id.* at 771. This is because injuries to a state "'conventionally arise' when the state 'has enacted a law, enforced it against a resident, and the resident has refused to comply.'" *Id.* (quoting *Saginaw Cnty., Michigan*, 946 F.3d at 956).

[19] Plaintiffs cite Arkansas Code Annotated § 16-123-102(7). *See* Mem. [108] at 13 n.5. But that statute was amended approximately one month before Plaintiffs' Memorandum was filed, and the definition Plaintiffs quote is actually found at § 16-123-102(11). *See* Ark. Code Ann. §§ 16-123-102(11) (eff. Aug. 1, 2023).

In *Harrison*, the plaintiffs were forced to attend school virtually and were seen on camera holding a BB gun in their homes during the virtual classes. *Id.* at 767. Each student's principal referred the student for expulsion, but ultimately, they were only suspended. *Id.* The students' parents attempted to appeal the suspensions, but the school board ("JPSB") denied the appeals, stating they were only available for expulsions. *Id.* The Louisiana Legislature subsequently passed a bill to address rights of students that "have been expelled or suspended for doing what would be considered normal at home," *id.*, which it applied retroactively to virtual learning for the dates in question, *id.* at 768. Before the act was signed into law, JPSB approved an interim virtual discipline policy that subjected virtual students to the same policies they would face in a classroom, and after the act was signed into law by the Governor, JPSB reviewed the students' suspensions and affirmed them. *Id.* After the students' families sued in state court raising state and federal claims, JPSB removed the case to federal court.

The State of Louisiana sought to intervene. *Id.* In its intervenor complaint, Louisiana alleged that JPSB was violating state and federal law in several ways: "mainly by: (1) 'acting ultra vires' in its disciplinary policies and actions; (2) violating several Louisiana statutes and (3) violating students' and their parents' due process rights under the state and federal constitutions." *Id.* JPSB argued that Louisiana lacked standing; the State countered that it had constitutional standing to sue in both a direct and *parens patriae* capacity to protect its citizens against alleged discriminatory disciplinary policies. *Id.* The Fifth Circuit acknowledged

that Louisiana's assertion that it had a sovereign interest in its subordinates following the law "facially has merit," but that the State was not hindered from enforcing its laws against JPSB because it "may use its full arsenal of enforcement mechanisms to force JPSB to comply with state law." *Id.* at 770.   While Louisiana's purported sovereign injury was that JPSB was violating state and federal law, the Fifth Circuit held that such a violation would not become an injury "until Louisiana brings an enforcement action against JPSB to bring JPSB into compliance with the law, and JPSB or another entity hinders the state from doing so." *Id.* at 771.   The Fifth Circuit concluded that Louisiana lacked standing. *Id.* at 775.

In the present case, Plaintiffs have adduced no evidence in the summary judgment record that, at the time suit was filed, any clinician in any of those States had in fact violated any State Plaintiff's discrimination law by adopting a plan under the Anti-Racism Rule or the CMS Disparities Impact Statement, or that such a violation was imminent.[20]   Nor have Plaintiffs submitted any evidence to indicate or explain how they enforce, or have enforced, their laws in the context of the

---

[20]  In Plaintiffs' Memorandum [108] and at oral argument, they rely upon Defendants' Answer [59] to argue that Defendants have conceded that clinicians have created and implemented anti-racism plans. *See* Mem. [108] at 20 (citing Ans. [59] at ¶51); *see also* Am. Compl. [28] at ¶51 ("Many clinicians will submit anti-racism plans under the Rule."); Ans. [59] at ¶51 ("Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 51 because Plaintiffs do not define 'many,' but Defendants admit that a number of individual clinicians and groups have attested to completing the activity to create and implement an anti-racism plan for the 2022 performance year.").   However, this statement in the Answer [59] does not speak of any clinicians within the State Plaintiffs' geographic boundaries, who would be the relevant clinicians for the standing analysis. *But see* Ans. [59] at ¶51. Any admission that "a number of individual clinicians and groups" somewhere in the United States may have created and implemented anti-racism plans at the time Defendants filed their Answer [59] is not evidence that any in the seven Plaintiff States had done so. *Id.*

healthcare industry in order to demonstrate how such enforcement would be impeded or hindered by the Anti-Racism Rule.

Although their laws preclude various forms of racial discrimination, State Plaintiffs have not pointed to any competent summary judgment evidence showing how the Anti-Racism Rule or the Disparities Impact Statement threatens actual or imminent discrimination in violation of those laws, or how they would actually interfere with any State's enforcement of its laws. No State Plaintiff has cited or pointed to an example of a State intending to enforce its discrimination laws based upon a professional's implementation of a clinical practice improvement activity under the Anti-Racism Rule, or of a State wishing to do so but refraining from enforcement. In short, at the summary judgment stage, Plaintiffs have not adduced sufficient competent summary judgment evidence to show that, at the time suit was filed, any State Plaintiff's asserted injury was sufficiently concrete and particularized and actual or imminent, rather than merely conjectural or hypothetical, to support a direct suit. *See Lujan*, 504 U.S. at 560-61; *Harrison*, 78 F.4th at 769.

Plaintiffs' allegations of possible future injury are also insufficient to show imminence. *Clapper*, 568 U.S. at 409. For example, to show standing for a direct suit, at a minimum the State Plaintiffs would need to present competent evidence that: (1) at the time they brought suit; (2) one or more clinicians in one of their States had created, or were about to create, an anti-racism plan under the Anti-Racism Rule; and (3) the anti-racism plan violated that Plaintiff State's anti-

discrimination laws, (4) as they would be enforced by that State.   Or, on a *parens patriae* theory, State Plaintiffs would need to present evidence that: (1) at the time they brought suit; (2) one or more clinicians in one of the Plaintiff States had not obtained a full score in reimbursement activities and did not create an anti-racism plan because of a dilemma with the Plaintiff State's anti-discrimination laws; and (3) the actual or imminent injury harmed a "sufficiently substantial segment" of the State's population, *Snapp*, 458 U.S. at 602, or threatened the State's economy, *Harrison*, 78 F.4th at 773.   Without competent summary judgment evidence that any of these had actually occurred or was about to occur, the Court is left with only a "highly attenuated chain of possibilities," which the Supreme Court has held does not satisfy the requirement that the injury "must be certainly impending."  *Clapper*, 568 U.S. at 410.   This is particularly true where, as here, "the injury's existence depends on the decisions of third parties [the clinicians] not before the court." *Little,* 575 F.3d at 540.

At the motion-to-dismiss stage, Plaintiffs' assertion that the Anti-Racism Rule "encourag[es] Medicare providers to make medical decisions based on race" in violation of their laws and agreements, Am. Compl. [28] at 5, was sufficient to plausibly allege a violation of at least one of the States' anti-discrimination laws, *see id.* But more is required at summary judgment.  *See Lujan*, 504 U.S. at 560-61. Plaintiffs, however, have not adduced evidence sufficient to show an actual or imminent harm to their asserted interests in order to establish standing at this stage; their Motion [78] for Summary Judgment should be denied.  *See id.*

Turning to Defendants' Cross-Motion [90] for Summary Judgment, even if a justifiable inference could properly be drawn from the Disparities Impact Statement that some races might in theory be prioritized over others in healthcare, *see Renwick*, 901 F.3d at 611 (requiring that all justifiable interferences be drawn in the non-movant's favor), the Court is not persuaded this is sufficient on the present record for Plaintiffs to withstand summary judgment on the basis of standing. However, Plaintiffs have requested standing-related discovery under Federal Rule of Civil Procedure 56(d) in order to oppose Defendants' Cross-Motion [90].

4. Whether discovery under Rule 56(d) is appropriate

In a footnote in their combined Reply and Response Memorandum [108], Plaintiffs request that, in the event the Court finds that they have not shown standing, it "should not rule on Defendants' cross-motion until after the States are given a chance to discover the facts that this Court says are necessary to establish standing." Mem. [108] at 12 n.3 (citing Fed. R. Civ. P. 56(d)). Although Plaintiffs did not file a formal Motion seeking a stay or additional discovery, *but see* L.U. Civ. R. 7(b), they reurged their request for discovery on the issue of standing at oral argument.

Under Rule 56(d),

> [i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declarations or to take discovery; or
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). "While Rule 56(d) motions for additional discovery are broadly favored and should be liberally granted, the party filing the motion must demonstrate how additional discovery will create a genuine issue of material fact." *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 422-23 (5th Cir. 2016) (quotations omitted).

To succeed on such a request, the party must "show (1) why he needs additional discovery and (2) how that discovery will create a genuine issue of material fact." *January v. City of Huntsville*, 74 F.4th 646, 651 (5th Cir. 2023) (quotation omitted). The party seeking discovery "must set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion." *Id.* (quotation omitted).

Although Plaintiffs did not submit an affidavit or declaration with their request for discovery to explain what they might discover or how it might defeat Defendants' Cross-Motion [90], at oral argument counsel for the State Plaintiffs renewed the request and cited authority for the proposition that no affidavit is required if the argument is made in the brief and it is obvious that the party needs discovery because none has taken place. Specifically, counsel referenced *Hart v. Philadelphia*, 779 F. App'x 121 (3d Cir. 2019), and 10B C. Wright & A. Miller, Federal Practice and Procedure § 2740 (4th ed.). Plaintiffs' counsel further averred at oral argument that Defendants have the information that is needed to address standing issues within their exclusive control, including evidence of anti-racism

plans and their contours within the Plaintiff States, which counsel represents would be easy to obtain during discovery. Defendants did not dispute these representations.

Plaintiffs' counsel also contended at oral argument that the Magistrate Judge's Scheduling Order [73] did not contemplate a cross-motion for summary judgment by Defendants, such that it would not be appropriate for the Court to grant summary judgment in Defendants' favor on grounds that Plaintiffs do not have enough facts to demonstrate standing when there has been no discovery. The record reflects that, in crafting the Scheduling Order [73], the Magistrate Judge considered the parties' previously submitted Joint Scheduling Report [69]. In that Report [69], Defendants sought jurisdictional discovery and filing of the Administrative Record, followed by the filing of cross-motions for summary judgment. *See* Report [69] at 1-2. In contrast, Plaintiffs took the position that time was of the essence and that they could file a motion for summary judgment without discovery or the Administrative Record. *See id.* at 2-3.

Ultimately, the Magistrate Judge's Scheduling Order [73] provided that:

> (1) Plaintiffs advised the Court that they will be filing an early dispositive motion; such motion shall be filed by June 9, 2023.
> (2) Defendants shall produce a copy of the administrative record by June 26, 2023.
> (3) Other than the above and in light of the procedural posture of the case, the Court declines to enter any further case management deadlines at this time.

Order [73] at 1. Thus, as represented by Plaintiffs' counsel, it appears that no cross-motion for summary judgment by Defendants was contemplated at that time.

*See id.*  While the plain language of the Scheduling Order [73] did not specifically prohibit such a filing, *see id.*; Fed. R. Civ. P. 56(b) (permitting a motion for summary judgment "at any time until 30 days after the close of all discovery"), when read in conjunction with the parties' Joint Scheduling Report [69], the Magistrate Judge chose not to include a deadline for Defendants to seek summary judgment and did not afford the jurisdictional discovery on the issue of standing that Defendants had indicated would be needed, *see* Report [69] at 1; Order [73] at 1.   In opposing Defendants' Cross-Motion [90], Plaintiffs thus seem to be at somewhat of a disadvantage to demonstrate standing, particularly when at least some of the evidence needed to make the showing is apparently within the exclusive control of Defendants.

Considering the request for Rule 56(d) discovery in Plaintiffs' Memorandum, *see* Mem. [108] at 12 n.3, along with the details provided at oral argument and the authority that such requests "are broadly favored and should be liberally granted," *Smith*, 827 F.3d at 422 (quotation omitted), on the whole the Court finds that State Plaintiffs have offered a sufficiently plausible basis for believing that specified facts may be discoverable within a reasonable time frame to enable them to potentially influence the outcome of Defendants' Cross-Motion [90], *see id.* at 423.  The Court will therefore grant Plaintiffs' Rule 56(d) request and deny without prejudice Defendants' Cross-Motion [90].  *See id.*

## III. CONCLUSION

In sum, Plaintiffs have not demonstrated that, at the summary judgment stage, any one of them has standing to sue. Plaintiffs' Motion [78] for Summary Judgment should therefore be denied. But the Court will grant Plaintiffs' Rule 56(d) request and allow limited discovery on the question of standing. Defendants' Cross-Motion [90] for Summary Judgment will be denied, without prejudice to their right to reurge the Motion upon the conclusion of this limited discovery. To the extent the Court has not specifically addressed any of the parties' remaining arguments, it has considered them and determined that they would not alter the result. And because the Court's finding that Plaintiffs have not demonstrated standing ends the inquiry at this stage, it does not reach, and expresses no opinion on, the merits of Plaintiffs' claims.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, the Motion [78] for Summary Judgment filed by Plaintiffs State of Mississippi, State of Alabama, State of Arkansas, Commonwealth of Kentucky, State of Louisiana, State of Missouri, and State of Montana is **DENIED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, the Cross-Motion [90] for Summary Judgment filed by Defendants Xavier Becerra, in his official capacity as Secretary of Health and Human Services; United States Department of Health and Human Services; Chiquita Brooks-LaSure, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services; Centers for

Medicare and Medicaid Services; and United States of America is **DENIED WITHOUT PREJUDICE**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Plaintiffs' request for relief under Federal Rule of Civil Procedure 56(d) relief is **GRANTED**, and the parties shall contact the Magistrate Judge for entry of a scheduling order for: (1) discovery limited solely to the issue of State Plaintiffs' standing; and (2) a deadline at the conclusion of the limited discovery period for the parties to file dispositive motions.

**SO ORDERED AND ADJUDGED**, this the 28th day of March, 2024.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE