**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

| | |
|---|---|
| STATE OF MISSISSIPPI, et al. | |
| *Plaintiffs*, | No. 1:22-cv-113-HSO-RPM |
| v. | |
| XAVIER BECERRA, et al., | |
| *Defendants.* | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**POST-DISCOVERY MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Authorities ....................................................................................................................iii

Introduction...................................................................................................................................1

Background.....................................................................................................................................2

    A.    Congress creates a scheme that encourages Medicare providers to consider cost and quality of care—but not race...................................................................................................2

    B.    The Biden Administration injects race with its Anti-Racism Rule. ......................................3

    C.    Plaintiffs challenge the Anti-Racism Rule, this Court denies Defendants' motion to dismiss, and this Court denies pre-discovery summary judgment.........................................5

    D.    Jurisdictional discovery establishes that clinicians are creating and implementing anti-racism plans in Plaintiff States.................................................................................................6

Legal Standard ..............................................................................................................................7

Argument .......................................................................................................................................8

    I.    Discovery has confirmed that the States have standing.........................................................8

        A.    The States are entitled to special solicitude. ................................................................8

        B.    The Anti-Racism Rule encourages clinicians to prioritize patients based on race in violation of the States' laws...............................................................................10

        C.    Federal permission to prioritize patients based on race in violation of the States' laws injures the States' sovereign interests.....................................................11

        D.    The States' sovereign injuries are traceable to the Anti-Racism Rule and redressable by vacatur.................................................................................................17

    II.    The Anti-Racism Rule is unlawful. ..................................................................................19

        A.    Anti-racism plans are not one of the clinical practice improvement activities specified in the bar on judicial review. ......................................................................19

        B.    The Anti-Racism Rule is ultra vires. ..........................................................................25

    III.    Vacatur of the Anti-Racism Rule is the appropriate remedy...............................................27

Conclusion ..................................................................................................................................28

## Table of Authorities

**Cases**

*Abbott v. Perez,*
   585 U.S. 579 (2018) ................................................................................................................19

*Aid Ass'n for Lutherans v. U.S. Postal Serv.,*
   321 F.3d 1166 (D.C. Cir. 2003) ...........................................................................................31

*Alaska v. U.S. Dep't of Transp.,*
   868 F.2d 441 (D.C. Cir. 1989) .............................................................................................17

*Alfred L. Snapp. & Son, Inc. v. P.R., ex rel. Barez,*
   458 U.S. 592 (1982) ..............................................................................................................14

*Am. Airlines, Inc. v. Herman,*
   176 F.3d 283 (5th Cir. 1999) ...............................................................................................31

*Am. Hosp. Ass'n v. Becerra,*
   596 U.S. 724 (2022) ..............................................................................................................23

*Am. Sch. of Magnetic Healing v. McAnnulty,*
   187 U.S. 94 (1902) .......................................................................................................... 30, 31

*Biden v. Missouri,*
   595 U.S. 87 (2022) ................................................................................................................25

*Biden v. Nebraska,*
   143 S. Ct. 2355 (2023) ...................................................................................................... 1, 29

*Cargill v. Garland,*
   57 F.4th 447 (5th Cir. 2023) ...............................................................................................26

*City of Morgan v. S. La. Elec. Co-op. Ass'n,*
   31 F.3d 319 (5th Cir. 1994) .................................................................................................17

*Colville v. Becerra,*
   2023 WL 2668513 (S.D. Miss. Mar. 28) ......................................................................passim

*Daily Wire, LLC v. U.S. Dep't of State,*
   2024 WL 2022294 (E.D. Tex.) ........................................................................ 15, 16, 17, 20

*Dart v. United States,*
   848 F.2d 217 (D.C. Cir. 1988) ....................................................................................... 31, 32

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.,*
   45 F.4th 846 (5th Cir. 2022) .................................................................................10, 32, 33

Dep't of Com. v. New York,
   588 U.S. 752 (2019) .....................................................................................................18, 20, 21

*Franciscan All. v. Becerra,*
   47 F.4th 368 (5th Cir. 2022) ...............................................................................................32

*Gen. Land Off. v. Biden,*
   2024 WL 1023047 (S.D. Tex. Mar. 8) ...............................................................................12

*Gen. Land Off. v. Biden,*
  71 F.4th 264 (5th Cir. 2023) ............................................................9, 10, 11

*Gonzales v. Carhart,*
  550 U.S. 124 (2007) ....................................................................................15

*Harrison v. Jefferson Par. Sch. Bd.,*
  78 F.4th 765 (5th Cir. 2023) ...............................................................14, 19

*Interstate Towing Ass'n v. Cincinnati,*
  6 F.3d 1154 (6th Cir. 1993) ......................................................................16

*Kentucky v. Biden,*
  23 F.4th 585 (6th Cir. 2022) ........................................... 14, 15, 16, 22

*Kirby Corp. v. Pena,*
  109 F.3d 258 (5th Cir. 1997) ....................................................................32

*Loper Bright Enters. v. Raimondo,* 144 S. Ct. 2244 (2024) ....................29

*Louisiana v. Becerra,*
  577 F. Supp. 3d 483 (W.D. La. 2022) ..............................................17, 21, 22

*Louisiana v. EEOC,*
  705 F. Supp. 3d 643 (W.D. La. 2024) ......................................................18

*Mach Mining, LLC v. EEOC,*
  575 U.S. 480 (2015) ....................................................................................23

*Mallory v. Norfolk S. Ry. Co.,*
  600 U.S. 122 (2023) ....................................................................................11

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ..........................................................................10, 20, 21

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
  60 F.4th 956 (5th Cir. 2023) ....................................................................29

*Mississippi v. Becerra,*
  2024 WL 1335084 (S.D. Miss. Mar. 28) ....................................2, 7, 9, 11

*Murthy v. Missouri,*
  144 S. Ct. 1972 (2024) ................................................................................11

*Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.,*
  50 F.4th 1126 (11th Cir. 2022) ........................................................14, 15

*SBA List v. Driehaus,*
  573 U.S. 149 (2014) ............................................................................10, 18

*SFFA v. Harvard,*
  600 U.S. 181 (2023) ....................................................................................29

*Tennessee v. Dep't of Educ.,*
  104 F.4th 577 (6th Cir. 2024) ........................................................15, 16, 20

*Texas v. Becerra,*
  623 F. Supp. 3d 696 (N.D. Tex. 2022) ..........................................17, 18, 20, 22

*Texas v. Becerra,*
    89 F.4th 529 (5th Cir. 2024) ...................................................................................17

*Texas v. Biden,*
    142 S. Ct. 2528 (2022) ...........................................................................................10

*Texas v. Biden,*
    20 F.4th 928 (5th Cir. 2021) ............................................................... 10, 11, 20, 22

*Texas v. Cardona,*
    2024 WL 3658767 (N.D. Tex. Aug. 5) ...................................................................11

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) ..................................................................................18

*Texas v. NRC,*
    78 F.4th 827 (5th Cir. 2023) ................................................................. 2, 20, 21, 22

*Texas v. United States (Texas II),*
    50 F.4th 498 (5th Cir. 2022) ....................................................................................9

*Texas v. United States,*
    40 F.4th 205 (5th Cir. 2022) ..................................................................................11

*Texas v. United States,*
    50 F.4th 498 (5th Cir. 2022) ............................................................................ 10, 16

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ........................................................................... 14, 22

*United Steel v. Mine Safety & Health Admin,*
    925 F.3d 1279 (D.C. Cir. 2019) ..............................................................................33

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ............................................................................................ 1, 29

**Statutes**

5 U.S.C. § 701 .....................................................................................................................32

5 U.S.C. §704 .....................................................................................................................24

5 U.S.C. §706 ...............................................................................................................24, 33

Ark. Code Ann. §16-123-102 ...........................................................................................13

Ark. Code Ann. §16-123-107 ...........................................................................................13

Ky. Rev. Stat. §344.120 .....................................................................................................13

Ky. Rev. Stat. Ann. §344.130 ...........................................................................................12

Ky. Rev. Stat. Ann. §344.140 ...........................................................................................13

Ky. Rev. Stat. Ann. §344.145 ...........................................................................................13

La. Stat. Ann. § 51:2232 ...................................................................................................13

La. Stat. Ann. §51:2232(5) ...............................................................................................17

La. Stat. Ann. §51:2247 ...................................................................................................13

Mo. Ann. Stat. §213.010 ..................................................................................................13

Mo. Ann. Stat. §213.065 ..................................................................................................13

Mont. Code Ann. §49-1-102 ............................................................................................13

Mont. Code Ann. §49-2-101 ............................................................................................13

Mont. Code Ann. §49-2-304 ............................................................................................13

Mont. Code Ann. §49-2-601 ............................................................................................13

Pub. L. 114-10 §101 ...........................................................................................................2

**Rules**

Fed. R. Civ. P. 12 ...............................................................................................................6

Fed. R. Civ. P. 56(a) ...........................................................................................................9

**Treatises**

Scalia & Garner, *Reading Law* 116 (2012) ......................................................................25

**Regulations**

*Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*,
86 Fed. Reg. 7,009 (Jan. 20, 2021) ...............................................................................3

*Medicare Program; CY 2022 Payment Policies Under the Physician Fee Schedule and Other Changes to Part B
Payment Policies; Medicare Shared Savings Program Requirements; Provider Enrollment Regulation Updates;
and Provider and Supplier Prepayment and Post-Payment Medical Review Requirements*,
86 Fed. Reg. 64,996 (Nov. 19, 2021).....................................................................passim

*Medicare Program; CY 2022 Payment Policies Under the Physician Fee Schedule and Other Changes to Part B
Payment Policies; Medicare Shared Savings Program Requirements; Provider Enrollment Regulation Updates;
Provider and Supplier Prepayment and Post-Payment Medical Review Requirements*,
86 Fed. Reg. 39,104 (July 23, 2021) ..............................................................................4

*Proposed Priorities-American History and Civics Education*,
86 Fed. Reg. 20,348 (Apr. 19, 2021) .............................................................................4

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) .........................................................................26

Canaparo, *Permissions to Hate: Antiracism and* Plessy,
27 Tex. Rev. L. & Pol. 97 (2022) .................................................................................1

C-TAC Comments,
https://downloads.regulations.gov/CMS-2021-0119-32235/attachment_1.pdf .............28

*Explore Measures & Activities, 2023 Improvement Activities: Traditional MIPS*, CMS, perma.cc/BHM9-
D5EE (archived June 6, 2023) .......................................................................................5

*Explore Measures & Activities, 2024 Improvement Activities: Traditional MIPS*, CMS, perma.cc/WMZ3-
NWMA (archived September 30, 2024) .........................................................................5

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933 (2018) .........................................33

Kendi, *How to Be an Antiracist* (2019)........................................................................................... 1, 4

## INTRODUCTION

This Court is familiar with the Anti-Racism Rule, including its unlawfulness. That rule uses Medicare to reward doctors who prioritize patients based on race. *See* 86 Fed. Reg. 64,996, 65,970 (Nov. 19, 2021). This racial prioritization is no accident: The Rule blows the dog whistle of "anti-racism," embracing a controversial ideology that says racially disparate outcomes should be remedied with "present discrimination." Kendi, *How to Be an Antiracist* 19 (2019). It teaches that "doctors should engage in Antiracist discrimination to prioritize group disparities over individuals' needs while providing care." Canaparo, *Permissions to Hate: Antiracism and* Plessy, 27 Tex. Rev. L. & Pol. 97, 152 (2022). But Congress did not empower the CMS to inject race into a statutory regime that lets it articulate activities that promote clinical practice or care delivery for patients. 42 U.S.C. §1395w-4(q)(2)(c)(v)(III). Because "Congress does not 'hide elephants in mouseholes,'" *Biden v. Nebraska*, 143 S. Ct. 2355, 2382 (2023) (Barrett, J., concurring), this Court should hold that Defendants' racial-prioritization plans are not clinical practice improvement activities and vacate the rule, *see West Virginia v. EPA*, 597 U.S. 697, 743-49 (2022) (Gorsuch, J., concurring).

This Court can now be confident that it has jurisdiction to decide this case. Though it was skeptical of the States' standing before discovery, *Mississippi v. Becerra*, 2024 WL 1335084, at *15-18 (S.D. Miss. Mar. 28), it should now be clear that the Rule causes sovereign injuries. It authorizes and incentivizes clinicians to implement anti-racism plans. As the States predicted, Defendants' incentives worked. Discovery proved that thousands of clinicians have already attested to creating and implementing anti-racism plans, including plans that expressly consider race. Discovery also proved that Defendants routinely tell clinicians to use the Disparities Impact Statement, a tool that tells clinicians to prioritize patients by race. There is also no genuine dispute that the States' laws discourage the racial prioritization that the Rule allows. Because vacatur would redress those sovereign injuries, *see Texas v. NRC*, 78 F.4th 827, 835-36 (5th Cir. 2023), this Court should enter that relief.

**BACKGROUND**

A.   **Congress creates a scheme that encourages Medicare providers to consider cost and quality of care—but not race.**

The Medicare Access & CHIP Reauthorization Act of 2015 directed the Department of Health & Human Services to establish the Merit-Based Incentive Payment System to incentivize cost-control, performance, and quality. Pub. L. 114-10 §101 (codified at 42 U.S.C. §1395w-4). "The MIPS program aims to drive value through the collection, assessment, and public reporting of data that informs and rewards the delivery of high-value care." 86 Fed. Reg. at 65,375. CMS uses MIPS to "pay for health care services in a way that drives value by linking performance on cost, quality, and the patient's experience of care." *Id.* Clinicians who are eligible to participate in MIPS must participate, and 99.9999% of MIPS-eligible clinicians do. *See id.*; Answer (Doc. 59) ¶33.

Each year, clinicians who participate in MIPS get a "composite performance score" between 0 and 100. *See* 42 U.S.C. §1395w-4(q)(5)(A). Based on their score, CMS will adjust the amount clinicians are paid up, down, or not at all. "Under the MIPS, the Secretary shall use the following performance categories … in determining the composite performance score": "(i) Quality"; "(ii) Resource use"; "(iii) Clinical practice improvement activities"; and "(iv) Meaningful use of certified EHR technology." §1395w-4(q)(2)(A)(i)-(iv). Clinical practice improvement activities make up 15 percent of a clinician's MIPS score. §1395w-4(q)(5)(E)(i)(III).

Under the Act, "the term 'clinical practice improvement activity' means" an activity that "relevant eligible professional organizations and other stakeholders identify as improving clinical practice or care delivery" and that "the Secretary determines, when effectively executed, is likely to result in improved outcomes." §1395w-4(q)(2)(C)(v)(III). The Act lists specific subcategories that meet this definition:

- "expanded practice access, such as same day appointments";
- "population management, such as monitoring health conditions of individuals to provide timely health care intervention";

- "care coordination, such as timely communication of test results";
- "beneficiary engagement, such as the establishment of care plans for individuals with complex care needs";
- "patient safety and practice assessment, such as through use of clinical or surgical checklists"; and
- "participation in an alternative payment model." §1395w-4(q)(2)(B)(iii).

The terms "equity" or "race" does not appear.

## B.  The Biden Administration injects race with its Anti-Racism Rule.

On the first day of his presidency, President Biden issued Executive Order 13985, 86 Fed. Reg. 7,009 (Jan. 20, 2021). That order directs the executive branch to address systemic racism and promote "equity." *Id.* It further directs agencies to identify policies undermining "equity" and to change policies to promote "equity." *Id.*

In response to the order to "Advance Racial Equity," CMS proposed a rule. *See* 86 Fed. Reg. 39,104, 39,345 (July 23, 2021). CMS "proposed" an "improvement activity titled 'create and implement an anti-racism plan.'" *Id.* The rationale for this proposed improvement activity asserts that "systemic racism is the root cause for differences between socially defined racial groups." *Id.*

According to the ideology of anti-racism, "[t]he only remedy to past discrimination is present discrimination," and "[t]he only remedy to present discrimination is future discrimination." Kendi, *supra*, 19. "[T]reating, considering, or making a distinction … based on" someone's race is good if it's "antiracist"—meaning it promotes "equity." *Id.* at 18-19. Because "race-neutral" approaches supposedly do not promote equity, they are actively "racist." *Id.* Equity, in turn, means that all racial groups must be "on approximately equal footing" in all things, no matter the cause of the existing disparity. *Id.* The Biden administration has explicitly cited Kendi's ideology in its policies. *E.g.*, 86 Fed. Reg. 20,348, 20,349 & n.3 (Apr. 19, 2021).

CMS later published the final rule. 86 Fed. Reg. 64,996. The final rule adopts the proposed rule's anti-racism plans. *Id.* at 65,384. It offers the same rationale: "This improvement activity acknowledges it is insufficient to gather and analyze data by race, and document disparities by different population groups. Rather, it emphasizes systemic racism is the root cause for differences in health outcomes between socially defined racial groups." *Id.* This improvement activity was assigned "[h]igh" priority. *Id.* at 65,969. Anti-racism plans were available for performance year 2022. And CMS is promoting them for performance years 2023 and 2024. *See Explore Measures & Activities, 2023 Improvement Activities: Traditional MIPS*, CMS, perma.cc/BHM9-D5EE (archived June 6, 2023) (under "Create and Implement Anti-Racism Plan"); *Explore Measures & Activities, 2024 Improvement Activities: Traditional MIPS*, CMS, perma.cc/WMZ3-NWMA (archived September 30, 2024) (under "Create and Implement an Anti-Racism Plan").

The Anti-Racism Rule injects race into medicine. Clinicians who participate in this improvement activity must "include a clinic-wide review of existing tools and policies … to ensure that they include and are aligned with a commitment to anti-racism and an understanding of race as a political and social construct, not a physiological one." 86 Fed. Reg. at 65,970. The plan "should also … include target goals and milestones." *Id.* And the plan can include "ongoing training on anti-racism." *Id.*

Moreover, the Rule requires clinicians to "[c]reate and implement an anti-racism plan using the CMS Disparities Impact Statement or other anti-racism planning tools." *Id.* CMS's Disparities Impact Statement "can be used by all health care stakeholders to achieve health equity for racial and ethnic minorities." AR2247; *accord* Answer ¶54 ("Defendants admit that CMS has developed a tool called the Disparities Impact Statement."). Clinicians should "[i]dentify health disparities and priority populations." AR2247. To "get started," clinicians should "[s]tratif[y]" measures and health outcomes by race and ethnicity." AR2248. And clinicians must then expressly identify the "population(s)" they will "prioritize." AR2248, 2253.

**C.      Plaintiffs challenge the Anti-Racism Rule, this Court denies Defendants' motion to dismiss, and this Court denies pre-discovery summary judgment.**

The States filed an amended complaint in August 2022. Am. Compl. (Doc. 28). It alleges one claim: the Anti-Racism Rule is ultra vires. Am. Compl. ¶¶5, 57-65. The States ask this Court to declare "that the Anti-Racism Rule violates the Medicare Access Act and is ultra vires"; to "vacat[e] the Anti-Racism Rule"; to "enjoi[n] enforcement of the Anti-Racism Rule or provid[e] the same benefits to those who do not submit anti-racism plans that satisfy the Rule as those who do"; and to "gran[t] Plaintiffs all other appropriate relief." *Id.* at 18.

Defendants filed a motion to dismiss the amended complaint on two procedural grounds. Doc. 36. Defendants first argued that Plaintiffs lack standing. Doc. 37 at 19-29; Fed. R. Civ. P. 12(b)(1). Defendants then argued that a statutory bar precludes judicial review. Doc. 37 at 29-37; Fed. R. Civ. P. 12(b)(1), (6). This Court denied Defendants' motion in relevant part. It held that the States "are entitled to special solicitude and have sufficiently alleged standing due to their sovereign interest in the enforcement of their anti-discrimination law." *Colville v. Becerra*, 2023 WL 2668513, at *14 (S.D. Miss. Mar. 28). It further held that "§1395w-4(q)(13)(B)(iii) does not preclude judicial review of the question whether the promulgated activity falls within the statutory definition of a 'clinical practice improvement activity.'" *Id.* at *19.

This Court later granted Plaintiffs' request to file a pre-discovery motion for summary judgment. Doc. 73 at 1. Plaintiffs then filed that motion. Doc. 78. They argued that this Court's motion-to-dismiss order resolved the merits in their favor. Doc. 79 at 5-7. And they argued that the legal conclusions in the court's order, the administrative record, and Defendants' answers to the amended complaint established their standing. *Id.* at 17-18. Defendants cross-moved. Doc. 90. They argued that Plaintiffs hadn't established their standing. Doc. 91 at 15-19. Though they reaffirmed their position

that the statute precludes judicial review of the merits, Defendants acknowledged that this Court "already held" otherwise. *Id.* at 19. Defendants therefore argued only that anti-racism plans are clinical practice improvement activities within the meaning of the statute. *Id.* at 19-31.

After a hearing, this Court denied both motions. *Mississippi*, 2024 WL 1335084, at *1. It ruled that the existing record was insufficient to prove Plaintiffs' standing. *Id.* at *1, *15-18. But this Court granted Plaintiffs' request for jurisdictional discovery. *Id.* at *18-19. The Court reasoned that "Plaintiffs have offered a sufficiently plausible basis for believing that specified facts may be discoverable within a reasonable time frame to enable them to potentially influence the outcome of Defendants' Cross-Motion." *Id.* at *19.

## D.   Jurisdictional discovery establishes that clinicians are creating and implementing anti-racism plans in Plaintiff States.

Discovery revealed that tens of thousands of clinicians received credit for creating and implementing anti-racism plans for performance years 2022 and 2023, including thousands in the Plaintiff States. Ex. 9 at 88; Ex. 10. Defendants admitted that individual clinicians "attested to creating and implementing an anti-racism plan in Alabama, Arkansas, Kentucky, Louisiana, Mississippi, and Missouri" for performance years 2022 and 2023. Ex. 6 at 5. Larger practices are taking advantage of the Anti-Racism Rule too. Though all information isn't in for 2023, practices of "more than 15 clinicians attested to creating an anti-racism plan in Alabama, Arkansas, Kentucky, Louisiana, and Missouri" for 2022. Ex. 7 at 3 (2d Admission resp. Nos. 8); *see also* Ex. 9 at 1-13, 74-75; Ex. 10 at 1. Defendants named 31 practices in the Plaintiff States that declared completion of an anti-racism plan in performance years 2022 or 2023. Exs. 2, 4. None of this is surprising: the Anti-Racism Rule "encourage[s]" and "incentivizes eligible clinicians to" complete and implement anti-racism plans under the rule. Ex. 6 at 2-3.

Defendants also encourage clinicians to use the "CMS Disparities Impact Statement." Defendants tells clinicians that "the CMS Disparities Impact Statement … can be effectively used to

facilitate the completion of the requirements of this activity." *Id.* When clinicians inquire, Defendants repeatedly "encourage [them] to review and complete the CMS Disparities Impact Statement … to improve the care [they're] delivering to a particular group of patients." Ex. 8 at 210-11, 240-41. Indeed, Defendants often offer to "[h]elp" them "draft a CMS Disparities Impact Statement" and "find … an intervention for a particular population." Ex. 8 at 217-18, 253, 262, 287, 298, 301, 313-14, 318, 327-28, 332, 345, 373. The record is filled with examples of Defendants encouraging clinicians to use the Disparities Impact Statement, describing it as "a useful tool." Ex. 8 at 290; *see also* Ex. 8 at 205, 244, 249, 259, 269, 283, 337, 357, 368, 376, 379 (similar). It's no wonder why Defendants had to admit that, under the Rule, clinicians can focus on "a particular race or ethnicity," Ex. 7 at 3, when setting "target goals and milestones," Ex. 3 at 7; Ex. 8 at 137.

Discovery also revealed that clinicians are taking Defendants' advice. One Arkansas practice completed a Diversity Impact Statement as part of its anti-racism plan. Ex. 11. The practice reported that its clinicians intended to "target priority populations" and address "race/ethnicity." *Id.* at 2. The plan targets "Hispanic/Latino" patients. *Id.* at 7. A Kentucky practice also implemented a plan that reflects Defendants' anti-racism ideology. Ex. 12 at 71. That plan says clinicians "must prioritize and integrate the voices and ideas of … people of color, women, people with disabilities, LGBTQ+, and those in rural and urban communities alike." *Id.* at 5. Practices should "consistently center the experiences and ideas of … Black, Indigenous, Latinx, Asian … physicians," among others. *Id.* at 8. The plan maligns "white," "male," and "Christian" persons as advantaged "at the expense of Black, Latinx, … non-Christia[n]," and other persons. *Id.* at 11. The plan also rejects "[s]eeking to treat everyone the 'same.'" *Id.* at 11-12.

## LEGAL STANDARD

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Texas v. United States*,

50 F.4th 498, 521-22 (5th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)). "In considering the record at summary judgment, all evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor." *Mississippi*, 2024 WL 1335084, at *10.

## ARGUMENT

This Court should enter summary judgment on both standing and the merits. On standing, the undisputed record evidence proves that the Anti-Racism Rule illegally tells clinicians in the Plaintiff States to prioritize by race and ethnicity, conflicting and interfering with the States' sovereign interests in their laws. And on the merits, this Court's order denying Defendants' motion to dismiss already shows that it can review the merits of the States' claims and that anti-racism plans aren't clinical practice improvement activities within the meaning of the statutory text. All that remains is vacating the Anti-Racism Rule.

## I.   Discovery has confirmed that the States have standing.

The States have standing. Only one "State … needs standing for the action to proceed." *See Gen. Land Off. v. Biden*, 71 F.4th 264, 271 & n.10 (5th Cir. 2023). To show it, a State needs to prove an injury, causation, and redressability. *SBA List v. Driehaus*, 573 U.S. 149, 157-58 (2014). Especially given the special solicitude that States receive on standing, Plaintiffs carried their burden here.

### A.   The States are entitled to special solicitude.

As this Court observed, "'States are not normal litigants for the purposes of invoking federal jurisdiction,' and, under certain circumstances, are 'entitled to special solicitude in [the] standing analysis.'" *Colville*, 2023 WL 2668513, at *14 (quoting *Massachusetts v. EPA*, 549 U.S. 497, 518-20 (2007)). "'Special solicitude has two requirements: (1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests.'" *Id.* (quoting *Texas*, 50 F.4th at 514).

The States satisfy both requirements. They "procee[d] under the APA, which [is] sufficient to satisfy the first prong of the analysis." *Gen. Land Off.*, 71 F.4th at 274; *see also Texas v. Biden*, 20 F.4th

928, 969 (5th Cir. 2021) ("the first prong was satisfied because a State challenged an agency action as invalid under a statute"), *rev'd on other grounds* 597 U.S. 785 (2022).[1] This Court has already held that Plaintiffs satisfy the first element for that reason. *Colville*, 2023 WL 2668513, at *14. And the second requirement is satisfied because States "possess a sovereign interest in 'the exercise of sovereign power over individuals and entities within the relevant jurisdiction,' which 'involves the power to create and enforce a legal code, both civil and criminal.'" *Id.* at *15. As explained more fully below, "the Anti-Racism Rule will harm their sovereign interests because it interferes with their enforcement of their laws prohibiting racial discrimination." *Id.*; *Texas*, 20 F.4th at 970.

Special solicitude lightens the States' burden on standing in important ways. "[I]mminence" is "easier to establish here than usual." *Texas v. United States*, 40 F.4th 205, 216 (5th Cir. 2022) (per curiam). As this Court acknowledged, "the risk of future harm" works for States "where it might not for an individual." *Colville*, 2023 WL 2668513, at *16. On traceability, all the States need to show is "that the challenged action 'has contributed to an injury,' and it need not demonstrate that the action was the sole cause." *Id.* at *15. And on redressability, all they need to show "is some possibility that the requested relief will reduce the harm." *Id.* at *15. Though some say that this doctrine "'seems to … be falling out of favor with the Supreme Court,'" *Mississippi*, 2024 WL 1335084, at *14 n.18, it remains binding until the Supreme Court says otherwise, *see Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023); *cf. Murthy v. Missouri*, 144 S. Ct. 1972, 1996 n.11 (2024) (confirming "that *state* plaintiffs are 'entitled to special solicitude' when it comes to standing"). Hence why courts have recently and repeatedly applied the doctrine. *Gen. Land Off.*, 71 F.4th at 274; *Texas v. Cardona*, 2024 WL 3658767, at *19 (N.D. Tex. Aug. 5); *Gen. Land Off. v. Biden*, 2024 WL 1023047, at *9 (S.D. Tex. Mar. 8).

---

[1] The *Texas v. Biden* "panel's understanding of … Article III standing" and of other issues not decided by the Supreme Court "remains binding." *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 856 n.2 (5th Cir. 2022).

**B.    The Anti-Racism Rule encourages clinicians to prioritize patients based on race in violation of the States' laws.**

The Anti-Racism Rule allows and encourages racial prioritization in medicine. The Rule requires clinicians to "[c]reate and implement an anti-racism plan using the CMS Disparities Impact Statement or other anti-racism planning tools." AR6; *see also* Answer ¶54. In that Statement, CMS tells clinicians what it means by anti-racism planning tools: clinicians should "identify and prioritize which population(s)" physicians "want to address." AR2248. It further states: "Stratifying measures and health outcomes by race and ethnicity can help you get started." *Id.* The tool is meant to benefit "racial and ethnic minorities" and other favored groups. AR2247. All without accounting for physiology. *See* 86 Fed. Reg. at 65,970. Unsurprisingly, clinicians have used the Statement or similar tools in at least one of the States. Exs. 11, 12.

The Anti-Racism Rule's group prioritization conflicts with the States' laws. The States define public accommodations broadly to include all facilities that provide services to the public, or that are supported directly or indirectly by state funds.[2] Some statutes expressly identify hospitals, proving that medical services are not exempt.[3] Others make it a criminal offense for persons, broadly, to unlawfully

---

[2] *See e.g.*, Ky. Rev. Stat. Ann. §344.130 ("includes any place … licensed or unlicensed, which supplies goods or services to the general public … or which is supported directly or indirectly by government funds"); Ark. Code Ann. §16-123-102(11) ("any place … licensed or unlicensed, that supplies accommodations, goods, or services to the general public … or that is supported directly or indirectly by government funds"); La. Stat. Ann. §51:2232(10) ("any place … or other establishment, either licensed or unlicensed, which supplies goods or services to the general public … or which is supported directly or indirectly by government funds"); Mo. Ann. Stat. §213.010(16) ("all places or businesses offering or holding out to the general public, goods, services, privileges, facilities, advantages or accommodations for the peace, comfort, health, welfare and safety of the general public").

[3] *E.g.*, Mont. Code Ann. §49-2-101(20)(a) ("includes without limitation a … hospital and all other … business establishments"). Other statutes make express exceptions for "[h]ospitals" and "nursing homes" to make clear that the prohibition of discrimination doesn't apply to bathrooms, proving that "facility" otherwise applies to medical facilities. Ky. Rev. Stat. Ann. §344.145(2)(d).

discriminate.[4] Still others prohibit completing and using tools like the ones the Rule requires.[5] And all protect persons from discrimination by persons, which includes patients and physicians.[6] Though some States don't have public-accommodations statutes, they do have other statutes and regulations that prohibit medical professionals from prioritizing certain races. Ex. 1 at 2-3, 6-9.

The States construe those policies, regulations, and statutes to ban what the Anti-Racism Rule permits. Each State has attested to having policies, regulations, or statutes that forbid racial prioritization in medicine. *E.g.*, Alabama Decl.; Ex. 1 at 2-10. And they each attest that those policies, regulations, and statutes do not permit anti-racism plans as conceived in the Anti-Racism Rule. *E.g.*, Alabama Decl. Simply put, there's no genuine dispute that the Anti-Racism Rule permits and encourages what the States prohibit.

## C.   Federal permission to prioritize patients based on race in violation of the States' laws injures the States' sovereign interests.

The Anti-Racism Rule frustrates the States' sovereign interests. States have a sovereign interest in "the exercise of sovereign power over individuals and entities within the" States, which "involves the power to create and enforce a legal code, both civil and criminal." *Alfred L. Snapp & Son, Inc. v. P.R., ex rel. Barez*, 458 U.S. 592, 601 (1982). The Fifth Circuit has "given several examples" of injuries to that interest. *Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 770 (5th Cir. 2023). First, "federal assertions of authority to regulate matters [the States] believe they control"; second, "federal preemption

---

[4] *E.g.*, Mont. Code Ann. §49-2-601 ("A person … who … willfully engages in an unlawful discriminatory practice prohibited by this chapter … is guilty of a misdemeanor").

[5] *See, e.g.*, Ky. Rev. Stat. Ann. §344.140.

[6] *E.g.*, La. Stat. Ann. §51:2247 ("it is a discriminatory practice for a person to deny an individual the full and equal enjoyment of the … services, facilities, privileges, advantages, and accommodations of a place of public accommodation … as defined in this Chapter, on the grounds of race. …"); Ky. Rev. Stat. §344.120 ("it is an unlawful practice for a person to deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation … on the ground of … race"); Ark. Code Ann. §16-123-107(a) (the "right of an otherwise qualified person to be free from discrimination because of race … is recognized as and declared to be a civil right"); Mo. Ann. Stat. §213.065 (similar).

of state law"; and third, "federal interference with the enforcement of state law." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) (cleaned up). All three exist here for one simple reason: the Anti-Racism Rule purports to permit and encourage what the States prohibit and discourage.

*First*, Defendants assert authority over health care, which is traditionally an area of local concern. States "have sovereign interests to sue when they believe that the federal government has intruded upon areas traditionally within states' control." *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022) (citing *Texas*, 809 F.3d at 153). "'The States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons'—latitude that includes regulating economic relationships." *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.*, 50 F.4th 1126, 1142 (11th Cir. 2022). "The regulation of health and safety matters is primarily, and historically, a matter of local concern." *Id.* (cleaned up); *see also Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) ("it is clear the State has a significant role to play in regulating the medical profession"). These traditional interests extend to protecting residents from discrimination in healthcare. *E.g.*, *Norwegian*, 50 F.4th at 1142-43. So if the Anti-Racism Rule "'interfere[s] with the power of the state[s]'" to regulate the public health, the States have suffered a concrete injury. *See Tennessee v. Dep't of Educ.*, 104 F.4th 577, 593 (6th Cir. 2024).

Defendants have done just that. They have "intruded upon an area traditionally left to the states—the regulation of the public health of state citizens," *Kentucky*, 23 F.4th at 599, with an illegal regulation that encourages clinicians to prioritize races and ethnicities. That unlawful interposition narrows the States' discretion in health and deters them from exercising their historic discretion in that area: They must either try to enforce their laws against residents for doing what the federal government tells them to do, or else decline to enforce laws they have an interest in enforcing. *See Colville*, 2023 WL 2668513, at *16-17; *see also Daily Wire, LLC v. U.S. Dep't of State*, 2024 WL 2022294, at *6 (E.D. Tex. May 7). All in a field in which they have "traditionally" exercised control. *See e.g.*, *Norwegian*,

12

50 F.4th at 1142. Accordingly, the States "have shown that they have sovereign interests and traditional prerogatives in regulating public health … and that the [Anti-Racism Rule] invades these prerogatives." *Kentucky*, 23 F.4th at 602.

**Second**, the Rule's preemption of State policies, regulations, or statutes is enough to show an injury. "[W]e know that preemption of a state law is an injury that gives rise to Article III standing because it infringes a state's sovereign interests." *Tennessee*, 104 F.4th at 593. We also know that, under the caselaw, "[r]egulations promulgated by a federal agency that conflict with state law preempt state law in the same manner as do specific acts of Congress." *Interstate Towing Ass'n v. Cincinnati*, 6 F.3d 1154, 1157 (6th Cir. 1993). And it doesn't matter that a federal agency "regulates private actors rather than the States" in this context, *Texas*, 50 F.4th at 516, or that "the federal agency … never *required* [anyone] to violate [the States'] law[s]," *Daily Wire*, 2024 WL 2022294, at *7. The only question is whether the States' laws "plausibl[y]" or "'at least arguably conflict'" with Defendants' Rule. *See Tennessee*, 104 F.4th at 594-95. "The answer: yes." *Id.* at 593.

As explained above, State policies, regulations, and statutes ban race and ethnicity prioritization in medicine. Racial prioritization involves a "direct or indirect act or practice of exclusion, distinction, restriction, segregation, limitation, refusal, denial, or any other act or practice of differentiation or preference in the treatment of a person or persons because of race." *E.g.*, La. Stat. Ann. §51:2232(5). The States have therefore concluded that racial prioritization in medicine conflicts with their laws. Even if there were an arguable basis to do so, neither Defendants nor courts can "reject, in the guise of standing analysis, the States' respective construction of their own laws." *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989).

Defendants authorize and encourage the very prioritization that the States outlaw. Defendants "encourage clinicians" to use the CMS Disparities Impact Statement to improve care "'to a particular group of patients.'" Ex. 3 at 7; Ex. 8 at 210-11, 240-41. And Defendants admit that clinicians can

focus on "a particular race or ethnicity." Ex. 7 at 3. Each State therefore seeks to "discourage conduct that federal [regulation] specifically seeks to encourage." *City of Morgan v. S. La. Elec. Co-op. Ass'n*, 31 F.3d 319, 322 (5th Cir. 1994). So "the Plaintiff States have standing … to attack preemption of state law by [Defendants]." *Louisiana v. Becerra*, 577 F. Supp. 3d 483, 492 (W.D. La. 2022); *see also Daily Wire*, 2024 WL 2022294, at *6.

 ***Finally***, the Anti-Racism Rule interferes with the enforcement of several state laws. As this Court has explained, if "the Anti-Racism Rule encourages professionals to alter their clinical guidelines in a way that would violate their laws," then that "qualifies as sufficient interference." *Colville*, 2023 WL 2668513, at *17 (citing *Texas v. Becerra*, 623 F. Supp. 3d 696, 714 (N.D. Tex. 2022), *aff'd*, 89 F.4th 529 (5th Cir. 2024)); *accord id.* at *16 ("Whether or not a given professional confronts the financial harm, the *possibility* of it occurring discourages the States' enforcement of their laws and pressures them to construe their laws as permitting the race-based decisionmaking in patient care they claim that the anti-racism plans effectively require." (emphasis added)).

 The States have proven that injury. When the States filed their complaint, there was a "'substantial risk'" that clinicians would create and implement antiracism plans. *See SBA List*, 573 U.S. at 158; *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019). Defendants not only encourage, but *direct*, clinicians to adopt ones that prioritize patients based on race. And, predictably, discovery showed that at least some clinicians in the States did adopt anti-racism plans. Exs. 9, 10, 11, 12. The Rule therefore forces a choice upon the States: enforce state laws against residents who are violating them because of the Rule, or else choose not to enforce them (or construe them narrowly) to protect resident clinicians. *See Colville*, 2023 WL 2668513, at *16-17. Either horn of that dilemma is enough to establish a concrete injury. *See id.*; *Becerra*, 623 F. Supp. 3d at 714 ("Here, the Guidance interferes with Texas's enforcement of its laws because it encourages its hospitals and doctors to violate Texas … laws[.]");

*Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) ("The Guidance consequently encourages employ-ers, to avoid liability, to deviate from state law when it conflicts with the Guidance.").

In sum, the Anti-Racism Rule undermines the States' sovereign power. The conflict with States' laws existed when the States filed their complaint, and it persists today. And the federal inter-ference with the "'continued enforceability'" of "'statutes'" that regulate conduct in an area tradition-ally reserved to the States is happening now. *Becerra*, 623 F. Supp. 3d at 714; *see also id.* at 713 ("an impermissible expansion of federal authority into" "matters that the states believed they controlled … works an actual injury to [their] sovereign interests"); *Louisiana v. EEOC*, 705 F. Supp. 3d 643, 653-54 (W.D. La. 2024) (there is "clearly … Article III standing" when an "agency … has exceeded its au-thority … in a way that subverts the will of the citizens of Louisiana and Mississippi" as expressed in their laws). These are classic sovereign injuries for which States can obtain equitable relief. *E.g.*, *Texas v. Becerra*, 575 F. Supp. 3d 701, 713-14 (N.D. Tex. 2021) (States "have 'special solicitude' standing to challenge the federal government's enforcement of a regulation that" "preempts state laws"); *id.* at 724 (collecting authorities); *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018).

The Fifth Circuit's decision in *Harrison v. Jefferson Parish School Board* is not to the contrary. In that case, a state intervened to challenge a school board's "actions as ultra vires." 78 F.4th at 767. To support its standing, the state asserted "that it has a sovereign interest in its *subordinates* obeying state … law." *Id.* at 769 (emphasis added). Though the Fifth Circuit reaffirmed the three examples of sov-ereign injuries discussed above, it held that none applied in that case. *Id.* at 770. The reason: A "state may use its full arsenal of enforcement mechanisms to force [a subordinate] to comply with state law," and nothing "hindered" the state from deploying that arsenal "against" the subordinate. *Id.* at 770-72. In that context, "'federal courts do not sit to resolve intramural disputes among state officials over the bounds of their authority under state law.'" *Id.* at 775. But that context is distinguishable, the Fifth Circuit explained, from one where "the federal government's actions infringed on [a state's] ability to

regulate intrastate" conduct. *Id.* at 771-72. When the *federal* government—not a subordinate one—purports to permit what a state prohibits, "the state's interest in the *enforceability* of its laws" is implicated. *Id.* at 772.

This case falls within the normal rule that *Harrison* identified. This case doesn't involve the States trying to bring a subordinate into compliance with state law; the federal government purports to authorize what the States prohibit. So the States don't need to prove an actual "violation" of their laws or that they brought an "enforcement action" before filing suit. *See Daily Wire*, 2024 WL 2022294, at *6 ("Texas does not need to initiate an enforcement action under H.B. 20 to allege Article III harm."). "[H]ere there's an enforceability conflict between the [Anti-Racism Rule], which authorizes [anti-racism plans], and [the States' laws], which proscribes" them. *NRC*, 78 F.4th at 836. Those "conflicting policies" were "in place at the time the complaint was filed." *Tennessee*, 104 F.4th at 595. "That's enough for [the States] to assert an injury." *NRC*, 78 F.4th at 836; *see also Tennessee*, 104 F.4th at 594-95 (holding that "a state's *ability* to enforce its laws, particularly over a traditional sovereign prerogative like education … is *sufficient* to confer standing" (emphases added)); *Becerra*, 623 F. Supp. 3d at 714 ("Because the Guidance constitutes an agency assertion that federal law preempts state law, Texas has shown an injury in fact.").

Even if more were required, more was proven. Not only did the States prove that thousands of clinicians have gotten credit for anti-racism plans in the States—"large-scale statistics and figures" that should be "enough" to show that clinicians "will" implement anti-racism plans as conceived in the Rule and encouraged by Defendants. *See Texas*, 20 F.4th at 971. But the States also proved that clinicians have already implemented race-based targets and goals, *e.g.*, Exs. 11, 12—an "effect" that was "predictable" from the outset of this litigation, *see Dep't of Com.*, 588 U.S. at 768. And if there were any doubt left about the "immediacy" of the States' injuries, they would be "alleviate[d]" by special solicitude. *See Colville*, 2023 WL 2668513, at *16. The godfather of special solicitude, *Massachusetts v.*

*EPA*, "countenanced a far less obvious injury than this one," *Texas*, 20 F.4th at 971, that depended on "sea levels" rising in part from fewer people driving fuel-efficient cars "over the course of the next century," *Massachusetts*, 549 U.S. at 522-23.

**D.    The States' sovereign injuries are traceable to the Anti-Racism Rule and re-dressable by vacatur.**

The States have traceability and redressability too, especially given the special solicitude they are owed. They need only show that the Anti-Racism Rule "'has contributed to'" their asserted injuries and that there "is some possibility that the requested relief will reduce the harm." *Colville*, 2023 WL 2668513, at *16. The States easily clear those bars.

On traceability, the Anti-Racism Rule causes the States' sovereign injuries. It authorizes or encourages clinicians in the States to do what the States prohibit and discourage. When a state "statute conflicts with" a federal rule, "there is an obvious link between the" rule "and the Plaintiff States' alleged injuries." *Louisiana*, 577 F. Supp. at 492. "'[B]ut for'" the Rule, there'd be no preemption. *Becerra*, 575 F. Supp. 3d at 714. The States' sovereign injuries therefore "directly result from" federal authorization of conduct forbidden by state law. *NRC*, 78 F.4th at 835.

Separately, the Anti-Racism Rule directly interferes with the enforceability of the States' policies, regulations, or laws in an area over which they traditionally have regulatory control. The Rule "creates … an incentive to the professionals to violate the States' anti-discrimination laws." *Colville*, 2023 WL 2668513, at *17. The States thus must choose "whether to enforce their laws against the professionals who complete the activity," *id.*, and whether to exercise discretion in an area over which they traditionally have control. It doesn't matter that "the ultimate violation of the State Plaintiffs' laws depends on professionals choosing the activity and carrying it out in a way that violates those laws." *Id.* The States' "basis for standing 'does not rest on mere speculation about the decisions of third parties' but 'instead on the predictable effect of Government action on the decisions of third

17

parties.'" *Id.* (quoting *Dep't of Com.*, 588 U.S. at 768). "The predictable effect of Defendants incentiv-izing professionals to create anti-racism plans by awarding them half of their necessary points for the improvement activities category if they do so is that the professionals will select the activity, and" as has been proven above, "those plans will violate the States' laws." *Id.*; *see also Texas*, 809 F.3d at 159-60 (explaining that the traceability requirement is satisfied even if "the independent act of a third party was a necessary condition of the harm's occurrence, and it was uncertain whether the third party would take the required step"); *id.* ("DAPA beneficiaries have strong incentives to obtain driver's licenses, and it is hardly speculative that many would do so if they became eligible"). And again, *Massachusetts* found special-solicitude "traceability where the EPA's challenged action may have caused people to drive less fuel-efficient cars, which may in turn contribute to a prospective rise in sea levels, which may in turn cause the erosion of Massachusetts's shoreline," *Texas*, 20 F.4th at 973—a causal chain far more tenuous than here. "Accordingly, the harm to the State Plaintiffs' sovereignty is traceable to the Anti-Racism Rule." *Colville*, 2023 WL 2668513, at *17.

On redressability, relief would immediately eliminate all the sovereign injuries the States have identified. "[A]n order from this court could vacate the" the Anti-Racism Rule—the federal rule re-sponsible for the preemption that "constitute[s] … injury" for the States. *NRC*, 78 F.4th at 835-36. Vacatur would also "remove the incentive provided to professionals to violate the States' anti-discrim-ination laws." *Colville*, 2023 WL 2668513, at *17; *see Becerra*, 623 F. Supp. 3d at 719 ("forbidding HHS from enforcing the Guidance's interpretation … 'would safeguard Texas's sovereign interests'" be-cause "an injunction would restore the status quo" and "Texas hospitals and doctors would defer to Texas law"). And it would end federal "intru[sion] upon areas traditionally within states' control." *Kentucky*, 23 F.4th at 598; *see Louisiana*, 577 F. Supp. 3d at 492 ("If Plaintiff States are successful in having the Head Start Mandate declared invalid, this would redress their injuries."). Accordingly, the

States have established traceability and redressability for their injuries, especially given special solicitude.

## II.     The Anti-Racism Rule is unlawful.

Defendants have attempted to evade judicial review based on two arguments. First, they've argued that a statutory limit on judicial review "expressly bar[s]" any challenge to the Anti-Racism Rule. MTD 21. Second, they've argued that the ultra vires exception to statutory bars does not apply here. *Id.* at 23. This Court has already rejected the first argument, which is sufficient to reach the merits and vacate the rule. Even if it hadn't, the second argument fails because the Rule is *ultra vires* for the same reasons the States have already identified.

### A.     Anti-racism plans are not one of the clinical practice improvement activities specified in the bar on judicial review.

Judicial review is available for Plaintiffs' claim. *See* 5 U.S.C. §704; §706(2)(A), (C). There is "a 'strong presumption' in favor of judicial review of final agency action." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 733 (2022). Defendants "bea[r] a heavy burden in attempting to show that Congress prohibited all judicial review of the agency's compliance with a legislative mandate." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (cleaned up). "If multiple readings of the statutory language are possible, the Court must adopt the version that preserves judicial review." *Colville*, 2023 WL 2668513, at *18. "Thus, if there is doubt as to Congress's intent, the presumption in favor of judicial review controls." *Id.*

No bar on judicial review precludes review of the Anti-Racism Rule. Defendants relied only on §1395w-4(q)(13)(B), but they have since conceded that this Court already rejected that argument. Doc. 91 at 19. This Court reasoned that, "in order for the prohibition on judicial review … to apply to a clinical practice improvement activity, the activity must satisfy the definition set forth in §1395w-4(q)(2)(C)(v)(III)." *Colville*, 2023 WL 2668513, at *19. "[A]s a result, [the statutory bar] does not pre-

clude judicial review of the question whether the promulgated activity falls within the statutory definition of a 'clinical practice improvement activity.'" *Id* "Accordingly, the Court has jurisdiction to review whether the Anti-Racism Rule satisfies the definition of a 'clinical practice improvement activity.'" *Id.* at *20.

The Anti-Racism Rule is illegal if anti-racism plans don't fit that definition. The statute defines "'clinical practice improvement activity'" to "mea[n] an activity that [(1)] relevant eligible professional organizations and other relevant stakeholders identify as improving clinical practice or care delivery *and* [(2)] that the Secretary determines, when effectively executed, is likely to result in improved outcomes." 42 U.S.C. §1395w-4(q)(2)(C)(v)(III) (emphasis added). Because subparagraph (C)(v)(III) uses the word *and*, an activity is a "clinical practice improvement activity" only if *both* conditions (1) and (2) are satisfied. Scalia & Garner, *Reading Law* 116 (2012) (explaining that "[w]ith the conjunctive list, all … [listed] things are required"). If one of the conditions is not true for anti-racism plans, then they are not "clinical practice improvement activities," 42 U.S.C. §1395w-4(q)(2)(B)(iii), and the Secretary would "lac[k] authority to 'identif[y]'" them as such. *Colville*, 2023 WL 2668513, at *19.

Anti-racism plans don't fit the statute's definition. This Court must determine whether antiracism plans *as conceived of in the Rule* are clinical practice improvement activities within the meaning of the statute. As Defendants have admitted, "anti-racism" can mean different things to different people. *See* Doc. 91 at 26. What matters is the kind of plans that *the Rule* requires or authorizes—namely, plans that have clinicians prioritize patients based on socially construed race or ethnicity, not based on physiology. *See* 86 Fed. Reg. at 65,969. Accordingly, this Court must determine whether "relevant eligible professional organizations and other relevant stakeholders identif[ied]" the prioritization of patients based on race or ethnicity "as improving clinical practice or care delivery." 42 U.S.C. §1395w-4(q)(2)(C)(v)(III). And it must determine whether racial prioritization relates to "clinical practice or

care delivery" in light of the specific examples enumerated in the statute. §1395w-4(q)(2)(B)(iii); *Colville*, 2023 WL 2668513, at *20. Four independent reasons support the States' view that anti-racism plans aren't clinical practice improvement activities.

**First**, anti-racism plans don't reasonably relate to "the examples of clinical practice improvement activities set forth at §1395w-4(q)(2)(B)(iii)." *Colville*, 2023 WL 2668513, at *20. Those examples—same-day appointments, "monitoring health conditions," "timely communication of test results," and the like—have one thing in common: improving care for patients generally, not a subset of them. 42 U.S.C. §1395w-4(q)(2)(B)(iii). If a relevant organization had said that more pay for physicians improves physicians' performance, and an agency had then incentivized plans that quadruple the cost of care for patients, no one thinks that proposed activity is contemplated by the Rule—whatever the organization said. Just so for anti-racism plans: The fact that the specific examples enumerated don't look anything like prioritizing patients of one race over patients of another, divorced from "physiolog[y]," shows that anti-racism plans aren't the kinds of activities that relevant organizations can identify as improving "clinical practice or care delivery" within the meaning of the statute. 86 Fed. Reg. at 65,970; *cf. Biden v. Missouri*, 595 U.S. 87, 89 (2022) (per curiam) (explaining that the Department's "core mission" is "patients' health and safety"); *Medicine*, Black's Law Dictionary (11th ed. 2019) ("The scientific study and practice of preserving health and treating disease or injury.").

**Second**, relevant organizations didn't identify, before Defendants acted, race-prioritization plans as improving clinical practice improvement activities within the meaning of the statute. "With statutes, '[c]ontext is a primary determinant of meaning.'" *Cargill v. Garland*, 57 F.4th 447, 461 (5th Cir. 2023) (en banc) (quoting Scalia & Garner, *supra*, 167). Considering context, the statute unambiguously requires that Defendants considered whether relevant stakeholders identified plans that prioritize patients by race or ethnicity *before* they act. The text of the relevant provision makes this clear: The Secretary is supposed to act based on what professionals think, and he can't do that if he acts before

they "identify" racial prioritization as "improving clinical practice or care delivery." 42 U.S.C. §1395w-4(q)(2)(C)(v)(III). Post-hoc general support for an activity that Defendants identified won't cut it. That's why "[i]n initially applying" the statute, "the Secretary shall use a request for information to solicit recommendations from stakeholders." §1395w-4(q)(2)(C)(v)(I). Accordingly, and as explained above, "'clinical practice or care delivery' must be construed in light of the examples of clinical practice improvement activities." *Colville*, 2023 WL 2668513, at *20. Reading the statute correctly, an activity isn't a clinical practice improvement activity unless relevant third parties *first* identify activities like "expanded practice access," "care coordination," etc., and specify the criteria for them. *See* §1395w-4(q)(2)(B)(iii), (C)(v)(I), (III). Given the unambiguous meaning of the statute, the question is whether the relevant third parties identified and specified criteria for plans to prioritize patients based on race or ethnicity, not physiology, as within the categories the statute enumerates.

As at the motion-to-dismiss stage, Defendants have failed to make that showing. It's no mystery which authorities the Secretary relied on, since Defendants identified those authorities in the Rule, 86 Fed. Reg. at 65,969, 65,977, and elsewhere, *see* AR2275 (listing three sources under "Evidence/Resources"). This Court was rightly unmoved. *Colville*, 2023 WL 2668513, at *20. These sources apparently described "anti-racism approaches," Doc. 91 at 22, without identifying Defendants' approach—plans that prioritize patients based on race, not physiology.[7] Defendants also "d[id] not address whether or how [their sources] count as 'relevant eligible professional organizations and other relevant

---

[7] *E.g.*, AR2295-99 (opposing racism and endorsing an "Anti-Racism Plan" that "consists of four key pillars": elevate the cause ("work to raise awareness within and outside of our institution, focusing on educational and curricular reform, community engagement, and strategy"), engage stakeholders ("engage employees, faculty, staff, students, and other learners and stakeholders in tactical solutions and activities to confront and mitigate racism"), equip communities, employees, and learners ("investing in scholarships, funding, training, toolkits, people, positions, and pathways that support anti-racism initiatives"), and empower those who are marginalized or oppressed ("anti-racist culture that encourages individuals to speak out against racism, invests in the voices of the unheard, and leads comprehensive evaluation efforts to demonstrate impact")).

stakeholders.'" *Colville*, 2023 WL 2668513, at *20 (quoting §1395w-4(q)(2)(C)(v)(III)). The statute defines "'eligible professional organization'" to "mea[n] a professional organization as defined by nationally recognized specialty boards of certification or equivalent certification boards." 42 U.S.C. §1395w-4(q)(2)(D)(ii)(II). The *relevant* stakeholders are therefore organizations of that type. *See, e.g.,* §1395w-4(q)(2)(D)(viii) ("other relevant stakeholders" "includ[es] State and national medical societies"). The three sources the Secretary apparently considered are papers by individuals, not professional organizations. AR2282 (Camara Phyllis Jones); AR2286 (Darshali A. Vyas, et al.); AR2295 (J. Nwando Olayiwola, et al.).

Other authorities Defendants have cited or that they put in the record don't satisfy the statute's requirements. *See* Doc. 91 at 22 & n.5. Those sources announced their general support for combating racism and discrimination and promoting health equity only after Defendants identified the activity, and the commenters didn't say that prioritizing patients based on race, not physiology, satisfies any of the subcategories in the statute (or ones like them).[8] Doc. 91 at 22 & n.5. Organizations can support

---

[8] AR215-16 (International Accreditation Commission asserting that this is an "opportunity to recognize clinicians for developing and implementing processes to reduce racism and discrimination to ensure equitable health care" without saying that prioritizing patients based on race improves clinical practice or care delivery within the meaning of the statute); AR210 (American Academy of Dermatology Association, similar, "important objectives"); C-TAC Comments, at 4, https://downloads.regulations.gov/CMS-2021-0119-32235/attachment_1.pdf (Coalition to Transform Advanced Care, similar, announcing support for "[h]ealth equity" and its "feel[ing]" that "activities about health equity" "will help to address inequity in the health care system"); AR46 (American College of Radiology announcing support for "anti-racism plans" without any additional details); AR146 (Association of American Medical Colleges endorsing the view that anti-racism plans "address systemic racism as a root cause of inequity" without saying that the ones contemplated by the Rule improve clinical practice or care delivery in the ways that the statute contemplates); AR191 (American Society of Radiation Oncology saying broadly that it "supports the addition of the proposed improvement activities" without additional details); AR233 (MarsdenAdvisors saying broadly that it "applaud[s] CMS's proposal to include this IA in the inventory in 2022" without additional details); Supp.AR2421 (Association of Black Cardiologists, Inc., "agree[ing]" that "systematic racism is the root cause for differences in health outcomes between socially defined racial groups"); Supp.AR2431 (Society of General Internal Medicine announcing that it "appreciates the new and modified MIPS improvement activities").

anti-racism plans for many reasons, including ideological ones that have little to do with the reason the statute requires: improving clinical practice or care delivery in the ways the statute describes.

**Third**, requiring the activities that stakeholders identify to "be construed in light of the examples of clinical improvement activities set forth" in the statute avoids constitutional concerns. *Colville*, 2023 WL 2668513, at *20. Even before the Supreme Court overruled *Chevron, see Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024), courts had to avoid constructions of statutes that "would raise grave constitutional concerns," *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 966-67 (5th Cir. 2023). If the statute means that any activity can be a clinical practice improvement activity—however unrelated to the enumerated examples—if a stakeholder says they're a good thing, then any number of illegal and even unconstitutional rules could be promulgated. If a stakeholder had said expressly that turning white patients away improves clinical practice and care delivery because it would reduce disparities, on Defendants' view, they could incentivize exactly that. The Anti-Racism Rule itself promotes an express racial classification, telling clinicians to prioritize patients based on race or ethnicity. Race-based classifications are unconstitutional, even if the goal is to reduce disparities. *SFFA v. Harvard*, 600 U.S. 181, 205-08, 223-25 (2023). This Court should not endorse a reading of the statute that allows these results.

**Finally**, even if Defendants' reading had "a colorable textual basis," this Court should reject it under the major-questions doctrine. *See West Virginia*, 597 U.S. at 722; *Becerra*, 575 F. Supp. 3d at 714. Defendants took the remarkable step of injecting antiracist ideology into medicine, going so far as to encourage clinicians to prioritize patients based on race. As explained above, that approach involves an "intrusion into state police powers." *Becerra*, 575 F. Supp. 3d at 716-17 (holding that a "CMS [Rule] implicates 'vast economic and political consequences'" where rule "appl[ies] to myriad employees and already understaffed employers"). The injection of race into medicine is precisely the kind of thing that Congress would have reserved for itself. *See Nebraska*, 143 S. Ct. at 2375. Given the specific

enumeration of the kinds of activities implicated in the statute that have no relationship to antiracist ideology, Defendants require clear congressional authorization "to justify the challenged program." *Id.* Yet the statute "provides no authorization for the Secretary's plan even when examined using ordinary tools of statutory interpretation—let alone 'clear congressional authorization' for such a program." *See id.*

The kinds of anti-racism plans described by the Anti-Racism Rule are not "clinical practice improvement activities." For that reason, the statutory bar to judicial review doesn't apply. *Colville*, 2023 WL 2668513, at \*19-20. And for the same reason, the Secretary "lacks authority" to promulgate the Anti-Racism Rule. *Id.* at \*19. Accordingly, the Rule exceeds Defendants' authority and is unlawful.

### B.   The Anti-Racism Rule is ultra vires.

As just explained, anti-racism plans are categorically not clinical practice improvement activities, so they cannot be used "in determining the composite performance score" under the MIPS. *See* 42 U.S.C. §1395w-4(q)(2)(A). In other words, the Anti-Racism Rule is wholly outside the agency's statutory authority. *Colville*, 2023 WL 2668513, at \*19 ("The Secretary lacks authority to 'identif[y]' an activity as an 'activit[y] specified under paragraph (2)(B)' when the activity does not satisfy the very definition of such activities set forth in the statute."). So even if the bar on judicial review in section 1395w-4(q)(13)(B) applied, the ultra vires exception would apply. The ultra vires exception is grounded, in part, on constitutional avoidance. Without it, "the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902).

The ultra vires exception applies independent of the availability of judicial review under statutes. *See Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) ("Prior to the APA's enactment, after all, courts had recognized the right of judicial review of agency actions that exceeded authority. … Nothing in the subsequent enactment of the APA altered th[at] … doctrine." (citing *McAnnulty*, 187

U.S. at 110)). "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Id.* And when a party claims that an agency "'exceeded its statutory authority' in purporting to apply the statute," the claim "clearly admit[s] of judicial review." *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1172-73 (D.C. Cir. 2003); *see, e.g., id.* at 1172 (holding that the ultra vires exception to review preclusion applied notwithstanding clear statutory bar because "both AAL and ABE allege[d] that, in promulgating the postal regulations at issue, the Postal Service exceeded its statutory authority"); *id.* ("It does not matter, therefore, whether traditional APA review is foreclosed, because judicial review is favored when an agency is charged with acting beyond its authority." (cleaned up)). Under this exception, "the APA's stricture barring judicial review 'to the extent that statutes preclude judicial review,' . . . 'does not repeal the review of *ultra vires* actions.'" *Id.* at 1173; *see also Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 293 (5th Cir. 1999) ("judicial intervention" is permitted, "even when the relevant statutory language precludes jurisdiction," where "an agency exceeds the scope of its delegated authority or violates a clear statutory mandate").

The ultra vires exception applies here. As demonstrated above, CMS "exceeded its statutory authority," *Aid Ass'n for Lutherans*, 321 F.3d at 1172-73, by declaring anti-racism plans "clinical practice improvement activities" when they clearly are not. Because anti-racism plans are not clinical practice improvement activities by the statute's plain text, CMS "exceeded its delegated powers" and "'on its face' violated a statute." *Kirby Corp. v. Pena*, 109 F.3d 258, 268-69 (5th Cir. 1997) (quoting *Dart*, 848 F.2d at 222)). The definition of "clinical practice improvement activities" has nothing to do with race, enumerated examples in the statute clarify that anti-racism plans do not qualify, and the Rule precludes considerations of race that *are* medically relevant. Moreover, the statute unambiguously declares that an activity is a "clinical practice improvement activity" only if two conditions are met. 42 U.S.C. §1395w-4(q)(2)(C)(v)(III). Anti-racism plans that require clinicians to prioritize certain populations over others do not satisfy at least one of the conditions.

Despite the failure of anti-racism plans to qualify as "clinical practice improvement activities" under the statute, the Anti-Racism Rule unambiguously declares and uses them as such. The "agency has exceeded its delegated powers or 'on its face' violated [the] statute." *Kirby*, 109 F.3d at 269. This Court should hold that the Anti-Racism Rule exceeds the agency's statutory authority and, alternatively, is ultra vires.

## III.   Vacatur of the Anti-Racism Rule is the appropriate remedy.

This Court should vacate the Anti-Racism Rule. "The APA gives courts the power to 'hold unlawful and set aside agency action[s].'" *Data Mktg.*, 45 F.4th at 859 (quoting 5 U.S.C. §706(2)). That power is "[v]acatur," "the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan All. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022) (citing 5 U.S.C. §706(2)(A). That "default rule" means courts should "'formally nullify and revoke … an unlawful agency action.'" *Data Mktg.*, 45 F.4th at 859 (quoting Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 950 (2018)). Vacatur is appropriate and "ordinary" when a rule is "*ultra vires* and unenforceable." *United Steel v. Mine Safety & Health Admin*, 925 F.3d 1279, 1287 (D.C. Cir. 2019).

This Court should not remand without vacatur. Though "remand *without* vacatur might be appropriate in 'rare cases,' this is not such a case because the Final Rule … suffers from a fundamental substantive defect that [Defendants] could not rectify on remand." *Rest. L. Ctr. v. DOL*, *Rest. L. Ctr. v. DOL*, 115 F.4th 396, 410 (5th Cir. 2024); *see also Bridgeport Hospital v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) ("Because an agency can't 'cure' the fact that it lacks authority to take a certain action, remand-without-vacatur is unavailable here."). If this Court holds that the "Secretary lacks authority to 'identif[y]'" anti-racism plans as clinical practice improvement activities, *Colville*, 2023 WL 2668513, at *19, then there's nothing the agency can do on remand. The default rule of vacatur applies. *See Data Mktg.*, 45 F.4th at 859-60.

## CONCLUSION

For all these reasons, this Court should grant the States' motion for summary judgment and vacate the Anti-Racism Rule.

Dated: October 15, 2024                     Respectfully submitted,

*s/ Justin L. Matheny*
LYNN FITCH
  *Attorney General*
Scott G. Stewart (MS Bar No. 106359)
  *Solicitor General*
Justin L. Matheny (MS Bar No. 100754)
  *Deputy Solicitor General*
MISSISSIPPI ATTORNEY
GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
scott.stewart@ago.ms.gov
justin.matheny@ago.ms.gov

*s/ Cameron T. Norris*
Cameron T. Norris*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

*s/ Edmund G. LaCour Jr.*
STEVE MARSHALL
  *Attorney General*
Edmund G. LaCour Jr.*
  *Solicitor General*
OFFICE OF THE ALABAMA
ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 353-2196
Edmund.LaCour@AlabamaAG.gov

*s/ Nicholas J. Bronni*
TIM GRIFFIN
  *Attorney General*
Nicholas J. Bronni*
  *Solicitor General*
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
nicholas.bronni@arkansasag.gov

*s/ Aaron J. Silletto*
RUSSELL COLEMAN
  *Attorney General*
Aaron J. Silletto*
  *Assistant Attorney General*
KENTUCKY OFFICE OF THE
ATTORNEY GENERAL
700 Capital Avenue, Suite 118
Frankfort, Kentucky
(502) 696-5439
Aaron.Silletto@ky.gov

*s/ Joshua M. Divine*
ANDREW BAILEY
  *Attorney General*
Joshua M. Divine*
  *Solicitor General*
Samuel C. Freedlund*
OFFICE OF THE MISSOURI
ATTORNEY GENERAL
815 Olive Street
Suite 200
St. Louis, MO 63101
(314) 340-4869
Josh.Divine@ago.mo.gov
Samuel.Freedlund@ago.mo.gov

*pro hac vice

*s/ Kelsey L. Smith*
ELIZABETH B. MURRILL*
  *Attorney General*
Kelsey L. Smith*
  *Deputy Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
(225) 428-7432
smithkel@ag.louisiana.gov

*s/ Christian Corrigan*
AUSTIN KNUDSEN
  *Attorney General*
Christian Corrigan*
  *Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders Street
Helena, MT 59601
christian.corrigan@mt.gov

## CERTIFICATE OF SERVICE

I e-filed this memorandum with the Court, which will email everyone requiring service.

Dated: October 15, 2024                                    *s/ Cameron T. Norris*

29