IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| STATE OF MISSISSIPPI; STATE OF ALABAMA; STATE OF ARKANSAS; COMMONWEALTH OF KENTUCKY; STATE OF LOUISIANA; STATE OF MISSOURI; and STATE OF MONTANA, <br> *Plaintiffs*, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; CHIQUITA BROOKS-LASURE, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services; THE CENTERS FOR MEDICARE AND MEDICAID SERVICES; THE UNITED STATES OF AMERICA, <br> *Defendants*. | No. 1:22-cv-113-HSO-RPM |

**BRIEF OF THE GREENSBORO HEALTH DISPARITIES COLLABORATIVE AND THE NAACP STATE CONFERENCES FOR ALABAMA, ARIZONA, ARKANSAS, KENTUCKY, LOUISIANA, MISSOURI, MISSISSIPPI, AND MONTANA AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................. ii

INTEREST OF THE *AMICI CURIAE* .............................................................1

INTRODUCTION ................................................................................................2

BACKGROUND ..................................................................................................3

LEGAL STANDARD...........................................................................................7

ARGUMENT .......................................................................................................8

    I.      The States Still Cannot Establish Standing.................................................8

           A.     The States Lack Evidence That The Anti-Racism Rule Impedes
                  Enforcement Of State Law..................................................................9

                  1.     The Arkansas language access plan does not
                        discriminate on the basis of race .....................................9

                  2.     "Kentucky's" anti-racism plan was not created by
                        Kentucky clinicians.........................................................11

                  3.     Neither Mississippi, Alabama, Louisiana, Missouri, nor
                        Montana can identify a single unlawful plan within
                        their borders ....................................................................12

           B.     The Anti-Racism Rule Does Not Preempt State Law Or
                  Otherwise Regulate Matters That States Control.............................13

    II.    The State's Purported Interest In Enforcing Their Anti-Discrimination
        Laws Is Belied By Evidence Of Rampant Racial Health Disparities
        Within Their Borders And *Amici*'s Members' Lived Experiences.............16

    III.   The States Still Lack Evidence That Anti-Racism Plans Result In
        Worse Care For Some Patients On The Basis Of Their Race....................23

CONCLUSION....................................................................................................26

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*Arizona v. United States*,
    567 U.S. 387 (2012)................................................................................14

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)..................................................................................8

*Cox v. Wal-Mart Stores E., L.P.*,
    755 F.3d 231 (5th Cir. 2014) ......................................................................7

*Crawford v. Bd. of Educ. of City of Los Angeles*,
    458 U.S. 527 (1982)................................................................................25

*Deanda v. Becerra*,
    96 F.4th 750 (5th Cir. 2024) ....................................................................15

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024)..................................................................................8

*Harrison v. Jefferson Par. Sch. Bd.*,
    78 F.4th 765 (5th Cir. 2023) ....................................................................13

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022) ....................................................................14

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..............................................................................7, 8

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923)................................................................................13

*Murguia v. Childers*,
    No. 5:20-CV-5221, 2022 WL 2911692 (W.D. Ark. July 22, 2022)........................11

*Murthy v. Missouri*,
    144 S. Ct. 1972 (2024)............................................................................13

*Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.*,
    50 F.4th 1126 (11th Cir. 2022) ................................................................14

*Tennessee v. Dep't of Educ.*,
    104 F.4th 577 (6th Cir. 2024) ........................................................... *passim*

*United States v. Texas*,
 599 U.S. 670 (2023).................................................................8, 13

*Yarls v. Bunton*,
 905 F.3d 905 (5th Cir. 2018) ...............................................................10

*Yogi Metals Group, Inc. v. Garland*,
 38 F.4th 455 (5th Cir. 2022) ..................................................................7

**CONSTITUTIONAL PROVISION:**

U.S. Const. Art. III.................................................................................8, 14

**STATUTES:**

36 U.S.C. § 150303.................................................................................4

Ark. Code Ann. § 16-10-1103(b)(1) .....................................................10

**REGULATIONS:**

29 C.F.R. § 38.9(b) ...............................................................................11

68 Fed. Reg. 32289 (U.S. Dep't of Labor May 29, 2003) .....................11

86 Fed. Reg. 39104 (July 23, 2021).......................................................5

86 Fed. Reg. 64996 (Nov. 19, 2021)......................................................5

86 Fed. Reg. 39104 (July 23, 2021).......................................................12

**RULE:**

Fed. R. Civ. P. 56(a) ..............................................................................7

**OTHER AUTHORITIES:**

*2023 Scorecard on State Health System Performance*, The Commonwealth Fund,
 https://www.commonwealthfund.org/publications/scorecard/2023/jun/2023-
 scorecard-state-health-system-performance ................................................17, 19

*About Priority Populations*, Agency for Healthcare Rsch. & Quality (2021),
 https://www.ahrq.gov/priority-populations/about/index.html .................24

*About Us*, Nat'l Academies, https://www.nationalacademies.org/about.......................4

Ala. Dep't of Pub. Health, *Pregnancy Outcomes* (2020),
 https://www.alabamapublichealth.gov/healthrankings/assets/2020_sha_health
 _indicator_3.pdf ..............................................................................18

Ala. Dep't of Pub. Health, *Social Determinants of Health* (2020),
https://www.alabamapublichealth.gov/healthrankings/assets/2020_sha_health
_indicator_5.pdf ..................................................................................................18

America's Health Rankings, *2023 Annual Report*, United Health Fund (2023),
https://assets.americashealthrankings.org/app/uploads/ahr_2023annual_compr
ehensivereport_final2-web.pdf .............................................................................17

*Annual Mississippi Health Disparities & Inequalities Report*, Miss. State Dep't of
Health (2023), https://msdh.ms.gov/page/resources/20313.pdf ............................17

Ark. Advoc. for Children & Families, *The Critical State of Black Women's Health*
(2022), https://npr.brightspotcdn.com/b7/3f/26881cb848a59c9d3d05591396c4
/report-the-critical-state-of-black-womens-health.pdf ...........................................19

Charles Esenwa et al., *Historical Slavery and Modern-Day Stroke Mortality in the
United States Stroke Belt*, 49 STROKE 465 (2018) ..................................................2

D. Rudy Macklin, *Eliminating Health Disparities*, Bureau of Minority Health
Access (2009),
https://ldh.la.gov/assets/docs/GovCouncil/MinHealth/HealthDisparitiesReport
200809.pdf ............................................................................................................20

David C. Radley et al., *Advancing Racial Equity in the U.S. Health Care: The
Commonwealth Fund 2024 State Health Disparities Report*,
https://www.commonwealthfund.org/publications/fund-
reports/2024/apr/advancing-racial-equity-us-health-care ......................................17

Glenda R. Miller, *State of Missouri Health Disparities Report*, Miss. Dep't of
Health & Senior Servs (2008),
https://health.mo.gov/living/families/minorityhealth/pdf/DisparityReport.pdf.....................21

*Health Disparities*, Nat'l Inst. of Health, http://www.nhlbi.nih
.gov/health/educational/healthdisp...........................................................................3

*Healthcare*, Nat'l Academies Press (2003),
https://nap.nationalacademies.org/read/12875/chapter/1 ........................................4

James N. Weinstein et al., *Communities in Action: Pathways to Health Equity*,
Nat'l Academies of Scis. Eng'g, & Med. (2017),
https://www.ncbi.nlm.nih.gov/books/NBK425848/pdf/Bookshelf_NBK42584
8.pdf ........................................................................................................................3

Kelly Hoffman, *Racial Bias in Pain Assessment and Treatment
Recommendations, and False Beliefs about Biological Differences between
Blacks and Whites* (2016),
https://www.pnas.org/doi/10.1073/pnas.1516047113 ............................................16

iv

Louis W. Sullivan, *The Heckler Report: Reflecting on Its Beginnings and 30 Years of Progress* (May 21, 2015), https://minorityhealth.hhs.gov/news/heckler-report-reflecting-its-beginnings-and-30-years-progress ................................................................................4

Matthew Wynia et al., *Collecting and Using Race, Ethnicity and Language Data in Ambulatory Settings: A White Paper with Recommendations from the Commission to End Health Care Disparities* (2011) ..............................................16

Mayo Clinic, *Racism in Pain Medicine: We Can and Should do More*, 96 Mayo Clinic Proceedings, https://www.mayoclinicproceedings.org/article/S0025-6196(21)00322-0/fulltext ..............................................................................16

*Minority Health Resources: Language Assistance*, Ark. Dep't of Health, https://healthy.arkansas.gov/programs-services/prevention-healthy-living/health-equity/minority-health-resources/ ......................................10

Mont. Dep't of Pub. Health & Human Servs., *Montana State Health Improvement Plan 2019-2023* (2021), https://dphhs.mt.gov/assets/publichealth/ahealthiermontana/2019SHIPfinal.pdf ....................................................................................................22

Nat'l Academies of Scis., Eng'g, & Med., *Ending Unequal Treatment: Strategies to Achieve Equitable Health Care and Optimal Health for All*, Nat'l Academies Press (2024), https://doi.org/10.17226/27820 ......................................3, 5

*Priority Populations Primer, A Few Things You Should Know about Social Inequities in Health in SDHU Communities*, Sudbury & District Health Unit (2009), https://www.phsd.ca/wp-content/uploads/2016/05/Priority_Populations_Primer_ENG.pdf .........................24

Sara N. Bleich et al., *Addressing Racial Discrimination in US Health Care Today*, JAMA Health Forum (2021), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2777406 ..............................................................................16

*Scientific Evidence*, Nat'l Academies (2011), https://nap.nationalacademies.org/catalog/13163/reference-manual-on-scientificevidence-third ......................................................................................4

U.S. Dept. of Health & Human Servs., *Report of the Secretary's Task Force on Black & Minority Health* (1985) ....................................................................3

Univ. of Ky. College of Med., *Improving the Health of Kentucky*, Ky. Health, https://medicine.uky.edu/centers/chet/kentucky-health ....................................20

V. Faye Jones, *Health Inequities: A Call to Action*, Univ. of Louisville, https://apps.legislature.ky.gov/CommitteeDocuments/7/12851/09 23 2020 Jones UL Health Care Disparities Presentation.pdf ....................................20

## INTEREST OF THE *AMICI CURIAE*

*Amici curiae* are the NAACP State Conferences from eight states (Mississippi, Alabama, Arkansas, Arizona, Missouri, Montana, Kentucky, and Louisiana) and the Greensboro Health Disparities Collaborative. The NAACP State Conferences conduct programming at the state and local level to combat discrimination in health care and improve the health of racially diverse individuals across their states.[1] *See, e.g.*, ECF No. 62-1, Decl. of Robert James ¶ 4 (Mississippi). The Greensboro Health Disparities Collaborative is a group of community leaders including health care professionals who, among other things, conduct research on racial health disparities. ECF No, 62-9, Decl. of Kari Thatcher ¶¶ 20, 28.

*Amici* have an interest in this case because of their longstanding commitment to combating the type of racial health disparities that the Anti-Racism Rule targets. Each of the NAACP State Conferences have Medicare-eligible members who are familiar with medical racism, have experienced it firsthand, or would otherwise benefit from the Anti-Racism Rule. *See, e.g.*, James Decl. ¶¶ 5-6, 9-31 (Mississippi); ECF No. 62-2, Decl. of Benard Simelton ¶¶ 5-18 (Alabama). The Collaborative also has an interest in preserving the Anti-Racism Rule. The Collaborative conducts health equity research that parallels the literature that CMS relied upon when issuing the Anti-Racism Rule. Thatcher Decl. ¶¶ 10-18; *see also generally* AR265-473, AR1430-1813, AR2282-99.

Invalidating the Anti-Racism Rule would have adverse consequences to the health of the NAACP State Conferences' constituents and would undermine the Collaborative's research, education, and outreach efforts. *Amici* have a direct interest in avoiding that result.

---

[1] The Court gave leave for the NAACP State Conferences and the Greensboro Health Disparities Collaborative to appear as *amici curiae*. ECF No. 87 at 17-18.

## INTRODUCTION

*Amici curiae* recognize that Black communities continue to suffer from persisting racial health disparities, resulting from a legacy from slavery,[2] segregation, and ongoing inequitable access to healthcare and insurance. Given Plaintiff States' purported interest in enforcing their anti-discrimination laws, *amici* would expect equitable health outcomes in States dedicated to policing racial discrimination in health care. Yet, racial health disparities in some Plaintiff States are the worst in the country. Black communities and communities of color within these States, including *amici's* members, bear the cost of these inequities and rely on interventions such as the Government's Anti-Racism Rule to root out deeply entrenched bias and discrimination in the provision of healthcare.

This Court's prior ruling was clear: Plaintiff States failed to establish standing at the summary judgment stage. ECF No. 135 at 39. The Court provided the States a roadmap for curing this deficiency. Given time and ample opportunity to make this showing, the States nonetheless came up empty. Their law-enforcement theory of standing—now, third behind two alternative theories—is not backed by evidence of any anti-racism plan that would provide some group of people *worse* care on the basis of their race or by evidence of any plans by the State to enforce their discrimination laws against an offending clinician. The States' alternative theories—that preemption or their local interest in health care affords them standing—are baseless as a matter of law.

---

[2] A legacy of slavery continues to contribute to racial health inequities affecting Black communities: Black people living in counties where enslavement persisted in 1860 experience higher current stroke mortality overall as compared to counties where slavery had ended by 1860. Charles Esenwa et al., *Historical Slavery and Modern-Day Stroke Mortality in the United States Stroke Belt*, 49 STROKE 465, 466 (2018).

If the Court reaches the merits, it should reject the States' ultra vires claim. The States have not and cannot show that the Anti-Racism Rule results in worse care for *anyone*, let alone that it requires worse care for some people on the basis of their race. Summary judgment in favor of the government is proper.

## BACKGROUND

For decades, the government has made slow and steady, albeit inadequate, progress toward identifying and addressing racial health disparities. Health disparity refers to the "differences that exist among specific populations . . . in the attainment of full health potential." James N. Weinstein et al., *Communities in Action: Pathways to Health Equity*, Nat'l Academies of Scis. Eng'g, & Med. 32 (2017)[3]; *Health Disparities*, Nat'l Inst. Of Health (last visited Nov. 9, 2024).[4] "[I]nequities in access to care exist across all inpatient and outpatient health care settings, including primary care, specialty care, emergency department (ED) and other hospital-based cared, and rehabilitative, long-term, and prison care facilities." Nat'l Academies of Scis., Eng'g, & Med., *Ending Unequal Treatment: Strategies to Achieve Equitable Health Care and Optimal Health for All*, Nat'l Academies Press 79 (2024).[5]

Appointed by President Ronald Regan, Secretary Margaret Heckler conducted the United States' first comprehensive study of racial health disparities. *See generally* U.S. Dept. of Health & Human Servs., *Report of the Secretary's Task Force on Black & Minority Health* (1985). The "Heckler Report" determined that, even though America had made "tremendous strides in improving the health and longevity of the American people," data showed "a persistent, distressing

---

[3] https://www.ncbi.nlm.nih.gov/books/NBK425848/pdf/Bookshelf_NBK425848.pdf.
[4] http://www.nhlbi.nih.gov/health/educational/healthdisp.
[5] https://doi.org/10.17226/27820.

disparity in key health indicators" among certain racial groups, especially for Black Americans. *Id.* at 2.

The Heckler Report prompted the United States to create the Office of Minority Health within the Department of Health and Human Services. Louis W. Sullivan, *The Heckler Report: Reflecting on Its Beginnings and 30 Years of Progress* (May 21, 2015).[6] Following the Heckler Report, Congress mandated that the National Academy of Medicine[7] (formerly the Institute of Medicine) conduct its own study of racial health disparities in America, which resulted in the 2003 report called *Unequal Treatment*.[8] *Unequal Treatment* discussed the disparate medical treatment that Black Americans receive across a range of conditions. *Id.* at 162-179. For example, Black women receiving treatment for breast cancer were less likely to be treated by an experienced physician or receive radiation therapy than white women. *Id.* at 53. A follow-on study by the National Academies of Science in 2024 identified a link between high levels of implicit bias toward Black patients and poor health outcomes that these patients experience. National

---

[6] https://minorityhealth.hhs.gov/news/heckler-report-reflecting-its-beginnings-and-30-years-progress.

[7] The National Academies of Sciences, Engineering, and Medicine are private, nongovernmental institutions established by an act of Congress to "investigate, examine, experiment, and report on any subject of science or art" upon request of the U.S government. 36 U.S.C. § 150303. The National Academies provide independent advice to inform Congress's policymaking. *About Us*, Nat'l Academies, https://www.nationalacademies.org/about (last visited Nov. 9, 2024). Its members are elected by their peers for their contributions to research, medicine and health, and engineering. *Id.* The National Academies publishes the Reference Manual on Scientific Evidence jointly with the Federal Judicial Center; the manual is provided to federal judges to guide them in "managing cases involving complex scientific and technical evidence." *Reference Manual on Scientific Evidence,* Nat'l Academies XV (2011), https://nap.nationalacademies.org/catalog/13163/reference-manual-on-scientificevidence-third edition.

[8] Brian D. Smedley et al., *Unequal Treatment: Confronting Racial and Ethnic Disparities in Healthcare*, Nat'l Academies Press 1 (2003), https://nap.nationalacademies.org/read/12875/chapter/1.

Academies, *Ending Unequal Treatment: Strategies to Achieve Equitable Health Care and Optimal Health for All,* The National Academies Press (2024). [9]

In 2021, the Centers for Medicare & Medicaid Services (CMS) (an agency housed in the Department of Health and Human Services, alongside the Office of Minority Health) promulgated the Anti-Racism Rule to address racial health disparities.[10] Under the Anti-Racism Rule, clinicians may—as one of 106 different options for receiving increased reimbursements for certain Medicare services—"create and implement an anti-racism plan." 86 Fed. Reg. at 65,384, 65,969-70; AR2, AR5-6. In promulgating the Rule, CMS explained that "among Medicare beneficiaries, racial and ethnic minority individuals often receive lower quality of care, report lower experiences of care, and experience more frequent hospital readmissions and procedural complications." 86 Fed. Reg. at 39344; AR242; *see also* 86 Fed. Reg. 65,384; AR4. CMS invoked a range of scholarship showing that racial disparities have persisted or worsened over time. *See, e.g.*, AR242 n.153; AR242 n.155-157; *see also* AR366-384 (longitudinal study on racial disparities for total knee and hip arthroscopy); AR302-308 (study discussing racial disparities in hospital care); AR385-417 (similar). And a comprehensive report by CMS itself revealed racial disparities across a range of medical conditions and treatment outcomes. AR242 n.151 (citing 1430-1608).

The Anti-Racism Rule sets five mandatory guidelines for how Medicare providers may gain credit for the improvement activity. They must: (1) create and implement a plan using some anti-racism planning tool; (2) include in the plan an clinic-wide review of tools and policies that already exist; (3) ensure the clinic's tools and policies include and are aligned with a commitment

---

[9] Nat'l Academies of Scis., Eng'g, & Med., *supra* note 5.

[10] CY 2022 Payment Policies Under the Physician Fee Schedule and Other Changes to Part B Payment Policies, 86 Fed. Reg. 39,104, 39,855 (July 23, 2021) (proposed rule); CY 2022 Payment Policies Under the Physician Fee Schedule and Other Changes to Part B Payment Policies, 86 Fed. Reg. 64,996, 65,384, 65,969-70 (Nov. 19, 2021) (final rule).

to anti-racism and an understanding of race as a political and social construct; (4) identify in the plan any "issues and gaps" revealed by the clinic-wide review; and (5) include in the plan target goals and milestones for addressing those issues and gaps. 86 Fed. Reg. 64996, 65970. The Rule also identifies several discretionary criteria that a clinician may consider. Neither mandatory nor discretionary criteria require clinicians to discriminate against their patients on the basis of race. For example, by developing an anti-racism plan a clinic could find that broadening access to health care for underserved communities of color—by increasing telehealth options, providing off-hour services, conducting mobile diagnostic testing—reduces racial health disparities in access to care, while implementing measures that increase access for all. *Id.*

CMS identified research showing that health care providers must take deliberate, affirmative steps to eliminate these disparities, including articles explaining that racial health disparities have persisted over the years in part because the medical profession has failed to identify and eliminate aspects of the American health care system that unfairly disadvantage some people on the basis of race. *See, e.g.*, AR2282; *see also* AR2254.

Despite this extensive support for the Anti-Racism Rule, Plaintiff States have challenged and twice sought summary judgment in an attempt to vacate the Rule. In the States' initial round of summary judgment briefing, they argued that they had standing to sue because the Anti-Racism Rule injured their "sovereign interest in the enforcement of their anti-discrimination law" – an injury that they claimed "requires no factual development." ECF No. 79 at 3, 6-7. This Court disagreed, holding that the States failed to "adduce[] evidence sufficient to show an actual or imminent harm to their asserted interests in order to establish standing." ECF No. 135 at 40. The Court explained:

> [T]o show standing for a direct suit, at a minimum the State Plaintiffs would need to present competent evidence that: (1) at the time they brought suit; (2) one or

more clinicians in one of their States had created, or were about to create an anti-racism plan under the Anti-Racism Rule; and (3) the anti-racism plan violated that Plaintiff State's anti-discrimination laws, (4) as they would be enforced by that State.

*Id.* at 39-40.

After six months of jurisdictional discovery, the States again seek summary judgment. Unable to satisfy the evidentiary requirements that the district court identified, the States now subordinate their law-enforcement theory of standing to two other theories—that the Anti-Racism Rule (1) intrudes on an "area of local concern," and (2) preempts state law. ECF No. 168 at 11-17. *Amici* file this brief in support of the government's cross-motion for summary judgment, ECF No. 170 at 7, 28.[11]

## LEGAL STANDARD

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Cox v. Wal-Mart Stores E., L.P.*, 755 F.3d 231, 233 (5th Cir. 2014). In cases brought under the Administrative Procedure Act, the summary judgment inquiry is a narrow one. *Yogi Metals Group, Inc. v. Garland*, 38 F.4th 455, 458 (5th Cir. 2022). It "does not seek the court's independent judgment; it asks only whether the agency engaged in reasoned decision making based on consideration of the relevant factors." *Id.* The Court must also satisfy itself that the party invoking federal jurisdiction has satisfied each element of standing with "specific facts," supported by affidavit or other evidence. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-561 (1992) (quoting Fed. R. Civ. P. 56(e)). "Mere allegations" of standing do not suffice. *Id.*

---

[11] This Court granted the Greensboro health Disparities Collaborative and the NAACP State Conferences leave to participate as *amici curiae* in this case. ECF No. 87 at 17-18.

**ARGUMENT**

**I.        The States Still Cannot Establish Standing.**

Article III of the Constitution confines federal courts to adjudicating "Cases" and "Controversies." U.S. Const. Art. III; *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). The irreducible constitutional minimum of standing requires (1) that a plaintiff "must have suffered an injury in fact," (2) the injury must be "fairly traceable to the challenged action of the defendant," and (3) "it must be likely, as opposed to merely speculative, that the injury will be 'redressed by a favorable decision." *Lujan*, 504 U.S. at 560-561 (internal quotations marks, citation, and alterations omitted).

Standing is "built on a single basic idea—the idea of separation of powers." *United States v. Texas*, 599 U.S. 670, 675 (2023). By limiting federal courts to adjudicating case and controversies, the standing requirements "prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). The standing inquiry is therefore "especially rigorous" when the merits of the dispute would force a court to "decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Id.* (citation omitted). Courts would otherwise become an open forum "press[ing] general complaints about the way in which government goes about its business." *All. for Hippocratic Med.*, 602 U.S. at 379 (citation omitted).

The States continue to disregard this constraint on federal courts' decision-making authority, seeking summary judgment on a claim that they lack standing to pursue. *See* ECF No. 168 at 1-27. But, as before, the States lack evidence of any injury in fact. The States' law-enforcement theory of standing still lacks any basis in the evidence. And their theories that the anti-racism rule preempts state law and regulates matters that states control lacks any basis in the law. Given time and opportunity to identify unlawful anti-racism plans, each State came up empty,

confirming what *amici* have long known to be true: the Anti-Racism Rule does not encourage racial discrimination.

**A. The States Lack Evidence That The Anti-Racism Rule Impedes Enforcement Of State Law.**

Discovery dispelled the notion that there is *any risk*, let alone a substantial one, that the Anti-Racism Rule encourages clinicians to prioritize patients on the basis of race in violation of state law. Notwithstanding the "thousands of clinicians [who] have gotten credit for anti-racism plans in the States," the States did not produce a single plan that even suggests clinicians should provide worse care to some patients on the basis of their race. One plan from Arkansas expands language access services, ECF No. 167-11; one plan from Kentucky is not actually from Kentucky—it is an article that the American Medical Association published *before* CMS promulgated the Anti-Racism Rule, ECF No. 167-12; and the remaining States do not even attempt to identify a plan that runs afoul of their laws. Pressed to substantiate their fears of unlawful discrimination, the States come up empty.

*1. The Arkansas language access plan does not discriminate on the basis of race.*

The States argue that the Arkansas anti-racism plan shows that the Anti-Racism Rule encourages unlawful discrimination. ECF No. 168 at 7. The plan, submitted by Family Medicine Clinic, P.A., uses CMS' Disparities Impact Statement to set short terms goals ("implement access plans for gender identity, mental health, and race"), long term goals ("equal health care for all"), and determined that creating a language access plan would best enable the clinic to reach these objectives. ECF No. 167-11 at 3-4; ECF No. 167-13 ¶ 14. That plan ultimately included two "Action Steps": (1) "pen a report within the HER to identify patients who told us their primary language is Spanish," and (2) "train staff on translator app or software." ECF No. 168 at 7; ECF No. 167-11; ECF No. 167-13 ¶ 14. And, despite identifying "Hispanic/Latino" as a "Priority

Population(s)," the plan does not afford that group any services on the basis of race or ethnicity that it deprives from another group.[12]

This Court need not take *amici*'s word that language access initiatives are consistent with Arkansas law. The Arkansas Department of Health stresses the importance of language assistance in reducing racial health disparities and provides resources to Arkansans seeking language services. *Minority Health Resources: Language Assistance*, Ark. Dep't of Health.[13] Arkansas informs its limited English proficient residents that they may be *entitled* to language assistance under state law, and recognizes that providing this assistance is important for ensuring that state programs "communicate effectively" with all Arkansans and "act appropriately based on that communication." *Id.*

What is more, Arkansas provides financial incentives for multilingual employees, allowing for "a 10 percent pay increase to any employee whose specific job assignment requires the skill to communicate in a language other than English." *Id.* This is but one of many ways that Arkansas recognizes the need for language access and accessibility services. For example, Arkansas requires its Supreme Court to "administer an interpreter program to appoint and use interpreters in court proceedings," Ark. Code Ann. § 16-10-1103(b)(1). Arkansas' suggestion that Family Medicine's limited language access plan violates state law runs face first into its own laws requiring language access services.

---

[12] As the government argues, the Arkansas plan also relies on an outdated version of CMS' Disparities Impact Statement. ECF No. 170 at 17. To the extent that the States injury turns on the wording of CMS' prior Disparities Impact Statement, their claim is now moot. *Id.*; *see also Yarls v. Bunton*, 905 F.3d 905, 909 (5th Cir. 2018) (explaining that a case becomes moot when there is no ongoing case or controversy *throughout* a suit's existence).

[13] https://healthy.arkansas.gov/programs-services/prevention-healthy-living/health-equity/minority-health-resources/ (last visited Nov. 9, 2024).

Arkansas' objections to Family Medicine's language access plan are also inconsistent with Arkansas' decision to accept federal funds under Title VI. These funds are conditioned upon states providing individuals with limited English proficiency with "meaningful access" to the State programs and services. 68 Fed. Reg. 32289 (U.S. Dep't of Labor May 29, 2003); *Murguia v. Childers*, No. 5:20-CV-5221, 2022 WL 2911692 (W.D. Ark. July 22, 2022), *aff'd,* 81 F.4th 770 (8th Cir. 2023). "Meaningful access" often requires some combination of services for oral interpretation and written translation of vital documents. 29 C.F.R. § 38.9(b).

Simply put, the States' best evidence of racial prioritization is no evidence at all. Family Medicine's language access plan does not differentiate between patients on the basis of race or ethnicity; it mirrors Arkansas' *own* efforts and obligations to increase limited English speakers' ability to communicate with health care providers.

### 2. *"Kentucky's" anti-racism plan was not created by Kentucky clinicians.*

The States fall back on a plan "implemented" by Kentucky providers "that reflects Defendants' anti-racism ideology." ECF No. 168 at 7 (citing ECF 167-12). This argument, too, suffers from fatal defects.

Kentucky's anti-racism plan is not an anti-racism plan at all. In support of their claim that Kentucky's anti-racism plan violates state law, Plaintiffs submit nothing more than an article published by the American Medical Association. *See generally* ECF No. 167-12 at 1-72. There is no indication that this document qualifies as a MIPS-eligible anti-racism plan. The article does not satisfy any of the Anti-Racism Rule's few requirements. It was not created by a Kentucky clinician; it does not "include a clinic-wide review" of any particular clinic's "existing tools and policies"; and does not identify ways to remedy "issues and gaps" identified by that review. *See* 86 Fed. Reg. 64996, 65969; AR5; *see also* ECF No. 167-12 at 1-72. That is no real surprise; the article, which

sets "[p]roposed key actions" starting in April 2021, ostensibly pre-dates even the *proposed* anti-racism rule. *Id.* at 167-12 at 60; *see also* 86 Fed. Reg. 39104, 39345, 39855 (July 23, 2021); AR243-244.

The States also disparage AMA's equity framework, but ignore why "treat[ing] everyone the 'same'" denies some people adequate care. ECF No. 167-12 at 11-12; ECF No. 168 at 7. AMA explains, "A person with low vision receiving the 'same' care" as someone else "might receive documents that are illegible, depriving them of the ability to safely consent to and participate in their own treatment." ECF No. 167-12 at 12. Ignoring language barriers or low health literacy can have the same effect as ignoring a patient's vision impairment. *Id.*

AMA's article discussing its organizational objectives does no better than the Arkansas language access plan in substantiating the States' claims of injury in fact.

        3. *Neither Mississippi, Alabama, Louisiana, Missouri, nor Montana can identify a single unlawful plan within their borders.*

Despite the thousands of clinicians who attested to implementing anti-racism plans within the Plaintiff States, *see* ECF 167-9 at 88, Mississippi, Alabama, Louisiana, Missouri, and Montana do not offer one example of an in-state anti-racism plan that runs afoul of their laws. *See* ECF No. 168 at 6-7. And Montana cannot identify an in-state anti-racism plan at all; not a single Medicaid provider within the state attested to creating and implementing an anti-racism plan in 2022 or 2023. *See* ECF No. 167-6 at 5.

Unable to identify a plan that violates State law, the States lack evidence of their purported injury: a forced choice between "enforce[ing] state laws against residents who are violating them" or "choos[ing] not to enforce them . . .to protect resident clinicians." ECF No. 168 at 14; *see also* ECF No. 135 at 39 (granting summary judgment where the States lacked "competent summary judgment evidence showing how the Anti-Racism Rule or the Disparities Impact Statement

threatens actual or imminent discrimination"). The States could not substantiate their law-enforcement theory seven months ago, ECF No. 135 at 38-39, and cannot do so now.

### B. The Anti-Racism Rule Does Not Preempt State Law Or Otherwise Regulate Matters That States Control.

The States maintain that they are injured by the Anti-Racism Rule because it "assert[s] authority over health care, . . . an area of local concern," and preempts the States' anti-discrimination laws. ECF No. 168 at 12-13. Both theories fall flat.

*First*, States are not injured every time federal law touches an issue of local concern. *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 593 n.14 (6th Cir. 2024); *see also, e.g.*, *Murthy v. Missouri*, 144 S. Ct. 1972, 1996-97 (2024) (states lacked standing to challenge purported restrictions on States "right to listen" to their citizens); *Texas*, 599 U.S. at 674, 677-678 (states lacked standing to challenge costs incurred by purported underenforcement of federal immigration laws). Federal action may bear on health care (*Mellon*[14]); the State treasury (*Texas*); residents' ability to discuss matters of State concern (*Murthy*)—all without providing States standing to sue. For states to assert sovereign-interest standing, "the acts of the defendant must invade the government's sovereign right, resulting in some *tangible* interference with its authority to regulate or to enforce its laws." *Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 770 (5th Cir. 2023) (alterations omitted) (emphasis added). To hold otherwise would "run headlong into the *Mellon* bar" on *parens patriae* suits against the federal government. *Tennessee*, 104 F.4th at 593 n.14. Here, he States lack any evidence that the Anti-Racism Rule—one of 106 voluntary improvement activities—tangibly interferes with their authority to regulate the public health.

The out-of-circuit cases the States rely upon do not free them from presenting evidence of some tangible effect. *See Tennessee*, 104 F.4th, at 587 (appeal from preliminary injunction);

---

[14] *Massachusetts v. Mellon*, 262 U.S. 447, 485-486 (1923).

*Kentucky v. Biden*, 23 F.4th 585, 593 (6th Cir. 2022) (same); *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.*, 50 F.4th 1126, 1130 (11th Cir. 2022) (same). *Norwegian Cruise Line* said nothing about sovereign-interest standing, as it did not involve a State plaintiff at all. 50 F.4th at 1130 (cruise line's challenge to Florida law prohibiting businesses from requiring proof of vaccination status). *Kentucky* and *Tennessee* involved federal *mandates* that supplanted a State's regulatory regime. *Kentucky* featured a federal vaccination requirement that mandated COVID-19 vaccines when the State had opted not to. 23 F.4th at 599. The federal mandate meant that Kentucky could not grant its residents the option to decline the COVID-19 vaccine without fear of punishment. *Id. Tennessee* similarly involved a direct conflict in federal and state regulation, with federal law prohibiting schools from "separating students based on biological sex" and state law mandating it. 104 F.4th at 594. The Anti-Racism Rule, which is voluntary and can indisputably be satisfied through non-discriminatory measures, is nothing like the mandates at issue in those cases. Clinicians may choose not to enact an anti-racism plan at all or they may choose to enact an anti-racism plan that complies with any applicable State prohibitions on racial discrimination. Either option would give full effect to federal and state law.

*Second*, while preemption of state law can give rise to Article III standing, *Tennessee*, 104 F.4th at 593, preemption does not exist here. Absent an express preemption provision, federal law only preempts state law (1) when Congress has properly determined that conduct in an entire field "must be regulated by its exclusive governance, (2) when federal and state law conflict such that compliance with both laws "is a physical impossibility" or state law impedes "the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399-400 (2012).

14

The States cannot overcome this strong presumption against federal preemption, and make no serious attempt to. For starters, the text of the Anti-Racism Rule is silent about preempting the states' anti-discrimination laws. 86 Fed. Reg. 64,996, 65382-84, 65969; AR1-5. The States do not argue otherwise. A rule's silence on preemption "is a flashing red sign" that the rule does not exhibit a "clear and manifest intent to preempt." *Deanda v. Becerra*, 96 F.4th 750, 765 (5th Cir. 2024) (internal quotation marks omitted). Moreover, there is no conflict because it is possible to satisfy the Anti-Racism Rule and comply with all of the State statutes, regulations, and policies pertaining to racial discrimination. The States seem to concede that the only way that complying with the Anti-Racism Rule would violate the States' laws is if the anti-racism plan "prioritize[s]" some patients over others on the basis of race. But the Rule does no such thing. Creating a plan requiring clinicians to provide *worse* care to some people on the basis of their race runs completely contrary to the Anti-Racism Rule's stated purpose: to achieve "the consistent and systematic fair, just, and impartial treatment of *all* individuals." AR3 (emphasis added) (citation omitted). Finally, the States fail to show how their antidiscrimination laws would impede the accomplishment and execution of the full purposes and objectives of the Anti-Racism Rule. The purpose of the Anti-Racism Rule is to "reduce health inequities" and ensure that "all individuals" have consistent and fair access to quality health care. AR3. Plaintiffs have not shown that they enforce their antidiscrimination laws in ways that undermine these goals.

* * *

"Without competent summary judgment evidence that [the States' asserted injuries] had actually occurred or was about to occur, the Court is left with only a 'highly attenuated chain of possibilities,'" not an injury that is " 'certainly impending.'" *Id.* at 40 (quoting *Clapper*, 568 U.S. at 410). Under those circumstances, summary judgment for lack of standing is proper.

II.     **The State's Purported Interest In Enforcing Their Anti-Discrimination Laws Is Belied By Evidence Of Rampant Racial Health Disparities Within Their Borders And *Amici*'s Members' Lived Experiences.**

Each of the States' purported injuries suggest that they aggressively police racial discrimination in health care. *See* ECF No. 168 at 10-19. But racial health disparities are pervasive in the Plaintiff States and their admitted reluctance toward pursuing claims of discrimination help explain why. Past and present discrimination within the States has led to distrust among Black communities of the medical profession, leading to delayed medical treatment, communication barriers, and worse health outcomes. *Amici*'s members know this firsthand.

Significant research from the scientific and medical community indicates that racial health disparities in America remain a prevalent problem and have existed since the beginning of this country. These disparities span the full spectrum of health care, including preventative and routine health care, Matthew Wynia et al., *Collecting and Using Race, Ethnicity and Language Data in Ambulatory Settings: A White Paper with Recommendations from the Commission to End Health Care Disparities* 6 (2011)[15]; emergency room treatment, Mayo Clinic, *Racism in Pain Medicine: We Can and Should do More*, 96 Mayo Clinic Proceedings (hereinafter "*Racism in Pain Medicine*"); [16] opioid prescription rate, Kelly Hoffman, *Racial Bias in Pain Assessment and Treatment Recommendations, and False Beliefs about Biological Differences between Blacks and Whites* (2016);[17] use of anesthesia, *Racism in Pain Medicine*; and scope of insurance coverage. Sara N. Bleich et al., *Addressing Racial Discrimination in US Health Care Today*, JAMA Health Forum (2021).[18]

---

[15] https://www.ama-assn.org/system/files/corp/media-browser/public/health-policy/cehcd-redata_0.pdf.

[16] https://www.mayoclinicproceedings.org/article/S0025-6196(21)00322-0/fulltext.

[17] https://www.pnas.org/doi/10.1073/pnas.1516047113.

[18] https://jamanetwork.com/journals/jama-health-forum/fullarticle/2777406.

The Plaintiff States are not immune from racial health disparities. Far from it: the disparities in these States are often *worse* than the disparities that exist in other States. America's Health Rankings, *2023 Annual Report*, United Health Fund (2023). In a 2023 report by the United Health Foundation, each of the Plaintiff States fell in the bottom half of all States, when evaluated for clinical care and health outcomes; Alabama, Arkansas, Mississippi, and Louisiana were in the bottom 10%. *Id.* Another report by the Commonwealth Fund reached similar conclusions, with all Plaintiff States in the bottom 50% and Mississippi and Arkansas in the bottom 10%. *2023 Scorecard on State Health System Performance*, The Commonwealth Fund (hereinafter "*State Scorecard*").[19] These contemporary findings align with the Plaintiff States' long history of racial health disparity.

*Mississippi*. Mississippi "ranks last, or close to last, in almost every leading health outcome." Health Equity, Miss. State Dep't of Health.[20] Health outcomes for Black Mississippians are even worse than they are statewide. David C. Radley et al., *Advancing Racial Equity in the U.S. Health Care: The Commonwealth Fund 2024 State Health Disparities Report* (hereinafter "*Advancing Racial Equity*"), Ex.1 (2024).[21] Compared to Mississippi's white population, the State's Black population has the highest mortality rate due to heart disease, hypertension, stroke, diabetes, renal disease, Covid-19, AIDS, and cancers…." *Annual Mississippi Health Disparities & Inequalities Report*, Miss. State Dep't of Health 10 (2023).[22]

---

[19] https://www.commonwealthfund.org/publications/scorecard/2023/jun/2023-scorecard-state-health-system-performance.
[20] https://msdh.ms.gov/page/44,0,236.html (last visited Nov. 9, 2024).
[21] https://www.commonwealthfund.org/publications/fund-reports/2024/apr/advancing-racial-equity-us-health-care.
[22] https://msdh.ms.gov/page/resources/20313.pdf.

*Amicus* Mississippi State Conference of the NAACP is well-acquainted with the racial health disparities that have existed for decades throughout Mississippi. Poor access to affordable health care has forced some of its members to "choose between getting medical care or providing food for their families or other necessities." ECF No. 62-1 ¶ 11. Other members went without drinkable running water for over a month in 2022 because the largest water treatment plant in the majority-Black city of Jackson failed. *Id.* ¶ 21-23.

Mississippi admits that it has not taken "investigative action" on any complaints or charges of racial discrimination against healthcare providers since at least 2020. ECF 167-1 at 13 (hereinafter "Ex. 1").

*Alabama*. Black Alabamians have also long struggled to achieve equitable access to health care. Ala. Dep't of Pub. Health, *Social Determinants of Health* (2020). [23] Although Alabama's white residents are in the 61st percentile for health outcomes nationally, Black Alabamians are in the 27th percentile; Latinx Alabamians are in the 8th percentile. *Advancing Racial Equity* at Ex. 1. [24] These health discrepancies are especially prevalent amongst Black women. In 2020, one in five Black women did not receive "adequate prenatal care" relative to one in ten white women. Ala. Dep't of Pub. Health, *Pregnancy Outcomes* 26 (2020). [25]

The members of *amicus* Alabama State Conference of the NAACP echo these experiences, and others. *Amicus* members have deep distrust of the medical system, born of the Tuskegee experiments where the government experimented hundreds of Black men and withheld post-study treatment. ECF No. 62-2 ¶ 8. This distrust is exacerbated by *amicus members'* current-day

---

[23] https://www.alabamapublichealth.gov/healthrankings/assets/2020_sha_health_indicator_5.pdf.
[24] https://www.commonwealthfund.org/publications/fund-reports/2024/apr/advancing-racial-equity-us-health-care.
[25] https://www.alabamapublichealth.gov/healthrankings/assets/2020_sha_health_indicator_3.pdf.

experiences with bias and discrimination in health care, and leads many of *amicus members* to delay medical treatment or avoid it altogether. *Id.* at ¶¶ 8, 13.

Alabama admits that it has not taken "investigative action" on any complaints or charges of racial discrimination against healthcare providers since at least 2020. Ex. 1 at 13.

*Arkansas*. In 2023 Black Arkansans experienced a mortality rate from preventable causes that was almost double the national rate. *State Scorecard*.[26] Ark. Advoc. for Children & Families, *The Critical State of Black Women's Health* 9 (2022).[27] In 2018, Black women in Arkansas were 2.2 times as likely to die from pregnancy-related causes than their white counterparts. *Id.* at 10.

*Amicus* Arkansas State Conference of the NAACP has many members who live below the poverty line and live in rural areas where accessing routine medical care is difficult. ECF No. 62-4 ¶ 14. These barriers become an even bigger obstacle to *amicus members* receiving quality care because of the cultural barriers many members experience when interacting with predominantly white medical providers. *Id.* As a result of these barriers, some of *amicus members* feel like they cannot adequately communicate about and receive treatment for their medical conditions. *See id.*¶ 16.

Arkansas admits that the Arkansas State Medical Board "has received and examined several complaints against physicians involving racial discrimination" but closed all of them out "for lack of evidence." Ex. 1 at 13.

*Kentucky*. Kentuckians of all races experience health issues that outpace those experienced in other States; racial health disparities exacerbate this problem for people of color. For example,

---

[26] https://www.commonwealthfund.org/publications/scorecard/2023/jun/2023-scorecard-state-health-system-performance.

[27] https://npr.brightspotcdn.com/b7/3f/26881cb848a59c9d3d05591396c4/report-the-critical-state-of-black-womens-health.pdf.

in 2016, Kentucky had the 4th highest death rate as a result of diabetes in America. Univ. of Ky. College of Med., *Improving the Health of Kentucky*, Ky. Health.[28] But the mortality rate for Black Kentuckians with diabetes was 48.5 per 100,000 while the mortality rate for white Kentuckians was 27.3 per 100,000. *Id.* Another study showed that Black men in Louisville, Kentucky died from diabetes at rates twice as high as the rate of the rest of the city's population. V. Faye Jones, *Health Inequities: A Call to Action*, Univ. of Louisville.[29]

*Amicus* Kentucky State Conference of the NAACP has seen how structural barriers to accessing health care, along with implicit and overt biases in the medical profession, lead to poor health outcomes. Because of "past negative experiences with the medical system," some of *amicus* members avoid seeking medical treatment until they are in debilitating pain. ECF No. 62-7 ¶ 13. Other members suffer from severe medical conditions because "they cannot afford to access preventative care and do not go to the hospital until it is too late." ECF No. 62-7 ¶ 10.

Kentucky admits that it has not taken "investigative action" on any complaints or charges of racial discrimination against healthcare providers since at least 2020. Ex. 1 at 13.

*Louisiana*. Louisiana has a long history of discriminatory health care practices. In a study conducted by the Bureau of Minority Access, community residents stated the reasons they felt there were disparities in health care within the State. D. Rudy Macklin, *Eliminating Health Disparities*, Bureau of Minority Health Access 56 (2009).[30] People of color explained that they lived in areas where there are fewer doctors; that medical professionals were not skilled or trained to communicate with people from different racial backgrounds; and that doctors assumed Black

---

[28] https://medicine.uky.edu/centers/chet/kentucky-health (last visited Nov. 9, 2024).
[29] https://apps.legislature.ky.gov/CommitteeDocuments/7/12851/09 23 2020 Jones UL Health Care Disparities Presentation.pdf (last visited Nov. 9, 2024).
[30] https://ldh.la.gov/assets/docs/GovCouncil/MinHealth/HealthDisparitiesReport200809.pdf.

and Brown residents lacked insurance to pay for care.[31] In the 2024 report from the Commonwealth Fund, white Louisianans were in the 63rd percentile nationally in terms of health system performance. *Advancing Racial Equity* at Ex. 1.[32] Black Louisianans scored in the 31st percentile while Latinx Louisianans were in the 21st percentile.[33]

Members of *amicus* Louisiana State Conference of the NAACP understand the States' pervasive racial health disparities from an academic perspective and first-hand experience. *Amicus'* president helped prepare a report on Louisiana's health care system during the COVID-19 pandemic. ECF No. 62-8 ¶ 11 & n.2. The study concluded that racial inequities in Louisiana, including housing discrimination, have led to "inter-generationally transferred black poverty and disadvantage" and have "a direct link to public health problems." *Id.* ¶¶ 12-13. This aligns with *amicus members'* experiences, who have identified implicit and overt bias in the health care system, including exposure to clinicians who "use racial epithets to insult Black people and treat marginalized people of color differently." *Id.* ¶ 16.

*Missouri*. The Missouri Department of Health and Senior Services issued a report on health disparities within the state and outlined different barriers to health care access, problems with affordability of health care, and issues with the quality of health care. Glenda R. Miller, *State of Missouri Health Disparities Report*, Miss. Dep't of Health & Senior Servs (2008).[34] These barriers included "discrimination against racial and ethnic minorities in some health care organizations." *Id.* at 34. Missourians reported that cultural and language differences can impede an "interaction

---

[31] *Id.*

[32] https://www.commonwealthfund.org/publications/fund-reports/2024/apr/advancing-racial-equity-us-health-care.

[33] *Id.*

[34] https://health.mo.gov/living/families/minorityhealth/pdf/DisparityReport.pdf.

with a doctor, nurse or other staff member from a different ethnic background," making it difficult to communicate medical needs. *Id.*

*Members of amicus* Missouri State Conference of the NAACP feel the "enduring effects of [the State's] long history of structural and individual racism." ECF No. 62-5 ¶ 9. Members face overt and implicit racial discrimination in health care that dates back to the State's entry into the Union. *Id.* Missouri became a State as part of a compromise designed to protect slavery throughout major areas of the United States—the Missouri Compromise. *Id.* To this day, "Black Missourians continue to face overt and implicit racial discrimination, including in health care." *Id.* Black Missourians, including *amicus members*, died at disproportionately higher rates than white Missourians during the COVID-19 pandemic. And several of *amicus members* have experienced instances of medical discrimination, including one member who was forced to wait outside in the cold after receiving treatment while other white patients were allowed to wait inside. *Id.* ¶ 20.

*Montana.* Pervasive racial health disparities in Montana led the State's Department of Public Health and Human Services to create a State Health Improvement Plan. Mont. Dep't of Pub. Health & Human Servs., *Montana State Health Improvement Plan 2019-2023* (2021).[35] The 2017 assessment found significant health disparities in the State, particularly among American Indians. *Id.* at 5. For example, American Indians in Montana have higher mortality rates for many of the most prevalent diseases across the country and in the state. This group is also more at risk for many diseases compared to the state overall. *Id.* The 2024 report from the Commonwealth Fund found that white individuals in the state experienced the highest health system performance and they scored in the 68th percentile compared to all population groups nationally. *Advancing*

---

[35] https://dphhs.mt.gov/assets/publichealth/ahealthiermontana/2019SHIPfinal.pdf.

*Racial Equity* at Ex. 1.[36] Montana did not have enough data to collect from all communities of color, but Latinx individuals were in the 22nd percentile and American Indian individuals were in the 3rd percentile. *Id.*

*Amicus* Rocky Mountain State Conference of the NAACP, which includes Montana, has members who have experienced mistreatment and racial stereotyping in the healthcare system. ECF No. 62-6 ¶¶ 15-16. And one member died at home after he was denied care in a hospital's emergency room three consecutive times "because medical staff repeatedly told him that he did not look sick enough." *Id.* ¶ 16.

Montana has only identified one case where a health care provider within the State was subject to a finding of racial discrimination. Ex. 1 at 13.

As *amici* know well, racial health disparities are far too pervasive across the Plaintiff States, and the States do far too little to remedy them. The Anti-Racism Rule is a much-needed incentive for Medicaid providers to take racial health equity into their own hands. The States should not be able to impede federal law by feigning interest in enforcing anti-discrimination laws that have for centuries failed to protect *amici*'s members against discrimination in health care.

### III.    The States Still Lack Evidence That Anti-Racism Plans Result In Worse Care For Some Patients On The Basis Of Their Race.

On the merits, the States still insist that anti-racism planning cannot be a clinical practice improvement activity because it requires clinicians to prioritize certain populations over others. *See* ECF No. 168 at 25-27. According to the States, health care providers cannot eliminate racial health disparities without providing worse care to some group of patients. But, as with standing,

---

[36] https://www.commonwealthfund.org/publications/fund-reports/2024/apr/advancing-racial-equity-us-health-care.

the States *still* lack any evidence to support this fundamentally flawed premise. *See id.*; *see also* ECF No. 167-1 at 1-16.

Nothing in the Anti-Racism Rule causes medical providers to prioritize the health of one population over another on the basis of their race. The Anti-Racism Rule expresses CMS' "commit[ment] to achieving equity in health care outcomes for Medicare beneficiaries," and defines equity to mean "the consistent and systematic fair, just, and impartial treatment of *all* individuals." AR3 (emphasis added). The Rule's administrative record includes articles discussing the need for a system in which *all* people can know and develop to their full potential," AR2282 (emphasis added). Nothing in the Anti-Racism Rule requires clinicians to provide clinicians to provide patients different, let alone worse, care on the basis of the patient's race.

To assist clinicians in developing an anti-racism plan, CMS provided the Disparities Impact Statement, which instructed users to "[i]dentify health disparities and priority populations." ECF No. 168 at 4 (alteration omitted); *see also* ECF No. 167-11. "Priority populations" is a globally used term that refers to any group of people who is at risk of socially produced health inequities. *Priority Populations Primer, A Few Things You Should Know about Social Inequities in Health in SDHU Communities*, Sudbury & District Health Unit (2009).[37] A "priority population" may identify a racial or ethnic group, but it could also identify groups not defined along lines of race. For example, a priority population could include women, children, low-wage workers, or people living in rural areas. ECF No. 79 at 6; *see also About Priority Populations*, Agency for Healthcare Rsch. & Quality (2021).[38] Indeed, CMS amended the Disparities Impact Statement to make clear

---

[37] https://www.phsd.ca/wp-content/uploads/2016/05/Priority_Populations_Primer_ENG.pdf.
[38] https://www.ahrq.gov/priority-populations/about/index.html.

that the document is designed "to promote efforts to identify and address health disparities while improving the health of *all* people." ECF No. 169-1 at 3.

Plaintiffs' arguments to the contrary ignore the difference "between state action that discriminates on the basis of race and state action that addresses, in neutral fashion, race-related matters." *Crawford v. Bd. of Educ. of City of Los Angeles*, 458 U.S. 527, 538 (1982). The Anti-Racism Rule is the latter. Farm from evincing discriminatory intent, the Rule is a remedy to address longstanding racism and discrimination. As such, the Rule addresses racial health inequity in a lawful, neutral manner. *See* 86 Fed. Reg. 64996, 65970. A clinic could determine that its current practices allow race-based decision-making, including through clinicians' own implicit bias or through algorithmic bias in clinical tools using medical artificial intelligence, *see, e.g.*, AR903; AR2291, and create a plan to phase those practices out. ECF No. 96 at 33. A clinic could also find that broadening access to health care generally—increasing telehealth options, providing off-hour services, conducting mobile diagnostic testing—reduces racial disparities in access to care. *Id.* These types of initiatives align with the very activities that Plaintiffs have previously condoned.

Plaintiffs' argument also suffers from a deeper flaw: It presumes that eliminating racial health disparities requires clinicians to provide worse care to white patients. But nothing in the Rule or the record suggests that CMS intends for clinicians to abate racial health disparities by diverting resources from one group of people to another. To the contrary, CMS argues that remedying health disparities requires policies that ensure "quality improvement for both socially at-risk populations and *for patients overall*." AR835 (emphasis added); *see also id.* (The "goal of Medicare payment and reporting systems are reducing disparities in health care access" and "quality improvement and efficient care delivery for all patients").

Research from *amicus curiae* the Greensboro Health Disparities Collaborative reaffirms this approach. The Collaborative conducted a study that evaluated the success of four interventions in reducing health disparities in lung and breast cancer treatments. *First*, each cancer center's "nurse navigator"—a healthcare provider and advocate who guides patients through the treatment process—participated in health equity training. ECF No. 62-9 ¶ 15. *Second*, each cancer center used an electronic alert system which notified the nurse navigator any time a patient participating in the study missed an appointment or did not reach an expected treatment milestone in care. *Id.* *Third*, each cancer center selected a "physician champion" who received health equity training and served as a liaison between the nurse navigator and other clinicians. *Fourth*, the staff of each cancer center received continuing education sessions on implicit bias, unintentional attitudes, and institutional racism. *Id.* None of these interventions mandated or encouraged race-based decision-making. Even so, they eliminated disparities between Black and white patients across several metrics and improved treatment outcomes for *both* Black and white patients. *Id.* ¶ 16.

Plaintiffs have not pointed to a single practitioner who can say in any concrete terms that they would have to discriminate against white patients to provide equal care to their non-white patients. *See* ECF No. 167-1 at 1-16. In contrast, the government showed that anti-racism plans can improve clinical practice and health outcomes for all patients. *See* ECF No. 170 at 19-26.

The States' challenge to the Anti-Racism Rule is, and has always been, flawed to its core. Summary judgment for the government is warranted.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' motion for summary judgment, and grant Defendants' motion for summary judgment.

November 12, 2024                                  Respectfully submitted,

                                                  */s/ Robert B. McDuff*

26

Kathryn Youker*
Adria Bonillas**
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street, NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8355
kyouker@lawyerscommittee.org

Robert B. McDuff (MS Bar #2532)
MISSISSIPPI CENTER FOR JUSTICE
210 E Capitol Street, Suite 1800
Jackson, MS 39201
Telephone: (601) 259-8484
rmcduff@mscenterforjustice.org

Jo-Ann Tamila Sagar*
Stanley J. Brown*
Johannah Walker*
Amanda Allen*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
jo-ann.sagar@hoganlovells.com

*Counsel for Amici Curiae*

*\* Admitted Pro Hac Vice*
*\*\* Pro Hac Vice Pending*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on November 12, 2024, the foregoing document was filed on the Court's

CM/ECF system which sent notification of such filing to all counsel of record.

*<u>/S/ Robert B. McDuff</u>*
Robert B. McDuff