# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

| | | |
|---|---|---|
| STATE OF MISSISSIPPI, et al. | | |
| | *Plaintiffs*, | |
| | | No. 1:22-cv-113-HSO-RPM |
| v. | | |
| XAVIER BECERRA, et al., | | |
| | *Defendants.* | |

## PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT[*]

---

[*] The States have 35 pages to respond to Defendants' cross-motion and 8 pages for their rebuttal in support of their motion. *See* Loc. R. 7(b)(5). This Court's briefing schedule contemplates one consolidated brief. With Defendants' consent, the States file this 23-page consolidated reply and opposition.

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................ iii

Introduction & Summary of the Argument ............................................................................ 1

Argument .............................................................................................................................. 2

    I.      The States had standing to challenge the Anti-Racism Rule when they filed their
            complaint. .................................................................................................................. 2

          A.      The States get special solicitude. ................................................................. 3

          B.      The Anti-Racism Rule encourages clinicians to prioritize patients based on
                 race in violation of the States' laws. ............................................................. 3

          C.      Federal permission to prioritize patients based on race in violation of the
                 States' laws injures the States' sovereign interests. ...................................... 8

          D.      The States' sovereign injuries are traceable to the Anti-Racism Rule and
                 redressable by vacatur. ............................................................................... 11

    II.     Defendants tried and failed to moot the case after the States filed their complaint. ........ 13

    III.    The Anti-Racism Rule is unlawful. ............................................................................ 15

          A.      The judicial-review bar does not stop this Court from reaching the merits. ........ 15

          B.      Judicial review of the merits is limited to the administrative record. .................... 15

          C.      Anti-Racism plans are not one of the clinical practice improvement activities
                 specified in the statute. ............................................................................... 16

           D.      The States weren't obliged to raise their objections during the notice-and-
                 comment period. ......................................................................................... 22

    III.    Vacatur of the Anti-Racism Rule is the appropriate remedy. .................................... 22

Conclusion .......................................................................................................................... 23

## TABLE OF AUTHORITIES

**Cases**

*Ala. Ass'n of Realtors v. HHS,*
  594 U.S. 758 (2021) (per curiam)..................................................................................21

*Alaska v. U.S. Dep't of Transp.,*
  868 F.2d 441 (D.C. Cir. 1989)........................................................................................6

*Alliance for Fair Board Recruitment v. SEC (AFBR),*
  2024 WL 5078034 (5th Cir. Dec. 11, 2024) (en banc) ..................................passim

*Am. Forest & Paper Ass'n v. EPA,*
  137 F.3d 291 (5th Cir. 1998) .......................................................................................22

*Baker v. Bell,*
  630 F.2d 1046 (5th Cir. 1980) .....................................................................................16

*BCCA Appeal Grp. v. EPA,*
  355 F.3d 817 (5th Cir. 2003) .......................................................................................22

*Biden v. Nebraska,*
  143 S. Ct. 2355 (2023) ....................................................................................................2

*Cent. & S. W. Servs., Inc. v. EPA,*
  220 F.3d 683 (5th Cir. 2000) .......................................................................................23

*City of Morgan v. S. La. Elec. Co-op. Ass'n,*
  31 F.3d 319 (5th Cir. 1994) ...........................................................................................8

*Colville v. Becerra,*
  2023 WL 2668513 (S.D. Miss. Mar. 28) ..........................................................passim

*Dep't of Com. v. New York,*
  588 U.S. 752 (2019) ......................................................................................................12

*Dierlam v. Trump,*
  977 F.3d 471 (5th Cir. 2020) .......................................................................................14

*Franciscan All. v. Burwell,*
  227 F. Supp. 3d 660 (N.D. Tex. 2016) ......................................................................21

*Franciscan All., Inc. v. Becerra,*
  47 F.4th 368 (5th Cir. 2022) ........................................................................................22

*Haaland v. Brackeen,*
  599 U.S. 255 (2023) .................................................................................................9, 10

*Harrison v. Jefferson Parish Sch. Bd.,*

78 F.4th 765 (5th Cir. 2023) .................................................................................2, 9, 10, 11

*Kentucky v. Biden*,

23 F.4th 585 (6th Cir. 2022) .................................................................................. 2, 10, 11

*Kirby Corp. v. Pena*,

109 F.3d 258 (5th Cir. 1997) ..............................................................................................15

*Kisor v. Wilkie*,

588 U.S. 558 (2019) ...............................................................................................................4

*Mallory v. Norfolk S. Ry. Co.*,

600 U.S. 122 (2023) ...................................................................................................... 10, 13

*Massachusetts v. EPA*,

549 U.S. 497 (2007) ...................................................................................................1, 10, 13

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*,

60 F.4th 956 (5th Cir. 2023) ..............................................................................................19

*Michigan v. EPA*,

576 U.S. 743 (2015) .............................................................................................................15

*Murthy v. Missouri*,

603 U.S. 43 (2024) ...............................................................................................................13

*Nebraska v. Wyoming*,

515 U.S. 1 (1995) ........................................................................................................... 10, 21

*Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.*,

50 F.4th 1126 (11th Cir. 2022) .........................................................................................21

*Pool v. City of Houston*,

978 F.3d 307 (5th Cir. 2020) ....................................................................................... 2, 14

*SEC v. Chenery Corp.*,

318 U.S. 80 (1943) ...............................................................................................................15

*SFFA v. Harvard*,

600 U.S. 181 (2023) ...............................................................................................1, 6, 19, 20

*Sierra Club v. Pruitt*,

293 F. Supp. 3d 1050 (N.D. Cal. 2018) .........................................................................22

*Speech First, Inc. v. Schlissel*,

939 F.3d 756 (6th Cir. 2019) .............................................................................................14

*Sw. Elec. Power Co. v. U.S. Env't Prot. Agency*,

920 F.3d 999 (5th Cir. 2019) .............................................................................................22

*Tennessee v. DOE,*
    104 F.4th 577 (6th Cir. 2024) ................................................................................. 8, 11

*Texas v. Biden,*
    20 F.4th 928 (5th Cir. 2021) .................................................................................. 4, 15

*Texas v. Biden,*
    2021 WL 4552547 (N.D. Tex. July 19) ......................................................................16

*Texas v. DHS,*
    2023 WL 2842760 (S.D. Tex. Apr. 7) ........................................................................16

*Texas v. NRC,*
    78 F.4th 827 (5th Cir. 2023) ...........................................................................2, 8, 11, 12

*Texas v. United States,*
    40 F.4th 205 (5th Cir. 2022) (per curiam) ...................................................................3

*Texas v. United States,*
    50 F.4th 498 (5th Cir. 2022) ......................................................................................3

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ............................................................................... 10, 11

*United States v. Texas,*
    599 U.S. 670 (2023) ..................................................................................................13

*United Steel v. Mine Safety & Health Admin,*
    925 F.3d 1279 (D.C. Cir. 2019) ...............................................................................22

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ...............................................................................................2

**Statutes**

42 U.S.C. §1395w-4 ...........................................................................................2, 17, 18, 20

42 U.S.C. §18116 ...........................................................................................................13

Ky. Rev. Stat. Ann. §344.140 ...........................................................................................7

La. Stat. Ann. §51:2232 ...................................................................................................7

**Other Authorities**

Curtin et al., U.S. Dep't of Health & Hum. Servs., CDC, *Suicide Rates for the Three Leading Methods by Race and Ethnicity: United States, 2000-2020*, at 1 (Nov. 2022), perma.cc/4QM7-R73L ............ 4, 6, 20

*Prioritize*, New Oxford American Dictionary (3d ed. 2010) ..........................................................6

## INTRODUCTION & SUMMARY OF THE ARGUMENT

The Department of Health and Human Services—an agency of our federal government—instructed doctors to prioritize patients based on race. Defendants try hard to downplay this reality, both by claiming that there's nothing to see in the Department's Disparities Impact Statement *and* by pointing to a new sanitized document, published years after the States filed this lawsuit. But no matter how hard Defendants try to downplay the facts or moot the case, the only Disparities Impact Statement that the Rule incorporates is the one in the administrative record. That statement says, unequivocally, that clinicians can satisfy the Rule by prioritizing "health equity *for racial and ethnic minorities*" rather than health equity for all, regardless of race. AR2247 (emphasis added). Discovery proved that Defendants repeatedly told clinicians to use that race-based statement "to improve the care [they're] delivering to a particular group of patients." Ex. 8 at 210-11, 240-41; MSJ.Br.7. Even now, it is undisputed that clinicians can still satisfy the Rule by focusing on "a particular race or ethnicity," Ex. 7 at 3, when setting "target goals and milestones," Ex. 3 at 7; Ex. 8 at 137. That clinicians might use some *other* tool doesn't mean that they won't or can't use the one the Rule incorporates by reference (or ones like it).

The Rule thus allows and encourages providers to focus on race rather than "physiology." Race-based government action is immoral, *see SFFA v. Harvard*, 600 U.S. 181 (2023), and forbidden by state anti-discrimination laws, MSJ-Br.10-11. That conflict between the Rule and the States' sovereign interest in enforcing their laws is ongoing.

The States have always had standing to vindicate that sovereign interest. "States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). As this Court held before, the States "are 'entitled to special solicitude in [the] standing analysis.'" *Colville v. Becerra*, 2023 WL 2668513, at *14 (S.D. Miss. Mar. 28) (quoting *Massachusetts*, 549 U.S. at 518-20). The Rule injures the States' sovereign interests in three ways. Encouraging the prioritization

of patients based on race intrudes upon public health, an area the States have traditionally regulated. MSJ.Br.12-13. Permitting race-prioritization plans conflicts with state laws that prohibit them. MSJ.Br.13-14. And the Rule interferes with the States' enforcement of those laws. MSJ.Br.14-15. Those injuries are concrete. *See Kentucky v. Biden*, 23 F.4th 585, 598-99 (6th Cir. 2022); *Harrison v. Jefferson Parish Sch. Bd.*, 78 F.4th 765, 769 (5th Cir. 2023); *Texas v. NRC*, 78 F.4th 827, 835-36 (5th Cir. 2023). And they're traceable to the Rule and redressable by vacatur. *Colville*, 2023 WL 2668513, at *17-18. So the States have standing.

On the legality of the Rule, there's no genuine dispute that Defendants exceeded their authority. Defendants concede, for purposes of these motions, that the Court can review the Rule's legality. Defendants claim that, when Congress enacted a statute promoting clinical practice and care delivery for patients, 42 U.S.C. §1395w-4(q)(2)(C)(v)(III), it gave them the extraordinary—and constitutionally suspect—power to instruct doctors to consider and, indeed, prioritize race. Just last week the en banc Fifth Circuit explained that diversity-and-inclusion rules that "came in response to 'the social justice movement'" are "politically divisive" and of "staggering" "political significance." *Alliance for Fair Board Recruitment v. SEC (AFBR)*, 2024 WL 5078034, at *16 (5th Cir. Dec. 11, 2024) (en banc). But "Congress does not 'hide elephants in mouseholes.'" *Biden v. Nebraska*, 143 S.Ct. 2355, 2382 (2023) (Barrett, J., concurring). And agencies cannot pretend to find them there. *See West Virginia v. EPA*, 597 U.S. 697, 744-47 (2022) (Gorsuch, J., concurring). This Court should hold that Defendants' racial-prioritization plans are not clinical practice improvement activities under the statute.

## ARGUMENT

I. **The States had standing to challenge the Anti-Racism Rule when they filed their complaint.**

The States have proven that the Rule inflicts a sovereign injury that this Court can redress. Standing is assessed when the States filed the complaint back in 2022, *see Pool v. City of Houston*, 978 F.3d 307, 313 (5th Cir. 2020), as Defendants concede, Def.-Br.17. So the fact that Defendants took

down the Disparities Impact Statement in 2024 is irrelevant to standing. If it's relevant at all, it goes to mootness. *Infra* II. So for purposes of standing, this Court should look only at the Disparities Impact Statement that's in the administrative record. AR2247-2253. That document proves the States had standing in 2022 and the Rule permits race-prioritization plans that cause a sovereign injury this Court can redress through vacatur.

### A.    The States get special solicitude.

The States enjoy special solicitude on standing. Defendants don't dispute that the States have satisfied the "two requirements" that trigger special solicitude: a "procedural right to challenge" the Rule and an effect on "one of the State's quasi-sovereign interests." *Texas v. United States*, 50 F.4th 498, 514 (5th Cir. 2022). Nor could they, since the States have "assert[ed] a procedural right under the APA" and "see[k] to defend [their] quasi-sovereign 'interest in the enforcement of [their] law[s].'" *Texas v. United States*, 40 F.4th 205, 216 n.4 (5th Cir. 2022) (per curiam). Accordingly, if the States *do* establish a sovereign injury, then they *are* entitled to special solicitude in the rest of the analysis. Defendants haven't given any reason to upset the Court's conclusion that the States have met the requirements for special solicitude. *Colville*, 2023 WL 2668513, at *15-16. Though "special solicitude does not relieve states of their obligation to establish a cognizable injury in fact," Def.-Br.14, it does make it "easier to establish" the "imminence" part of the injury analysis—another point Defendants don't dispute, *Texas*, 40 F.4th at 216; MSJ.Br.9; Def.-Br.14.

### B.    The Anti-Racism Rule encourages clinicians to prioritize patients based on race in violation of the States' laws.

The Rule's race prioritization conflicts with the States' laws. To benefit "people of color," the Rule incorporates a document that tells clinicians to prioritize patients to improve outcomes for "racial and ethnic minorities." AR6, 2247-2253. Despite that undisputed evidence, Defendants insist that "nothing" in the Rule "authorizes … prioritizing patients based on race." Def.-Br.8. Defendants do *not* ask this Court for deference on that reading of the Rule, so they've "forfeited … deference under

*Auer v. Robbins*." *Texas v. Biden*, 20 F.4th 928, 961 (5th Cir. 2021), *rev'd on other grounds* 597 U.S. 785 (2022).[2]

No deference would be due anyway. The Rule isn't "genuinely ambiguous" about whether it permits race prioritization. *See Kisor v. Wilkie*, 588 U.S. 558, 574-75 (2019). Defendants nowhere deny that the Rule incorporates by reference the Disparities Impact Statement in the "Activity Description": "Create and implement an anti-racism plan using the CMS Disparities Impact Statement" to "addres[s] historic health inequities experienced by *people of color*." AR5-6 (emphasis added). That document, in turn, affirms what is already evident from the face of the rule: "This tool can be used by all health care stakeholders to achieve health equity *for racial and ethnic minorities*." AR2247 (emphasis added). The document goes on: Clinicians should "identify and prioritize which population(s)" they "want to address," and should stratify "health outcomes by race and ethnicity." AR2248.

Some amici suggest that "priority populations" isn't problematic language. NAACP-Br.24. But even that group admits that "[a] 'priority population' may identify a racial or ethnic group" even if, in theory, "it could also identify groups not defined along lines of race*." Id.* That point is solely theoretical, for the Anti-*Racism* Rule tells providers to create anti-*racism* plans to help *racial* minorities. Defendants tell clinicians to pick priority populations within specified categories, including "racial and ethnic minorities." AR2247-48. And picking patient populations based on race is the problem. There are health problems that disproportionately affect white people, like suicide. *See, e.g.*, Curtin et al., U.S. Dep't of Health & Hum. Servs., CDC, *Suicide Rates for the Three Leading Methods by Race and Ethnicity: United States, 2000-2020*, at 1 (Nov. 2022), perma.cc/4QM7-R73L ("Curtin"). But if a provider created

---

[2] Those parts of *Texas v. Biden* not decided by the Supreme Court "remain[n] binding." *Data Mktg. P'ship v. DOL*, 45 F.4th 846, 856 n.2 (5th Cir. 2022).

a suicide-prevention plan to prioritize "white patients," it would rightfully be liable for racial discrimination. Substitute "white" for "[patients] of color" and the Anti-Racism Rule encourages anti-racism plans that do exactly that. AR6, 2247-2253.

If the plain text of the Rule and the documents it expressly incorporates left any doubt that it instructs racial prioritization, Defendants' behind-the-scenes conduct would remove it. The States discovered that Defendants repeatedly "encourage[d]" clinicians "to review and complete the CMS Disparities Impact Statement … to improve the care [they're] delivering to a *particular group of patients*." Ex. 8 at 210-11, 240-41 (emphasis added). Defendants also repeatedly offered to help clinicians "find … an intervention for a particular population" for completing the "CMS Disparities Impact Statement." Ex. 8 at 217-18, 253, 262, 287, 298, 301, 313-14, 318, 327-28, 332, 345, 373; MSJ.Br.6-7. And Defendants were forced to "[a]dmit that a valid anti-racism plan" could focus on "individuals of a particular race or ethnicity." Ex. 7 at 3; *see also* Ex. 3 at 7 (anti-racism plans "should also consider … addressing historic health inequities experienced by people of color"); Ex. 8 at 137 (same). Defendants don't address any of this evidence. There is therefore no *genuine* dispute that the Rule encourages clinicians to focus on racial and ethnic minorities even though there are health disparities that affect people who aren't in Defendants' favored groups.

Nor can Defendants credibly assert that clinicians don't use the Disparities Impact Statement or other similarly problematic tools to satisfy the Rule. The States identified two concrete examples. MSJ.Br.7; Exs.11-12. In the first, clinicians, prompted by the Rule, picked their focus based on "race /ethnicity" and "mental health, & race." Ex. 11 at 2-3; Def.-Br.9.  A race-neutral rule might've allowed clinicians to focus on or consider mental health without respect to race, but the Disparities Impact Statement didn't give clinicians an option to consider patients outside the populations it identified. Though Defendants say the clinicians ultimately picked means that would otherwise have been permissible, Def.-Br.9, that fact doesn't refute that the Rule provoked, at the outset, a race-based *intent*.

Defendants' response to the other example of a problematic anti-racism plan fares no better. In that example, clinicians ratified a plan that reflects Defendants' anti-racism ideology.[3] Ex. 12 at 71; MSJ.Br.7. Defendants don't deny that the plan says clinicians "must prioritize and integrate the voices and ideas of … people of color." Ex. 12 at 5. Instead, Defendants assert that race-based prioritization doesn't mean "a call for racial discrimination." Def.-Br.9. But it's what "prioritize" means: "designat[ing] or treat[ing] [races or ethnicities] as more important than other[s]" and "determin[ing] the order for dealing with [them] according to their relative importance." *See Prioritize*, New Oxford American Dictionary (3d ed. 2010). The plan rejects "equality" in favor of affirmative action because "Black people" and "Brown people," but not "white families," have "historic[ally]" been oppressed. Ex. 12 at 11-12. Nor can Defendants meaningfully dispute that the plan maligns "white," "male," and "Christian" persons as advantaged "at the expense of" Defendants' favored groups. Ex. 12 at 11. Defendants simply dismiss these groups as ones "that have not experienced health disparities," Def.-Br.10, even though Defendants themselves recognize that some do, Curtin at 1. Nor does federal law allow racial classifications to remedy the effects of past societal discrimination, *Harvard*, 600 U.S. at 226-27, as Defendants (now) seem to admit, Def.-Br.25 n.9.

Racial prioritization, like all racial classifications, also violates the States' laws. Defendants concede that this Court owes deference to "'the States' respective construction of their own laws,'" and Defendants "do not dispute that at least some state laws prohibit racial discrimination." Def.-Br.11 n.2; *see Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989). Those concessions are important, since the States attest that their laws and regulations do not permit their clinicians "to prioritize patient populations based on race" or to "conside[r] [race] in medical practice except when

---

[3] One group of amici suggests this isn't an anti-racism plan because it was created by the AMA. NAACP-Br.11. They miss that the clinicians ratified the document as their *own* anti-racism plan to satisfy the Rule. Ex. 12 at 71. Defendants apparently agree, since they don't make the same mistake as the amici. *See* Def.-Br.9-10.

physiologically relevant."[4] Defendants' sole response is that the Rule doesn't permit prioritizing patients based on race. Def.-Br.10-11. That response is wrong for reasons already given, and not least because the Rule expressly tells clinicians to prioritize racial and ethnic populations. AR2247-48. By failing to interact with any of the States' laws, Defendants have failed to explain how using a tool that tells clinicians to use race is not, for example, an "act or practice" of "distinction" or "differentiation or preference in the treatment of a person or persons because of race." La. Stat. Ann. §51:2232(5). Nor have Defendants explained how using their race-based tool is consistent with laws that forbid using race-based documents that "indicat[e]" that care might be "withheld" or that an individual—for example, a white Christian—"is objectionable" or "undesirable." *See* Ky. Rev. Stat. Ann. §344.140. These are just some examples that the States highlighted. *See* MSJ-Br.10-11. Defendants fail to interact with them. Def.-Br.10-11. So there's no *genuine* dispute that the Rule permits what the States say their laws prohibit.

Unable to plausibly deny a conflict, Defendants suggest that the States aren't *really* interested in enforcing their laws governing healthcare. Def.-Br.11. That assertion flies in the face of the States' attestations to the contrary. Exs. 14-19. The only support Defendants point to is that some (but not all) of the States haven't yet "taken any enforcement action" against a healthcare provider in the last few years. Def.-Br.11. That assertion is misleading. As the States attested, the "absence of an enforcement action does not mean that the States do not prohibit racial discrimination by healthcare providers, or that they do not wish to enforce their anti-discrimination laws." Doc. 169-6 at 14. Some States didn't receive complaints against healthcare providers within the discovery period. Doc. 169-6 at 12-13. Others did and investigated those complaints, including cases that are "ongoing and active." *Id.* To the extent the States have not brought enforcement actions, the reason is *not* that they don't wish to enforce their laws; it's that they *do* enforce their laws and have determined that the complaints

---

[4] Ex. 14 ¶11; Ex. 15 ¶10; Ex. 16 ¶11; Ex. 17 ¶10; Ex. 18 ¶10, Ex.19 ¶9.

lacked merit after "activ[e] investigat[ion]." *Id.* Federal laws also ban racial discrimination by healthcare providers, "and the States rely in part on those laws to police discrimination." *Id.* at 14. But those laws can't be used "here because the Anti-Racism Rule—a federal regulation—encourages the kind of discrimination at issue." *Id.* at 14-15. So it simply isn't true that "the States fail to submit any evidence to indicate or explain how they enforce, or have enforced, their laws in the context of the healthcare industry." Def.-Br.11 (cleaned up). And it isn't true that any State needed to bring an enforcement action in the last few years to have standing to challenge the Rule. *Infra* I.C.

### C.    Federal permission to prioritize patients based on race in violation of the States' laws injures the States' sovereign interests.

The conflict between the Rule and the States' sovereign interests in the enforceability of their anti-discrimination laws is a concrete injury. Defendants don't deny that, to prevail, the States need only show that their laws "plausibl[y]" or "at least arguably conflict" with the Rule. *See Tennessee v. DOE*, 104 F.4th 577, 594-95 (6th Cir. 2024); MSJ.Br.13. Nor do they deny that, under Fifth Circuit precedent, there would be a conflict if the States' laws and regulations seek to "discourage conduct that federal [regulation] specifically seeks to encourage." *City of Morgan v. S. La. Elec. Co-op. Ass'n*, 31 F.3d 319, 322 (5th Cir. 1994). Both are true here and supported by the States' evidence and the administrative record, for the reasons given above. The States seek to discourage the use of race in medicine, which is "a traditional sovereign prerogative." *Tennessee*, 104 F.4th at 594-95; Ex. 14, Ex. 15; Ex. 16; Ex. 17; Ex. 18, Ex. 19. And Defendants "encourage [clinicians] to review and complete the CMS Disparities Impact Statement … to improve the care [they're] delivering to a particular group of patients" based on race. Ex. 8 at 210-11, 240-41; MSJ-Br.6-7. So the Rule conflicts with the States' laws by "authoriz[ing]" what the States prohibit, *see NRC*, 78 F.4th at 836, especially given that special solicitude "alleviate[s]" any "immediacy" concerns, MSJ.Br.16 (quoting *Colville*, 2023 WL 2668513, at *16).

With the facts not in genuine dispute, Defendants try to minimize their legal implications. Def.-Br.11-14. Their lead case against the above reasoning is *Harrison v. Jefferson Parish School Board*, which Defendants take to require the States to prove a "conflict in the form of an enforcement action," Def.-Br.11. But, as Defendants concede (at 11-12), *Harrison* involved a State asserting "that it ha[d] a sovereign interest in its *subordinates* obeying state … law" (there, a school board). 78 F.4th at 769 (emphasis added). Defendants can't say that the States here are asserting that interest. Def.-Br.11-12. Instead, Defendants say there's no "principled reason" why the interest the States assert here is any different from the one asserted in *Harrison*. *Id.* But *Harrison* itself says otherwise: "'[F]ederal courts do not sit to resolve intramural disputes among state officials over the bounds of their authority under state law,'" 78 F.4th at 775, not least because a "state may use its full arsenal of enforcement mechanisms to force [a subordinate] to comply with state law," *id.* at 770. Yet that dynamic doesn't exist when "the federal government's actions infring[e] on [a state's] ability to regulate intrastate" conduct. *Id.* at 771-72. Defendants don't address that key distinction, even though the States highlighted it from *Harrison* itself. MSJ.Br.15-16.

Defendants next rely on *Haaland v. Brackeen*, 599 U.S. 255 (2023), but that decision has nothing to do with these cross-motions. *Contra* Def.-Br.12. In that case, Texas brought "an *equal protection* challenge to" a federal statute. 599 U.S. at 291 (emphasis added). Because Texas "has no equal protection rights of its own," it attempted to "assert equal protection claims on behalf of its citizens," a claim that fits within the third-party *parens patriae* standing bar for suits against the federal government.[5] *Id.* at 294-95. The argument that Texas advanced and that the Supreme Court rejected was "an 'unclean hands' injury," one that stemmed from Texas's alleged "complicit[y] in enforcing federal law." *Id.* at 295. Had the Court not rejected that theory, it worried that "a State would always have standing to

---

[5] Indeed, the Court rejected Texas's explicit assertion of "third-party standing" as "a thinly veiled attempt to circumvent the limits on *parens patriae* standing." *Brackeen*, 599 U.S. at 295 n.11.

bring *constitutional challenges* when it is complicit in enforcing federal law." *Id.* at 295 (emphasis added).

Here, the States don't assert standing based on the constitutional rights of their residents or based on

their complicity in enforcing federal law. On the contrary, the States have standing to assert injuries

to their *own* sovereign and quasi-sovereign interests, including their interests in exercising "'sovereign

power'" *against* "'individuals and entities within'" the States. *Harrison*, 78 F.4th at 770. An injury to that

sovereign interest "satisf[ies] standing's first requirement." *Id.* at 769. "[N]one of th[e] sovereign-and-

quasi-sovereign-interest theories" the States advance "relies on impermissible notions of third-party

standing in which a state asserts in a purely vicarious manner the interests of its citizens" against the

federal government. *Kentucky*, 23 F.4th at 596-99.

    Other Supreme Court decisions reject Defendants' attempt to conflate this theory of standing

with the bar on third-party *parens patriae* standing. That bar, the Supreme Court made clear in *Massa-

chusetts v. EPA*, does not apply with respect to "'*quasi-sovereign rights actually invaded or threatened*.'" 549

U.S. at 520 n.17. In *Nebraska v. Wyoming*, the Supreme Court "h[eld] that Wyoming had standing to

bring a cross-claim against the United States to vindicate its 'quasi-sovereign interests which are inde-

pendent of and behind the titles of its citizens, in all the earth and air within its domain.'" *Id.* (cleaned

up) (quoting *Nebraska*, 515 U.S. 1, 20 (1995)). This Court would "clearly er[r]" if it were to say that

*Brackeen* "had 'implicitly overruled'" those other decisions. *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122,

136 (2023).

    After Defendants' erroneous interpretations of *Harrison* and *Brackeen* are rejected, the States

have established multiple sovereign injuries. MSJ-Br.11-17. Defendants don't deny that the Fifth Cir-

cuit has given three "examples" of injuries to sovereign interests that States can suffer: "'federal asser-

tions of authority to regulate matters'" traditionally left to the States, "'federal preemption,'" and "'fed-

eral interference with the enforcement of state law.'" *Harrison*, 78 F.4th at 770 & n.18 (quoting *Texas

v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) (cleaned up)); MSJ-Br.11-17. Defendants also don't

deny that the regulation of health care "is traditionally an area of local concern," MSJ-Br.12, or that "'preemption of a state law'" by regulation "'is an injury that gives rise to Article III standing,'" *id.* at 13 (quoting *Tennessee*, 104 F.4th at 593). Nor do they dispute that the States establish a sovereign injury if "there's an enforceability conflict between the [Anti-Racism Rule], which authorizes [anti-racism plans], and [the States' laws], which proscrib[e]" them. *NRC*, 78 F.4th at 836; MSJ-Br.16. Their only response is that there's no "cognizable injury" because there's no conflict between the States' laws and the Rule. Def.-Br.12-14. But that assertion is wrong for all the reasons given above: the Rule permits what the States' laws forbid.

### D. The States' sovereign injuries are traceable to the Anti-Racism Rule and redressable by vacatur.

Traceability and redressability follow from the States' sovereign injuries. The States proved that federal law permits what the States prohibit, interfering with their "ability to enforce" laws that regulate "a traditional sovereign prerogative like" the public health. *See Tennessee*, 104 F.4th at 595; *Harrison*, 78 F.4th at 771-72; *Kentucky*, 23 F.4th at 598 (citing *Texas*, 809 F.3d at 153). That sovereign injury is "directly" traceable to the Rule, the source of the federal-state conflict: No Rule, no conflict. *See NRC*, 78 F.4th at 835. And "an order from this court could vacate" the Rule. *Id.* at 835. That vacatur would end the federal "intru[sion] upon areas traditionally within the states' control" and remove the incentive that clinicians have to violate the States' laws. *Kentucky*, 23 F.4th at 598; MSJ-Br.18-19.

Defendants distort the States' injury. The "asserted injury" is not merely "clinicians engaging in racial discrimination in violation of state law." *Contra* Def.-Br.15. Instead, the States assert injury to their sovereign interests in the *enforceability* of laws that regulate an area traditionally within their control. Because that interest is a cognizable one that the Rule injures, the Rule causes injury even if no "clinician created a discriminatory anti-racism plan in violation of state law." *Contra* Def.-Br.15. "'A state has standing based on a conflict between federal and state law if the state statute at issue regulates

behavior.'" *NRC*, 78 F.4th at 836. The States' laws satisfy that condition by banning race-based deci-

sions in medicine. Defendants haven't denied that, under Fifth Circuit precedent, traceability follows

if "there's an enforceability conflict." *Id.* Their only response is that the Rule "is not a license for

clinicians to" break the States' laws, a concession that the issue of standing boils down to whether

there's a conflict. Def.-Br.16.

   Even if actual violations were relevant, the States would still prevail. Defendants argue that

illegal anti-racism plans "would be traceable to the unlawful conduct of [the] clinician, not the exercise

of the challenged improvement activity." Def.-Br.15. On redressability, they make an argument that

rests on the same flawed premise that the States' "'injury … results from the independent action of

some third party.'" Def.-Br.15. But as this Court has already explained, the States' theory of standing

"'does not rest on mere speculation about the decisions of third parties' but 'instead on the predictable

effect of Government action on the decisions of third parties.'" *Colville*, 2023 WL 2668513, at *17

(quoting *Dep't of Com. v. New York*, 588 U.S. 752, 769 (2019)). This Court rightly held that "[t]he pre-

dictable effect of Defendants incentivizing professionals to create anti-racism plans by awarding them

half of their necessary points for the improvement activities category if they do so is that the profes-

sionals will select the activity." *Id.* What the States alleged then is proven now. Discovery proved that

tens of thousands of clinicians receive credit for creating and implementing anti-racism plans and that

Defendants consistently encouraged them to use the Disparities Impact Statement to do so. MSJ-Br.6-

7. The Rule's predictable effect is that clinicians will continue to create and implement anti-racism

plans of the kind the Rule itself identifies.

   Finally, special solicitude should resolve any doubts about traceability and redressability. MSJ-

Br.8-9, 18-19. To say otherwise, Defendants invent a "heightened showing" that the States must sup-

posedly make here, Def.-Br.16, based on a case where other States "want[ed] the Federal Judiciary to

order the Executive Branch to alter its arrest policy so as to make more arrests," *United States v. Texas*,

599 U.S. 670, 674 (2023). There, the States complained that the federal government's failure to make more arrests "impose[d] costs on the States." *Id.* The Court explained that, when that "kind" of injury is asserted and a plaintiff's "'injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed' to establish standing." *Id.* at 678. The States here aren't asserting an injury in the form of costs from the federal government's failure to enforce the law. So Defendants' sole authority is not on point.

By contrast, binding Supreme Court precedent says that the States get special solicitude when they establish a sovereign injury. MSJ-Br.8-9, 16-18; *Massachusetts*, 549 U.S. at 520-21. Just this year the Supreme Court reminded everyone that, "[i]n [*Massachusetts*], we explained that *state* plaintiffs are 'entitled to special solicitude' when it comes to standing, and we conducted our analysis accordingly." *Murthy v. Missouri*, 603 U.S. 43, 74 n.11 (2024). This Court must do likewise, or else it would "clearly er[r]" if it were to say, as Defendants suggest again (at 16 n.4), that a stray line in an earlier decision far afield from this one "'implicitly overruled'" special solicitude. *Mallory*, 600 U.S. at 136.

## II.    Defendants tried and failed to moot the case after the States filed their complaint.

After two years, the motion-to-dismiss phase, and a round of summary-judgment briefing, Defendants have now tried to moot the case. Def.-Br.17-19. They did so "[o]n August 20, 2024," by taking down the Disparities Impact Statement to which the Rule refers, removing the racial language, adding an anti-discrimination disclaimer for the first time, and (only now) giving assurances that federal law prohibits the race preferences at issue all along. Def.-Br.5, 18; *see* Hill Decl. Doc. 169-1 ¶9 ("discrimination would be prohibited by 42 U.S.C. §18116(a)").

Defendants' gambit does not work. They misleadingly assert that the "improvement activity itself" doesn't encourage "racial prioritization" and that the Disparities Impact Statement is "outdated." Def.-Br.17. The Rule expressly tells clinicians to "[c]reate and implement an anti-racism plan using the CMS Disparities Impact Statement" or other anti-racism tools. AR5-6. It is undisputed that

the Rule still refers to the Disparities Impact Statement (*i.e.*, the one in the administrative record) and that the 2024 document is not "the Disparities Impact Statement." *Id.* The Disparities Impact Statement, which the Rule incorporates by reference, *does* tell clinicians to "identify and prioritize" populations "to achieve health equity for racial and ethnic minorities." AR2247-48; *contrast with* Doc. 169-2 at 2 ("eliminate health disparities while improving the health of people from all populations, *including* people from racial and ethnic minorities" (emphasis added)); Doc. 169-3 at 2 (similar). The Rule *still* refers to that document, and that document (or ones like it) can therefore *still* be used to satisfy the Rule. *See* Doc. 167-3 at 7 (admitting that the "Disparities Impact Statement" can be used as "'Validation Documentation'"). Defendants nowhere say otherwise, and they certainly don't explain how any statement to that effect now would be "legally effective" without a "formal policy change," like "'repea[l]'" or "retraction" of a Rule that expressly permits use of anti-racism plans like the Disparities Impact Statement. *See Pool*, 978 F.3d at 314. Nor could they credibly do so after spending years telling inquiring clinicians that they could create anti-racism plans by using the Disparities Impact Statement to satisfy the Rule. MSJ-Br.6-7. At best, Defendants' "suspicio[us]" attempt to moot the case while it "continues to defend" the Disparities Impact Statement is no more than an "ad hoc regulatory action." *See Speech First, Inc. v. Schlissel*, 939 F.3d 756, 769-70 (6th Cir. 2019).

So the States' claim remains live. The Rule still permits the kinds of race-prioritization plans that the States say violate their laws and that are not clinical practice improvement activities under the statute. Defendants may disagree with that characterization of the Rule, but this "court must not confuse mootness with the merits." *Dierlam v. Trump*, 977 F.3d 471, 477 (5th Cir. 2020) (cleaned up). It follows that it is "[p]ossible for the court to 'grant … effectual relief'"—race-prioritization plans can't be used to satisfy the Rule once it's vacated. *See Pool*, 978 F.3d at 313-14 (holding that case was not mooted by post-litigation government conduct because "it [was] not clear the [government] made a formal policy change").

III.    **The Anti-Racism Rule is unlawful.**

A.    **The judicial-review bar does not stop this Court from reaching the merits.**

This Court should reiterate that the statute does not bar judicial review of the States' APA claim. MSJ.Br.19-25. In response, Defendants wrongly assert that the States have a "heavy burden" on their ultra vires claim. Def.-Br.20. The only "'heavy burden'" to speak of is that of "the government" when it argues "that Congress meant to prohibit all judicial review." *Kirby Corp. v. Pena*, 109 F.3d 258, 261 (5th Cir. 1997). Though the ultra-vires "exception" to judicial-review bars is "narrow," *id.* at 268-69, Defendants have waived, "for the purposes of this motion," their argument that the judicial-review bar applies, Def.-Br.19. With good reason: the bar applies only if anti-racism plans are within the statutory definition of "clinical practice improvement activities," *Colville*, 2023 WL 2668513, at *19-20, which also happens to be the merits question that Defendants think is unreviewable. So the narrow, ultra-vires exception to judicial-review bars needn't be implicated to reach the merits.

B.    **Judicial review of the merits is limited to the administrative record.**

A telling indication that the administrative record isn't sufficient, Defendants try to use "evidence outside the record" to "provid[e] additional support." Def.-Br.22. It is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). This rule applies "to review for compliance with statutes." *Texas*, 20 F.4th at 965 (citing 5 U.S.C. §706(2)(C)). Considering extra-record evidence flouts that foundational principle.

Defendants' attempt to get around this rule doesn't work. They assert that the extra-record "evidence is properly before the Court" because the States' claim doesn't "arise under the APA." Def.-Br.23. But the States' claim expressly arises under the APA. Am. Compl. ¶58 (quoting 5 U.S.C. §706(2)(A), (C)); *id.* ¶20 ("Defendants' final rule constitutes a final agency action that is judicially reviewable under the APA." (citing §§704, 706)). And the States seek a declaration "that the Anti-Racism

Rule violates the Medicare Access Act," *id.* at 18, because it is "'not in accordance with law' or 'in excess of statutory jurisdiction, authority, or limitations'" under the APA, *id.* ¶58; *see also Colville*, 2023 WL 2668513, at *7 (Plaintiffs' "Complaint" challenges "the Anti-Racism Rule under the Administrative Procedure Act").

The decisions that Defendants cite aren't to the contrary. Def.-Br.23. At most, they say extra-record evidence can sometimes be considered for claims that involve a "stand-alone" "*ultra vires* claim." *Texas v. DHS*, 2023 WL 2842760, at *3 (S.D. Tex. Apr. 7); *see also Texas v. Biden*, 2021 WL 4552547, at *5-6 (N.D. Tex. July 19). By contrast, the States argue both that anti-racism plans are not clinical performance improvement activities under the statute, Am. Compl. ¶¶61-63, and, "[i]ndependent[ly]," that the judicial review bar doesn't apply because the "agency action … exceed[ed] the agency's authority," *id.* ¶¶59-60. Only if this Court had found that the judicial review bar otherwise precludes it from reviewing whether anti-racism plans are "clinical practice improvement activities" would the *ultra vires* exception to review preclusion have been relevant. If anti-racism plans aren't clinical practice improvement activities at all, then the judicial review bar doesn't apply and, for the same reason, the Rule is reviewable as "not in accordance with the law" under the APA. 5 U.S.C. §706. Because this Court held that it "has jurisdiction to review whether the Anti-Racism Rule satisfies the definition of a 'clinical practice improvement activity,'" the States needn't rely on the *ultra vires* exception to review preclusion. *Colville*, 2023 WL 2668513, at *20. Their claim is an APA claim. *See id.* at *7, *14. Accordingly, review of whether anti-racism plans are within the statutory definition is limited to the "agency record." *Baker v. Bell*, 630 F.2d 1046, 1051 (5th Cir. 1980).

## C.    Anti-Racism plans are not one of the clinical practice improvement activities specified in the statute.

The States gave four reasons why race-prioritization plans aren't clinical practice improvement activities: they don't reasonably relate to the statute's own examples, relevant organizations didn't identify them as improving clinical practice or care delivery, they raise constitutional concerns, and

they aren't clearly authorized by the statute under the major-questions doctrine. MSJ.Br.21-25. Defendants refute none of the four reasons.

*First*, Defendants' race-prioritization plans look nothing like the examples of clinical practice improvement activities in the statute. *See* 42 U.S.C. §1395w-4(q)(2)(B)(iii). Defendants argue that the "examples are meant to be non-exhaustive." Def.-Br.21. That response misses the point, which is that none of the statute's examples even slightly resembles activities that are expressly race-based and "divorced from 'physiology.'" MSJ-Br.21. The complete lack of resemblance is evidence that such activities categorically lack the "common attribute" that Defendants admit activities must have: improving "clinical practice or care delivery." Def.-Br.21. Defendants say they innocently aimed to improve care for "patients experiencing health disparities." *Id.* But the "patients" in question are "racial and ethnic minorities" or "people or color," AR5; AR2247, and prioritizing patients based on skin color is nothing like targeting "'individuals with complex care needs,'" Def.-Br.21. None of the sources Defendants cite—both in and outside the administrative record—say that a *racial* classification is necessary to "improve health outcomes" for people experiencing disparities. Def.-Br.22-23.

A recent Fifth Circuit decision supports the States' point. *See AFBR*, 2024 WL 5078034. There, the en banc Court confronted a challenge to the SEC's approval of a package of Nasdaq rules related to "the racial, gender, and sexual characteristics of [firms'] directors." *Id.* at *1. The statute at issue required the SEC to "determin[e]" that the proposed rules be "related to the purposes of the" governing statute or in the "public interest." *Id.* at *1-2, *13. Though the SEC made those determinations, the Court disagreed that it could, explaining that "the question is whether [the proposed rule] protects investors or the public from the kinds of harms that the Exchange Act explicitly lists as its targets." *Id.* at *10. *Id.* at *3-*5, *10, *13-15. The Court also held that a proposed rule requiring disclosure of information "about the racial, gender, and LGBTQ+ characteristics of its directors" was unrelated to a statutory provision authorizing rules that "'promote just and equitable principles of trade.'" *Id.* at

*11-12. Similarly, the Anti-Racism Rule is unrelated to what is common throughout the statute's examples of clinical practice improvement activities. *See* 42 U.S.C. §1395w-4(q)(2)(B)(iii). Defendants' only attempt to identify a link between the race-based plans and the statute's listed activities relies on the idea "that improvement activities [can] be targeted at specific categories of patients." Def.-Br.21 (citing §1395w-4(q)(2)(B)(iii)(IV) ("the establishment of care plans for individuals with complex care needs")). But Defendants do not  show that providing individualized care based on physiology is reasonably related to promoting racial stratification in healthcare. In short, race-based targets are too far removed from things like the "timely communication of test results" to count as clinical practice improvement activities. *See* MSJ.Br.21.

**Second**, Defendants did not identify any relevant stakeholders that identified race-prioritization plans as improving clinical practice or care delivery. Defendants concede that this Court has already found an "absence of organizational support for the challenged rule" while considering "incorporated materials" that the Rule cited. Def.-Br.24. The States again highlighted the "authorities the Secretary relied on" and the ones this Court already considered and found wanting. MSJ.Br.22-23; AR2275, 2282, 2286, 2295. Those sources "described 'anti-racism approaches,'" but they didn't identify the Rule's approach, plans that prioritize patients based on race or ethnicity, as improving practice or care. MSJ.Br.22. After being given another opportunity to allay this Court's concerns, Defendants still haven't "explained how" the sources that the Secretary relied on or the ones this Court already considered "identified that … 'a commitment to anti-racism and an understanding of race as a political and social construct, not a physiological one' will improve clinical practice or care delivery.'" *Colville*, 2023 WL 2668513, at *20; MSJ-Br.22-23 & n.7.

Unable to disprove this Court's prior rejection of the sources in the Rule, Defendants implausibly rely on *other* sources. Def.-Br.24. But Defendants nowhere try to distinguish those sources from the ones this Court has already found wanting. *Id.* at 23-24. Not surprising, since each source expresses

similar boilerplate support for anti-racism. *Id.* The States already addressed each commenter that Defendants now rely on and explained that none "said that prioritizing patients based on race, not physiology," improves clinical practice or care delivery as exemplified by the "subcategories in the statute (or ones like them)." *Compare* MSJ.Br.23-24 & n.8, *with* Def.-Br.23-24 & n.7. Defendants don't even try to suggest otherwise. Def.-Br.23-24. The one commenter they highlight illustrates the point. Def.-Br.23. That commenter said Defendants' proposal "ha[d] important *objectives* grounded in better meeting the diverse needs of patients and clinicians and [that were] commendable." AR210 (emphasis added). That's it. Commending objectives without concluding that the *means* expressly incorporated into the Rule—race-prioritization plans—would improve clinical practice or care delivery won't cut it. That no commenter could bring itself to say so is damning.

**Third**, constitutional avoidance counsels against Defendants' interpretation of the governing statute. Defendants don't deny that this Court should avoid a construction that "would raise grave constitutional concerns." *See Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 966-67 (5th Cir. 2023); MSJ-Br.24; Def.-Br.25. Nor do they deny that race preferences are unconstitutional, even if the goal is to reduce disparities. *See Harvard*, 600 U.S. at 205-08, 223-25. And Defendants don't deny that their construction of the statute "could" permit race preferences in medicine if stakeholders and Defendants say they're a good thing or would reduce disparities in medicine. MSJ-Br.24; Def.-Br.25. Their only response is that "CMS would not conclude" that "'turning white patients away'" improved outcomes. Def.-Br.25. But that response misses the point: Defendants' interpretation would allow them to do so under the statute if they and a single stakeholder wanted to, against the Constitution. The States' interpretation would foreclose it.

Contra Defendants, the existence of federal anti-discrimination laws doesn't solve the concern over racial preferences in medicine. Def.-Br.25 n.9. Racial preferences to promote "equity" were longstanding in education (including medical schools) until recently, even though Title VI was on the

books. *See Harvard*, 600 U.S. at 205-08, 223-25. The federal government even defended that discrimination. *See id.* And, of course, Defendants now encourage physicians to "promote health equity for racial and ethnic minorities." AR2247. They tell clinicians to focus on race, rather than the health disparities themselves. For example, Defendants report that "[s]uicide rates … have traditionally been higher for non-Hispanic White than non-Hispanic Black and Hispanic people." Curtin at 1. Yet it would be wrong (and unconstitutional) to encourage physicians to "promote health equity for white patients" by prioritizing that population when there's an obvious race-neutral way to combat suicide: encouraging physicians to focus on suicide prevention without mentioning patients' race. Governments can virtually never use race itself, *Harvard*, 600 U.S. at 205-08, 223-25, but that's exactly what Defendants did in the Rule based on their flawed interpretation of the statute. This Court should avoid that constitutional red flag by rejecting the interpretation that allows it.

***Finally***, the Rule can't survive the major-questions doctrine. A rule that "attempt[s] to increase 'diversity and inclusion'" in medicine "in response to 'the social justice movement'" is "politically divisive" and is of "staggering" "political significance." *See AFBR*, 2024 WL 5078034, at *16. Moreover, "it is primarily the *States*" that regulate the medicine and the medical profession for the public health. *See id.* at *17; MSJ-Br.12-13, 24. Defendants' intrusion "'into an area that is the particular domain of state law'" is "another reason to think that" their "exercise of purported authority presents a major question." *See AFBR*, 2024 WL 5078034, at *17. So Defendants had to point to "'clear congressional authorization'" for the Rule. *Id.* But "clear authorization is sorely lacking" for antiracism plans because all Defendants "can do is point to … 'vague statutory'" language, *id.*, like "improving clinical practice or care delivery" and "improved outcomes," 42 U.S.C. §1395w-4(q)(2)(C)(v)(III).

In response, Defendants try to limit the doctrine to "'assertions of extravagant statutory power over the national economy.'" Def.-Br.25. But they don't respond to the States' argument that the doctrine also applies when an agency purports to intrude "'into state police powers.'" MSJ-Br.24. The

Supreme Court told Defendants that the doctrine applies when agency action "intrudes into an area that is the particular domain of state law," like "the landlord-tenant relationship." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam). Defendants nowhere dispute that the regulation of the medical profession, public health, and private discrimination are traditionally within the domain of state law. *See* MSJ-Br.12-13; Def.-Br.12-13; *e.g.*, *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.*, 50 F.4th 1126, 1142-43 (11th Cir. 2022). Nor could they plausibly argue that the regulation of the physician-patient relationship is somehow less important than the regulation of the "landlord-tenant relationship." *See AFBR*, 2024 WL 5078034, at *17 & n.8 ("the major questions doctrine applies when federal agencies use implied powers to regulate" areas that are "'the particular domain of state law'"). Paying doctors to focus on "health equity for racial and ethnic minorities" instead of health outcomes for all, AR2247, "undoubtedly implicates significant policy questions" about "discrimination," *Franciscan All. v. Burwell*, 227 F. Supp. 3d 660, 687 (N.D. Tex. 2016).

Even if Defendants could cabin the doctrine to assertions of power with significant economic consequences, the doctrine would still apply. "Defendants admit that MIPS eligible clinicians must participate and that 99.9999% of MIPS eligible clinicians" do participate. Answer (Doc. 59) ¶33. Discovery proved that tens of thousands of physicians around the country have used the Rule to get money from Defendants by creating anti-racism plans. MSJ-Br.6; Ex. 9 at 88. Discovery also proved that clinicians around the country inquired about the nature of these plans and that Defendants repeatedly "encourage[d]" them to use the "'Disparities Impact Statement'" to "'find … an intervention for a particular population.'" MSJ-Br.7. Injecting race into medicine by encouraging tens of thousands of physicians around the country to use race to set "'target goals and milestones,'" Ex. 3 at 7; Ex. 8 at 137, is precisely the kind of shocking assertion of power that, if allowed at all, Congress would have wanted to be the one to say so, *see Nebraska*, 143 S. Ct. at 2375.

**D.    The States weren't obliged to raise their objections during the notice-and-comment period.**

In a footnote, Defendants assert that the States "waived their claim" because they didn't raise it in a comment. Def.-Br.24 n.8. They admit that this "argument is foreclosed by [Fifth Circuit] precedent." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1022 n.23 (5th Cir. 2019). Correct. Because "the question presented" here is "a purely legal one, requiring [the] court's evaluation of whether [Defendants] complied with the statute," the waiver rule doesn't apply. *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 829 n.10 (5th Cir. 2003). And, in any event, "the waiver rule does not apply to preclude argument[s] where," as here, "the scope of the agency's power to act is concerned." *Sierra Club v. Pruitt*, 293 F. Supp. 3d 1050, 1061 (N.D. Cal. 2018). The rule urged by Defendants "'would require everyone who wishes to protect himself from arbitrary agency action not only to become a faithful reader of the notices of proposed rulemaking published each day in the Federal Register, but a psychic able to predict the possible changes that could be made in the proposal when the rule is finally promulgated.'" *Am. Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 295 (5th Cir. 1998). Defendants haven't identified "any provision in the" governing statutes supporting such a requirement. *See id.*

## III.    Vacatur of the Anti-Racism Rule is the appropriate remedy.

This Court should vacate the Anti-Racism Rule. *Contra* Def.-Br.26-28. "The APA gives courts the power to 'hold unlawful and set aside agency action[s].'" *Data Mktg.*, 45 F.4th at 859 (quoting 5 U.S.C. §706(2)). Though Defendants say relief should be limited to a declaratory judgment, Def.-Br.26-27, "[v]acatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation," *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 274-75 (5th Cir. 2022). "The default rule is that vacatur is the appropriate remedy," meaning courts "'formally nullify and revoke … an unlawful agency action.'" *Data Mktg.*, 45 F.4th at 859; *see also United Steel v. MSHA*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (If a rule is "*ultra vires* and unenforceable," the "ordinary practice is to vacate unlawful

agency action."). A rule that encourages doctors to discriminate based on race is the poster child for vacatur, not the rare exception.

This Court should not "remand without vacatur." *Contra* Def.-Br.27-28. The test for this relief is conjunctive, requiring the agency to prove both disruptive consequences "and" that it could make the rule lawful on remand. *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000). Defendants haven't established either element.

First, Defendants won't be able to fix the illegality of the Rule on remand. As explained, the Rule incorporates the Disparities Impact Statement and therefore expressly permits race-prioritization plans. Those plans are not clinical practice improvement activities, whatever "relevant stakeholders" might say in a hypothetical remand. Def.-Br.27. So if this Court holds that the "Secretary lacks authority to 'identif[y]'" anti-racism plans as clinical practice improvement activities, *Colville*, 2023 WL 2668513, at *19, then vacatur is required; there's nothing the agency can do on remand to fix the Anti-Racism Rule. *See Data Mktg.*, 45 F.4th at 860.

Second, vacatur won't "cause significant disruptive consequences." *Contra* Def.-Br.27. All Defendants say is that "CMS *may* be required to recoup funds from clinicians who created anti-racism plans," but they nowhere argue that they *must* do so. Def.-Br.27 (emphasis added). And they certainly don't explain why they'd have to "recoup funds" for the period "2022-2024" from a vacatur that wouldn't take effect until 2025 at the earliest. *Id.* Defendants' threats about their own choices are not a "developed argument that" *vacatur* would be disruptive. *Data Mktg.*, 45 F.4th at 860. Defendants concede that only *retroactive* vacatur would have the disruptive consequences they say are possible. Def.-Br.28. They have no argument against *prospective* vacatur.

## CONCLUSION

For all these reasons, this Court should grant the States' motion for summary judgment and vacate the Anti-Racism Rule.

Dated: December 20, 2024

Respectfully submitted,

_s/ Justin L. Matheny_
LYNN FITCH
   *Attorney General*
Scott G. Stewart (MS Bar No. 106359)
   *Solicitor General*
Justin L. Matheny (MS Bar No. 100754)
   *Deputy Solicitor General*
MISSISSIPPI ATTORNEY
GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
scott.stewart@ago.ms.gov
justin.matheny@ago.ms.gov

_s/ Cameron T. Norris_
Cameron T. Norris*
C'Zar Bernstein
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com
czar@consovoymccarthy.com

_s/ Edmund G. LaCour Jr._
STEVE MARSHALL
   *Attorney General*
Edmund G. LaCour Jr.*
   *Solicitor General*
OFFICE OF THE ALABAMA
ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 353-2196
Edmund.LaCour@AlabamaAG.gov

_s/ Nicholas J. Bronni_
TIM GRIFFIN
   *Attorney General*
Nicholas J. Bronni*
   *Solicitor General*
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
nicholas.bronni@arkansasag.gov

_s/ Aaron J. Silletto_
RUSSELL COLEMAN
  *Attorney General*
Aaron J. Silletto*
  *Assistant Attorney General*
KENTUCKY OFFICE OF THE
ATTORNEY GENERAL
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5439
Aaron.Silletto@ky.gov

_s/ Kelsey L. Smith_
Elizabeth B. Murrill*
  *Attorney General*
Kelsey L. Smith*
  *Deputy Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
(225) 428-7432
smithkel@ag.louisiana.gov

_s/ Joshua M. Divine_
ANDREW BAILEY
  *Attorney General*
Joshua M. Divine*
  *Solicitor General*
Samuel C. Freedlund*
OFFICE OF THE MISSOURI
ATTORNEY GENERAL
815 Olive Street
Suite 200
St. Louis, MO 63101
(314) 340-4869
Josh.Divine@ago.mo.gov
Samuel.Freedlund@ago.mo.gov

_s/ Christian Corrigan_
AUSTIN KNUDSEN
  *Attorney General*
Christian Corrigan*
  *Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders Street
Helena, MT 59601
christian.corrigan@mt.gov

*pro hac vice

**CERTIFICATE OF SERVICE**

I e-filed this motion with the Court, which will email everyone requiring service.

Dated: December 20, 2024                    _s/ Cameron T. Norris_